**No. 24-7157**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

**EPOCH EVERLASTING PLAY, LLC and AMAZON.COM SERVICES LLC,**

***Defendants-Appellants,***

***v.***

**WILLIENE JACKSON-JONES, individually and on behalf of all others similarly situated,**

***Plaintiff-Appellee.***

**On Appeal from the United States District Court
for the Central District of California
No. 2:23-cv-02567-ODW
The Honorable Otis D. Wright, II**

# DEFENDANTS-APPELLANTS' EXCERPTS OF RECORD
## VOLUME 1 OF 1

Robert W. Sparkes, III
K&L GATES LLP
One Congress Street, Suite 2900
Boston, MA 02114
Tel: (617) 261-3100
robert.sparkes@klgates.com

*Attorney for Defendant-Appellant Amazon.com Services LLC*

James F. Speyer
ARNOLD & PORTER KAYE SCHOLER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017
Tel: (213) 243-4000
james.speyer@arnoldporter.com

Ian S. Hoffman
William C. Perdue
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue NW
Washington, DC 20001

*Attorneys for Defendant-Appellant Epoch Everlasting Play, LLC*

# INDEX

**Page**

Order Granting Plaintiffs' Motion for Class Certification,
Docket No. 92 (filed September 5, 2024) ........................................ 3

Reply in Support of Plaintiffs' Motion for Class Certification,
Docket No. 82 (filed June 7, 2024) ........................................ 23

Excerpts of Deposition of Williene Jackson-Jones,
Exhibit 1 to Hoffman Declaration,
Docket No. 81-3 (filed May 17, 2024) ........................................ 46

Excerpts of Deposition of William Ingersoll, Ph.D.,
Exhibit 2 to Hoffman Declaration,
Docket No. 81-4 (filed May 17, 2024) ........................................ 79

Declaration of William Ingersoll, Ph.D. in Support of Plaintiffs'
Motion for Class Certification,
Docket No. 63-12 (filed March 11, 2024) ........................................ 166

Order Denying Motion to Dismiss,
Docket No. 43 (filed November 13, 2023) ........................................ 176

Defendants Epoch Everlasting Play, LLC and Target Corporation's
Motion to Dismiss,
Docket No. 15 (filed April 26, 2023) ........................................ 189

CPSC's Opinion Letter dated Sept. 3, 1992, regarding "Sylvanian Families,"
Exhibit C to Request for Judicial Notice
Docket No. 15-1 (filed April 26, 2023) ........................................ 212

CPSC's Opinion E-mail dated Oct. 29, 2021, to EEP Counsel,
Exhibit D to Request for Judicial Notice
Docket No. 15-1 (filed April 26, 2023) ........................................ 214

Complaint,
Docket No. 1-1 (filed January 30, 2023) ........................................ 216

Order Granting Petition,
Docket No. 101 (filed November 19, 2024) ........................................ 238

District Court Docket Sheet ........................................ 239

**O**

# United States District Court
# Central District of California

| | |
|---|---|
| WILLIENE JACKSON-JONES et al.,<br>Plaintiff,<br>v.<br>EPOCH EVERLASTING PLAY, LLC et al.,<br>Defendants. | Case № 2:23-cv-02567-ODW (SKx)<br><br>**ORDER GRANTING MOTION FOR CLASS CERTIFICATION [63]** |

## I. INTRODUCTION

Plaintiff Williene Jackson-Jones brings this putative class action against Defendants Epoch Everlasting Play, LLC and Amazon.com Services LLC (collectively "Defendants"), asserting claims under California's Unfair Competition Law ("UCL") and for unjust enrichment. (Notice Removal Ex. A ("Compl.") ¶¶ 13, 16, 78–102, ECF No. 1-1.) Jackson-Jones now moves for class certification under Federal Rule of Civil Procedure ("Rule") 23. (Mot. Class Certification ("Mot." or "Motion") 3, ECF No. 63 (redacted), ECF No. 77 (sealed, unredacted).) For the reasons discussed below, the Court **GRANTS** Jackson-Jones's Motion.[1]

[1] Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

This putative class action concerns Defendants' sale of certain Calico Critters flocked toys to the proposed plaintiff class. (Mot. 3–4; Compl. ¶¶ 17–32.) Jackson-Jones alleges that certain Calico Critters are "banned hazardous substances" under the Federal Hazardous Substances Act ("FHSA") because they (1) are intended for use by children under the age of three and (2) are or contain a small part. (Compl. ¶¶ 17–32.)

Jackson-Jones purchased Epoch's Calico Critters flocked toys for her grandchildren on Amazon. (*Id.* ¶ 55.) Had Jackson-Jones known that the toys were banned hazardous substances, she would not have purchased them. (*Id.* ¶ 57.)

Jackson-Jones initiated this putative class action against Epoch and Amazon alleging three causes of action: (1) violations of the "unlawful" prong of the UCL; (2) violations of the "unfair" prong of the UCL; and (3) unjust enrichment. (Compl. ¶¶ 78–102.)[2] She seeks restitution and injunctive relief. (*Id.* ¶¶ 83, 94, 101.) She bases each cause of action on her underlying allegation that Defendants violated the FHSA by selling banned hazardous substances to the proposed plaintiff class.

Defendants previously moved to dismiss Jackson-Jones's claims on the grounds that Calico Critters are not intended for children under three years old as a matter of law. (Defs.' Mot. Dismiss 2, ECF No. 15.) The Court denied Defendants' motion and found that flocked figures, like Defendants' Calico Critters, are undeniably intended for children under three years of age as a matter of law under the FHSA's regulations. (Order Den. Defs.' Mot. 5, 13, ECF No. 43.)

Jackson-Jones now seeks to certify the following class pursuant to Rule 23(b)(3) or, alternatively, Rule 23(b)(2): "All persons in the State of California who purchased at least one of the Products, for personal use and not for re-sale, since

---

[2] Two Plaintiffs—Jackson-Jones and Karen Santos—filed the operative Complaint against three Defendants—Epoch, Target Corporation, and Amazon. (*See* Compl. ¶¶ 11–16.) After Jackson-Jones and Santos filed the instant Motion for Class Certification, the Court dismissed Karen Santos and Target Corporation pursuant to the parties' Stipulation. (Order Granting Stip., ECF No. 73.) The Court therefore refers to all allegations and arguments as made by only Jackson-Jones, against only Epoch and Amazon.

January 30, 2019." (Mot. 8.) Jackson-Jones defines "Products"[3] as encompassing "all Calico Critters flocked toys that were sold with a small part," and lists them in Appendix A to the Motion.[4] (Mot. 8–9; *see id.* App. A ("Products List") 1–7, ECF No. 63-1.) The Motion is fully briefed. (*See* Opp'n, ECF No. 81; Reply, ECF No. 82; Sur-resp., ECF No. 88.)

## III. LEGAL STANDARD

Whether to grant class certification is within the discretion of the court. *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). A cause of action may proceed as a class action if a plaintiff meets the threshold requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012), *overruled on other grounds by Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). "[T]he failure [to meet] any one of Rule 23's requirements destroys the alleged class action." *Rutledge v. Elec. Hose & Rubber Co.*, 511 F.2d 668, 673 (9th Cir. 1975); *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997) (noting that plaintiff bears burden of affirmatively satisfying each element of the Rule 23 analysis).

"Rule 23 does not set forth a mere pleading standard," *Dukes*, 564 U.S. at 350, and a party may not rest on mere allegations, *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977). Rather, plaintiffs must affirmatively establish that Rule 23's criteria are satisfied by a preponderance of the evidence. *Olean*,

---

[3] The Court applies the same definition to the term "Products" throughout this Order.

[4] In a footnote, Defendants assert that Jackson-Jones's Products List "is inaccurate and overbroad" because "it includes dozens of products that do not contain small parts under the Small Parts Rule." (Opp'n 5 n.1.) However, Defendants do not oppose Jackson-Jones's Motion on this basis; rather, they relegate the entire discussion on the issue to two sentences in a single footnote. (*Id.*) Consequently, the Court does not consider this argument. *See Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) (declining to address a footnote argument because "[a]rguments raised only in footnotes, or only on reply, are generally deemed waived").

31 F.4th at 665, *cert. denied sub nom.*, *StarKist Co. v. Olean Wholesale Grocery Coop., Inc.*, 143 S. Ct. 424 (2022).

Consequently, a district court must perform a "rigorous analysis" to ensure that the plaintiff has satisfied each of Rule 23's prerequisites. *Dukes*, 564 U.S. at 351; *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011). In many cases, "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Dukes*, 564 U.S. at 351. The district court may consider the merits only to the extent that they overlap with the requirements of Rule 23 and "not to determine whether class members could actually prevail on the merits of their claims." *Ellis*, 657 F.3d at 983 n.8; *see Dukes*, 564 U.S. at 350–52. When resolving factual disputes, even in the context of a motion for class certification, district courts must consider "the persuasiveness of the evidence presented." *Ellis*, 657 F.3d at 982.

## IV. DISCUSSION

Jackson-Jones contends the Court should certify the proposed class action because it meets the four threshold requirements of Rule 23(a) and is eligible for certification under Rule 23(b)(3), or alternatively Rule 23(b)(2). Jackson-Jones also asserts the Court should appoint her counsel as counsel for the putative class ("Class Counsel") pursuant to Rule 23(g).

### A. Rule 23(a)

Defendants do not dispute that Jackson-Jones has established the first three threshold requirements provided by Rule 23(a)—numerosity, commonality, and typicality. *See Mazza*, 666 F.3d at 588 (listing four Rule 23(a) requirements). The Court agrees and finds these three requirements satisfied.

In contrast, Defendants argue that Jackson-Jones fails to establish Rule 23(a)'s fourth requirement, adequate representation, because Jackson-Jones lacks Article III

standing to seek injunctive relief on behalf of all proposed class members.[5] (Opp'n 4, 28–30.) Under Rule 23(a)(4), a plaintiff must demonstrate that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This means that, in a class action, at least one named plaintiff must have Article III standing "with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). For injunctive relief, the named plaintiff must demonstrate that she "has suffered or is threatened with a 'concrete and particularized' legal harm . . . coupled with 'a sufficient likelihood that [s]he will again be wronged in a similar way.'" *Id.* at 985 (first citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); and then citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 111 (1983)). A plaintiff may satisfy the second part of this inquiry by establishing a "real and immediate threat of repeated injury." *Id.* "The claimed threat of injury must be likely to be redressed by the prospective injunctive relief." *Id.*

Defendants argue that Jackson-Jones lacks standing because "she has no intention of purchasing the products again," which Defendants urge means she has no likelihood of repeated injury. (Opp'n 26.) Defendants are mistaken. To the contrary, Jackson-Jones testified that her grandchild asked her for more Calico Critters, but she declined to purchase them because she believes the toys are unsafe in their current form. (Decl. Gillian L. Wade ISO Reply Ex. A ("Jackson-Jones Dep.") 74:24–75:19, 127:19–23, 132:5–7, ECF No. 82-2.) Although Jackson-Jones does not intend to purchase the Calico Critters toys *while they are still hazardous substances*, she would be interested once more if "[i]njunctive relief . . . removed choking dangers."

---

[5] The issue of a class plaintiff's standing to seek injunctive relief is generally a threshold issue, distinct from the plaintiff's adequate representation under Rule 23(a)(4). *See, e.g.*, *Ellis*, 657 F.3d at 979, 985–86 (analyzing standing to seek injunctive relief separately, but also as an issue bearing on adequate representation); *Aldapa v. Fowler Packing Co., Inc.*, 323 F.R.D. 316, 328–31 (E.D. Cal. 2018) (analyzing standing to seek injunctive relief separately from analyzing Rule 23(a)'s requirements). However, because Defendants raise this argument in Opposition as a Rule 23(a)(4) issue, the Court will likewise address Jackson-Jones's standing within its discussion of Rule 23(a)(4).

(Reply 3–4; *see* Jackson-Jones Dep. 132:7.) Thus, Jackson-Jones demonstrates a sufficient likelihood of repeated injury for Article III standing in this action and is an adequate representative under Rule 23(a)(4).

**B. Rule 23(b)(3)**

Jackson-Jones asks the Court to certify the class under Rule 23(b)(3). To do so, a court must find: (1) "that the questions of law or fact common to class members predominate over any questions affecting only individual members"; and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

*1. Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "It 'presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2),' and focuses on whether the 'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'" *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998)). "If so, 'there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Id.*

An "assessment of predominance begins, of course, with the elements of the underlying cause of action." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) (internal quotation marks omitted). Thus, the Court's inquiry depends on the nature of the underlying causes of action—unfair and unlawful competition, and unjust enrichment.

Jackson-Jones alleges that Defendants sold banned hazardous substances to the proposed class, unfairly and unjustly benefiting from those unlawful sales. This allegation is at the heart of each of cause of action that Jackson-Jones raises. Thus, the question of whether the Products are indeed banned hazardous substances is

central and common to all proposed class members' claims. To resolve this common question, the Court must determine "whether the Products are intended for children under 3, pursuant to 16 C.F.R. § 1501.2; and whether the Products contain small parts pursuant to 16 C.F.R. § 1501.4." (*See* Mot. 16.) As the Court has already answered the first question in the affirmative, (*see* Order Den. Defs.' Mot 5, 13), all that remains is whether the Products contain small parts under the regulations. Common evidence regarding the Products themselves will provide common answers to this question. These common questions, answers, and evidence present a central and significant aspect of the case. Because "they can be resolved for all members of the class in a single adjudication, . . . there is clear justification for handling the dispute on a representative rather than on an individual basis." *In re Hyundai*, 926 F.3d at 557. Accordingly, the Court finds Jackson-Jones meets the predominance requirement.

Nevertheless, Defendants argue Jackson-Jones cannot satisfy the predominance requirement because (a) she cannot prove causation on a classwide basis, as required for her UCL claims, and (b) she cannot calculate restitution damages on a classwide basis, as required for all her claims. (Opp'n 13–25.) Defendants contend these are individual issues that outweigh the common issues and defeat predominance. (*Id.*)

a. UCL—Causation

Defendants argue Rule 23(b)(3) class certification is improper because Jackson-Jones cannot prove causation, a requirement for her UCL claim, for all unnamed class members. (Opp'n 6, 23–25.) However, the Court is not persuaded that Jackson-Jones needs to establish causation on a classwide basis.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. Before 2004, private parties could assert UCL claims without alleging they suffered any injury as a result of the defendant's challenged conduct. *In re Tobacco II Cases*, 46 Cal. 4th 298, 305 (2009) ("*Tobacco II*"). Proposition 64, which became effective in 2004, changed this by adding a standing requirement for a private party

plaintiff asserting a claim under the UCL: she must demonstrate she "lost money or property" (i.e., demonstrate some form of economic injury) "as a result of the unfair competition." *See* Cal. Bus. & Prof. Code § 17204; *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323 (2011) ("[P]rivate standing is limited to any person who has suffered injury in fact and has lost money or property as a result of unfair competition." (internal quotation marks omitted)). Shortly thereafter, the California Supreme Court held in *Tobacco II* that this causation requirement for establishing private party standing does not apply to unnamed class members; rather, only the named plaintiff needs to establish causation. *See Tobacco II*, 46 Cal. 4th at 324; *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 154 (2010) ("[T]he standing provision added by Proposition 64 'was not intended to have any effect at all on unnamed members of UCL class actions.'" (quoting *Tobacco II*, 46 Cal. 4th at 321)). The California Supreme Court reasoned in part that the UCL's focus is "the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices." *Tobacco II,* 46 Cal. 4th at 312.

This Court joins the courts in the Ninth Circuit that have applied the reasoned analysis of *Tobacco II* to UCL class actions in federal court, thereby "reliev[ing] UCL plaintiffs of their obligation to establish absent class members'" injury resulting from defendant's challenged acts." *Walker*, 953 F.3d at 630 ("We have repeatedly relied on *Tobacco II* in recognizing what amounts to a conclusive presumption of reliance in UCL cases." (internal quotation marks omitted)); *see, e.g.*, *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 376 (N.D. Cal. 2010) (applying *Tobacco II* and certifying a class action alleging UCL violations without requiring classwide proof that defendant's misstatements caused class members' injury).

Regardless, even if the holding of *Tobacco II* were limited to UCL class actions in state court, Jackson-Jones would still not need to prove classwide causation in this case. Like she argues, an objective reasonable consumer would find whether the

Products are a "banned hazardous substance" to be a material factor when deciding whether to purchase the toys. Therefore, because common sense suggests that class members would not have knowingly purchased illegal products, Jackson-Jones need not establish causation for unnamed class members. *See In re Morning Song Bird Food Litig.*, 320 F.R.D. 540, 555 (S.D. Cal. 2017) (holding that plaintiffs did not need to prove causation and reliance on a classwide basis because "common sense" suggested they would not have purchased the bird food had they known it was actually bird poison); *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157 (finding that a reasonable person would find it material that a product was illegal to sell without a prescription, based on the "assum[ption] that a reasonable person would not knowingly commit a criminal act").

Thus, Defendants' challenge to predominance on this basis fails.

b. Damages Models

Defendants also argue that Jackson-Jones cannot meet the Rule 23(b)(3) predominance requirement because neither of her proposed restitution models can reliably measure monetary relief on a classwide basis. (Opp'n 13–23.)

In *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), the United States Supreme Court held that, as part of the predominance inquiry under Rule 23(b)(3), plaintiffs must establish that "damages are capable of measurement on a classwide basis." Although the Court noted that "[c]alculations need not be exact," plaintiffs must present a damages model consistent with their theory of liability (i.e., a damages model measuring "only those damages attributable to that theory"). *Id.* at 35.

Jackson-Jones offers two models that she contends are capable of measuring restitution on a classwide basis: (1) the "Full Refund Method" model, which would refund "the entirety of the price paid by consumers for the subject products," and (2) the "Offset Method" model, which would refund "the portion of price attributable to the offending portion of the subject products." (Mot. 7.)

Defendants argue Jackson-Jones's Full Refund model is inappropriate because she derived some benefit from the Products, and thus a full refund would confer on her a windfall. (Opp'n 15.) In support of this argument Defendants rely on cases in which courts rejected a full refund model where plaintiffs had received some value or benefit from misbranded or misrepresented products. (*Id.* at 16.) These cases are inapposite, as Jackson-Jones alleges that the Products themselves (distinct from their advertising or representations) are unlawful and unfair because they are banned hazardous substances. (*See* Reply 10–12.) When a party sells products to consumers that are "inherently unfair or illegal," a full refund damages model is appropriate. *See In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 976 (N.D. Cal. 2022) (citing *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157) (approving plaintiffs' damages theory that, "because it was illegal or inherently unfair to market and sell the JUUL product to youth, youth purchasers received no value from it at all"). Here, because Jackson-Jones alleges that Defendants sold banned hazardous substances in violation of the FHSA, Jackson-Jones's Full Refund model is appropriate for measuring damages in a way that is consistent with her theory of liability, and supports certification. *See Comcast*, 569 U.S. at 34–35.

As such, the Court declines to reach Defendants' arguments against Jackson-Jones's alternative Offset Method damages model and finds that Defendants' challenge to predominance on this basis also fails.

2. *Superiority*

To certify a class under Rule 23(b)(3), in addition to finding predominance, a court must also find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." A class action may be superior if "class-wide litigation of common issues will reduce litigation costs and promote greater efficiency" and "if no realistic alternative exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).

Jackson-Jones maintains that, because the restitution amounts sought on behalf of each class member are too small for the class members to file individual claims, a class action is the only reasonable vehicle for litigating the class claims. (Mot. 20.) She is "not aware of any other class actions currently pending against Defendants regarding the Products on behalf of any segment of the class," and contends a class action "will prevent inconsistent adjudications and promote fair and efficient use of the judicial system." (*Id.* at 21.) Thus, she argues, proceeding as a class action is superior.

Defendants do not oppose the issue of superiority. (*See generally* Opp'n.) The Court views this failure to oppose as a concession. *See, e.g.*, *Gordian Med., Inc. v. Percival*, No. 8:19-cv-02244-JVS (ADSx), 2020 WL 5921947, at *10 (C.D. Cal. Aug. 27, 2020) (construing a party's failure to oppose an argument as a concession). Further, the Court finds that addressing the common issues on a classwide basis will be more efficient than individual legal actions, and the costs of individual actions are high compared to the potential recovery for each class member, making individual actions undesirable. The Court therefore finds a class action is superior to other potential methods of adjudication.

In summary, the Court finds that the proposed class satisfies the four requirements of Rule 23(a), the common issues will predominate over individualized issues, and a class action will be superior to alternative methods of adjudication. Accordingly, the proposed class may be certified under Rule 23(b)(3), and the Court need not address Jackson-Jones's alternative argument for certification under Rule 23(b)(2).

**C. Rule 23(g)—Class Counsel**

Lastly, Jackson-Jones requests that the Court appoint her counsel as Class Counsel. (Mot. 14–15.) Defendants do not oppose appointment of Jackson-Jones's counsel, and therefore concede the issue. (*See generally* Opp'n.)

Under Rule 23(g)(2), "a court that certifies a class must appoint class counsel." "When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4)." Rule 23(g)(1)(A) sets out four factors the court must consider: (i) "the work counsel has done in identifying or investigating potential claims in the action"; (ii) "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action"; (iii) "counsel's knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class." Rule 23(g)(4) requires that class counsel "fairly and adequately represent the interests of the class." The court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Here, nothing suggests that Jackson-Jones's counsel has any interests antagonistic to the class, and the record in this case reflects counsel's vigorous and skillful prosecution. Further, counsel sufficiently establishes their undisputed significant experience in handling consumer class action. (*See* Decl. Gillian L. Wade ISO Mot. ¶¶ 1–23, ECF No. 63-2.) Accordingly, the Court appoints Jackson-Jones's counsel as Class Counsel. In light of counsel's recent change of firm affiliation, (ECF No. 90), which occurred after the Court took the Motion under submission, Jackson-Jones shall submit to the Court a Proposed Order Appointing Class Counsel, listing her counsel and their current firm affiliations. Only those attorneys whose experience and credentials are adequately supported in the Motion and supporting documents may be listed.

## V. CONCLUSION

For the reasons discussed above, the Court **GRANTS** Jackson-Jones's Motion for Class Certification. (ECF No. 63.)

Accordingly, the Court **CERTIFIES** the following class under Federal Rule of Civil Procedure 23(b)(3) on all causes of action set forth in Jackson-Jones's Complaint: "All persons in the State of California who purchased at least one of the

Products, for personal use and not for re-sale, since January 30, 2019." The term "Products" in the class definition means all Calico Critters flocked toys that were sold with a small part. A list of the Calico Critters toys at issue **is attached to this Order as Appendix A**. Excluded from the class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and directors; and the judicial officers and their immediate family and associated staff assigned to this case.

The Court **ORDERS** Jackson-Jones to lodge with the Court a Proposed Order Appointing Class Counsel as described above **within seven (7) calendar days** of the date of this Order.

**IT IS SO ORDERED.**

September 5, 2024

____________________________________

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

# PLAINTIFF'S APPENDIX A

| Item Number and Product Description |
|---|
| CC1406 Striped Cat Family |
| CC1407 Sandy Cat Twins |
| CC1455 Koala Family |
| CC1460 Kangaroo Family |
| CC1472 Tuxedo Cat Family |
| CC1480 Walnut Squirrel Family |
| CC1481 Hazelnut Chipmunk Twins |
| CC1482 Baby Friends Triplets Plush |
| CC1484 School Friends Set |
| CC1485 School Music Set |
| CC1486 School Lunch Set |
| CC1489 Mango Monkey Family |
| CC1492 Red Panda Family |
| CC1507 Wilder Panda Family |
| CC1509 Bear Family |
| CC1567 Chocolate Rabbit Grandparents |
| CC1571 Ellwoods Elephant Twins |
| CC1642 Hopscotch Rabbit Family |
| CC1643 Chocolate Rabbit Twin |
| CC1693 Silk Cat Family |
| CC1735 Toy Poodle Family |
| CC1737 Toy Poodle Twins |
| CC1791 Baby Tree House |
| CC1792 Baby Castle Playground |
| CC1793 Baby Choo Choo Train |
| CC1794 Maple Cat Family |
| CC1795 Maple Cat Twins |
| CC1799 Baby Ferris Wheel |
| CC1800 Baby Airplane Ride |
| CC1802 Marshmallow Mouse Family |
| CC1803 Woolly Alpaca Family |
| CC1804 Splashy Otter Family |
| CC1806 Marshmallow Mouse Triplets |
| CC1832 Baby Shopping Series |
| CC1840 Nursery Friends Set |

| **Item Number and Product Description** |
|---|
| CC1843 Sweet Raspberry Home |
| CC1845 Baby Party Series |
| CC1865 Persian Cat Family |
| CC1866 Persian Cat Twins |
| CC1867 Persian Cat Triplets |
| CC1873 Baby Camping Series |
| CC1880 Caramel Dog Family |
| CC1882 Playful Starter Furniture Set |
| CC1884 Lakeside Lodge Gift Set |
| CC1886 Adventure Tree House Gift Set |
| CC1887 Baby Ropeway Park |
| CC1888 Baby Hedgehog Hideout |
| CC1890 Baby Outdoor Series |
| CC1900 Baby Windmill Park |
| CC1902 Baby Balloon Playhouse |
| CC1906 Triplets Care Set |
| CC1907 Baby Costume Series |
| CC1911 Hoppin' Easter Set |
| CC1915 Baby Amusement Park |
| CC1916 Baby Star Carousel |
| CC1917 Spooky Surprise House |
| CC1918 Royal Carriage Set |
| CC1919 Baby Magical Party Series |
| CC1923 Hedgehog Family |
| CC1924 Hedgehog Twns |
| CC1939 Midnight Cat Family |
| CC1940 Pookie Panda Family |
| CC1967 Sheep Family |
| CC1968 Sheep Twins |
| CC1969 Goat Family |
| CC1971 Pony's Stylish Hair Salon |
| CC1972 Pony's Hair Stylist Set |
| CC1973 Princess Dress Up Set |
| CC1974 pony friends set |
| CC1975 Party Time Playset Tuxedo Cat Girl |

| **Item Number and Product Description** |
|---|
| CC1976 Husky Family |
| CC1977 Highbranch Giraffe Family |
| CC1978 Tandem Cycling Set |
| CC1979 Husky Twins |
| CC1980 BBQ Picnic Set Elephant Girl |
| CC1981 Cycle and Skate Set Panda Girl |
| CC1983 Weekend Travel Set Snow Rabbit Mother |
| CC1984 Baby Treats Series |
| CC2018 Yellow Labrador Family |
| CC2019 Yellow Labrador Twins |
| CC2024 Baby Fun Hair Series |
| CC2026 Popcorn Delivery Trike |
| CC2027 Trick or Treat Parade |
| CC2028 Chocolate Rabbit Family |
| CC2029 Red Roof Cozy Cottage |
| CC2053 Baby’s Toy Box Snow Rabbit & Panda Babies |
| CC2058 Reindeer Family |
| CC2060 Reindeer Twins |
| CC2061 Easter Celebration Set |
| CC2062 Penguin Family |
| CC2063 Penguin Babies Ride N Play |
| CC2067 Adventure Treehouse Gift |
| CC2069 Fennec Fox Family |
| CC2070 Fennec Fox Twins |
| CC2071 Sunny Picnic Set Fennec Fox Sister & Baby |
| CC2072 Baby Fairy Tale Series |
| CC2073 Baby Mermaid Castle |
| CC2074 Floating Cloud Rainbow Train |
| CC2075 Milk Rabbit Family |
| CC2076 Triplets Baby Bath Time |
| CC2077 Royal Princess Set |
| CC2078 Pony's Vanity Dresser Set |
| CC2080 Village Doctor Starter Set |
| CC2081 Happy Christmas Friends |
| CC2082 Baby Seashore Friends Set |

| Item Number and Product Description |
|---|
| CC2083 Red Roof Country Home Gift Set-Secret Attic Playroom |
| CC2099 Chocolate Rabbit Twin |
| CC2105 Hedgehog Twins |
| CC2131 Yellow Labrador Twins |
| CC2144 Toy Poodle Twins |
| CC2149 Sophie’s Love N Care |
| CC2488 Connor and Kerri's New Carriage Ride |
| CC2537 Sophie's Love N Care |
| CC2625 Patty N Paden Double Stroller |
| CC2771 Apple and Jake Ride N Play |
| CC3011 Grand Department Store Gift Set |
| CC3013 Designer Studio |
| CC3022 Dress Up Duo Set |
| CC3023 Violin Concert Set |
| CC3025 Grand Piano Concert Set |
| CC3026 Town Girl Stella Hopscotch |
| CC3027 Town Girl Lulu Silk Cat |
| CC3028 Town Girl Laura Toy Poodle |
| CC3036 Cute Couple Set |
| CC3038 Town Girl Series Marshmallow Mouse |
| CC3042 Elegant Town Manor Gift Set |
| CC3048 Fashion Boutique |
| CC3049 Fashion Play Set Persian Cat |
| CC3050 Fashion Play Set Tuxedo Cat |
| CC3051 Fashion Play Set Sugar Sweet Collection |
| CC3052 Fashion Play Set Shoe Collection |
| CC3053 Fashion Play Set Jewels Gems Collection |
| CC4001 Nursery Chocolate Rabbit Baby Key Chain |
| CC4002 Baby Trio Mascot |
| CC4003 Baby Trio Fruits |
| CC4004 Baby Bride and Groom |
| CC4006 Snuggly Sloth Family |
| CC4007 Mole Family |
| CC4008 Raincoat Babies |
| CC4013 Baby Duo Flowery Garden Friends |

| **Item Number and Product Description** |
|---|
| CC4015 Colorful Baby Unicorn |
| CC4016 Shiba Dog Family |
| CC4021 Handsome Brothers Set |
| CC4022 Winter Carolers |
| CC4023 French Bulldog Family |
| CC4024 Ice Castle Amusement Park |
| CC4500 Calico Husky Family Pack |
| CF1564 Seaside Cruiser |
| CF1825 Hillcrest Home Gift Set |
| CF1842 Red Roof Tower Home |
| CF1872 Red Roof Grand Mansion Gift Set |
| CF1905 Sky Blue Terrace Gift Set |
| CF1920 Mr. Lion's Winter Sleigh |
| CF1930 Trick or Treat Trio |
| CF1945 Log Cabin Gift Set |
| CF3024 Cello Concert Set |
| 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 Calico Critters Persian Cat Fashion Playset |
| 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 Calico Critters Wilder Panda Twins |
| 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 Calico Critters Hopscotch Grandparents |
| 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 Calico Critters Fluffy Hamster Twins |
| 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 Calico Critters Ellwoods Elephant Family |
| 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 Calico Critters Sweetpea Rabbit Family Playset |
| 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 Gingerbread Playhouse |
| 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 Halloween Playhouse |
| 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 Flower Gifts Playset |
| B00004U322 Calico Critters Beagle Dog Twins |
| B000096M5G Calico Tanner & Tallulah's Nursery Fun Time Sleep N |
| B000096M5L Calico Critters: Dalmatian Dog Twins |
| B00009VE0D Calico Critters Carry and Play House |
| B000227NAG Calico Critters Camryn's Country Boutique |
| B000227NAQ Calico Critters Fisher Cat Family |
| B0007ORYA8 Calico Critters Pigglywink Pig Family |
| B0007ORYBC Calico Critters Deluxe Baby's Nursery Set |
| B0007ORYC6 Calico Critters Margaret and Halley's Dress Shop |
| B000F4I30U Calico Critters in Mini Carrying Case |

| **Item Number and Product Description** |
| --- |
| B001P8H3II Calico Critters Britney Bunny Ballet Recital |
| B001P8TMMI Calico Critters Furbanks Squirrel Twins |
| B002QB7WPW Calico Critters Caramel Cat Twins |
| B002QBDISW Calico Critters Sugar Bear Twins |
| B0045WTDAC Calico Critters Seaside Camping Set |
| B005OZZEI4 Calico Critters Buckley Deer Family |
| B005P04FVK Calico Critters Tuxedo Cat Triplets |
| B009AWBLDO Calico Critters Melissa and Melody Bath Time Set |
| B009AWEAZU Calico Critters Chocolate Labrador Triplets |
| B009AWRJL2 Calico Critters Chihuahua Twins Set |
| B009XJTQ7M Calico Critters Luxury Townhome Gift Set |
| B087DWS19D Calico Critters Border Collie Family Set |
| B00AMEILGE Calico Critters Border Collie Twins Set |
| B00E4LJC6O Calico Critters Outdoor Sports Fun |
| B00ENQ1Z4M Calico Critters Winter Sports Fun Playset |
| B00HEYGR4S Calico Critters Woodbrook Beaver Family Playset |
| B00KE2C8DQ Calico Critters Lakeside Lodge Gift Set |
| B00NY64BYSCalico Critters Country Nurse Set Playset |
| B00NY6F4MQ Calico Critters Cuddle Bear Family |
| CC1454 Calico Critters Chocolate Labrador Family Doll Set |
| B00NY6OU76 Calico Critters Country Dentist Set Playset |
| B00NY6TPXA Calico Critters Cuddle Bear Twins Doll |
| B00NY6YGPM Calico Critters Country Doctor Playset |
| B0102AC69K Calico Critters Fluffy Hamster Family |
| B01AO2LCXW Calico Critters Seaside Ice Cream Shop |
| B01AYEY354 Calico Critters Seaside Treasure Set |
| B01KIGDW64 Calico Critters Ice Skating Friends |
| B01KIGHOLI Calico Critters Ballerina Friends |
| B01L7F9MJG Calico Critters Ballet Theater |
| B01L7FC9B4 Calico Critters Doughnut Store |
| B01L7FEEEE Calico Critters Dressing Area Set |
| B01L8VY320 Calico Critters Pizza Delivery Set |
| B01L8VY32U Calico Critters Brick Oven Bakery |
| B071HWHGZ9 Calico Critters Cake Decorating Set |
| B071VTPH1V Calico Critters Village Cake Shop |

| Item Number and Product Description |
|---|
| B07Q4R9R7Q Calico Critters Town Girl Series - Miranda Maple Cat |
| B087DSKJ8M Calico Critters Baby Celebration Marching Band Set |
| B087DXGL5P Calico Critters Marguerite Rabbit Family Dolls |
| B087F168HC Calico Critters Sea Breeze Rabbit Family Dolls |
| B087F5XRZV Calico Critters Deluxe Celebration Home Premium Set (Amazon Exclusive) |
| B08TTQ7546 Calico Critters Darling Ducklings Baby Carriage |
| B08V4KW6GF Calico Critters Fairytale Friends |
| B08V4P55J3 Calico Critters Veggie Babies |
| B08V4YWX9D Calico Critters Costume Cuties - Bunny & Puppy |
| B08V51L8B3 Calico Critters Costume Cuties - Kitty & Cub |
| B08V56XD35 Calico Critters Costume Cuties - Bunny & Birdie |
| B08V57HL71 Calico Critters Ice Cream Cuties |
| B08VM2877X Calico Critters Baby Ninja Trio |
| B08VM5M156 Calico Critters Meerkat Family |
| B08VM9Q1TP Calico Critters Friesian Cow Family |
| B09S1FC8HF Calico Critters Country Tree School Gift Set |
| B09S1FCNSF Calico Critters Large House with Carport Gift Set |

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
2450 Colorado Ave., Ste. 100E
Santa Monica, California 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

[Additional counsel on signature page.]

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

WILLIENE JACKSON-JONES, individually and on behalf of all others situated,

Plaintiff

vs.

EPOCH EVERLASTING PLAY, LLC, a Delaware limited liability company and AMAZON.COM SERVICES LLC, a Delaware corporation,

Defendants.

Case No. 2:23-cv-02567-ODW-SK

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Date: June 24, 2024
Time: 1:30 p.m.
Judge: Hon. Otis D. Wright II
Crtrm.: 5D

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... ii
INTRODUCTION ..... 1
ARGUMENT ..... 2
A. Plaintiff is An Adequate Class Representative, and The Class May Be Certified Pursuant to Both 23(b)(3) and 23(b)(2) ..... 2
1. Plaintiff's Deposition Testimony ..... 2
2. Plaintiff has standing to seek injunctive relief ..... 3
3. Defendants' Claim-Splitting Argument is Meritless—The Court May Certify a Class Pursuant to Either Rule 23(b)(2) or 23(b)(3) ..... 5
B. The Class is Well-Defined and the Product List is Not Overbroad ..... 7
C. Causation Can be Decided on a Classwide Basis ..... 8
D. Classwide Restitution Is Easily Calculated ..... 9
1. Plaintiff's Full Refund Methodology is Appropriate ..... 10
2. Plaintiff's Proposed Alternative Offset Methodology Satisfies *Comcast* ..... 13
3. Dr. Ingersoll is Well-Qualified ..... 15
4. Defendant's Rebuttal Report is Not Persuasive ..... 16
CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Cases** ***Page***

*Adams v. Cal. Dep't of Health Servs.*
487 F.3d 684 (9th Cir. 2007) ....................6

*Andren v. Alere, Inc.*,
2017 U.S. Dist. LEXIS 160213 (S.D. Cal. Sep. 28, 2017)....................6

*Ang v. Bimbo Bakeries USA, Inc.*
2018 U.S. Dist. LEXIS 149395 (N.D. Cal. Aug. 31, 2018) .......... 11, 12, 14

*Bazemore v. Friday*
478 U.S. 385 (1986)....................14

*Bowles v. Leprino Foods Co.*
2020 U.S. Dist. LEXIS 105114 (E.D. Cal. June 16, 2020) ....................6

*Bruton v. Gerber Prod. Co.*
2018 U.S. Dist. LEXIS 30814 (N.D. Cal. Feb. 13, 2018)....................14

*Cotton v. City of Eureka*
2010 U.S. Dist. LEXIS 136270 (N.D. Cal. Dec. 14, 2010)....................15

*Davidson v. Kimberly-Clark Corp.*
889 F.3d 956 (9th Cir. 2017) ....................5

*Easterling v. Conn. Dep't of Corr.*
278 F.R.D. 41 (D. Conn. 2011) ....................6

*Giuliano v. Sandisk Corp.*
2015 U.S. Dist. LEXIS 193817 (N.D. Cal. May 14, 2015)....................15

*Hamm v. Mercedes-Benz USA, LLC*
2021 U.S. Dist. LEXIS 65098 (N.D. Cal. Apr. 2, 2021)....................15

*In re Steroid Hormone Products*
181 Cal. App. 4th 145 (2010) ....................9, 11

*In re TFT-LCD Antitrust Litig.*
267 F.R.D. 583 (N.D. Cal. 2010) ....................14

*In re Tobacco Cases II*
240 Cal. App. 4th 779 (2015) ....................10

*In re Universal Serv. Fund Tel. Billing Prac. Litig.*
219 F.R.D. 661 (D. Kan. 2004) ....................6

*Jones v. Conagra Foods, Inc.*
2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014)....................14

*Kwikset Corp. v. Superior Court*
51 Cal. 4th 310, 330-32 (2011)....................15

*Lytle v. Nutramax Labs, Inc.*
99 F.4th 557 (9th Cir. 2024) ....................10, 14

*Makaeff v. Trump Univ., LLC*
309 F.R.D. 631 (S.D. Cal. 2015) ....................10

*Merchant v. Corizon Health, Inc.*
993 F.3d 733 (9th Cir. 2021) ....................8

*Miller v. Fuhu Inc*.
2015 U.S. Dist. LEXIS 162564 (C.D. Cal. Dec. 1, 2015)....................14

*Opperman v. Kong Techs*.
2017 U.S. Dist. LEXIS 116333 (N.D. Cal. July 25, 2017) ....................14

*Ortega v. Nat. Balance, Inc.*
300 F.R.D. 422 (C.D. Cal. 2014)....................11

*Pet Food Express, Ltd. v. Applied Underwriters, Inc*.
2019 U.S. Dist. LEXIS 156198 (E.D. Cal. Sept. 11, 2019) ....................13

*Raffin v. Medicredit, Inc.*
2017 U.S. Dist. LEXIS 5311 (C.D. Cal. Jan. 3, 2017)....................6

*Rudebusch v. Hughes*
313 F.3d 506 (9th Cir. 2002) ....................14

*Ruiz Torres v. Mercer Canyons Inc.*
835 F.3d 1125 (9th Cir. 2016)....................2, 8

*Samet v. Procter & Gamble Co.*
2019 U.S. Dist. LEXIS 244829 (N.D. Cal. Jan. 15, 2019)............................11

*Schmidt v. Int'l Playthings LLC*
536 F. Supp. 3d 856 (D.N.M. 2021)...........................................................4, 8

*Shahinian v. Kimberly-Clark Corp.*
2016 U.S. Dist. LEXIS 203115 (C.D. Cal. Nov. 14, 2016) ..........................11

*Taylor v. Sturgell*
553 U.S. 880 (2008)...........................................................................................6

**Other**

15 U.S.C. § 1263(a) .........................................................................................11

16 C.F.R. § 1501.4.............................................................................................14

Fed. R. Civ. P. 23............................................................................1, 2, 5, 6

Fed. R. Civ. P. 37(c)(1) .......................................................................................8

## INTRODUCTION

The Opposition to Plaintiff's Motion for Class Certification filed by Defendants Epoch Everlasting Play, LLC ("Epoch") and Amazon.com Services, LLC ("Amazon") (collectively, "Defendants") (Dkt. 81) confirms Plaintiff's Motion (Dkt. 63-1) ("Motion") should be granted and a class should be certified.

Defendants do not contest Plaintiff satisfies Rule 23(a)(1)-(3) (numerosity, commonality, and typicality) or that Rule 23(a)(4)'s adequacy of counsel requirements are satisfied. Their only challenges are that (1) Plaintiff lacks Article III standing to seek injunctive relief, and therefore is not adequate under Rule 23(a)(4); and (2) Plaintiff's two classwide restitution models and evidence used to demonstrate causation fail Rule 23(b)(3)'s predominance requirement. Defendants also assert, in a footnote and without any admissible support, that the list of 227 products in the proposed class definition "is inaccurate and overbroad" Opp. at 5, n. 1. Each argument fails.

Plaintiff has standing to seek injunctive relief—she testified she does not wish to purchase additional Products *unless and until* they are made safe. But this does not mean she would never buy the Products again, if those conditions were met. As she said in her deposition: "I had a lot invested into this. So I really didn't want to get rid of it, but I knew I had to." She has made clear her goal in this case is "just to make the product safer," which dismantles Defendants' standing argument.[1]

Defendants' attacks on Plaintiff's two proposed methods for calculating restitution also fail. First, they wrongly insist Plaintiff's model must account for the Product's value, but the case law is clear that requiring an offset for the value of an unlawful product is not necessary, as such a requirement would legitimize an illegal sale. Plaintiff's *alternative* model—offered only in the event the Court, at the appropriate time, determines that an offset value is required—satisfies *Comcast*

[1] Defendants also bootstrap a "claims splitting" argument to their standing challenge, but this separately fails given that no claims would be split regardless of whether the Court certifies a class under Rule 23(b)(2) or Rule 23(b)(3).

because it would measure the amount attributable to the claimed injury by isolating the aspect of each Product that renders it a banned hazardous substance (i.e. the value of the small parts). It would also be consistent with Plaintiff's testimony she did not get the benefit of the bargain because she had to reluctantly get rid of the Calico Critters. In short, Plaintiff has readily met her burden of showing restitution is capable of measurement on a classwide basis under both models.

Defendants' causation arguments fare no better, as they rest on inapposite case law from the false labeling context. This is not a false advertising case—Plaintiff's claim arises from the indisputable fact that each Product is a banned hazardous substance. Defendants' illegal sales therefore violated California's Unfair Competition Law and constitute unjust enrichment because the Products should never have been sold in the first place.

Finally, the list of Products is not, as Defendants claim, "inaccurate and overbroad" such that certification would be improper. Defendants' purported "evidence"—a vague and improper declaration by a witness Defendants failed to identify in their Rule 23(a) disclosures—does not support their claim that "dozens" of the 227 Products are not banned hazardous substances. And even if it did, it is well-settled that "minor overbreadth problems that do not call into question the validity of the class as a whole" do not defeat certification. *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1139 (9th Cir. 2016).

## ARGUMENT

### A. Plaintiff is An Adequate Class Representative, and The Class May Be Certified Pursuant to Both Rule 23(b)(3) and 23(b)(2).

#### 1. Plaintiff's Deposition Testimony

Plaintiff and her granddaughter, C.J., regularly played with the collection of Calico Critters toys she amassed over several years. *See* Deposition of Plaintiff Williene Jackson-Jones ("Jackson-Jones Dep.") attached as Ex. A to the Declaration of Gillian L. Wade ("Wade Reply Dec."). But Plaintiff testified she grew increasingly

concerned about C.J. playing with the toys because of safety concerns about the small accessories, including C.J. putting them in her mouth. *Id.* 73:11-75:19.

In July 2022, Plaintiff stopped allowing C.J. to play with Calico Critters altogether after C.J. had an accessory stuck in her ear. *See id.* 74:15-23; 81:19-82:16 ("that was the straw that broke the camel's back. I mean, a lot of these pieces started disappearing. So we were like, 'Where are they? Where are they going to?' Between my home and her mom's home, we couldn't find these little pieces. So her dad started getting a little concerned…[t]hat she probably had consumed some of them").

Plaintiff ultimately gave the entire Calico Critters collection to a co-worker with a much older daughter who was far less likely to be at risk of choking on small accessories *Id.* 83:19-24; 84:6-11; 87:2-12; 94:7-15. Plaintiff even gave away those "that were fairly new" because she "didn't want to keep any of it and trigger my granddaughter to want any more of it. So I just got rid of everything." *Id.* 98:11-25.[2]

2. <u>Plaintiff has standing to seek injunctive relief</u>

Defendants mischaracterize two cherry-picked lines of Plaintiff's testimony to make the case that she would never buy Calico Critters toys again, under any circumstances, and therefore is no longer at risk of injury by Defendants' unlawful sale of banned hazardous substances.

Per Defendants, "when asked whether she had a 'desire to buy any more Calico Critters products,' Plaintiff answered '[n]ot at this time, no.'" Opp. at 26 (quoting Jackson-Jones Dep. 132:5-7). And further, Plaintiff stated she did not think the products "should be sold." *Id.* at 27 (quoting Jackson-Jones Dep. 132:20-22).

But when read in context, it is clear Plaintiff is well-suited to represent a class of consumers seeking injunctive and declaratory relief in this Action. The reason Plaintiff is not interested in buying Calico Critters "*at this time*" is because at present they are "banned hazardous substances" under the FHSA. This is not just Plaintiff's opinion—this Court and the District of New Mexico have held that Defendants'

[2] Plaintiff also has two grandchildren under three years of age. *Id.* 16:8-17.

flocked toys are intended, as a matter of law, for children under the age of three, and when they are sold with small parts, they become unlawful goods. *See,* Dkt. 43 at 5, 13; *Schmidt v. Int'l Playthings LLC*, 536 F. Supp. 3d 856, 918 (D.N.M. 2021).

Fundamentally, Plaintiff is concerned about "the safetiness [*sic*] of this product" (Jackson-Jones Dep. 156:16), and seeks to require Defendants either to make the pieces sold in playsets larger, so that they are not "small parts" under the Small Parts Rule (*id*. 146: 4-7), or else "eliminat[e]…those small pieces" from the playsets entirely (*id.* 146:14). Alternatively, Plaintiff suggested the removal of flocking from the figurines (*id.* 147:1-14), which would mean they no longer would be targeted to children under 3 as a matter of law per the FHSA.

Regardless of the particular injunctive relief that would be implemented, Plaintiff's goal in seeking that relief is "mainly just to make the product safer." *Id*. 146:12-13. This is because Plaintiff otherwise *likes* the products at issue, testifying both that "it's a great product" and "[]it could be improved. Those items, regardless of me purchasing or not, are way too small for -- I think for anyone.…But mainly for safety reasons; that no child suffers or no one, you know, get hurt behind these little pieces and that material." *Id.* 104:16-23. Indeed, Plaintiff was reluctant to get rid of the Calico Critters toys, stating "***I had a lot invested into this. So I really didn't want to get rid of it, but I knew I had to***." *Id*. 99:17-19.

Defendants are correct that Plaintiff testified she would not purchase a Calico Critters product "at this time" and that she believes the toys should not continue to be sold in their current incarnation. But if Plaintiff were to obtain the injunctive relief she seeks, the inquiry would be different. Injunctive relief that removed choking dangers would make the toys attractive to Plaintiff and her grandchildren, once more.[3] Thus, her situation is virtually identical to that contemplated by the Ninth Circuit in *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 971-72 (9th Cir. 2017) (Article III

[3] Plaintiff testified that her granddaughter has asked for more Calico Critters for Christmas, but Plaintiff declined because of the safety risks. *Id*. at 74:24-75:19; 127:19-23.

standing for injunctive relief where plaintiff is "unable to rely on [defendant's] representations of its product in deciding whether or not she should purchase the product in the future).

3. Defendants' Claim-Splitting Argument is Meritless—The Court May Certify a Class Pursuant to Either Rule 23(b)(2) or 23(b)(3).

Defendants improperly assert that in order for a putative class representative to be adequate under Rule 23(a)(4), she must have standing to pursue certification of every possible class contemplated by Rule 23. Opp. at 30 ("Because Plaintiff lacks standing to seek injunctive relief, she is inadequate to represent a class of California consumers seeking injunctive relief or monetary relief. Accordingly, Plaintiff is not adequate to represent the proposed class under either Rule 23(b)(3) or Rule 23(b)(2)[.]").

This interpretation of Rule 23 would render the Rule, itself, to be a collection of subparts that are nothing but surplusage: if a plaintiff must have standing to pursue both prospective injunctive relief and damages, then it makes no sense for Rule 23 to have distinct subparts that allow courts—including this Court—to certify classes seeking *only* injunctive relief (under 23(b)(2)) or damages (under 23(b)(3)). The subpart (b) of the Rule is titled "Types of Class Actions," making clear there are multiple types of classes that may be certified, based upon the facts giving rise to a given action and to the relief sought by the putative class—a (b)(2) class is one type of class action; a (b)(3) class is another; and indeed so is a (b)(1) class or a class certified under Rule 23(c)(4). Defendants make no mention of these latter types of class action, but their argument begs the question of whether a plaintiff must have standing to prosecute four separate and distinct actions simultaneously in order for *any* class to be certified. The answer, of course, is no.

And this is because Defendants mischaracterize "claims splitting" as the certification of a (b)(2) class but not a (b)(3) class, or vice versa. "The anti-claim-

splitting doctrine prevents a party from maintaining 'two separate actions involving the same subject matter at the same time in the same court and against the same defendant.'" *Bowles v. Leprino Foods Co.*, No. 1:19-cv-00635-AWI-BAM, 2020 U.S. Dist. LEXIS 105114, at *8 (E.D. Cal. June 16, 2020) (quoting *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007), overruled on other grounds by *Taylor v. Sturgell*, 553 U.S. 880, 904, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008)). Here, no claims have been split, nor would they be split if a class is certified.

Rather, the *relief* available to the Class will be determined by which portion of Rule 23 the Court applies to this Action. If the Court certifies a (b)(2) class, then only injunctive relief is in play, and any judgment or verdict will only address injunctive relief; no class member's damages claims will be affected. In the alternative, a (b)(3) certification means that damages are the ultimate aim of the litigation, and any judgment or verdict will address the class's right to monetary relief, exclusively. *See, e.g., Raffin v. Medicredit, Inc.*, No. CV 15-4912-GHK (PJWx), 2017 U.S. Dist. LEXIS 5311, at *29 (C.D. Cal. Jan. 3, 2017) ("[T]he plaintiff's claims for class-wide declaratory and injunctive relief are certified under Rule 23(b)(2), while the plaintiff's claims for monetary and individualized injunctive relief are certified under Rule 23(b)(3).") (quoting *Easterling v. Conn. Dep't of Corr.*, 278 F.R.D. 41, 51 (D. Conn. 2011)).

Pursuing one avenue of *relief* over another simply is not "claim splitting," which occurs when a plaintiff pursues "certain ***claims*** on a class-wide basis while jeopardizing the class members' ability to subsequently pursue other claims." *Andren v. Alere, Inc.*, No. 16-cv1255-GPC(AGS), 2017 U.S. Dist. LEXIS 160213, at *2-3 (S.D. Cal. Sep. 28, 2017) (emphasis added). Here, no claims are being split, and accordingly "[t]his is not a case where the class representatives are pursuing relatively insignificant claims while jeopardizing the ability of class members to pursue far more substantial, meaningful claims." *In re Universal Serv. Fund Tel. Billing Prac. Litig.*, 219 F.R.D. 661, 668 (D. Kan. 2004). Fundamentally, Defendants' adequacy

argument misconstrues and impermissibly conflates two distinct concepts—claims and relief—and fails for this reason.

**B. The Class is Well-Defined and the Product List is Not Overbroad.**

Appendix A to the Motion lists 227 Products. Motion at 32-36; *see also* Dkt. 63-2 at 11-12 (discussing how Plaintiff compiled the list of Products). Plaintiff identified the Products in such a manner for two reasons. First, in its Order denying Defendants' Motion to Dismiss, this Court held that the "plain language of [16 C.F.R.] § 1501.2 unambiguously defines flocked animals and figures as undeniably intended for children under three years of age." Dkt. 43 at 5; *see also* Dkt. 78 at 4 (denying Motion to Certify Order for Interlocutory Appeal and observing its prior holding that the "Small Parts rule unambiguously defines all flocked toys as per se intended for children under three"). Second, Epoch *has itself* identified those of its flocked toy products that either is, or contains as an accessory, a small part. Dkt. 63-2 at 11-13. Epoch has done so by placing warnings on the websites and packaging associated with each product stating "Choking Hazard-Small Parts. Not for children under 3 years." Dkt. 63-2 at 13. Defendants rely on these labels as a basis to avoid liability for selling banned hazardous substances. *See, e.g.*, Dkt. 15 at 6.

In a footnote, Defendants claim the list of Products is "inaccurate and overbroad," "includ[ing] dozens of products that do not contain small parts under the Small Parts Rule." Dkt. 81 at 5 n.1. To support this position—that their own warnings regarding "Small Parts" do not in fact mean what they say—Defendants rely on the Declaration of Alyssa Masterson, Vice President of Marketing and Product. *See* Dkt. 81 at 12 n.1; *see also* Dkt. 81-5 ("Masterson Decl."). Masterson claims this "warning is included out of an abundance of caution and refers to small parts in a colloquial sense," and that "many" products "that have that warning do not in fact contain small parts as defined by the rule." *Id.* But the Declaration omits which Products on Plaintiff's list are the "dozens" containing "small parts" merely "in a colloquial sense." Dkt. 81-5 at 3. Nor does it describe any testing or research done to make this

determination. For this reason alone, Masterson's Declaration should be given little, if any, weight.

Moreover, Defendants did not identify Ms. Masterson as a potential witness in their Initial Disclosures, flouting Rule 26(a)(1)(a) and Rule 26(e)(1)(a). *See* Wade Reply Dec. at ¶ 2, Ex. B (attaching Epoch's Initial Disclosures). Defendants should be prohibited from "using that information or witness to supply evidence" in support of the Opposition. *See* Rule 37(c)(1). Indeed, Rule 37(c)(1) "is an 'automatic' sanction that prohibits the use of improperly disclosed evidence." *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 740 (9th Cir. 2021) (citation omitted).

To be sure, both parties were aware of Masterson's existence because, in July 2020, Epoch designated her as its corporate representative witness in an earlier wrongful death case also involving Calico Critters toys and the Small Parts Rule, *Schmidt et al. v. International Playthings, LLC, et al.*, No. 1:19-cv-00933 JB/SCY (D. N.M.); *see also Schmidt v. Int'l Playthings, LLC*, 536 F. Supp. 3d 856, 869 (D.N.M. 2021) (citing Masterson's deposition).[4]

Defendants cannot show their failure to disclose Masterson was "substantially justified," because Epoch designated Masterson as a corporate representative in the *Schmidt* case. Fed. R. Civ. P. 37(c)(1). Further, Epoch's non-disclosure was not "harmless" because Masterson's sworn statement comes as a surprise to Plaintiff.

Regardless, class certification is still warranted. *See Ruiz Torres*, 835 F.3d at 1139 (explaining that in circumstances such as these, involving—at most—"minor overbreadth problems that do not call into question the validity of the class as a whole," courts should certify the class and, if needed, later amend the class definition "to correct for [any] overbreadth").

[4] In that deposition, Masterson made clear she did not conduct any testing to determine whether Calico Critters toys constituted small parts under the Rule. In fact, her testimony conveyed only a vague understanding of the Rule. *See* Wade Reply Dec. ¶ 3, Ex. C (attaching Masterson Dep., July 1, 2020, at 39:1-3). It is possible that Masterson learned more about the regulations since her deposition in the prior case. But if that is so, Epoch should have disclosed Masterson as a witness before filing the Opposition, so that Plaintiff could have conducted discovery.

**C. Causation Can be Decided on a Classwide Basis.**

Defendants incorrectly aver "Plaintiff's theory of causation is that she would not have bought Calico Critters had she known they were banned hazardous substances." Opp. at 24. In reality, it is immaterial as to whether Plaintiff "can establish, on a classwide basis, that class members would not have bought the product had they known it was a banned hazardous substance." *Id.* This is because the underlying sale was *unlawful*.

*In re Steroid Hormone Products*, 181 Cal. App. 4th 145 (2010) is directly on point. There, the plaintiff sought to certify a class of consumers to pursue, among other things, a claim under the unlawful prong of the UCL alleging "GNC sold products containing androstenediol [a controlled substance] without requiring a prescription." *Id.* at 150. In moving for class certification, plaintiff argued—and the court agreed—that it could be demonstrated the "alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation was material, even if GNC might be able to show that some class members would have bought the products even if they had known they were unlawful to sell or possess without a prescription." *Id.* at 156-57.

In that instance—precisely like the one before this Court—the *Steroid* court held that "the question that must be answered in this case is whether a reasonable person would find it important when determining whether to purchase a product that it is unlawful to sell or possess that product. It requires no stretch to conclude that the proper answer is 'yes'—we assume that a reasonable person would not knowingly commit a criminal act." *Id*. at 157 (citations omitted). The same applies here: it is no stretch to conclude consumers would not wish to buy a product that is, by law, a banned hazardous substance that should not be on store shelves.

**D. Classwide Restitution Is Easily Calculated.**

Most of Defendants' challenge to Plaintiff's restitution model focuses on Dr. Ingersoll's *alternative* method of calculation: the Offset Method (including a 65-page

"rebuttal" report which effectively circumvents the Court's word limitations). But they fail to meaningfully address Plaintiff's *primary* model—a full refund—which is appropriate in cases where the underlying product is an illegal substance that should not have been sold, *ab initio*. In either instance, however, "the model will likely be able to generate common answers at trial," and thus certification is appropriate. *Lytle v. Nutramax Labs, Inc.*, 99 F.4th 557, 578 (9th Cir. 2024).

1. **Plaintiff's Full Refund Methodology is Appropriate.**

Relying on false advertising cases, Defendants argue the proposed full refund method is inappropriate because the Products have intrinsic value, even if they are banned hazardous substances. Opp. at 15-16. It is not disputed that in *false advertising* cases, a plaintiff is entitled to a full refund of the purchase price only if he or she "received no value" from the product purchased. *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 802 (2015). But this is not a false advertising case.

Here, Defendants illegally sold Plaintiff and Class members banned hazard substances and such conduct is capable of redress through a refund of the full purchase price. Indeed, a full refund damages model is appropriate where the underlying sale is illegal. *Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631, 639 (S.D. Cal. 2015). Under those circumstances, permitting "an offset" when the underlying transaction is illegal "would legitimize the illegal sale." *Id*. Plaintiffs must account for a product's value only when their theory of liability puts at issue the valuation of the product, such as with a claim that a misrepresentation caused the plaintiffs to pay more for a product than it was worth. *See id.* at 637 & 639 (distinguishing mislabeling cases that disapprove of full-refund models because in those cases "plaintiffs put valuation at issue by alleging that due to the alleged misrepresentations they paid more for [the products] than [they were] worth]").

Here, Defendants induced Plaintiffs into illegal transactions that never should have occurred in the first place. *See* 15 U.S.C. § 1263(a) (prohibiting "[t]he introduction or delivery for introduction into interstate commerce of any misbranded

hazardous substance or banned hazardous substance"). Accordingly, a full refund damages model is appropriate and fits Plaintiffs' theory of liability. *See In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 156-57 (approving full refund); *Ortega v. Nat. Balance, Inc*., 300 F.R.D. 422, 430 (C.D. Cal. 2014) (allowing plaintiffs to "recover their full purchase price" because the product "was illegal").

As noted above, the *In re Steroid Hormone Products* case is instructive, as the plaintiffs sought a full refund on grounds the transactions were illegal, and they therefore would not have purchased the products absent GNC's unlawful conduct. 181 Cal. App. 4th at 156-57. The Court certified the class and agreed a full-refund was proper, reasoning that the plaintiff "does not put valuation at issue when he alleges that he bought a product that was illegal to sell or possess." *Id*. at 160. The same holds true here.

Defendants cite to three cases in support of the proposition that the plaintiffs' restitution methodology must account for the product's value. *See* Opp. at 16 (*citing Shahinian v. Kimberly-Clark Corp.*, No. CV 14-8390 DMG (PLAx), 2016 U.S. Dist. LEXIS 203115 (C.D. Cal. Nov. 14, 2016); *Ang v. Bimbo Bakeries USA, Inc*., No.13-cv-01196-HSG, 2018 U.S. Dist. LEXIS 149395 (N.D. Cal. Aug. 31, 2018); *Samet v. Procter & Gamble Co*., No. 12-cv-01891-RS, 2019 U.S. Dist. LEXIS 244829 (N.D. Cal. Jan. 15, 2019)). But these cases are inapplicable as they involve mislabeling or misrepresentation, not the sale of inherently illegal products.

In *Shahinian*, the plaintiff sued defendants on grounds they fraudulently marketed and sold surgical gowns, representing they provided the highest level of liquid barrier protection (AAMI Level 4) despite knowing that the gowns failed to meet this standard. *Shahinian*, 2016 U.S. Dist. LEXIS 203115, at *5-7. The court rejected a full-refund damages model (*id.* at 40), but crucially, the issue in *Shahinian* was mislabeling, not that the surgical gowns were unlawful to sell.

Similarly, in *Ang*, the plaintiffs alleged, *inter alia*, that defendant's food products improperly used the American Heart Association's "Heart-Check Mark"

without disclosing it as a paid endorsement and falsely advertised products as "100% Whole Wheat" despite containing non-whole wheat flour. 2018 U.S. Dist. LEXIS 149395. Because the products in *Ang* were not illegal to sell, and instead just misrepresented, the court rejected a full-refund restitution model. *Id*. at *30.

Finally, the *Samet* matter involved misrepresentations of fact, not the sale of a banned hazardous substance—the plaintiffs challenged the allegedly deceptive labeling of the defendants' Pringles and MorningStar Farms products. 2019 U.S. Dist. LEXIS 244829, at *4-5.

Plaintiffs' theory here is not about overpaying for a misrepresented product—it is about transactions that never should have occurred. This is underscored by Plaintiff's testimony she reluctantly stopped letting C.J. play with her Calico Critters toys and eventually gave them away, doing so only because of concerns about the safety of the small parts. *See, e.g.,* Jackson-Jones Dep. 99:17-19 ("I had a lot invested into this. So I really didn't want to get rid of it, but I knew I had to."). And allowing C.J. to play only with the non-small parts was not an option because she "did not want to trigger [her] granddaughter to want any more of it." *Id*. 94:24-95:11, 98:11-25.

Defendants rely on out-of-context snippets from Dr. Ingersoll's testimony to suggest restitution must always account for the value received and a full refund is an inappropriate measure of restitution. Opp. at 8. But Dr. Ingersoll is not a lawyer, and prior to making the statements Defendants rely on, he prefaced his testimony with his understanding that the issue of whether a full refund is appropriate is a "matter of law" and "depend[s] on what the Court decides." and that he "doesn't have a full understanding, necessarily, of the law or what applies." Wade Reply Dec. ¶ 4, Ex. D ("Ingersoll Dep.") at 36:18-37:10, 54:25-55:12, 87:12-23. Plaintiff has sufficiently shown the proposed Full Refund Method is appropriate for calculating class-wide restitution, using class-wide evidence.

//

//

#### 2. Plaintiff's Proposed Alternative Offset Methodology Satisfies *Comcast*.

As an alternative way to calculate class-wide restitution using class-wide evidence, Plaintiff offers a proposed "Offset Method" in the event the Court determines the Products have some value, despite their status as banned hazardous substances. Dkt. 63-12 at ¶ 13.

To that end, Dr. Ingersoll proposes using a hedonic regression to determine how much of each Product's price is due to the small parts (as defined under 16 C.F.R. §1501.4) which render the product a banned hazardous substance. Dkt. 63-12 at ¶ 14; Ingersoll Dep. at 71:8-72:6. Dr. Ingersoll explains he would first identify the various features of the Products, such as the number of large, medium, and smaller pieces. Dkt. 63-12 at ¶ 16; Ingersoll Dep. 73:23-74:20. Then he would input these features into his hedonic regression to analyze how the Products' different characteristics affect their prices. Dkt. 63-12 at ¶ 18. This would allow Dr. Ingersoll to determine how much of the Product's price is due to the small parts. *Id*. To find the total value attributed to those parts, he would multiply the price contribution by the quantity sold of each Product. Dkt. 63-12 at ¶ 19. As a second approach under the Offset Method, Dr. Ingersoll could isolate the value of the presence or absence of small parts rather than counting them for each product. Ingersoll Dep. at 85:20-86:11.

Contrary to Defendants' contentions, the Offset Method would measure the amount attributable to the claimed injury by isolating the aspect of each Product that renders it a banned hazardous substance. It would also be consistent with Plaintiff's theory of liability that she overpaid for the Products due to their illegality. *See, e.g., Pet Food Express, Ltd. v. Applied Underwriters, Inc*., No. 2:16-CV-01211 WBS AC, 2019 U.S. Dist. LEXIS 156198, *18 (E.D. Cal. Sept. 11, 2019) (recognizing "economic loss because the plaintiffs paid more than they would have paid had defendant complied with the law").

Dr. Ingersoll's proposed alternative offset model is neither vague nor uncertain.

Unlike the authority cited by Defendants,[5] wherein the plaintiffs made little effort to identify the specific attributes in the damages model, Dr. Ingersoll has specified using the size of the pieces that make up each of the Products to serve as variables in his regression. Defendants argue the Offset Method is inadequate because it does not include "brand" or "cuteness" as variables. Opp. at 23. However, because Dr. Ingersoll is not considering competitive brands, his model naturally controls for brand specific characteristics, including aesthetic value, which will appear in the regression as a constant, rather than a variable.

Defendants further rely on another out-of-context statement from Dr. Ingersoll's testimony to argue that a hedonic regression is unreliable if it fails to account for *every single product characteristic*. Opp at 10. But Plaintiffs "need not demonstrate that their multiple regression analysis captures all the proper variables and thus reaches the 'right' answer." *In re TFT-LCD Antitrust Litig*., 267 F.R.D. 583, 604 (N.D. Cal. 2010). It is rare that a hedonic regression could consider every characteristic of a product and an expert's selection of only certain variables simply "affect[s] the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). "The selection of variables to include in a regression analysis is normally a question that goes to weight of the expert's analysis rather than its admissibility." *Giuliano*, 2015 U.S. Dist. LEXIS 193817, at *34 (citing *Rudebusch v. Hughes*, 313 F.3d 506, 516 (9th Cir. 2002)).

Additionally, Defendants argue the Offset Method fails because it assigns no value to the small parts defined under 16 C.F.R. § 1501.4.[6] However, the small parts

[5] *See* Opp. at 20-21 (*citing Lytle,* 99 F. 4th at 578; *Jones v. Conagra Foods, Inc.*, No. C 12-01633 CRB, 2014 U.S. Dist. LEXIS 81292 (N.D. Cal. June 13, 2014); *Miller v. Fuhu Inc*., No. 2:14-cv-06119-CAS-AS, 2015 U.S. Dist. LEXIS 162564 (C.D. Cal. Dec. 1, 2015); *Opperman v. Kong Techs*., No. 13-cv-00453-JST, 2017 U.S. Dist. LEXIS 116333 (N.D. Cal. July 25, 2017); *Ang*, 2018 U.S. Dist. LEXIS 149395; *Bruton v. Gerber Prod. Co*., No. 12-CV-02412-LHK, 2018 U.S. Dist. LEXIS 30814, (N.D. Cal. Feb. 13, 2018)).

[6] Dr. Ingersoll's offset method assumes that the small parts lack value because they render the Products banned hazardous substances. "[W]hether the assumptions underlying [an expert's] opinions are accurate is germane to the weight, as opposed

Continued on the next page

constitute the illegal aspect of the Products. And for the reasons set forth *supra* (*see* Section D(1)), the Court should decline to assign a value to an illegal substance.

Further, Defendants' argument that the value of the product equals the market price (again, relying on misquoted soundbites from Dr. Ingersoll, who is not a lawyer) misstates the law. If that were the case, no consumer class action would ever be certified, as restitution would be zero in every case. Indeed, this theory was squarely rejected in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 330-32 (2011) (rejecting premise that "consumers who receive a fully functioning product have received the benefit of their bargain, even if the product label contains misrepresentations that may have been relied upon by a particular class of consumers"). Plaintiff did not get the benefit of her bargain and reluctantly gave the Products away because she was concerned about the safety of the Products' small parts. *See,* Jackson-Jones Dep. 94:7-15, 99:17-19, 117:23-118:22.

3. **Dr. Ingersoll is Well-Qualified.**

Dr. Ingersoll is a published economist with a Ph.D. in economics with several specializations, including econometrics. Dkt. 63-12 at ¶ 2. He has conducted hedonic regressions in his studies, in his professional capacity as a professor, and has performed "plenty of regressions in [his] time as a Ph.D. economist." Ingersoll Dep. at 30:14-31:2. As noted in his deposition, the hedonic regressions employ a "standard technique that . . . falls within the purview of [his] expertise." Ingersoll Dep. 31:20-32:2. The hedonic regression model is a "widely accepted econometric methodology that satisfies the four *Daubert* factors of testability, peer review and publication, measurable error rate, and general acceptance." *Hamm v. Mercedes-Benz USA, LLC*,, No. 5:16-cv-03370-EJD, 2021 U.S. Dist. LEXIS 65098, at *42 (N.D. Cal. Apr. 2,

---

to the admissibility, of his opinions." *Cotton v. City of Eureka*, No. C 08-04386 SBA, 2010 U.S. Dist. LEXIS 136270, at *40 (N.D. Cal. Dec. 14, 2010). "At the class certification stage, the issue is not which expert is the most credible, or the most accurate modeler, but rather whether the plaintiffs have advanced a plausible methodology to demonstrate that . . . injury can be proved on a class-wide basis." *Giuliano v. Sandisk Corp*., No. C 10-02787 SBA, 2015 U.S. Dist. LEXIS 193817, at *30-31 (N.D. Cal. May 14, 2015) (citation omitted).

2021) (citation omitted). Contrary to Defendants' assertions, Dr. Ingersoll has cited to several books, articles, and academic literature published in economic journals supporting his use of the hedonic regression model. Dkt. 63-12 at 6. Additionally, Dr. Ingersoll did not testify he would *not* perform the proposed methodologies outlined in his declaration. Rather, he testified whether he performs one versus the other "depends on what the Court decides is the appropriate measure of how people were wronged." Ingersoll Dep. at 116:10-21. It is also possible, of course, that Dr. Ingersoll will calculate class-wide damages using both methods, and present both aggregate numbers to the trier of fact, as alternatives (if and when the matter proceeds as a class and the merits are at issue).

4. **Defendant's Rebuttal Report is Not Persuasive.**

The Rebuttal Expert Report of Dr. Ran Kivetz, offered by Defendants, is 65-page regurgitation of the same arguments Defendants raised in their Opposition. For the same reasons as set forth in Section D(2), *supra*, the arguments in this report are misplaced.

## CONCLUSION

Plaintiff respectfully requests the Court to grant her motion for class certification.

Dated: June 7, 2024

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**

By: */s/ Gillian L. Wade*
Gillian L. Wade, Esq.
Sara D. Avila, Esq.
Marc A. Castaneda, Esq.

**WH LAW**
David F. Slade (*pro hac vice*)
dslade@wh.law
1 Riverfront Pl., Ste. 745
North Little Rock, AR 72114
Telephone: (501)404-2052

**DURHAM, PITTARD & SPALDING, LLP**
Justin R. Kaufman (*pro hac vice*)
jkaufman@dpslawgroup.com
Philip Kovnat (*pro hac vice*)
pkovnat@dpslawgroup.com
505 Cerillos Rd., Ste. A209
Santa Fe, NM 87501
Telephone: (505)986-0600

**MARTIN WALKER**
Jack Walker (*pro hac vice*)
jwalker@martinwalker.com
121 N. Spring Ave.
Tyler, TX 75702
Telephone: (903)526-1600

*Attorneys for Plaintiff and the Proposed Class*

**CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2**

The undersigned, counsel of record for Plaintiff, certifies that this brief contains 5,493 words, which complies with the Court's order of May 16, 2024. Dkt. 80.

Dated: June 7, 2024

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**

By: */s/ Gillian L. Wade*
Gillian L. Wade, Esq.
Sara D. Avila, Esq.
Marc A. Castaneda, Esq.

**WH LAW**
David F. Slade (*pro hac vice*)
dslade@wh.law
1 Riverfront Pl., Ste. 745
North Little Rock, AR 72114
Telephone: (501)404-2052

**DURHAM, PITTARD & SPAULDING, LLP**
Justin R. Kaufman (*pro hac vice*)
jkaufman@dpslawgroup.com
Philip Kovnat (*pro hac vice*)
pkovnat@dpslawgroup.com
505 Cerillos Rd., Ste. A209
Santa Fe, NM 87501
Telephone: (505)986-0600

**MARTIN WALKER**
Jack Walker (*pro hac vice*)
jwalker@martinwalker.com
121 N. Spring Ave.
Tyler, TX 75702
Telephone: (903)526-1600

*Attorneys for Plaintiff and the Proposed Class*

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

```
-------------------------------x
WILLIENE JACKSON-JONES, et     :
al., on behalf of themselves   :
and all others similarly       :
situated,                      :  Civil Action No.:
         Plaintiffs,           :  2:23-cv-02567-ODW-SK
   v.                          :
EPOCH EVERLASTING PLAY, LLC,   :
et al.,                        :
         Defendants.           :
-------------------------------x
```

Videotaped Deposition of

WILLIENE JACKSON-JONES

Conducted Virtually

Tuesday, March 19, 2024

8:34 a.m. PST

Job No.: 530054

Pages: 1 - 170

Reported By: DEBRA BOLLMAN FARFAN, RDR, CRR, CRC

CA CSR No. 11648

Videoconference Deposition of WILLIENE JACKSON-JONES, held remotely:

Witness Location:
REMOTE

Pursuant to notice, before Debra Bollman Farfan, Registered Diplomate Reporter, Registered Merit Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Certified Shorthand Reporter No. 11648, in and for the State of California.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS, WILLIENE JACKSON-JONES, et al.:

MILSTEIN, JACKSON, FAIRCHILD & WADE, LLP
BY: Marc Castaneda, ESQUIRE
Sara Avila, ESQUIRE
2450 Colorado Avenue, Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600
Mcastaneda@mjfwlaw.com

ON BEHALF OF THE DEFENDANTS, EPOCH EVERLASTING PLAY, LLC AND TARGET CORPORATION:

ARNOLD & PORTER, KAYE, SCHOLER, LLP
BY: Ian Hoffman, ESQUIRE
Henry Morris, ESQUIRE
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone: (202) 942-6406
Email: Ian.hoffman@arnoldporter.com

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT, TARGET:

K&L Gates LLP

BY: Robert Sparkes, ESQUIRE

1 Congress Street

Suite 2900

Boston, Massachusetts 02114

Telephone: (617) 951-9134

Robert.sparkes@klgates.com

ALSO PRESENT VIA ZOOM:

Jack Walker

Anna Vreeland, Party Representative from Epoch

Paul Kaminski, PLANET DEPOS VIDEOGRAPHER

I N D E X

DEPONENT PAGE
WILLIENE JACKSON-JONES
EXAMINATION BY MR. HOFFMAN 8

I N D E X O F E X H I B I T S

(EXHIBITS ARE ATTACHED TO THE TRANSCRIPT.)


| | DESCRIPTION | PAGE |
|---|---|---|
| EXHIBIT 2 | PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES PROPOUNDED UPON PLAINTIFF WILLIENE JACKSON-JONES | 31 |
| EXHIBIT 2-A | CHART OF PURCHASES | 47 |
| EXHIBIT 3 | "VERIFICATION" TO INTERROGATORIES | 35 |
| EXHIBIT 4-A | PL000006 THROUGH PL000011 WAL-MART RECEIPT CALICO CRITTERS DOLLHOUSE | 58 |
| EXHIBIT 12-A | AMZ_00003034 TO 3040 PRODUCT PAGE FROM AMAZON ON MAY 22ND, 2021 | 124 |
| EXHIBIT 22-A | AMZ_00001005 TO 1012 AMAZON SCHOOL LUNCH SET PRODUCT PAGE | 100 |
| EXHIBIT 23 | DECLARATION | 137 |
| EXHIBIT 24 | CLASS ACTION COMPLAINT | 166 |

P R O C E E D I N G S

* * * * *

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Williene Jackson-Jones, in the matter of Jackson-Jones vs. Epoch Everlasting Play, LLC, et al., in the United States Court for the Central District of California, Case Number 2:23-cv-02567-ODW-SK. 08:33:37 08:33:38 08:33:41 08:33:45 08:33:49 08:33:51

Today's date is March 19th, 2024. The time on the video monitor is 8:34 a.m. Pacific Standard Time. 08:34:02 08:34:05 08:34:09

The remote videographer today is Paul Kaminski, representing Planet Depos. All parties of this video deposition are attending remotely. 08:34:09 08:34:11 08:34:14

Would counsel please voice identify themselves and state whom they represent. 08:34:17 08:34:18

MR. HOFFMAN: Good morning. Ian Hoffman with the law firm of Arnold & Porter. I represent the defendant, Epoch Everlasting Play and the defendant, Target Corporation. 08:34:20 08:34:22 08:34:26 08:34:29

I'm joined by Henry Morris, also of Arnold & Porter, who represents the same two parties. 08:34:30 08:34:33 08:34:35

MR. CASTANEDA: Good morning. This is Marc Castaneda from Milstein, Jackson, Fairchild & Wade, 08:34:36 08:34:41

Q. And you reviewed them to ensure that they were true and accurate before you signed this; is that right? 09:13:22 09:13:29 09:13:30
A. Yes, yes. 09:13:30
Q. Okay. Mr. Morris, you can take that down. 09:13:32
But let's go back to Exhibit 2, please, the responses themselves. So, yeah, just you can -- there you go, exactly. 09:13:51 09:13:55 09:13:58
Mr. Morris, you can actually take down the screen share for now, and then we'll bring it up again shortly. 09:13:59 09:14:17 09:14:19
Ms. Jackson-Jones, are you aware of a brand of products known as Calico Critters? 09:14:24 09:14:26
A. Yes. 09:14:29
Q. How did you first become aware of Calico Critters? 09:14:29 09:14:32
A. Advertisement on TV. 09:14:33
Q. And what do you remember about that advertisement on TV? 09:14:38 09:14:39
A. I thought they was cute little characters. 09:14:40
Q. Do you recall what channel you were watching? 09:14:45 09:14:51
A. No. Probably ID, because I'm an ID junkie. 09:14:53
Q. What's ID? 09:14:57
A. Crime show. 09:14:58

Q. Do you recall approximately when you saw that commercial? 09:15:03 09:15:09
A. Three, four years ago. 09:15:09
Q. Tell me more about what -- strike that. Let me start over. 09:15:25 09:15:29
Tell me what else you remember, if anything, about the commercial and what it showed. 09:15:30 09:15:32
A. It was a little bunny family. So that's what got it started. After seeing the commercial, I went on one of the platforms to look at cost and pricing and all the other products that they might sell before I purchased it for -- or considered purchasing it for my granddaughter. 09:15:36 09:15:44 09:15:49 09:15:52 09:15:57 09:16:00
Q. You beat me to my next question. 09:16:03
When you saw the commercial and it seemed appealing to you, who did it seem appealing to you for? For one of your grandchildren? 09:16:05 09:16:10 09:16:14
A. Yes. C.J. 09:16:16
Q. C.J. 09:16:18
And did -- was it appealing for you for any of your other grandchildren or just C.J.? 09:16:26 09:16:28
MR. CASTANEDA: Vague and ambiguous. 09:16:31
BY MR. HOFFMAN: 09:16:32
Q. Go ahead, Ms. Jackson-Jones. 09:16:32
A. I didn't hear Counsel. 09:16:34

MR. CASTANEDA: Oh, I just said "Vague and ambiguous." But you may respond. 09:16:36 09:16:38

THE WITNESS: My other granddaughter, who is also the same age as C.J., I had considered buying it for her as well. But she lived out of state, and I didn't want to deal with the shipping and all the different -- making sure it got there. So I decided not to purchase for that grandchild. 09:16:40 09:16:42 09:16:47 09:16:51 09:16:55 09:16:58

BY MR. HOFFMAN: 09:17:02

Q. And did you consider purchasing it for any of your other grandchildren beyond those two? 09:17:02 09:17:04

A. No. 09:17:06

Q. Why not? 09:17:11

A. The only two girls, and that wasn't something I wanted to purchase for my grandsons. 09:17:11 09:17:14

Q. Had you ever heard of Calico Critters before you saw that TV commercial? 09:17:19 09:17:22

A. No. 09:17:24

Q. So you had never owned any of those products before the commercial? 09:17:25 09:17:27

A. No. 09:17:28

Q. To the best of your knowledge and recollection, had you ever seen Calico Critters like in any stores, like brick-and-mortar stores before that commercial? 09:17:29 09:17:36 09:17:41 09:17:44

A. No. 09:17:45
Q. And to the best of your recollection, did you see any other advertisements for Calico Critters before that commercial, like any print advertisements? 09:17:45 09:17:55 09:17:58 09:17:59
A. No, I didn't. 09:18:00
Q. No internet advertisements as well? 09:18:01
A. No. 09:18:03
Q. And you said that you thought they looked cute; is that right? 09:18:04 09:18:11
A. Yes. 09:18:12
Q. What else, if anything, was appealing to you about the Calico Critters? 09:18:14 09:18:17
MR. CASTANEDA: Vague and ambiguous. 09:18:21
But you may respond. 09:18:22
THE WITNESS: Just the little bunny -- cute little bunny family and the little accessories that went with them. I thought that it was something my granddaughter would enjoy playing with. 09:18:23 09:18:28 09:18:31 09:18:34
BY MR. HOFFMAN: 09:18:42
Q. What do you remember about the accessories from the commercial? 09:18:42 09:18:44
A. Well, from the commercial, I just paid notice to the family, the bunny family. They had a little dog and a little cat and little babies. 09:18:45 09:18:50 09:18:55

I hadn't yet got into any accessories yet until I did some research on the family. 09:18:59 09:19:03
Q. So, Mr. Morris, let's pull up Exhibit 2 again. 09:19:06 09:19:23
Ms. Jackson-Jones, this is your responses to the interrogatories, and so feel free to look at a paper copy or what we share on the screen. 09:19:25 09:19:28 09:19:31
A. Okay. 09:19:34
Q. But let's go to page 11 of the PDF, Mr. Morris. 09:19:35 09:19:40
We'll just zoom in and take a look starting on line 14. We can zoom in a little bit. 09:19:48 09:19:51
Actually, let's back up a little bit on your screen share, Henry. It cuts off the text a little bit. So let's back up. Zoom out a little. Okay. That's fine. 09:20:01 09:20:03 09:20:06 09:20:13
Okay, Ms. Jackson-Jones, we're looking here at Exhibit Number 2. And I want to direct your attention -- and we're on page 11. 09:20:14 09:20:27 09:20:31
A. Uh-huh. 09:20:33
Q. I want to direct your attention to the paragraph that starts at line 14, and the first few words are "Plaintiff saw the products." 09:20:34 09:20:36 09:20:38
Do you see that? Are we -- 09:20:41
A. Yes. 09:20:41

Q. Are you with me? Okay. 09:20:42
And you understand that "Plaintiff" here refers to you; is that right? 09:20:44 09:20:46
A. Yes. 09:20:47
Q. Okay. And so I'm just going to read this for the record. 09:20:48 09:20:53
It says: Plaintiff saw the products themselves on a television commercial before purchasing them on Amazon.com. 09:20:53 09:20:57 09:20:59
Did I read that correctly? 09:21:01
A. Yes. 09:21:03
Q. And the products we're talking about here are Calico Critters products; is that right? 09:21:03 09:21:05
A. Yes. 09:21:07
Q. And I'll go on and keep reading: Among other things, the aesthetic quality of the products and the inclusion of accessories factored into plaintiff's decision to purchase them. 09:21:08 09:21:12 09:21:17 09:21:20
Did I read that correctly? 09:21:24
A. Yes. 09:21:25
Q. And is that a true and accurate statement? 09:21:25
A. Yes. 09:21:27
Q. Okay. So what about the aesthetic quality and inclusion of accessories appealed to you? 09:21:28 09:21:33
A. From the commercial? Because at this point 09:21:36

I hadn't purchased them yet. 09:21:39

Just knowing my granddaughter. My granddaughter likes to play house. So I liked the fact that it was a family, you know, it had the mom and the dad and the babies and the animals. The little -- they were -- they looked furry, you know, and just very cute. 09:21:45 09:21:48 09:21:50 09:21:53 09:21:57 09:22:04

Q. For the record, I agree. Very cute. 09:22:06

And it notes here in the interrogatory response that the inclusion of accessories factored into your decision to purchase them. 09:22:12 09:22:14 09:22:18

What do you mean by that? 09:22:21

A. Like I said, they had the little -- the little cat and the dogs. And then at this point I started doing -- I looked on Amazon and saw there's a whole line of things that I did not see on the commercial. 09:22:21 09:22:27 09:22:30 09:22:34 09:22:38

So that was enticing because I can have purchased a whole little bunny world for her. 09:22:41 09:22:47

Q. And so the inclusion of accessories, that was one of the things that made you want to purchase the product; is that right? 09:22:57 09:22:59 09:23:01

A. Yes. 09:23:02

Q. And do you recall what kinds of accessories you saw that were appealing to you when you did the 09:23:02 09:23:14

the three babies product that we talked about a moment ago? 09:32:12 09:32:15

MR. CASTANEDA: Objection. Vague and ambiguous. 09:32:20 09:32:21

THE WITNESS: I'm sorry? 09:32:23

MR. CASTANEDA: Oh, I said "Objection. Vague and ambiguous." 09:32:24 09:32:26

BY MR. HOFFMAN: 09:32:29

Q. Did you give an answer, Ms. Jackson-Jones, to the question? I couldn't hear. 09:32:29 09:32:32

A. No. Did I -- I can -- 09:32:34

THE WITNESS: Can I answer, Counsel? 09:32:36

MR. CASTANEDA: Oh, yes, you may. 09:32:37

THE WITNESS: This is what I remember, but, honestly, it could be more. 09:32:39 09:32:46

BY MR. HOFFMAN: 09:32:49

Q. Okay. And what makes -- 09:32:50

A. Because -- 09:32:51

Q. Go ahead. I'm sorry. 09:32:53

A. Because I had one -- I -- I was obsessed with this little family. Every time -- every other week something new was coming out. 09:32:54 09:32:57 09:33:02

But, when doing my research, this is what I -- the documents that I could find. But, honestly, I can't tell you if this is everything 09:33:05 09:33:11 09:33:15

A. I want to say Amazon, but I'm not a hundred percent sure. It was one of the two. But I want to say Amazon. 09:40:33 09:40:45 09:40:48
Q. Okay. But that purchase is not reflected in this chart, correct? 09:40:55 09:41:02
A. Right. Correct. 09:41:03
Q. But you feel confident that you purchased the bunny family first because that's what you saw in the TV commercial? 09:41:04 09:41:09 09:41:12
A. Oh, for sure. For sure I purchased the bunny family. 09:41:14 09:41:16
Q. What do you remember about the bunny family product, like when it came and you opened it up? 09:41:18 09:41:21
A. That they were fuzzy, cute, small. 09:41:23
Q. Do you recall if that bunny family product came with any accessories in the product? 09:41:38 09:41:41
A. The family, initially, was just -- it was just the -- well, actually, I believe the family came with like -- the mom had a purse. They had clothes on. 09:41:43 09:41:46 09:41:54 09:42:01
Q. Anything else? Do you remember anything else about that bunny family's product, the product itself? 09:42:03 09:42:05 09:42:09
A. No, not other than what I said, that it was, you know, fuzzy and that they -- they were 09:42:10 09:42:14

actually smaller, and I thought that they -- I thought they would -- I thought they were taller, would be taller. 09:42:20 09:42:24 09:42:25

But that was, you know, at the time okay. They weren't where you couldn't see them. I just thought that they would be a little taller. 09:42:26 09:42:29 09:42:33

Q. And it was a bunny family, correct, that first product? 09:42:41 09:42:46

A. The first product was the mom and the dad, and then I purchased the -- I guess the sister and brother separately. 09:42:47 09:42:49 09:42:55

The four did not come together. I recall it was that they were two and two. 09:42:58 09:43:02

Q. I see. Do you recall whether you purchased those two products at the same time? 09:43:06 09:43:08

A. I don't recall if I purchased them at the same time. They weren't far apart, but I don't recall if I did it the exact same day. 09:43:09 09:43:14 09:43:18

Q. Okay. And am I correct that the brother and sister part of the family, those figures are smaller than the mom and dad? 09:43:21 09:43:28 09:43:31

A. Yes. 09:43:32

Q. And the brother and the sister, do you recall if they came with any accessories, sort of like the purse came with the mom? 09:43:33 09:43:38 09:43:41

January 24th of 2020; is that right? 10:08:20
A. Yes. 10:08:22
Q. Okay. So the bunny family product you bought, it would have been sometime before January 24th, 2020; is that right? 10:08:23 10:08:27 10:08:31
A. Yes. I do believe it was around Christmastime. 10:08:32 10:08:35
Q. Okay. And that's what I was going to ask too. Because I want to talk a little bit about your granddaughter C.J. And at the time you purchased that first Calico Critters product, was C.J. -- how old was C.J.? 10:08:36 10:08:38 10:08:44 10:08:48 10:08:53
A. She was born in 2015. This was in 2020 -- 2019, Christmastime, I think, when I bought the bunnies. So 4, 5, if my math -- is my math mathing? 10:08:54 10:09:06 10:09:09 10:09:18
Q. I think your math is mathing. That seems right to me. 10:09:18 10:09:21
Okay. And all the Calico Critters products that you bought, the ones that are identified on Exhibit 2-A and also the ones that we've talked about, like the bunny family and also the triplets, those were all purchased for use with your granddaughter C.J.; is that right? 10:09:22 10:09:34 10:09:37 10:09:39 10:09:42 10:09:44
A. Yes. Primarily for her. 10:09:46

Q. Primarily for her? 10:09:49
A. Primarily for C.J. 10:09:50
Q. Okay. Who else were they purchased for? 10:09:51
A. Well, no, they were purchased for C.J. But when the other grandkids came over, they played with her with them when they were all here at the house together. But they were purchased for C.J. 10:09:57 10:09:59 10:10:02 10:10:04
Q. I understand. And at all times when you purchased these Calico Critters products, C.J. was either 4 or older, correct? 10:10:06 10:10:19 10:10:23
A. Yes. 10:10:24
Q. Which other grandchildren of yours played with the Calico Critters products when they came over to your house? 10:10:25 10:10:31 10:10:34
A. The other 8-year-old -- now 8-year-old. 10:10:34
Q. And she's close in age to C.J.? 10:10:42
A. They're -- they're four months apart, C.J. being born in May, the other one born in September. 10:10:45 10:10:51
Q. And that would be September of -- 10:10:56
A. '15. 10:11:04
Q. '15, okay. Any other of your grandchildren -- other than C.J. and the other granddaughter close in age to C.J. -- did any other grandchildren play with the Calico Critters products? 10:11:05 10:11:16 10:11:19 10:11:23 10:11:25

A. C.J. has two older brothers, 13 now -- now 13 and 11. They would sit and play with her sometimes when she would have them out playing with them. 10:11:25 10:11:31 10:11:37 10:11:44

Q. And you had described C.J. as a normal child. There's no mental development issues with C.J.? 10:11:53 10:11:59 10:12:01

A. No. No. 10:12:02

Q. Sorry. Okay. 10:12:03

Okay. So for all of the Calico Critters products you purchased, do I understand correctly that you purchased them for yourself, kept them at your house, but they were for C.J. to play with when she came over? Is that right? 10:12:20 10:12:23 10:12:26 10:12:29 10:12:33

A. Correct. They stayed here at my home. 10:12:34

Q. So they weren't gifted and physically given over to her to play with at her house; is that right? 10:12:37 10:12:39 10:12:42

A. No. They were primarily for here. Although, as a little time went by, I learned she started taking some of these critters home in her overnight bag. But they were purchased for here. 10:12:42 10:12:48 10:12:50 10:12:54

Q. Maybe I should have asked this earlier. In the time frame in which you were purchasing these products, did C.J. live with you or no? 10:13:00 10:13:09 10:13:11

A. No, she did not live with me. They would come to visit me on Fridays. 10:13:14 10:13:20
Q. So at least once per week they would come to visit you? C.J. would come? 10:13:25 10:13:27
A. Yes. Yes. 10:13:29
Q. Now, tell me about how C.J. would play with the Calico Critters products. 10:13:37 10:13:39
A. We have a loft area, open area in our home. She would just set everything out and make her little conversation, her little voices. She'd just have everything laid out and playing with it, bringing them to the malls, bringing them into the little house with the accessories. Her imagination. 10:13:41 10:13:45 10:13:49 10:13:54 10:13:57 10:14:00 10:14:05
Q. When C.J. would come over to visit on those Fridays, approximately how long would she stay at your house? 10:14:09 10:14:12 10:14:14
A. They would get dropped off. She wasn't in school yet. So she would come like when her brothers were getting dropped off at school, so like 8:00 in the morning, and stay until I would take them home, like 6:00, 7:00 p.m. So the whole day, pretty much. 10:14:18 10:14:21 10:14:24 10:14:26 10:14:30 10:14:36
Q. And just, again, referencing Exhibit 2-A, the chart of purchases, it's fair to say that you 10:14:37 10:14:42

purchased Calico Critters products from, say, late 2019, that Christmastime area, late 2019 through July of 2022; is that right? 10:14:46 10:14:51 10:14:56
A. Yes. 10:14:58
Q. That's the window of time in which you purchased them? 10:14:58 10:15:00
A. Correct. 10:15:01
Q. And in that window of time, Christmas 2019 to July 2022, did C.J. play with the Calico Critters regularly throughout that time period? 10:15:02 10:15:06 10:15:11
A. Every time she was here. 10:15:12
Q. Were these one of her favorite toys? 10:15:18
A. Her favorite toys. 10:15:20
Q. So she liked playing with the Calico Critters? 10:15:24 10:15:33
A. Yes, she did. 10:15:33
Q. And how could you tell? What were some of the ways that that manifested? 10:15:35 10:15:37
MR. CASTANEDA: Objection. Vague and ambiguous. 10:15:40 10:15:41
BY MR. HOFFMAN: 10:15:42
Q. Go ahead. 10:15:43
A. She had lots of toys, lots of different products that wasn't Calico Critters. But she would always migrate to those, to the Calico 10:15:44 10:15:47 10:15:52

Critters. 10:15:55
Q. And do you have any understanding as to why she took some of them home with her? 10:16:00 10:16:06
A. She just had a habit of doing that. When it was something she really liked, and she didn't want to wait a week to play with it again, she would take items home. 10:16:08 10:16:12 10:16:15 10:16:18
Q. And then would she bring them back the next week? 10:16:19 10:16:24
A. Once I found she had them, I would have her mom bring them back. 10:16:24 10:16:27
Q. I see. Did you ever play with the Calico Critters with C.J.? 10:16:29 10:16:37
A. Yes. 10:16:38
Q. And tell me about that. How would you play together? 10:16:39 10:16:42
A. Well, she was the only girl here, because my other granddaughter didn't live here -- live in this area, and the boys didn't want to play with that most of the time. 10:16:42 10:16:45 10:16:48 10:16:51
So I would sit down with her and play with her. She would tell me, "Grammy, you're her. I'm this one. And you live over there, and I live this one. You're going to go to the mall." 10:16:53 10:16:56 10:17:02 10:17:04
You know, so we just interacted, played 10:17:06

together with the characters. 10:17:09
Q. Did she ever ask you for more Calico Critters? 10:17:11 10:17:17
A. Yes, she did. 10:17:17
Q. What do you recall about that? 10:17:19
A. She would see ads. Her mom is an avid Target shopper, so she would see things in Target, although they weren't purchased there. And then she would come to me and say that, you know, "Grammy, can you buy me this?" They have a this or they have a that. And I would then research it and try to find it. 10:17:20 10:17:30 10:17:32 10:17:35 10:17:37 10:17:40 10:17:46
Q. So is that what led to at least some of the purchases that we've been talking about today? 10:17:51 10:17:53
A. Yes. 10:17:54
Q. Did you ever play with any of the Calico Critters or explore them yourself without C.J.? 10:17:55 10:18:04
A. Oh, no. 10:18:06
Q. And did C.J. like playing with the accessories with the Calico Critters products? 10:18:07 10:18:15
A. Yes. 10:18:17
Q. How so? Tell me more about that. 10:18:18
A. She would change up the clothes. She would set up the table with the food. She wanted -- she had a Ferris wheel. They would go to the amusement 10:18:20 10:18:27 10:18:31

park, and she'd have them on the Ferris wheel. Any little -- any little product that I had bought, she -- she would play with it. 10:18:35 10:18:39 10:18:44

Q. And she liked the small accessories too, like the food and the handbags and things like that? 10:18:46 10:18:49 10:18:51

A. She liked the small accessories. The house came -- the house accessory had little soap bars and little bathroom accessories and kitchen accessory, plates and little tiny spoons and forks. 10:18:51 10:18:57 10:19:01 10:19:04

Yes, she'd play with all the little accessories. 10:19:10 10:19:12

Q. And that was part of her regular playtime routine, was to play with the critters and those accessories? 10:19:13 10:19:15 10:19:17

A. Yes. We had them in little bins, and she would drag the bins out and pull everything out of the bins. 10:19:18 10:19:21 10:19:24

Q. Did C.J. play with the Calico Critters on her own, sort of in that loft without your supervision, or were you always right there with her? 10:19:24 10:19:33 10:19:37 10:19:38

A. No, sometimes she would play -- my grandkids have bedrooms at my home. And sometimes I would go in her bedroom, and she'd have the bins 10:19:39 10:19:41 10:19:44

out in her bedroom playing with the items. 10:19:47
Q. Did it ever concern you, her playing with these toys on her own? 10:19:49 10:19:53
A. I did grow concerned when I discovered how tiny these little pieces were. 10:19:55 10:20:02
Q. Tell me more about that. When did you grow concerned about how tiny the pieces were? 10:20:09 10:20:12
A. When I saw her playing with some of these little items inappropriately, pieces in her mouth. 10:20:14 10:20:19
One time she had the whole bunny head in her mouth. She was carrying the bunny -- she had things in her hand, and she had the bunny in her mouth because she was carrying it to go somewhere else. 10:20:27 10:20:29 10:20:32 10:20:34 10:20:36
She had put the little tiny soap that -- I didn't even know it was soap. I actually thought it was a piece of trash on the floor. I picked it up, and apparently it was the soap bar, and she had stuck it in her ear. 10:20:43 10:20:46 10:20:49 10:20:52 10:20:56
We was able to get it out. She hadn't pushed it further down. But at that time I made a decision that she wasn't going to play with those things anymore. 10:21:00 10:21:04 10:21:10 10:21:12
Q. And when you say "at that time," are you referring to the time of that soap-in-the-ear 10:21:13 10:21:18

incident? 10:21:20
A. Yes. 10:21:20
Q. Okay. Do you recall when that occurred? 10:21:22
A. Probably -- let's see. It was in -- I'd say the last purchase was like July of '22. So it was before Christmas of 2022. Because I remember at Christmas she wanted more, and I -- she wasn't getting any more. We weren't going to purchase any more. 10:21:26 10:21:43 10:21:50 10:21:58 10:22:03 10:22:06
Q. I see. So C.J. had asked for more Calico Critters for Christmas, in Christmas of '22, but you said no? 10:22:06 10:22:10 10:22:15
A. I said no. 10:22:16
Q. So your purchases of Calico Critters spanned from around Christmas of 2019 through July of '22, and it was sometime after July of '22 when you stopped allowing C.J. to play with them; is that right? 10:22:17 10:22:43 10:22:46 10:22:52 10:22:55
A. Right. 10:22:55
Q. You also hired counsel sometime before July 7th of 2022; is that right? 10:22:58 10:23:02
A. Right. 10:23:04
MR. CASTANEDA: Objection. Vague and ambiguous. 10:23:06 10:23:07
///

A. No, I did not. 10:39:18
Q. Same with Walmart. Did you try to return any products to Walmart? 10:39:21 10:39:24
A. No, I did not. 10:39:25
Q. Have you ever made any returns to Walmart of non-Calico Critters products? 10:39:27 10:39:40
A. I shop there a lot. So I'm quite sure I have. I do a lot of online shopping there. 10:39:42 10:39:44
Q. And what do you recall about the return process, in general, and what it requires? 10:39:46 10:39:51
A. With Walmart, I don't remember that much. 10:39:53
Amazon -- we're speaking right now just about Walmart, right? 10:40:03 10:40:06
Q. Well, we'll take them separately. Tell me what you remember of return process for Walmart, and then tell me what you remember about the return process for Amazon. 10:40:10 10:40:12 10:40:14 10:40:15
A. I don't recall with Walmart ever having a problem returning anything. 10:40:16 10:40:18
Amazon, honestly, have a great return policy. I've never had a problem. I've returned a lot of things with Amazon. I've never had a problem returning anything. 10:40:23 10:40:25 10:40:28 10:40:31
Q. So tell me more about when you gave your Calico Critters products away to a friend. Tell me 10:40:52 10:40:58

what you recall about that. 10:41:01

A. I was talking to my friend about it and telling her, you know, what C.J. -- the problem we were having with some of the small pieces and things like that. And I told her I was going to -- just in GP conversation that I was going to throw the items away. 10:41:04 10:41:09 10:41:13 10:41:15 10:41:23 10:41:25

She was like, "Hey, you know" -- her daughter is a lot older, doesn't put things in her mouth -- "don't throw them away. Give them to me. And if I can't use them, I'll find someone that I can give them to." 10:41:28 10:41:29 10:41:32 10:41:36 10:41:39

This friend that I'm speaking of has family in Mexico, and things are hard to come by for them. So that was something that she said that she could send if her daughter didn't want them. 10:41:42 10:41:44 10:41:49 10:41:53

Q. What's the friend's name? 10:41:59

A. Karla. I don't know if she wants me saying her name, but Karla. 10:42:00 10:42:10

Q. Okay. And what is Karla's last name? 10:42:12

A. It's I-l-l-e-c-a. And she was a co-worker of mine. So I don't always pronounce her last name right. 10:42:15 10:42:22 10:42:27

Q. So it's Carla? Is that C-a-r-l-a? Is that right? 10:42:27 10:42:31

children at that age that still put things in their mouth. But they have a better understanding. And a more conscious -- they're more conscious of what they're doing. 12:38:19 12:38:22 12:38:26 12:38:31

Q. But it's theoretically possible that even a 10-year-old could choke on these products; is that right? 12:38:32 12:38:44 12:38:46

A. That's right. 12:38:46

Q. You mentioned earlier that C.J. had other toys at your house. Were you ever concerned that those -- any of those products posed a choking hazard? 12:38:59 12:39:02 12:39:08 12:39:11

A. None of the things that she had here. This was the first product that I had purchased for her that had these small pieces. All the other things that she's had here have been big items or bigger items. 12:39:11 12:39:15 12:39:17 12:39:21 12:39:25

Q. After you gave away all the Calico Critters products, well, strike that. 12:39:43 12:39:46

You gave them away in some time, you said, like, the second half of 2022. Is that right? 12:39:49 12:39:52

A. Yes. 12:39:54

Q. Since that time, you didn't buy any more Calico Critters products, right? 12:39:54 12:40:00

A. No. 12:40:01

Q. Why not? 12:40:02
A. That would have been repeating the same thing I did before. I would have been buying them to throw them away or to give them away. 12:40:03 12:40:08 12:40:11
Q. So it's fair to say that you have no desire to buy any more Calico Critters products, right? 12:40:13 12:40:16
A. Not at this time, no. 12:40:20
Q. And you don't have any plans to sell or resell any Calico Critters products, right? 12:40:21 12:40:27
A. No. 12:40:29
Q. What age do you think Calico Critters are intended for? 12:40:32 12:40:43
A. Like I said earlier, I would think at least 10. I put it in the same class with, like, buying beads to make bracelets with all those little pieces. That's not intended for a small child. 12:40:43 12:40:49 12:40:59 12:41:02
Q. So you think they're really intended for 10-year-old and up? 12:41:05 12:41:07
A. Yeah, in my book, it definitely should be at least 10 and up. I don't -- honestly, I don't think they should be sold. They're just way too little for any child. 12:41:08 12:41:12 12:41:18 12:41:20
Q. And you certainly don't think Calico Critters are intended for kids under 3, right? 12:41:24 12:41:26
MR. CASTANEDA: Objection. Calls for a 12:41:29

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

-------------------------------x

WILLIENE JACKSON-JONES, et :
al., on behalf of themselves :
and all others similarly :
situated, : Civil Action No.:
Plaintiffs, : 2:23-cv-02567-ODW-SK
v. :
EPOCH EVERLASTING PLAY, LLC, :
et al., :
Defendants. :

-------------------------------x

I, DEBRA BOLLMAN FARFAN, Certified Shorthand Reporter, License No. 11648, in the State of California, hereby certify that the foregoing is a true and accurate transcript of the proceedings taken before me on Tuesday, March 19, 2024, as thereon stated.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Norco, California, on the 24th of March, 2024.

__________________________________

DEBRA BOLLMAN FARFAN, CSR 11648
RDR, CRR, CRC

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
----------------------------x
WILLIENE JACKSON-JONES, et :
Al., on behalf of themselves:
And all others similarly :
Situated, :
Plaintiffs, :
v. : Civil Action No.:
EPOCH EVERLASTING PLAY, : 2:23-cv-02567-ODW-SK
LLC, et al., :
Defendants. :
----------------------------x

Video deposition of WILLIAM INGERSOLL, PH.D.
Conducted Virtually
Friday, April 26, 2024
10:01 a.m. EST
Job No.: 533958
Pages: 1 - 136
Stenographically reported by: Judith E. Bellinger,
RPR, CRR, CSR-TX, CCR-WA, CCR-NM

And, Henry, and Dr. Ingersoll, do you know how to do that? Should we work that out now so -- let's try to work that out now. 10:06:39 10:06:43 10:06:48

MR. MORRIS: I believe I do. I see the remote control option. Let me give that a shot. 10:06:52 10:06:53

THE VIDEOGRAPHER: Dr. Ingersoll should get a notification to claim control on his computer. 10:07:02 10:07:03 10:07:05

THE WITNESS: I received that notification. I think I can. I've just got to move some stuff. I zoomed out by mistake. So in theory, I can do that, but here. This is way fancy, zooming in just parts of it. 10:07:06 10:07:07 10:07:13 10:07:22 10:07:31

MR. SPEYER: It's okay. This is important. So let's figure out a way so that you're comfortable with doing this, Doctor. 10:07:38 10:07:39 10:07:41

Henry, can you give him any tips here? I'm seeing two different pages on the screen. Can we make it all one page? 10:07:51 10:07:58 10:08:00

THE WITNESS: Me as well. So I'm not sure what I did. 10:08:02 10:08:04

MR. MORRIS: Jamie, do you want to go off the record, briefly, so we can sort this out without it being all transcribed. 10:08:06 10:08:07 10:08:10

MR. SPEYER: Okay. Let's go off the 10:08:12

record. 10:08:13
THE VIDEOGRAPHER: We're going off the 10:08:14
record. The time is now 10:08 a.m. 10:08:15
(Recess taken.) 10:08:20
THE VIDEOGRAPHER: We're back on the 10:09:38
record. The time is now 10:09 a.m. 10:09:38
BY MR. SPEYER: 10:09:41
Q Okay. So, Dr. Ingersoll, you signed 10:09:41
this declaration on March 8th, 2024; is that 10:09:44
right? 10:09:49
A I believe that's correct, yes. 10:09:49
Q Okay. Do you have any expert opinions 10:09:51
in connection with this case that are not 10:09:56
reflected in your declaration? 10:09:59
A So, the opinions in this declaration 10:10:01
are simply defining a methodology. There might be 10:10:04
further opinions that come from actually executing 10:10:07
on this analysis, but as far as defining this 10:10:09
methodology, this is the totality of my opinion. 10:10:13
Q Thank you. 10:10:17
Since you signed the declaration, have 10:10:19
you done any work in connection with the case? 10:10:21
A Nothing other than reading documents to 10:10:26
prepare in review for this deposition. 10:10:28
Q And how much time did you spend 10:10:35

preparing for this deposition? 10:10:39
A A couple phone calls and some reviewing of documents, maybe two and a half, three hours. 10:10:42 10:10:43
Q What documents did you review to prepare for this deposition? 10:10:48 10:10:50
A So, I reviewed my declaration, that we're looking at now, I believe I also skimmed over the motion for class certification. 10:10:51 10:10:55 10:10:58
Q Anything else that you can recall? 10:11:05
A Not that I recall. 10:11:09
Q Have you reviewed the plaintiff's deposition transcript in this case? 10:11:11 10:11:13
A I have not. 10:11:16
Q Have you met or spoken to the plaintiff in this case? 10:11:18 10:11:20
A No. 10:11:21
Q Have you read the Complaint? 10:11:24
A I have read the Complaint earlier. I didn't review it in preparation for the depo, though. 10:11:29 10:11:31 10:11:38
Q Can you tell me the name of the plaintiff in the case? 10:11:39 10:11:40
A Ms. Jackson-Jones. 10:11:42
Q Do you know if she's the only plaintiff in the case? 10:11:43 10:11:46

A I mean, she is the named plaintiff. This is a class action, so the class would be much wider than that. 10:11:46 10:11:49 10:11:51
Q Sure. Do you know if she's the only named plaintiff? 10:11:53 10:11:55
A That's my understanding. 10:11:55
Q Okay. I'd like to understand the work that you did to prepare your declaration. 10:11:58 10:12:04
A Is that a question? Sure. 10:12:13
Q Yeah. Yes, that is a question. 10:12:15
A So you're asking me to explain? 10:12:24
Q Yes. I'd like you to -- 10:12:26
A Okay. 10:12:28
Q I'll phrase another question. 10:12:28
Can you tell me the work you did in the course of preparing your declaration? 10:12:30 10:12:32
A Sure. So, I reviewed the complaints, I did have a conversation with Plaintiff's counsel to understand the situation, and given the knowledge there, I think I also reviewed some of the -- the interrogatories, to understand what data had been requested and might be available. And using those, I put together a methodology to measure -- basically, come up with two potential measures that might be relevant to the Court, 10:12:35 10:12:39 10:12:42 10:12:49 10:12:51 10:12:56 10:13:02 10:13:06 10:13:11

depending on what is decided by the trier of fact, for determining the losses in this case. 10:13:15 10:13:19

Q So, besides reviewing the complaint and some interrogatory responses, can you identify anything else that you read in connection with preparing your declaration? 10:13:26 10:13:28 10:13:31 10:13:36

A Nothing comes to mind. 10:13:45

Q How long did it take to prepare the declaration? 10:13:48 10:13:50

A Probably a few hours. 10:13:53

Q Two hours, five hours, something in between? 10:13:58 10:14:01

A In between. Maybe, three or four. 10:14:02

Q And you understand what the consumer products in question are in this case? 10:14:12 10:14:16

A Yes. 10:14:18

Q And what are they? 10:14:19

A They're Calico Critters, they're, little, like, toys that are, like, animals and then they have little accessories, little vehicles and tables, and things like that. 10:14:25 10:14:27 10:14:30 10:14:34

Q Did you do any research, in connection with preparing your declaration, on Calico Critters? 10:14:36 10:14:39 10:14:43

A I think I might have looked at the 10:14:44

website to get a general idea of the range of products. 10:14:45 10:14:48
Q About how long have you spent on the website? 10:14:50 10:14:52
A Probably 15 minutes. 10:14:54
Q Okay. Have you viewed any Calico Critters personally? 10:14:56 10:15:01
A Yes. 10:15:03
Q What did you do in that regard? How did that come about? 10:15:07 10:15:09
A My daughter has a set. 10:15:14
Q Oh, your daughter has a set. What kind? 10:15:16 10:15:18
A I believe it's a little cat and maybe a little tea set, something like that. 10:15:19 10:15:25
Q So you were familiar with the product before you were engaged on the case? 10:15:28 10:15:29
A My daughter purchased, with her own allowance money, a set from a toy store locally. And, you know, when I was made aware of the case, at some point, I did make the connection that it was the same product. 10:15:31 10:15:33 10:15:38 10:15:43 10:15:45
Q So I take it, your daughter has an allowance, which means she's probably older than three, right? 10:15:47 10:15:52 10:15:56

Critters accessories that came with the figures, correct? 10:21:11 10:21:15
MS. WADE: Vague and ambiguous. 10:21:16
A That's my understanding of her testimony, yes. 10:21:18 10:21:20
Q Okay. And you understand that the accessories she liked to play with included very small accessories, like soap bars and tiny little spoons and forks, correct? 10:21:20 10:21:24 10:21:27 10:21:34
MS. WADE: Vague and ambiguous. 10:21:36
A That's my understanding of what the testimony said, yes. 10:21:36 10:21:37
Q Okay. So is it fair to say, Doctor, that Ms. Jackson-Jones and her granddaughter derived some benefit or value from the toys she was playing with, including the accessories? 10:21:39 10:21:42 10:21:49 10:21:53
MS. WADE: Lacks foundation. Calls for speculation. Vague and ambiguous. 10:21:56 10:21:56
A It appears that they had playtime with it, and, presumably, that was enjoyable. 10:22:03 10:22:05
Q And so, that would be a benefit to them of playing with those toys, correct? 10:22:07 10:22:09
MS. WADE: Lacks foundation. Calls for speculation. Vague and ambiguous. 10:22:11 10:22:12
A Yeah. I think doing -- getting an 10:22:16

enjoyable experience is a benefit. 10:22:19
Q Okay. Are you a damages expert, 10:22:21
Dr. Ingersoll? 10:22:31
MS. WADE: Vague and ambiguous. 10:22:33
A So, I'm an economist, so I measure 10:22:35
economic loss. Damages is an issue of legal 10:22:41
origin. Something has to be determined to be 10:22:47
liable and a court awards damages, that might 10:22:49
be -- you know, has some basis on a loss or some 10:22:53
other wrongdoing. So I wouldn't characterize 10:22:58
myself as someone determining damages. 10:23:00
Q So you wouldn't -- so, I'm not getting 10:23:02
into the issue of liability. I understand that 10:23:06
you're not here to opine on liability, and that -- 10:23:09
well, so, I just want to get a clear answer. 10:23:14
Do you consider yourself a damages 10:23:21
expert? 10:23:22
MS. WADE: Vague and ambiguous. 10:23:24
A So, again, I'm hired, often, to provide 10:23:27
calculations that one side or another anticipates 10:23:31
might be useful for determining damages in a 10:23:35
particular matter. 10:23:38
Q And are you an expert in that field? 10:23:42
A I'm an expert as an economist, so 10:23:45
there's some damages or, you know, losses that I 10:23:49

can speak to. I can't speak to others, like emotional damages and things like that. 10:23:53 10:23:56

Q Are you an expert in restitution? 10:23:59

MS. WADE: Vague and ambiguous. 10:24:02

A Can you define restitution for me here, in this context? 10:24:06 10:24:08

Q Do you have an understanding of what the phrase restitution means? 10:24:10 10:24:12

A Yes. 10:24:15

Q What's that understanding? 10:24:16

A Yes, to make someone whole or to give something back for being wronged. 10:24:20 10:24:24

Q Okay. Based on that definition, do you consider yourself an expert in restitution? 10:24:35 10:24:37

MS. WADE: Vague and ambiguous. 10:24:42

A And there might be some areas where I can speak to that, and I do speak to that in courts. But, again, there are some areas of -- I can't declare that always, and in every situation, I would be the correct fit for something like that. 10:24:45 10:24:47 10:24:50 10:24:55 10:24:58 10:25:02

Q Sure. What areas would you consider yourself an expert in restitution in? 10:25:04 10:25:06

MS. WADE: Vague and ambiguous. 10:25:09

A So as an economist, I mostly rely on 10:25:12

market data when I'm looking at my analysis. So if there are things that, when I'm trying to value something or put a number on something, then I typically will rely on the market or some other measure of willingness to pay to do that. 10:25:16 10:25:18 10:25:22 10:25:25 10:25:28

And so, whenever that's relevant, that would be a place where I could speak to, or other things like, you know, lost earnings, wage data, stuff like that, lost profits. Those are all things -- like, valuing property and things like that. So, those are the types of things I might -- I would be able to speak to. 10:25:32 10:25:35 10:25:40 10:25:45 10:25:48 10:25:51 10:25:54

Q Let's go back to Exhibit 1. And I just want to -- I just want to review with you the list of cases in which you've testified. 10:25:58 10:26:02 10:26:06

MR. SPEYER: It's the very last page, Henry. 10:26:23 10:26:24

Q Okay. Do you see your list here -- 10:26:29

A I do. 10:26:32

Q -- Dr. Ingersoll? 10:26:32

A I do. 10:26:33

Q Now, these cases only include cases where you have either given a deposition or trial or arbitration testimony? 10:26:34 10:26:40 10:26:44

A That's correct. 10:26:47

Q Okay. So, you have, in fact, worked on other cases as an expert witness that are not listed on here; is that right? 10:26:47 10:26:52 10:27:00
A That's correct. 10:27:01
Q Okay. Which other cases? 10:27:02
A Are you asking about cases on which I've been retained as the lead expert or -- 10:27:09 10:27:11
Q Let's start with that. 10:27:18
Retained as a testifying expert. 10:27:21
A There are numerous. It would be difficult for me to recall them all here. Perhaps, with some time, I could have someone at the office collect some of that information. 10:27:28 10:27:30 10:27:34 10:27:37
Q Okay. So, let's try to narrow it down to, are there cases where you have submitted declarations or expert reports that are not listed on this testimony list? 10:27:41 10:27:46 10:27:48 10:27:51
A Yes. 10:27:53
Q Okay. Can you identify those cases? 10:27:54
A I don't always remember the specific names. I mean, I might remember things I've done and, you know, if I could check my records, then I would be able to come up with the list, but... 10:28:03 10:28:05 10:28:10 10:28:14
Q Can you identify any cases in which you have submitted a declaration or expert witness 10:28:19 10:28:21

report that is not listed in this list? 10:28:27

A Yeah. So, I have some expense reimbursement cases, one against Rocket Mortgage. I'm not sure I remember the plaintiff's name. 10:28:30 10:28:38 10:28:47

There's another, I guess, Knight Transportation, I'm not sure I remember the plaintiff's name. 10:28:53 10:29:02 10:29:05

Q Is that an employment case? 10:29:06

A That was also an expense reimbursement case. 10:29:07 10:29:07

Q By expense reimbursement, that falls under the category of labor and employment? 10:29:08 10:29:09

A Yeah. If -- presumably. I'm not a lawyer, so I don't know exactly how it's all categorized. 10:29:12 10:29:15 10:29:19

I have done conjoint analysis for Del Rosario v. Sazerac, in New York. 10:29:22 10:29:33

I've done other proposed conjoint studies on other consumer cases. I'm trying to remember the specific names of that. 10:29:41 10:29:47 10:30:00

Q Okay. Let me try to shorten this. Is the Rosario case, is that a consumers product case? 10:30:05 10:30:09 10:30:14

A Yes. 10:30:15

Q What's the consumer product at issue? 10:30:15

advertising group. 10:34:59
A Okay. 10:35:02
Q Are any of the cases that you listed not false advertising consumer cases? 10:35:03 10:35:05
MS. WADE: Vague and ambiguous. 10:35:12
A I don't believe so, no. 10:35:13
Q Okay. Have you ever submitted, in connection with a consumer products case, a hedonic regression analysis? 10:35:16 10:35:27 10:35:33
MS. WADE: Vague and ambiguous. 10:35:37
A No. 10:35:38
Q Have you ever submitted a hedonic regression analysis in connection with any other case in which you have been retained as an expert witness? 10:35:42 10:35:43 10:35:47 10:35:49
A I'm trying to recall the precise work I did in preparation for, like, a real estate-type analysis. Often, hedonic regression is used with that context because you have things with different characteristics, like houses. But I don't know that I had the data to do one in that -- in that case. So I don't believe -- I think the answer to your question is, no. 10:36:00 10:36:03 10:36:08 10:36:13 10:36:14 10:36:17 10:36:22 10:36:24
Q And what experience do you have with hedonic regression analysis? 10:36:31 10:36:33

A Sure. So I have a Ph.D. in economics from the University of Arizona. My specializations are in microeconomic theory, industrial organization, and econometrics, which is applying economic models -- applying statistics to economic models. 10:36:36

And so, within that context, you know, hedonic regression is used, often in microeconomic theory and industrial organization, to understand the demand, the characteristics of different goods and understanding what characteristics or attributes are contributing to explaining, you know, the price in particular cases. 10:36:56

Q So, have you personally carried out a hedonic regression analysis? 10:37:21

A In my academic, like, in classwork and training, when I teach at the University, in econometrics, that is something we'll do. We'll talk about the housing market and how we would apply it there, that kind of thing. 10:37:30

Q But have you actually conducted a hedonic regression analysis? 10:37:49

A I've done hedonic regressions for exercises for homework. I've done plenty of regressions in my time as a Ph.D. economist. I 10:38:00

don't think I've ever submitted one for litigation purposes, though, no. 10:38:10 10:38:13
Q Can you identify any hedonic regression analysis that you have conducted in a non-litigation setting? 10:38:21 10:38:26 10:38:28
A I don't believe I have any published work with hedonic regression. 10:38:34 10:38:35
Q I'm not limiting my question to published work, Doctor. 10:38:39 10:38:42
Do you want me to repeat it? 10:38:44
A Please. 10:38:46
Q Sure. Can you identify any hedonic regression analysis that you have conducted outside of the litigation setting? 10:38:46 10:38:49 10:38:52
A Like, just run a regression sometime in my life? 10:38:58 10:39:01
Q Well, you used the phrase hedonic regression. 10:39:02 10:39:06
A Uh-huh. 10:39:07
Q So I'm specifically asking you about hedonic regression. 10:39:07 10:39:09
A I'd have to look through old schoolwork and things like that. But, I mean, this is a standard technique that economists use that falls within the purview of my expertise. So I'm 10:39:14 10:39:18 10:39:20 10:39:23

other applies here. It seems like, to me, that's a matter of law and something that is at issue in this case. And that's not something I'm speaking to as an expert or anything like that. And my understanding would be that's why I've been asked to calculate two different potential models, right, one which would be the full refund amount and one would be kind of an offset method that would account for some amount of the value that they've received here. 10:47:57 10:47:59 10:48:02 10:48:06 10:48:09 10:48:10 10:48:13 10:48:18 10:48:21 10:48:24

Q So, do you have an opinion, one way or the other, on whether restitution must account for the value that the plaintiff has received from the defendant? 10:48:25 10:48:28 10:48:31 10:48:34

MS. WADE: Vague and ambiguous. 10:48:36

A I don't -- I mean, as I read the sentence, it seems to say that. But, again, I lack context or training to really feel confident in trying to interpret a judgment. 10:48:43 10:48:45 10:48:49 10:48:52

Q Okay. I'm not asking you to interpret this. I'm asking you for your own opinion. 10:48:54 10:48:57

Do you have an opinion as to whether restitution must account for the value that the plaintiff received from the defendant? 10:49:00 10:49:02 10:49:05

A That seems reasonable, yes. 10:49:16

Q About whether buying it and possessing it is illegal as a result of it being a banned hazardous substance? 10:58:33 10:58:34 10:58:38
A I don't know. 10:58:40
Q Okay. Now, is it your position that the plaintiff in this case has suffered a financial injury? 10:58:40 10:58:44 10:58:47
MS. WADE: Vague and ambiguous. 10:58:50
A So, I'm not speaking to liability. 10:58:52
Q I'm not asking you about liability. 10:58:57
Do you want me to repeat the question? 10:59:06
A Sure. 10:59:08
Q Is it your position that the plaintiff in this case has suffered a financial injury? 10:59:09 10:59:11
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 10:59:15 10:59:16
A It appears that knowing that the risk that might occur because of the -- this being a banned hazardous substance has decreased the benefit, if any, that they received from having the good. And so, seems like there might be an injury in that sense, sure. 10:59:21 10:59:30 10:59:34 10:59:39 10:59:42 10:59:46
Q So, is it your testimony -- so, let's -- let me just make -- let me just get clear. 11:00:06 11:00:10 11:00:13

Are you saying that the plaintiff in this case has suffered a financial injury or not? 11:00:15 11:00:16
MS. WADE: Vague and ambiguous. 11:00:21
A So, if they purchased these things and as part of what they thought they were getting was that they were compliant with regulations and that's not what they got, then, that would seem to be an injury to me, yes. 11:00:33 11:00:38 11:00:41 11:00:45 11:00:49
Q And that is a financial injury to you? 11:01:07
MS. WADE: Vague and ambiguous. 11:01:13
A I mean, if one of the characteristics of the product is whether it's compliant with, you know, safety laws or not, then if they place value on that, which appears to be what they're stating that they did, then it seems reasonable to me that there'd be an injury associated with that, potentially. 11:01:18 11:01:19 11:01:23 11:01:28 11:01:31 11:01:33 11:01:38
Q How do you know that they placed value on compliance with regulations? 11:01:40 11:01:44
MS. WADE: Vague and ambiguous. 11:01:47
A I mean, as I've already stated, I'm not making an expert opinion on this matter, and that's not what I've been retained to do. So I was speculating as to, you know, what might be the case. It seems to me that's something that's to 11:01:50 11:01:53 11:01:57 11:01:59 11:02:03

be determined at trial. 11:02:07
Q I'm sorry, what is something that is to be determined at trial? What were you referring to? 11:02:11 11:02:13 11:02:16
A Whether the law believes this is an injury or not or, you know, how it defines this stuff. I mean, I could see reasons why someone thought they were buying something and the value of what they thought they were buying was significantly less because of some information that wasn't available. If there's a risk to someone of choking or risk to someone I might donate this to of choking, if there's things that, you know, shouldn't -- I shouldn't have to bear any worry about, if regulations were complied with, then, I mean, it doesn't seem unreasonable, to me, that there'd be injury there. 11:02:18 11:02:23 11:02:26 11:02:33 11:02:34 11:02:36 11:02:38 11:02:44 11:02:48 11:02:53 11:02:55 11:02:58 11:03:02
Q An economic injury? 11:03:07
A Well, I'd pay a lot less for something that is dangerous or banned than I would for something that, you know, complies with regulations. 11:03:11 11:03:14 11:03:20 11:03:22
Q Do you have an opinion on the value of the products bought by the plaintiff in this case? 11:03:30 11:03:32
MS. WADE: Vague and ambiguous. 11:03:38

A The value to whom. 11:03:43
Q The market value is what I'm referring to. 11:03:45 11:03:47
A Typically, price reflects market value. 11:03:50
Q Okay. So is it your opinion that the market value of this product is equivalent to its price? 11:03:55 11:03:58 11:04:05
MS. WADE: Vague and ambiguous. 11:04:05
A Yes, typically, that's how we think about things in economics. Yeah, that market, prices moved to reflect market value, yeah. 11:04:09 11:04:11 11:04:17
Q Okay. Does the methodology you propose in your declaration provide or determine -- let me rephrase that. 11:04:20 11:04:26 11:04:33
Does the methodology you propose in your declaration allow one to determine the value of the product or products bought by the plaintiff? 11:04:34 11:04:38 11:04:42 11:04:45
MS. WADE: Vague and ambiguous. 11:04:47
A The products as a whole? The products -- I mean, so I rely on prices to do that. If it's the whole product, then I would rely on the price that they paid. If it was found to be some portion of the product, then I have a methodology in there to attribute which part of 11:04:55 11:04:56 11:04:59 11:05:02 11:05:07 11:05:10

the price is due to which part of the product and would be able to attribute some specific amount to part of the product. 11:05:16 11:05:19 11:05:24

Q Okay. So I'm talking about an entire product, an entire Calico Critters product. 11:05:25 11:05:29

So, does your methodology enable you to determine the value of an entire product bought by the plaintiff? 11:05:35 11:05:39 11:05:45

MS. WADE: Vague and ambiguous. 11:05:47

A Yes, I will rely on the price paid. 11:05:50

Q Okay. If you pay -- I'm switching gears a little bit here, Doctor. 11:05:54 11:06:00

If you paid $10 for a consumer product and you received a product that is worthless, what is your net loss? 11:06:02 11:06:05 11:06:08

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. Incomplete hypothetical. 11:06:11 11:06:13 11:06:17

A If the worth of a product was zero and I paid $10, then I would be out $10. 11:06:19 11:06:21

Q And if you paid $10 for a product and received a product that is worth $5, what is your net loss? 11:06:26 11:06:29 11:06:32

MS. WADE: Same objections. 11:06:33

A That would be $5. 11:06:35

Q Okay. And if you paid $10 for a product and receive a product that is worth $10, what is your net loss? 11:06:36 11:06:39 11:06:42
MS. WADE: Same objections. 11:06:44
A It would be zero. 11:06:46
Q So, if you pay the same amount as the value of the product you receive in return, there's no net loss, correct? 11:06:50 11:06:55 11:06:57
MS. WADE: Vague and ambiguous. Calls for speculation. Incomplete hypothetical. 11:07:01 11:07:01
A I believe that's correct. 11:07:07
Q So do I. Just so we're on the same page. 11:07:10 11:07:12
Okay. And you agree that without any loss, there is no basis for a party to receive an award of restitution? 11:07:15 11:07:18 11:07:24
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. Incomplete hypothetical. 11:07:26 11:07:27 11:07:29
A If there were no loss in the situation, then there wouldn't be compensatory damages. 11:07:32 11:07:35
Q Or restitution? 11:07:40
A Correct, yes. 11:07:43
Q Okay. So, let's assume that a plaintiff spends $10 and, in return, gets a 11:07:51 11:07:57

product that is worth $10, okay? Are you with me? 11:08:02
A Yes. 11:08:09
Q Okay. Now let's assume that this person receives a damages award of $1, okay? 11:08:09 11:08:14
A Okay. 11:08:23
Q All right. In that scenario, he's received that $1 award without suffering any loss, correct? 11:08:23 11:08:25 11:08:32
MS. WADE: Vague and ambiguous. Calls for speculation. Incomplete hypothetical. 11:08:33 11:08:34
A So if they paid $10 and received $10 benefit from the good and additionally got another dollar, then total benefits would be $11 versus the 10. 11:08:40 11:08:42 11:08:45 11:08:49
Q And in that scenario, he will have received an award without suffering any loss, correct? 11:08:51 11:08:53 11:08:55
MS. WADE: Vague and ambiguous. Calls for speculation. 11:08:57 11:08:59
A Yes. 11:09:02
Q Okay. So, in that scenario, you could say that the plaintiff has received a windfall? 11:09:02 11:09:07
MS. WADE: Vague and -- 11:09:15
A Yes. 11:09:21
Q Now, when a plaintiff buys a product 11:09:29

other negative attributes that go along with it, might counterbalance any benefits then -- then there would be a partial restitution if they do have some positive net benefit from that, yeah. Similar to how I suggest measuring things in my second method. 11:16:38 11:16:43 11:16:52 11:16:54 11:16:57 11:17:05

Q Okay. So I think we agreed, earlier, that if a plaintiff spends $10 to buy a product and gets a product that has a value of $2, okay? In that circumstance, a full refund would be inappropriate? 11:17:08 11:17:11 11:17:20 11:17:31 11:17:34

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 11:17:35 11:17:36

A If they got something that benefit, such as $2, as you suggest, and they paid $10, then the restitution would be $8 in that case. 11:17:37 11:17:41 11:17:45

Q Not $10, correct? 11:17:52

A Correct. 11:17:53

Q Okay. So, in other words, in that scenario, a full refund would be inappropriate? 11:17:54 11:17:58

MS. WADE: Vague and ambiguous. 11:18:03

A Correct. 11:18:05

Q Okay. 11:18:06

MR. SPEYER: Okay. We've been going for an hour and 18 minutes. The rooster is 11:18:13 11:18:14

getting crotchety. Let's take a -- how long a break should we take, Gillian, and Doctor? What do you think? 11:18:21 11:18:28 11:18:31

MS. WADE: Ten minutes and come back at, what time is it, 10:30. 11:18:32 11:18:33

MR. SPEYER: Yeah, that's perfect. 11:18:37

THE WITNESS: Sounds good. 11:18:39

MS. WADE: I want to let you know, during the break, my associate Marc Castaneda is going to join and observe. He had a hearing this morning, but he's done. 11:18:40 11:18:41 11:18:45 11:18:48

MR. SPEYER: Thanks for that heads-up, appreciate it. 11:18:49 11:18:50

THE VIDEOGRAPHER: We're going off the record. The time is 11:18 a.m. 11:18:52 11:18:52

(Recess taken.) 11:18:55

THE VIDEOGRAPHER: We're back on the record. The time is now 11:31 a.m. 11:19:13 11:31:50

BY MR. SPEYER: 11:31:53

Q Dr. Ingersoll, let me go back to something we were talking about earlier. 11:31:56 11:31:59

You testified that you had not run a hedonic regression analysis in connection with litigation and that you had some experience with hedonic regression analysis when you were in 11:32:06 11:32:09 11:32:13 11:32:15

school, correct? 11:32:22
A Yes. It was part of my training in my 11:32:26
econometrics field and my Ph.D. That's something 11:32:31
that we studied. We probably also studied it in 11:32:35
my undergraduate classes in econometrics as well, 11:32:38
and it's something that I at least mention to my 11:32:42
students at Azusa Pacific University, when I'm 11:32:45
teaching them econometrics. 11:32:49
Q Have you actually run a hedonic 11:32:53
regression? 11:32:55
A Like, with data? 11:32:56
Q Yes. 11:33:00
A I mean, yeah. 11:33:01
Q Yes? 11:33:01
A Yes. 11:33:03
Q When was that? 11:33:03
A I'm sure, as part of exercises for 11:33:07
homework, that was something that I've done. 11:33:10
Q Can I ask you another question? 11:33:23
A Sure. 11:33:25
Q How old was your daughter when she 11:33:27
bought her Calico Critters? 11:33:29
A I think eight. I think it was this 11:33:33
year. 11:33:35
Q Okay. And does she still play with the 11:33:36

Calico Critters? 11:33:38
A She gets them out from time to time. I'm not sure I've seen it for a bit. 11:33:39 11:33:42
Q But you've never taken them away because they're a choking hazard or anything like that, correct? 11:33:44 11:33:46 11:33:52
MS. WADE: Vague and ambiguous. 11:33:53
A Correct. She still has access to them. 11:33:54
Q And as far as you know, is the only time that she got Calico Critters is when she spent her own money out of her allowance to buy them herself? 11:33:58 11:34:02 11:34:05 11:34:10
A Yes. 11:34:10
Q Okay. Dr. Ingersoll, do you have an opinion on what the appropriate measure of restitution should be in this case? 11:34:13 11:34:18 11:34:21
A No. 11:34:25
Q Now, one of the potential methods you prepare in your declaration is what you call the offset method, correct? 11:34:37 11:34:42 11:34:45
A Correct. 11:34:47
Q Okay. And that method proposes to estimate the portion of prices that are due to the offending portion of the subject products, correct? 11:34:48 11:34:56 11:34:59 11:35:03

You see paragraph 13, correct? 11:42:13
A I do. 11:42:15
Q Okay. Now, explain to me what you mean by the offending portion of the subject products, please. 11:42:15 11:42:22 11:42:27
A Sure. So if the -- it was found that the offending portion of the product were, you know, the small parts of some kind, but, you know, often, these are sold in a package where you've got multiple different sizes of things, right? If only the small parts of that were found to be a problem, then I would be trying to figure out, hey, you know, part of that price was for this other stuff that the court has deemed or the trier of fact has deemed okay and part of it is for, in this case, the small parts, we're assuming that's the problematic part, then I would, basically, be trying to figure out, okay, how much of that money did they pay for the small parts versus the other things that they received in that package. 11:42:28 11:42:32 11:42:34 11:42:40 11:42:42 11:42:45 11:42:47 11:42:53 11:42:57 11:42:59 11:43:03 11:43:06 11:43:08 11:43:10 11:43:13
Q Okay. And you talk about a portion of the subject product, right? 11:43:15 11:43:25
A Right. By which I mean those, you know, those parts. 11:43:29 11:43:31
Q Okay. And a portion of something means 11:43:32

a fraction of something, some percentage of something, correct? 11:43:39 11:43:41

A I mean, some parts, some percentage of the price, right, would be put in percentage terms that's associated with those -- those -- 11:43:44 11:43:48 11:43:52

Q Well -- 11:43:55

A -- small parts, or whatever the relevant thing is. Sorry. 11:43:56 11:44:00

Q You talk about the portion of the price, but you also talk about the portion of the product. 11:44:01 11:44:02 11:44:05

And my question is, how are you going to determine the portion of the product that consists of small parts? 11:44:06 11:44:11 11:44:15

A So, as I state later on in my declaration, that's something that I'll have to rely on, and I can't make that determination myself. It's a question of what the law views as the problem and, so, I need to rely on either the Court or Plaintiff's counsel to guide and identify which parts those are. 11:44:19 11:44:22 11:44:24 11:44:26 11:44:30 11:44:35 11:44:38

Q I'm not talking about identifying small parts. I'm talking about determining how you determine what portion of the product is comprised of small parts? 11:44:42 11:44:45 11:44:48 11:44:56

A So, once it's been communicated to me which parts of each of the SKUs is, you know, one that is at issue here, then I would use that information, in the hedonic regression, to estimate the value of those parts or contribution of those parts to the overall price. 11:46:23 11:46:29 11:46:35 11:46:43 11:46:46 11:46:48

So if it just had one small part and that was flagged as the problem, then, presumably, the restitution would be very small because there's only one piece there, right? If it's almost all small parts, right, then the restitution would be closer to the whole value of the price, right, depending on what the hedonic regression would say about how much those things contribute to the actual makeup of the price. 11:46:50 11:46:53 11:46:57 11:47:00 11:47:03 11:47:05 11:47:08 11:47:11 11:47:16

Q But what if it's one small part and that makes up the entire item? 11:47:19 11:47:21

A Then it would be equivalent to the full refund, I guess. 11:47:26 11:47:30

Q Okay. So, you understand, Doctor, that you can have a product that has three different small parts and those small parts comprise a large portion of the product, right? 11:47:31 11:47:36 11:47:40 11:47:47

MS. WADE: Vague and ambiguous. 11:47:52

A What do you mean by portion now? 11:47:58

You're saying there's, like, four pieces and three of them are small parts and so you're thinking in terms of 75 percent? Is that what you're saying? 11:48:00 11:48:03 11:48:06

Q Sure. 11:48:08

A I mean, presumably, I haven't done the analysis, I don't have the data, but it would make sense to me, my intuition would suggestion that bigger parts probably are a bigger portion of the price. And so, smaller parts, you know, if you add one big part versus adding one small part to any particular package, probably the bigger part would be, add the price a little bit more, from a cost perspective, than a small part. And so, a portion would depend on whether those are big or small parts and the marginal effects of those particular -- particular sizes. 11:48:10 11:48:12 11:48:15 11:48:18 11:48:22 11:48:25 11:48:29 11:48:32 11:48:35 11:48:42 11:48:45 11:48:47

Q Okay. It's correct, isn't it, that you can have a product with three small parts and those small parts can be a very small portion of a particular product, a particular Calico Critters product, right? 11:48:50 11:48:54 11:48:59 11:49:05 11:49:09

MS. WADE: Vague and ambiguous. Calls for speculation. 11:49:10 11:49:11

A Since I haven't estimated the model, I don't know how much, you know, the small parts add 11:49:15 11:49:17

percentages because, you know, part of the -- I think part of our issue here is the ambiguity of what portion can mean. Is it, like, percentage of oh, there's ten small parts -- nine small parts and one big one, that's 90 percent. That's not what I'm trying to say, you know, or, like, by weight, or anything like that. 11:50:49 11:50:53 11:50:54 11:50:57 11:51:01 11:51:03 11:51:07

I anticipate enumerating how many small parts are there, and the regression will treat those differently. And so the weighting, in the end, might weigh them as a smaller portion. 11:51:08 11:51:11 11:51:13 11:51:16

So, I guess the portion has to do with the percentage of the total price that's attributable to those smaller parts which, again, intuition suggests would be worth less than the big parts that are there. 11:51:19 11:51:22 11:51:27 11:51:30 11:51:34

Q Once again, you're talking about a portion of the price in your answer. And I'm trying to figure out something much more basic, which is how are you going to determine what the offending portion of the product is? 11:51:38 11:51:39 11:51:43 11:51:45 11:51:47

And just let me say, I understand part of your process is you're going to count the number of small parts. But then your declaration says "I will determine the offending portion of 11:51:51 11:51:56 11:51:58 11:52:01

are problematic in this case. 11:53:30
Q Okay. So you just used the term 11:53:31
"subset," okay? 11:53:33
So the small parts are a subset of 11:53:35
something else, correct? 11:53:39
A Of the overall product, yes. 11:53:43
Q Okay. And that subset is what you call 11:53:45
the offending portion of the product, correct? 11:53:50
A Yes, by which I mean the discrete parts 11:53:55
of it. I'm not talking about a continuous 11:53:57
percentage. 11:54:01
Q I don't understand what that means. 11:54:01
Can you try to explain that more? 11:54:02
A Yeah. I literally mean the portion of 11:54:05
the product, if we say, put in a bucket, like, we 11:54:07
empty the box of the parts or of the toy and we 11:54:12
separated out the ones that I was told were the 11:54:17
problematic ones, then I'd have, you know, one 11:54:19
portion, which is the problematic ones, and I'd 11:54:22
have some other portion of the product which were 11:54:25
not the problematic ones. 11:54:29
I mean, maybe there's a better word 11:54:31
than portion that would suggest something else to 11:54:33
you, but I'm clarifying to you right now, that's 11:54:35
what I mean when I say portion here. 11:54:37

Q So when you use the term "portion," you're not saying it to denote any particular percentage of the overall product, you're simply using it to denote the number of small parts that are in the overall product; is that correct? 11:54:45 11:54:47 11:54:50 11:54:55 11:54:59
MS. WADE: Vague and ambiguous. 11:55:03
A Assuming that small parts is the correct definition of what would be the problematic parts, yes. 11:55:06 11:55:07 11:55:09
Q Okay. So, for example, when you say, in paragraph 14, "I propose measuring the portion of the price attributable to the offending portion of the product using hedonic regression analysis," you're really saying, I propose measuring the portion of the price attributable to the number of offending pieces in the product. 11:55:14 11:55:33 11:55:37 11:55:41 11:55:47 11:55:50 11:55:53
Correct? 11:55:56
MS. WADE: Vague and ambiguous. 11:56:00
A I think, in this case, that is equivalent. So I think the answer is yes. 11:56:08 11:56:11
Q Okay. Now, let's go to paragraph 16. 11:56:15
MR. SPEYER: Thank you, Henry. 11:56:35
Q Okay. So, directing your attention to the second sentence "If we account for other price-relevant characteristics (for example, 11:56:36 11:56:41 11:56:46

number or presence of larger pieces, number or presence of medium pieces, number or presence of smaller allegedly offending pieces, et cetera) the resulting hedonic regression price estimate for the smaller allegedly offending pieces will give us a value of how much of the price of the product was due to that characteristic compared to a similar product without this characteristic." 11:56:50 11:56:52 11:56:55 11:56:58 11:57:01 11:57:03 11:57:05 11:57:08

I read that correctly? 11:57:10

A Yes, although it's the third sentence. 11:57:13

Q Okay. Thank you. 11:57:15

Okay. So, your proposed methodology requires you to count the number of small parts, the number of medium parts, and the number of larger parts, correct? 11:57:19 11:57:24 11:57:26 11:57:29

MS. WADE: Vague and ambiguous. 11:57:32

A Correct. 11:57:34

Q Okay. And did -- 11:57:37

A You know, some appropriate set of characteristics. 11:57:40 11:57:41

Q In addition to the size of the product -- of the pieces? 11:57:46 11:57:47

A I think size is important here because the smaller ones are potentially the ones that are the offending ones. So I don't know if there 11:57:51 11:57:52 11:57:56

needs to be a line between medium and large. I'd have to do more research and, you know, looking at the products and understanding it better to see what would seem to be appropriate here, but... 11:57:59 11:58:02 11:58:04 11:58:07

Q Okay. What has prevented you, if anything, from doing that work before -- before this deposition? 11:58:09 11:58:12 11:58:16

MS. WADE: Vague and ambiguous. 11:58:18

A It would be a large undertaking to look at every problematic product and enumerate all of that. 11:58:23 11:58:25 11:58:29

Q Anything else? 11:58:32

A I also wasn't asked to fully explain the entire detail what I would do, but propose a methodology. 11:58:44 11:58:47 11:58:52

Q And how will you determine what's a medium part and what's a large part? 11:58:52 11:58:54

MS. WADE: Vague and ambiguous. 11:59:02

A I haven't determined that yet or if that distinction is even necessary. 11:59:02 11:59:04

Q So that distinction may not even be part of your analysis, correct? 11:59:06 11:59:08

A It's possible. 11:59:11

Q What difference does it make to your analysis whether a piece is a medium piece or a 11:59:18 11:59:20

larger piece? 11:59:23
MS. WADE: Vague and -- 11:59:25
A I can -- I can see a larger piece being 11:59:26
more expensive to produce and that might lead to a 11:59:29
higher price associated with that one. So if 11:59:33
there are, you know, very large pieces, like, if 11:59:35
there are large vehicles or something, then that 11:59:38
might make sense to treat that differently than, 11:59:41
like, a figure that would be -- presumably, cost 11:59:44
less to make. 11:59:47
Q Well, what data do you have or expect 11:59:48
to have on the cost of different components of 11:59:52
this product? 11:59:56
MS. WADE: Vague and ambiguous. 11:59:59
A I'm not sure that's available, so I 12:00:01
don't anticipate having any of it. 12:00:04
Q Okay. So then, without that data, what 12:00:06
difference does it make to your analysis whether a 12:00:12
piece is a medium piece or a larger piece? 12:00:14
A Well, because cost does influence 12:00:17
price, and so, while -- 12:00:21
Q But you don't have any information on 12:00:24
the cost, right? We just established that. 12:00:25
A Sorry, you interrupted my answer, what 12:00:33
was the question I was answering? 12:00:35

hazards or not. So some kind of size or volume measure. 12:03:35 12:03:40

Q Do you even have any understanding of whether any individual Calico Critters item comes without small parts? 12:03:47 12:03:48 12:03:58

MS. WADE: Vague and ambiguous. 12:03:59

A No, I haven't -- I haven't determined if there's specific ones that don't have small parts. 12:04:02 12:04:04 12:04:08

Q Do you have any thoughts on how you would make the distinction between what's a medium part and what's a large part? 12:04:13 12:04:15 12:04:18

A So, I would anticipate inspecting the products and trying to determine that and making clear what it is that I'm deciding based on. It could be, you know, there are larger vehicles and that might be something, perhaps, you know, furniture. But I would make clear why I'm putting one in a bucket or another so the Court could understand the assumptions I've made on that. 12:04:23 12:04:29 12:04:33 12:04:36 12:04:39 12:04:42 12:04:45 12:04:49

Q So you -- so in other words, you would make a judgment call as to what constitutes a small -- a medium part and what constitutes a large part, and then you would be careful to explain to the Court what you were basing your 12:04:51 12:04:53 12:04:55 12:04:59 12:05:02

judgment on? 12:05:05
MS. WADE: Vague and ambiguous. 12:05:06
A Something like that. If there are some uncertainty as to where one should go versus not, it might make sense to run a model and, you know, with different assumptions, just to see if the results are robust to make sure that any slight misclassification or, you know, disagreement on classification doesn't actually matter in that. 12:05:08 12:05:10 12:05:13 12:05:17 12:05:20 12:05:24 12:05:28
Q And your methodology proposes to count the number of small parts in each separate product involved in the case, correct? 12:05:34 12:05:40 12:05:44
MS. WADE: Vague and ambiguous. Misstates testimony. Lacks foundation. Calls for speculation. 12:05:46 12:05:47 12:05:49
A So, when trying to -- my intention is to figure out the characteristics, and I think the number of parts, small parts is probably an important characteristic here, yes. So we would have to figure out the number for each of those products. 12:05:52 12:05:56 12:05:58 12:06:02 12:06:06 12:06:09
Q Including the number of small parts in each product? 12:06:09 12:06:11
A Correct. 12:06:14
Q Okay. And do you understand that the 12:06:14

number of small parts will vary from product to product? 12:06:23 12:06:28
A Yes. 12:06:29
Q Okay. And that's because some items will have more small parts than other items, right? 12:06:30 12:06:41 12:06:43
A That's correct. 12:06:45
Q Okay. And are you assuming a linear effect, whereby adding each small part will add to the recovery or the same amount of damages? 12:06:45 12:06:51 12:06:57
MS. WADE: Vague and ambiguous. 12:07:07
A Yeah. If we use number of small parts, then as it moves up, then it would increase, incrementally, by that amount. That's correct. 12:07:10 12:07:13 12:07:16
Q And you're saying -- so, the greater the number of small parts, the greater the restitution award to the consumer, correct? 12:07:19 12:07:21 12:07:25
MS. WADE: Vague and ambiguous. Misstates testimony. 12:07:29 12:07:30
A I believe that would be an implication of the model, yes. 12:07:33 12:07:35
Q Okay. So, under your methodology, awards to class members will vary depending on the number of small parts in each product, correct? 12:07:36 12:07:42 12:07:46
MS. WADE: Vague and ambiguous. Lacks 12:07:50

foundation. Calls for speculation. Misstates testimony. 12:07:53 12:07:54

A So, I mean, again, this is all in the context of the second methodology, but as a number -- if small parts are determined to be the part that's problematic, then it would mostly depend, yes, on the number of small parts there that would tell us, hey, how many since were -- you know, whatever the scale happens to be, was this product, you know, comprised of a problematic portion -- was the price comprised of a problematic portion. 12:07:58 12:08:01 12:08:06 12:08:11 12:08:14 12:08:17 12:08:22 12:08:26 12:08:33 12:08:37

Q I think I understand what you're saying. Just to make clear. 12:08:38 12:08:39

Under your proposed offset methodology, restitution awards to class members will vary depending on the number of small parts in each product, correct? 12:08:40 12:08:43 12:08:46 12:08:49

MS. WADE: Vague and ambiguous. Lacks foundation. Calls for speculation. Misstates testimony. 12:08:50 12:08:53 12:08:55

A That's -- the proposal here has, yes, the number of small parts, and as the number would go up, then the amounts due for restitution would increase there. 12:08:58 12:09:01 12:09:05 12:09:14

for speculation. Lacks foundation. 12:10:38
A I don't remember. There might have been a document from the Court or, perhaps, there was some quoting from the Court that seemed to come to that conclusion. I recall seeing something like that. 12:10:47 12:10:48 12:10:51 12:10:54 12:10:57
Q Okay. And so, you understand that the product is considered a banned hazardous substance if it is flocked and contains just one small part, right? 12:10:58 12:11:02 12:11:05 12:11:09
A I believe that that was the definition that they were using, yeah. 12:11:10 12:11:13
Q And if the product contains 10 small parts and is flocked, then, under the Court's construction of CPSC regs, it is also considered a banned hazardous substance, correct? 12:11:18 12:11:21 12:11:26 12:11:31
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:11:34 12:11:36
A I believe that's my understanding. 12:11:38
Q Okay. So, you understand that whether the product is a banned hazardous substance or not has nothing to do with the number of small parts the product contains, so long as it contains at least one small part, correct? 12:11:39 12:11:42 12:11:47 12:11:50 12:11:54
MS. WADE: Vague and ambiguous. Calls 12:11:58

for speculation. Lacks foundation. 12:11:58
A That seems to be my understanding -- 12:12:03
Q Okay. 12:12:05
A -- as a layperson. 12:12:07
Q Okay. And earlier we talked about how the plaintiff's theory of causation is that she would not have bought the product had she known the product was a banned hazardous substance, correct? 12:12:08 12:12:12 12:12:15 12:12:18 12:12:24
A Yes. 12:12:26
MS. WADE: Vague -- okay. 12:12:27
Q So, Plaintiff's theory has nothing to do with the number of small parts in a particular item; isn't that right? 12:12:28 12:12:30 12:12:34
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:12:36 12:12:36
A It does have to do with the number because the number needs to be more than zero, I think. 12:12:45 12:12:48 12:12:50
Q With that proviso, you understand that Plaintiff's theory has nothing to do with the number of small parts in a particular item, as long as there is at least one small part in the item, right? 12:12:54 12:12:59 12:13:03 12:13:06 12:13:09
MS. WADE: Vague and ambiguous. Calls 12:13:11

for speculation. Lacks foundation. 12:13:12
A I'm not sure if I know the entirety of their theory. In my proposed model, I do use the number of small parts here. I do suggest that, if it was more appropriate, I could just use the presence of small parts, which, perhaps, would match up more closely. 12:13:17 12:13:20 12:13:27 12:13:29 12:13:32 12:13:35
Q You suggest that if it was more appropriate, I could just use the presence of small parts? Where do you suggest that? 12:13:38 12:13:42 12:13:45
A Paragraph 16. Number or presence. 12:13:49
Q Okay. So, have you determined whether your methodology will consist -- let me rephrase that. 12:14:02 12:14:07 12:14:12
Have you determined whether your methodology will count the number of small parts or just take into account whether small parts exist or not in each particular item? 12:14:13 12:14:15 12:14:18 12:14:23
A I don't know I've determined that with 100 percent certainty. But I anticipate using the number of small parts this time. 12:14:29 12:14:32 12:14:36
Q So how does your theory, that involves using the number of small parts, fit with the plaintiff's theory of causation? 12:14:47 12:14:51 12:14:56
MS. WADE: Vague and ambiguous. Lacks 12:14:59

foundation. Calls for speculation. 12:15:01
A I'm not a lawyer, and I'm not sure if I fully know what their theory is, from a legal sense. So I'm not sure how to answer that question. 12:15:08 12:15:13 12:15:19 12:15:22
Q Okay. Well, are you familiar with the principle that any theory of restitution should fit the plaintiff's theory of liability? 12:15:22 12:15:26 12:15:30
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:15:34 12:15:35
A I do know of something like that, yeah. 12:15:39
Q Okay. So that's my question. How does your theory of restitution, in which you count the number of small parts, fit with the plaintiff's theory of causation? 12:15:43 12:15:45 12:15:48 12:15:50
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:15:52 12:15:53
A I mean, I don't know what the appropriate specific version of this is, if it's the full refund or if it is some portion of it. So my calculations are there, depending on what the Court decides or the trier of facts decides what would be the appropriate measure. 12:15:58 12:16:01 12:16:05 12:16:08 12:16:12 12:16:14
Q Okay. So -- I'm sorry, are you finished? 12:16:18 12:16:24

A Yeah, sorry. 12:16:24
Q So you're not taking any position of whether your theory of restitution fits with the plaintiff's theory of causation; isn't that right? 12:16:25 12:16:27 12:16:29
MS. WADE: Vague and ambiguous. 12:16:36
A Not at this time. I don't think the Court's determined, either, what is appropriate here. So it would be hard for me to do so as well. 12:16:52 12:16:54 12:16:57 12:17:01
Q Okay. I think, you correct me if I'm wrong, but I think we agreed, a little while ago, that the plaintiff and her granddaughter derived some benefit from playing with the Calico Critters, including the accessories that are very, very small, correct? 12:17:09 12:17:15 12:17:17 12:17:21 12:17:28 12:17:32
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:17:35 12:17:36
A She testified having fun playtimes with her, which is usually a good thing. 12:17:39 12:17:43
Q And constitutes some benefit to her, right? 12:17:47 12:17:52
MS. WADE: Same objection. 12:17:53
A That is something that would be a positive benefit. 12:17:55 12:17:57
Q Okay. So how does your theory of 12:18:00

restitution account for the benefit that the plaintiff or her granddaughter received from playing with the small part accessory? 12:18:03 12:18:09 12:18:12

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:18:18 12:18:18

A I mean, as the plaintiff testified to, she said she wouldn't have bought it if she had known more information about the attributes of the product. And so, basically, I'm assuming that that -- this utility, from that knowledge and that attribute, would outweigh any benefits from playing with those small parts. 12:18:24 12:18:31 12:18:33 12:18:37 12:18:39 12:18:43 12:18:47

Q So, that's your assumption, that the disutility from that knowledge and that attribute would outweigh any benefits from playing with those small parts, and your -- what's your basis for that assumption? 12:18:51 12:18:58 12:19:03 12:19:08 12:19:12

MS. WADE: Vague and ambiguous. Compound. 12:19:13 12:19:14

A I mean, I think that the -- that's what the plaintiffs -- or plaintiff testified to, I think. 12:19:16 12:19:18 12:19:21

Q Well, the plaintiff testified, I think we can all agree, that she would not have bought the product had she known that it was a banned 12:19:22 12:19:25 12:19:28

hazardous substance, correct? 12:19:31

A Correct. 12:19:33

Q Okay. But that doesn't have anything to do with the fact that the plaintiff and her daughter [sic] actually derived some benefit from playing with the small parts, correct? 12:19:34 12:19:37 12:19:40 12:19:43

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:19:47 12:19:47

A I mean, they had the fun. But, overall, I wouldn't -- she isn't made aware of this information. She said that she would have done something differently. And so, it wouldn't have been worth it, in that sense. 12:19:51 12:19:59 12:20:03 12:20:05 12:20:07

Q So, are you saying that because she testified that she would not have bought the item had she known it was a banned hazardous substance, that she is entitled to a full refund? 12:20:11 12:20:15 12:20:20 12:20:25

MS. WADE: Vague and ambiguous. 12:20:30

A As I've stated before, I'm not testifying to what is the appropriate, you know, method that the Court would support here. I think my purpose is to provide a way to calculate these things and, so, I don't think I'm testifying to one method or another. 12:20:31 12:20:34 12:20:37 12:20:41 12:20:43 12:20:49

Q I'm just trying to figure out how your 12:20:50

method takes into account the fact that the plaintiff and her granddaughter both obtained value from the small-part accessories? 12:20:52 12:20:54 12:20:59

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:21:05 12:21:06

A So, as I said, there'd have to be an assumption of, like, a negative disutility weighing against any value of the small parts. 12:21:13 12:21:17 12:21:20

Q Okay. Does that assumption appear anywhere in your declaration, Doctor? 12:21:22 12:21:24

A I don't believe so. 12:21:31

Q Okay. Since the plaintiff and her granddaughter obtained some benefit from playing with the small-part accessories, why should Plaintiff be entitled to a refund of the portion of the price attributable to those small parts? 12:21:32 12:22:00 12:22:04 12:22:09 12:22:12

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 12:22:18 12:22:19

A I mean, I think it comes down to a matter of law. As I said, I'm not testifying as to which is appropriate or not. I'm here saying how I could calculate these things and, you know, I think issues -- you know, the issues of the case are all tied up in this stuff. And so, I'm not sure that I have an opinion as to what is 12:22:23 12:22:26 12:22:28 12:22:31 12:22:36 12:22:40 12:22:48

appropriate or not appropriate. And I'm just trying to present these ways, you know, that we could measure and someone else would have to make an argument to say why they're the inappropriate ones. 12:22:53 12:22:58 12:23:01 12:23:06 12:23:09

So my methodology, right, does -- as I state, you know, would provide a way that we could portion out parts of the price, two different portions of that, and it doesn't require, you know, the assumption that we talked about before, right, that's why it's not stated here. This would just be a way of saying, hey, what portion of this price is associated with that? 12:23:10 12:23:13 12:23:17 12:23:22 12:23:25 12:23:29 12:23:32 12:23:34

And so, yeah. 12:23:36

Q How did you come up with this proposed method of refunding a portion of the price attributable to the offending portion of the product? 12:23:39 12:23:41 12:23:48 12:23:51

MS. WADE: Vague and -- 12:23:55

A Yeah, I mean, that was something that plaintiffs requested that might be useful for the Court. 12:23:57 12:24:00 12:24:09

Q Are you aware of any textbooks or articles that endorse this proposed method as an appropriate method of restitution? 12:24:10 12:24:11 12:24:15

MS. WADE: Vague and ambiguous. 12:24:20
A Of using hedonic regression? 12:24:20
Q No. Of determining the portion of the 12:24:22
price attributable to the offending portion of the 12:24:27
product as a method of determining restitution. 12:24:30
A I mean, regression, generally, is there 12:24:37
to help explain something, in this case, the 12:24:42
price, based on other relevant variables. Here 12:24:45
are the attributes of the products and regression 12:24:50
is used all the time in calculating, like, losses 12:24:53
and damages. And so, if I were to -- I don't know 12:24:57
if I have a specific citation on the tip of my 12:25:02
tongue. 12:25:08
Q Are you aware of any textbook or 12:25:09
articles that endorse the proposed method of 12:25:11
determining the portion of the price attributable 12:25:15
to the offending portion of the product as an 12:25:17
appropriate method of restitution? 12:25:22
MS. WADE: Vague and ambiguous. Asked 12:25:26
and answered. 12:25:27
A So, I mean, experts talking about 12:25:31
hedonic regression, the point of hedonic 12:25:35
regression is to measure the value of a particular 12:25:37
characteristic. So within the context of 12:25:40
determining economic loss or something, right, if 12:25:42

something didn't have a characteristic versus have it, that would be a valid measure of what economic loss to someone could be of that. And that's what I'm generally testifying to, is the value of economic loss. Restitution is a legal thing that lays on top of that, when you're talking about damages, so I don't know of any textbook that goes all the way from here's a hedonic regression and these are now restitution damages at the very end of it. 12:25:44 12:25:47 12:25:51 12:25:54 12:25:56 12:26:00 12:26:02 12:26:06 12:26:09 12:26:11

Q The method that you are proposing, that requires counting the number of small parts and then refunding the portion of the product attributable to the small parts, are you aware of any academic literature that endorses this or proposes this? 12:26:31 12:26:37 12:26:41 12:26:46 12:26:54 12:26:58

MS. WADE: Vague and ambiguous. Calls for speculation. Misstates testimony. 12:27:01 12:27:02

A I mean, hedonic regression is there to put valuations on these different attributes of a product. And so, the small parts are an attribute of the product, so there's a large literature on the use of hedonic regression in, you know, all kinds of different places. So, originally looking at value of farmland, there's looking at different 12:27:09 12:27:11 12:27:15 12:27:18 12:27:20 12:27:23 12:27:26

attributes of wine, there's looking at the value of different website names. There's other, you know, places that I cite as well, where they all use this methodology to portion out a price of a portion of value due to those attributes. And the attribute here is number of small parts and along with other attributes of the good. 12:27:32 12:27:35 12:27:40 12:27:44 12:27:47 12:27:54 12:27:57

So it's appropriate and applied as in those other cases. 12:27:59 12:28:01

Q Okay. Hang on just one second. I'm trying to find something in your declaration. 12:28:09 12:28:21

MS. WADE: And, Counsel, when you're ready, I need to take a break in a couple minutes. It's been about an hour. 12:28:28 12:28:30 12:28:33

MR. SPEYER: Sure. Do you want to do it now? 12:28:34 12:28:36

MS. WADE: It's up to you. I don't want to mess up. 12:28:37 12:28:38

MR. SPEYER: No, that's fine, thanks, Gillian. 12:28:40 12:28:41

So, you want to come back at 45 minutes past the hour? 12:28:43 12:28:46

MS. WADE: Perfect. Thank you so much. Appreciate it. 12:28:47 12:28:49

MR. SPEYER: Okay. Thanks a lot. 12:28:50

A Okay. 12:47:34

Q Okay. Now, under your theory, your offset theory, the item that comes with ten small parts and a flocked figure, that is not a small part, the buyer of that item would be entitled to an award that is ten times more than the buyer of the item that is entirely a small part, correct? 12:47:34 12:47:39 12:47:44 12:47:49 12:47:54 12:47:59

MS. WADE: Vague and ambiguous. Misstates testimony. 12:48:08 12:48:11

A I mean, there could be ways to account for differences like that. Again, I haven't fully designed it; it depends on what the data looks like and, you know, what exists in products as to the appropriate way to measure that. And so, you know, it could be set up to measure that differently or just looking at the presence of a small part that could be the appropriate one. So it depends, a little bit, on once I dig in and, actually, I'm able to do the analysis here. 12:48:14 12:48:17 12:48:21 12:48:24 12:48:26 12:48:31 12:48:34 12:48:39 12:48:42 12:48:45

Q Okay. But -- so, I take it you acknowledge that a problem with your proposed theory is that you could have a situation where you have a product that has ten small parts and it's just a small portion of the overall item that entitles the consumer to a much greater award than 12:48:53 12:48:57 12:49:06 12:49:09 12:49:11 12:49:16

a consumer who has bought a product that is entirely a small part? 12:49:20 12:49:23

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. Misstates testimony. 12:49:29 12:49:30 12:49:32

A I mean, again, it would depend on the specifics of how it was modeled in the regression as to how the situations would be treated. 12:49:35 12:49:37 12:49:41

Q But you're -- but what you've been telling me, throughout this deposition, is you're going to count the number of small parts and the greater number of small parts in the item, the greater the restitution award; isn't that right? 12:49:45 12:49:48 12:49:49 12:49:52 12:49:55

A I mean, that was the -- I'm sorry. 12:49:59

MS. WADE: Vague and ambiguous. Misstates testimony. 12:50:04 12:50:05

A I mean, that's the example that I went through, which, again, you know, isn't necessarily the one that would make the most sense, depending on what the data looks like and what it is that the Court needs to evaluate this correctly. 12:50:06 12:50:09 12:50:11 12:50:17 12:50:22

And so, you know, there could be ways of accounting for specifics by adding other variables or attributes along with that, so... 12:50:28 12:50:30 12:50:35

Q But these other ways you're talking 12:50:41

about are not expressed in your declaration, are they? 12:50:43 12:50:51

A I mean, at the end, I believe I have a -- you know, reserve the right to, and once I've actually seen what's available in the data. I don't think that's been made available in discovery or anything like that. So it's hard for me to come up with the exact specific way I would do something without having the raw materials before me to do it. 12:50:51 12:50:54 12:50:59 12:51:01 12:51:03 12:51:05 12:51:08 12:51:15

Q Okay. The -- now, you mentioned that you might actually not use a method that involves counting the number of small parts in each product, but just simply is based on whether or not each product contains a small part, correct? 12:51:25 12:51:38 12:51:41 12:51:43 12:51:47

A That's what presence would be, yeah. 12:51:53

Q And by "that's what presence would be," you're saying that's what you refer to in paragraph 16, presence or number of offending parts? 12:51:59 12:52:01 12:52:03 12:52:09

A That's correct. 12:52:11

Q Okay. But in paragraph 18, where you give the actual formula that you propose to use, that formula just contains part of it for the number of small parts, it doesn't say anything 12:52:12 12:52:14 12:52:21 12:52:28

about the presence of small parts, right? 12:52:30
MS. WADE: Vague and ambiguous. 12:52:32
A Yeah. I mean, that's a specific example to help us understand what a hedonic regression is. The other beta, with the other attributes, contains all the other attributes, not just one thing. It's supposed to be, like, a vector of betas and a matrix of X attributes that go along with it. 12:52:34 12:52:36 12:52:39 12:52:44 12:52:47 12:52:49 12:52:54
Q I understand. But the model that you -- the only equation that you give us, in your entire declaration, is based on the number of small parts, not simply the presence or absence of small parts, correct? 12:52:56 12:52:57 12:53:00 12:53:03 12:53:06
A Yeah, I mean, as it states right there, I do have a copy of my declaration in front me. So it says "a possible model to be estimated would look like the following." 12:53:08 12:53:10 12:53:13 12:53:18
So that's a possible way it could be done. 12:53:19 12:53:21
Q Okay. So you're not proposing that that's the way that this would be done, it's just a possibility, correct? 12:53:21 12:53:23 12:53:26
A That's correct. 12:53:27
Q Okay. Now, the -- a model that relies 12:53:28

Q Okay. So, if your model is based on, simply, the presence or nonpresence of a small part, and -- let me rephrase that. 12:55:01 12:55:05 12:55:10

You don't know whether any Calico Critters toys do not contain small parts, correct? 12:55:28 12:55:30

MS. WADE: Vague and ambiguous. 12:55:33

A As I sit here, no, I don't. 12:55:36

Q Okay. So, then, if there are no Calico Critters flocked toys that do not contain small parts, how are you going to do your hedonic regression model, to the extent it would be based on the presence or absence of small parts? 12:55:38 12:55:46 12:55:49 12:55:51 12:55:55

MS. WADE: Vague and ambiguous. 12:56:00

A So, if it were true that every single one had small parts, then just the yes-or-no question wouldn't be estimable with that as an attribute. You need to have some kind of variation that acts as the variable. 12:56:05 12:56:07 12:56:16 12:56:23 12:56:25

Q How many variations would you need? 12:56:30

A Some. 12:56:32

Q Some, like, it would be okay if one percent of the product had small -- did not have small parts? 12:56:34 12:56:39 12:56:42

A Sometimes it can be okay. 12:56:46

Q Are you aware of any literature that 12:56:49

appropriate method is or is not, I'm just presenting methods for measuring this. 13:00:02 13:00:06

Q Okay. Let's go back to your declaration. 13:00:14 13:00:18

Okay. In paragraph 13 you say "I can calculate the portion of the price due to the offending portion of the subject products with data that the defendants have in their possession." 13:00:23 13:00:26 13:00:27 13:00:30 13:00:32

Do you see that? 13:00:33

A It's on the screen, but, yeah. 13:00:36

Q Right. Well, yeah, because you already told us that you have the declaration in front of you? 13:00:38 13:00:41 13:00:44

A Yes. 13:00:45

Q Okay. So under the proposal in your declaration, you are not proposing to study, in any way, the products of competitors, correct? 13:00:46 13:00:52 13:00:55

A That's correct. 13:01:00

Q And so, the method that you're proposing, according to your declaration, does not require any other information besides data that the defendants have in their possession? 13:01:05 13:01:06 13:01:08 13:01:11

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 13:01:14 13:01:15

A You mean for this particular method? I think it should be doable with that information. There might be other methods and other data that could be useful. 13:01:20 13:01:22 13:01:25 13:01:27

Q So just to clarify, for this particular method, it should be doable with that information. By that statement, you mean it should be doable with information solely obtained from the defendant, correct? 13:01:33 13:01:36 13:01:38 13:01:40 13:01:42

MS. WADE: Vague and ambiguous. 13:01:46

A I don't have the data specifically, so it would depend on how that was actually provided and what form it was in. And my understanding, impression, from reading the interrogatories, was that the type of information that could be provided would be able to support this method. 13:01:49 13:01:52 13:01:55 13:02:00 13:02:03 13:02:07

Q Okay. And what data will you need from Defendant to perform your hedonic regression, exactly? 13:02:12 13:02:18 13:02:21

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 13:02:24 13:02:24

A If I recall, I think some of the things that were requested were prices of these products, the products at issue, amount sold of these products. There may be other things, but that's 13:02:30 13:02:33 13:02:43 13:02:48

what I recall right now. 13:02:53
Q Well, you're going to need data on the 13:02:57
number of small parts in each item, right? 13:03:00
A I mean, I think, actually, data can be 13:03:05
determined by -- it doesn't have to come solely 13:03:10
from the defendant, in that sense. 13:03:12
Q Fair enough. Okay. 13:03:14
A I don't really know. I haven't looked, 13:03:17
so, I don't know how available or not available 13:03:19
those types of things are. 13:03:21
Q Can you think of any other data from 13:03:23
the defendant that you'd need to perform your 13:03:26
proposed offset method? 13:03:29
MS. WADE: Vague and ambiguous. 13:03:44
A I mean, beyond just general 13:03:45
characteristics of the products, which, I mean, 13:03:46
presumably, defendant has, but, again, there might 13:03:49
be other sources for some of these -- some of this 13:03:51
data, I'm not sure. 13:03:54
I don't know -- nothing comes to mind 13:03:59
at the moment. But, again, the methods I can use 13:04:04
might depend on what data actually is made 13:04:08
available. 13:04:10
Q Okay. So, in paragraph 16, you say 13:04:11
that your method would require you to denote the 13:04:19

characteristics of the specific products, yes? 13:04:28
A That's what it says. 13:04:34
Q Okay. And you stand by that? 13:04:34
A I mean, that's how a hedonic regression is done. You need to look at the characteristics, yeah. 13:04:39 13:04:42 13:04:47
Q Okay. And then you also say that you will account for other price-relevant characteristics, correct? 13:04:48 13:04:54 13:04:58
A That's what it says, yes. 13:05:00
Q Okay. And then, in paragraph 18, in your formula, you use the phrase "other attributes." 13:05:01 13:05:08 13:05:14
Do you see that? 13:05:17
A I do. 13:05:18
Q Okay. And my question is simple. It is -- when you refer to other price-relevant characteristics, you're meaning the same thing as "other attributes"? 13:05:19 13:05:23 13:05:29 13:05:33
A Yes. 13:05:37
Q Okay. And do you agree that to perform an acceptable hedonic regression, you must account for all other price-relevant characteristics? 13:05:39 13:05:44 13:05:47
MS. WADE: Vague and ambiguous. 13:05:54
A If we're looking from an attribute 13:05:58

perspective, I think we can apportion the different parts of the price, as explained by those attributes. 13:06:01 13:06:05 13:06:08

Q As explained by what attributes? You mean all price-relevant characteristics? 13:06:19 13:06:22

A The attributes of the product that consumers might value, or some measure of that. 13:06:26 13:06:28

Q And that's what you mean by price-relevant characteristics, right? 13:06:35 13:06:38

A Yeah. 13:06:42

Q Okay. So, to do your hedonic regression, you will have to determine the price-relevant characteristics of the product, correct? 13:06:42 13:06:44 13:06:49 13:06:51

MS. WADE: Vague and ambiguous. 13:06:54

A I mean, if I set out the attributes -- attributes of the product, then a model can tell me which ones are valued versus not, based on the data. 13:06:58 13:07:03 13:07:08 13:07:15

Q Okay. And it's true, is it not, that omitting certain attributes of the product could bias your result, correct? 13:07:15 13:07:22 13:07:27

MS. WADE: Vague and ambiguous. 13:07:31

A Yeah, I mean, omitted variables do cause -- can cause bias in estimates and 13:07:32 13:07:34

regressions. 13:07:40

Q Okay. How will you make sure that you include all price-relevant attributes? 13:07:43 13:07:49

MS. WADE: Vague and ambiguous. 13:07:54

A I'll have to do analysis to determine what those are at the end. The products and other attributes of the product, trying to understand that. So when I have data and something available to me, then that's something that could be specified. 13:07:57 13:08:01 13:08:10 13:08:12 13:08:17 13:08:20

Q What data would you need to determine those other price-relevant characteristics? 13:08:23 13:08:26

MS. WADE: Vague and ambiguous. Calls for speculation. 13:08:31 13:08:32

A I mean, the characteristics of the product, so -- 13:08:33 13:08:38

Q Well, give me an example. 13:08:40

A The number of large -- the number of large items in the product. 13:08:44 13:08:50

Q Can you give me an example that doesn't include the number of small, medium, or large pieces? 13:08:53 13:08:55 13:08:58

A I mean, I'd have to investigate the product more and see what might be relevant. 13:09:03 13:09:05

Q So as you sit here today, you can't 13:09:09

give me an example of a price-relevant characteristic, other than small, medium, or large pieces? 13:09:11 13:09:15 13:09:18

A Again, I don't know -- I mean, I could speculate. 13:09:19 13:09:24

Q Do you have a plan for determining the other price-relevant characteristics of the product? 13:09:37 13:09:39 13:09:42

MS. WADE: Vague and ambiguous. 13:09:43

A Once I have the data available to me, then I'll be able to start that process. 13:09:46 13:09:49

Q But you haven't told me what data you need. You're not able to identify any data that you need; isn't that right? 13:09:52 13:09:54 13:09:57

A I mean, information on the products and its attributes. 13:10:02 13:10:05

Q Like what? 13:10:07

A So, I mean, it could be -- I haven't conducted the analysis yet and, so, I haven't planned out exactly how to do that, at this point. 13:10:14 13:10:19 13:10:21

Q Okay. Do you think cuteness of the characters would be a price-relevant characteristic? 13:10:24 13:10:36 13:10:47

MS. WADE: Vague and ambiguous. 13:10:48

A It could be, but hard to measure. 13:10:49

Often, in these models, we have some, like, terms for things that we can't observe. And so, it might be appropriate to try to put some kind of term like that into, you know, observed characteristics and measure that through something like that, someone else that ends up in the disturbance term. 13:10:51 13:10:57 13:11:02 13:11:04 13:11:11 13:11:12 13:11:15

Q So, do you think attractiveness of the product could be a price-relevant characteristic? 13:11:27 13:11:33

MS. WADE: Vague and ambiguous. 13:11:42

A Potentially. I also don't know exactly how the firm determines their pricing. They might have some internal way of doing so that is based on different metrics. Those could be useful too. 13:11:43 13:11:46 13:11:51 13:11:56

Q Can you think of a way to determine whether cuteness is a price-relevant characteristic and -- I'm sorry, let me rephrase that. 13:12:02 13:12:06 13:12:11 13:12:14

Are you aware of a way to determine the extent to which the level of cuteness in a product is a price-relevant characteristic? 13:12:15 13:12:19 13:12:23

MS. WADE: Vague and ambiguous. 13:12:27

A I mean, you could use some type of consumer survey, or something like that, to measure a particular attribute, and that might be 13:12:31 13:12:36 13:12:39

able to give you some type of measure for that. 13:12:47
Q But that's not part of your proposal as we sit here today, right? 13:12:51 13:12:53
A That's correct. 13:12:54
Q Okay. Dr. Ingersoll, is brand important in consumers' decisions to buy a product? 13:12:54 13:13:46 13:13:50
MS. WADE: Vague and ambiguous. 13:13:51
A Often, yes. 13:13:54
Q Okay. And isn't it true that the Calico Critters brand could be important to consumers here? 13:13:55 13:13:59 13:14:01
MS. WADE: Vague and ambiguous. 13:14:03
A It could be. 13:14:04
Q Okay. But your model will not include brand, correct? 13:14:05 13:14:10
MS. WADE: Vague and ambiguous. Calls for speculation. 13:14:14 13:14:16
A I mean, if we're just considering products within the brand, you know, we can't separately measure the brand effects without comparing to some other unbranded or different brand -- branded product. 13:14:18 13:14:21 13:14:26 13:14:28 13:14:33
Q Right. And your proposal does not propose to compare to any other different brand, 13:14:37 13:14:39

correct? 13:14:45
A The example laid out doesn't have that 13:14:48
in it. Again, if there's -- there are other 13:14:51
methodologies that could be used if data was 13:14:54
available. 13:14:56
Q Why do you use the word "example"? 13:15:04
Why do you use that word to refer to 13:15:09
your proposed offset method? Why is that just an 13:15:18
example? 13:15:22
A It's an example demonstrating how this 13:15:23
could be done so that it could be shown that this 13:15:25
methodology can apply in this case. 13:15:29
Q Right. Now, you would agree that -- 13:15:34
well, first of all, do you have any understanding 13:15:45
whether Calico Critters is a monopoly? 13:15:47
MS. WADE: Vague and ambiguous. 13:15:56
A No. 13:15:56
Q Do you believe Calico Critters 13:15:57
constitutes a monopoly in any relevant market? 13:16:00
MS. WADE: Vague and ambiguous. 13:16:04
A So, I would -- it gets complicated. I 13:16:08
think they have some amount of market power; they 13:16:13
do have goods that are probably unique, compared 13:16:16
to other ones, so that makes them more attractive 13:16:19
than others. But, monopoly, it depends a little 13:16:24

on how you're defining the scale of the market, but probably there are other imperfect substitutes out there for these products. 13:16:28 13:16:31 13:16:32

Q So you would agree that Calico Critters' products compete with other brands in the market, correct? 13:16:37 13:16:40 13:16:42

A Yes. 13:16:45

Q And you would agree that the Calico Critters products are a differentiated product, correct? 13:16:54 13:16:56 13:16:59

MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. 13:17:01 13:17:03

A Yeah, yes. 13:17:06

Q Okay. With respect to your prepared model, wouldn't you agree that competitive brands are relevant in a market consisting of differentiated goods? 13:17:15 13:17:18 13:17:23 13:17:27

MS. WADE: Vague and ambiguous. 13:17:32

A So, I mean, when someone pays a price for something, then they're giving a value of what's there. And so, the outside market might influence a little bit, like, where the price sits, but the value that they're getting from it is still encapsulated in price. 13:17:37 13:17:39 13:17:44 13:17:47 13:17:49 13:17:52

Q So, it's your testimony that the 13:17:57

Okay. Do you think that the way the product is packaged may be a price-relevant characteristic? 13:22:46 13:22:49 13:22:55

MS. WADE: Vague and ambiguous. 13:22:57

A I mean, people might like packaging, but if I'm thinking of getting value from something, I'm trying to think of how much of the value from the prices are due to some part or another, unless there's -- some toys, these days, have, like, an opening experience that goes with it, then it might be more important than others. It might make it more attractive, overall, in the market, and that might yield a higher price. But when I'm portioning out which portion of the price is due to what parts, I'm not sure that it factors in. 13:23:00 13:23:03 13:23:05 13:23:08 13:23:14 13:23:20 13:23:22 13:23:25 13:23:34 13:23:36 13:23:39 13:23:42

Q But you don't know that at this point, right? 13:23:43 13:23:45

A Do I know, for certain, whether people would pay more for one -- get more value from something packaged one way versus another? 13:23:51 13:23:54 13:24:01

Q Yes. 13:24:05

A No, I don't know that at this time. 13:24:05

Q But how would your model take into account the levels of visual packaging appeal? 13:24:06 13:24:09

MS. WADE: Vague and ambiguous. 13:24:15
A I mean, one way of doing that would be to add those as attributes, but, again, I'm not necessarily convinced that when we're -- the question is, what portion of this is due to the specific parts there that it's necessarily relevant. 13:24:18 13:24:20 13:24:24 13:24:27 13:24:35 13:24:39
Q I understand that you could add it as an attribute. But how would you go about determining the different levels of visual packaging appeal? 13:24:43 13:24:45 13:24:48 13:24:52
A I mean, you could just have different dummy variables, if you wanted to do something about that, depends on how different the packaging is, I suppose. 13:24:56 13:24:58 13:25:00 13:25:04
Q What do you mean by "dummy variables"? 13:25:06
A So, a dummy variable is a variable that's, basically, a binary variable. It's a 1 if something is true and zero otherwise. And so, you could say, hey, this type of packaging is its own distinct thing as it has a value and has its attributes, 1 and then to zero. In cases where it's not like that, that would allow us to measure any distinctives from something like that, if we thought it was relevant. 13:25:09 13:25:12 13:25:16 13:25:18 13:25:25 13:25:28 13:25:30 13:25:33 13:25:38

Q But what if attractiveness of the packaging is not a binary proposition, then what would you do? 13:25:40 13:25:42 13:25:45

A Well, again, I'm not convinced that the packaging is relevant when we're trying to just figure out the portion of the price that's due to the parts of the toy. 13:25:48 13:25:50 13:25:54 13:25:56

Q But you don't know, one way or the other, whether that's true, in fact? 13:26:00 13:26:01

A I mean, I think intuition, just because something's prettier. I don't know that I value it more. Again, if it is because people are paying more because of this, then that's already within the price itself that we're starting with. And so, it might raise up the price people are willing to pay because the brand's stronger or the advertising looks really nice, but we still have the price and then -- and what they're getting for that are the actual products, so... 13:26:08 13:26:15 13:26:17 13:26:20 13:26:22 13:26:25 13:26:28 13:26:31 13:26:34 13:26:37

Q Let's go back to the attractiveness of the toys itself. Because you -- let's just go back to the attractiveness of the toys itself. 13:26:40 13:26:42 13:26:47

How would you measure whether a flocked toy is attractive or not attractive? How would you do that? 13:26:50 13:26:52 13:26:59

MS. WADE: Vague and ambiguous. 13:27:00
A So I mentioned, I mean, it's possible you could do surveys for something like that. It's also possible, we have quantity data on some of these things, there might be ways of incorporating that as -- and it can be something about other attributes that are hard to specify. It's going to be -- not everyone, necessarily, will be affected by that the same way and, so, there are ways to try to deal with those kind of unobservables. 13:27:03 13:27:07 13:27:09 13:27:13 13:27:15 13:27:20 13:27:26 13:27:28 13:27:31 13:27:38
Q Are you familiar with any research into the difficulty of measuring product attractiveness? 13:27:47 13:27:51 13:27:54
MS. WADE: Vague and ambiguous. 13:27:59
A I don't know that I've looked at papers specifically looking at that. 13:28:04 13:28:06
Q Are you aware that it's an incredibly tough thing to quantify and measure? 13:28:08 13:28:11
MS. WADE: Vague and ambiguous. 13:28:15
A I wouldn't be surprised if that's the case. 13:28:16 13:28:18
Q Okay. Could the fact that some of these products have warnings about choking hazards be a price-relevant characteristic? 13:28:25 13:28:27 13:28:32

MS. WADE: Vague and ambiguous. 13:28:38
A It's possible. 13:28:46
Q How would your model account for that? 13:28:48
MS. WADE: Vague and ambiguous. 13:28:53
A So the -- you know, we can have a variable that is a binary variable that says whether or not they had that signage or that information on there. Would be one way of trying to do that. 13:28:57 13:28:59 13:29:02 13:29:06 13:29:09
Q But if this characteristic is not binary, how would you account for it? 13:29:15 13:29:17
MS. WADE: Vague and ambiguous. 13:29:19
A I'm not sure what you mean. You mean, like, have the warning on it? 13:29:27 13:29:28
Q No, the consumer's reaction to the warning that they may have a very strong reaction, a lukewarm reaction, a medium reaction. 13:29:30 13:29:32 13:29:35
It doesn't have to be binary, does it, Doctor? 13:29:39 13:29:42
MS. WADE: Vague and ambiguous. 13:29:42
A I mean, the binary variable would measure the average effect of that attribute, all else equal. 13:29:44 13:29:46 13:29:58
Q The type of accessories that come with the product could also be a price-relevant 13:29:59 13:30:01

characteristic, right? 13:30:06
MS. WADE: Vague and ambiguous. 13:30:08
A Eventually. 13:30:10
Q And you haven't made any attempt to measure that? 13:30:11 13:30:13
A I mean, I have room there to talk about attributes, potentially, if we use the method that kind of we have as an example. There might be other methodologies that could be used as well. 13:30:21 13:30:24 13:30:28 13:30:31
Q Would you agree that if the data that a hedonic regression analysis is required to use does not exist or is infeasible to collect, then the entire approach is invalid? 13:30:37 13:30:39 13:30:45 13:30:50
MS. WADE: Vague and ambiguous. Incomplete hypothetical. 13:30:56 13:30:58
A As I said, there might be -- I think there are other methodologies that could be applied, depending on the data that's there. I mean, if the data doesn't exist to do a hedonic regression, there's no way to do the regression, right, because you need data to do that. 13:31:01 13:31:03 13:31:05 13:31:08 13:31:12 13:31:14
Q Sitting here today, can you tell me that the data exists to do the hedonic regression analysis that you're proposing? 13:31:18 13:31:22 13:31:25
MS. WADE: Vague and ambiguous. Calls 13:31:28

for speculation. 13:31:28
A I don't have the data, so it's -- I can't say, for certain, whether it can be done. It appeared, to me, that the defense had data that would be relevant to this, but, again, I haven't been able to look at that and inspect it. 13:31:32 13:31:34 13:31:44 13:31:47 13:31:50
Q Let's be clear on that. It appeared to you that the defendant had some data that might be relevant to this, correct? 13:31:54 13:31:57 13:31:59
A You mean just as in -- like, what wouldn't they have? They have products. 13:32:15 13:32:19
Q Well, we talked about a lot of things. We talked about the attractiveness of the product, we have talked about the cuteness of the product, we talked about the attractiveness of the packaging, we talked about the fact that warnings may or may not be a price-relevant characteristic. All of that is going to require data in order to -- in order to -- in order for you to complete your hedonic regression analysis, correct? 13:32:25 13:32:26 13:32:29 13:32:31 13:32:33 13:32:38 13:32:41 13:32:44 13:32:51
A I mean -- 13:32:54
MS. WADE: Vague and ambiguous. 13:32:56
THE WITNESS: Go ahead. 13:32:57
MS. WADE: Vague and ambiguous. Calls for speculation. Lacks foundation. Misstates 13:32:58 13:32:58

testimony. 13:33:00

A I mean, data on the attributes speak to some of those things. We don't have, necessarily, a number associated with attractiveness, but if we have attributes that, you know, people, then -- you know, that, basically, inform what people's attractiveness are, then we have some of the bases for that, and the methodology would account for that in some ways. So, I mean, having the attributes, as far as the hedonic regression goes, right, that's what it does; it's looking at the attributes of the product and associating that with, you know, different premia associated with those items. 13:33:02 13:33:04 13:33:06 13:33:10 13:33:14 13:33:17 13:33:20 13:33:22 13:33:27 13:33:32 13:33:35 13:33:38 13:33:42

Q Right. But as we sit here today, you do not have a list of price-relevant characteristics that you would be able to plug into your hedonic regression, correct? 13:33:44 13:33:47 13:33:51 13:33:53

MS. WADE: Vague and ambiguous. 13:33:59

A That's correct. 13:34:00

Q Now, it's also your contention that the number of larger pieces, the number of medium pieces, and the number of smaller pieces are price-relevant characteristics, correct? 13:34:09 13:34:13 13:34:16 13:34:20

MS. WADE: Vague and ambiguous. 13:34:25

Misstates testimony. 13:34:26
A Yeah, I mean, that's part of the example there. So, it could be. 13:34:27 13:34:28
Q It could be, but you're not certain, one way or the other, correct? 13:34:31 13:34:33
A I haven't done the analysis yet. That's correct. 13:34:34 13:34:36
Q Did you consider any other possible methodologies for this case? 13:34:49 13:34:51
MS. WADE: Vague and ambiguous. 13:34:54
A Not as of yet. 13:35:02
Q Okay. Well, what I'm asking is, at some point, you came up with the idea of doing a hedonic regression analysis in connection with this case, right? 13:35:03 13:35:08 13:35:10 13:35:12
A Right. 13:35:14
Q Okay. Before that point, did you, in your mind, go through any other possibilities for a methodology for this case? 13:35:14 13:35:20 13:35:24
A When it comes to -- I do a lot of these consumer cases, often, when we're looking at ways of measuring loss, and one of the ways is hedonic regression. Another potential way, at times, is conjoint, you know, some type of conjoint survey, but I'm not sure that that's the appropriate one 13:35:30 13:35:38 13:35:44 13:35:49 13:35:56 13:35:59

in this particular case. 13:36:01
Q Okay. So if it's not conjoint and, let's say, hedonic regression is not viable, what other possible methodologies would you be able to use? 13:36:05 13:36:08 13:36:13 13:36:16
MS. WADE: Vague and ambiguous. 13:36:17
A There could be some other form of modeling, maybe it's kind of the quantity, some kind of multinomial logit might be an approach for something like this. 13:36:21 13:36:24 13:36:32 13:36:35
Q I'm sorry. Multinomial what? 13:36:36
A Logit. 13:36:40
Q L-O-G-I-T? 13:36:41
A That's correct. 13:36:43
Q Did you consider that before you started your declaration? 13:36:44 13:36:47
A Not explicitly. 13:36:53
Q Anything else besides multinominal logit? 13:37:01 13:37:02
A Again, it depends on a lot of the data that's available as to what types of techniques are even open to being done. It's hard to say without more information. 13:37:04 13:37:06 13:37:08 13:37:19
Q Do you have any concerns that hedonic regression might not actually be an appropriate 13:37:20 13:37:21

methodology for this case? 13:37:24
A No. 13:37:30
Q In paragraph 15 of your declaration, in the last sentence -- well, let me just read the last two sentences of that paragraph. "There are numerous examples in the literature of using a hedonic pricing model to estimate price premiums in differentiated good products." 13:37:31 13:37:41 13:37:45 13:37:50 13:37:52 13:37:55
For some examples, see Corsia and Strømb, on organic wine, Kuminoff Zhang and Rudi on green hotels, Maguire, Owens, and Simon on organic baby food, Schollenberg on Fair Trade coffee, and Phillips on Internet domain names. 13:37:57 13:37:59 13:38:03 13:38:05 13:38:14
Do you see that? 13:38:21
A I do. 13:38:21
Q So putting side the Internet domain names, which is its own thing. 13:38:21 13:38:25
Isn't it true that all the examples you listed involve comparing one product to products offered by competitors? 13:38:27 13:38:29 13:38:34
A In those ones, yes, I believe it's true. 13:38:41 13:38:43
Q Okay. Can you give me any examples of hedonic pricing models that do not involve comparing a product to products offered by 13:38:44 13:38:53 13:38:57

competitors? 13:38:59
MS. WADE: Vague and ambiguous. 13:39:02
A So, I mean, the methodology is still breaking down the value of the attributes given the data that we have. We can't identify, like, a brand effect or anything like that, but we still can get a valuation on those characteristics or a breakdown with the prices of those characteristics. 13:39:06 13:39:11 13:39:15 13:39:17 13:39:22 13:39:26 13:39:30
Q Okay. That wasn't exactly responsive to my question, so I'll repeat the question. 13:39:31 13:39:33
Can you identify any examples of hedonic pricing models that do not involve comparing a product to competitors' products? 13:39:35 13:39:38 13:39:41
A We often -- 13:39:47
MS. WADE: Vague. 13:39:48
A Usually these are applied to markets as a whole, right, to understand people's behavior in them. In this case, we're worried about the particular firm's products and, so, this case, it's appropriate to only focus on the one. I'm not sure that I know, specifically, of any paper that has only looked at a single one, though one might exist out there. 13:39:49 13:39:51 13:39:56 13:39:59 13:40:03 13:40:07 13:40:12 13:40:15
Q Now, it's correct, isn't it, that 13:40:21

hedonic regression relies on a set of assumptions? 13:40:24
A Yes. 13:40:30
Q Okay. And one of those assumptions is that the model accurately accounts for all the relevant attributes that contribute to price differences, correct? 13:40:31 13:40:35 13:40:40 13:40:42
MS. WADE: Vague and ambiguous. 13:40:46
A Yes. We want to account for all those attributes. 13:40:49 13:40:51
Q Okay. And another assumption is that there's sufficient variation in the attributes across products in the data to distinguish between relevant attributes, correct? 13:40:52 13:40:59 13:41:02 13:41:06
MS. WADE: Vague and ambiguous. 13:41:09
A I think that's correct. 13:41:11
Q Okay. And another assumption is that the observed prices represent a market equilibrium, correct? 13:41:12 13:41:15 13:41:19
A I think that's -- 13:41:22
MS. WADE: Vague and ambiguous. 13:41:25
A I think that's correct. 13:41:26
Q Okay. And you agree that hedonic regression does not show causal effects, just correlational effect? 13:41:29 13:41:34 13:41:39
MS. WADE: Vague and ambiguous. 13:41:43

BY MR. SPEYER: 13:55:50

Q Dr. Ingersoll, you're aware that the Calico Critters figures come in many different types of animals, right? 13:55:53 13:55:56 13:55:58

MS. WADE: Vague and ambiguous. 13:56:01

A Yes. 13:56:03

Q Okay. And the type of animal could be a price-relevant characteristic, correct? 13:56:04 13:56:18

A It's possible. 13:56:23

Q Okay. And certain accessories that are not small parts could be a price-relevant characteristic, right? 13:56:26 13:56:34 13:56:38

MS. WADE: Vague and ambiguous. 13:56:41

A It's possible. 13:56:42

Q And certain claims or statements made on the packaging could be a price-relevant characteristic, correct? 13:56:44 13:56:48 13:56:52

MS. WADE: Vague and ambiguous. 13:56:53

A Maybe sometimes, but I do -- I might steer more towards setting the overall price in the market, as opposed to putting values on the actual things that are inside. 13:57:10 13:57:14 13:57:17 13:57:20

Q But the statements made on the package could be important to some consumers and be a price-relevant characteristic; that's a 13:57:26 13:57:29 13:57:32

possibility, right? 13:57:34
MS. WADE: Vague and ambiguous. 13:57:35
A It's possible. 13:57:38
Q And could the fact that some people collect Calico Critters be a price-relevant characteristic? 13:57:40 13:57:47 13:57:53
MS. WADE: Vague and ambiguous. 13:57:56
A It's possible, but, again, some of the stuff might already be kind of baked into the cake of the price that we see. 13:57:57 13:57:59 13:58:03
Q But you don't know that? 13:58:06
A I'd have to think about how it interacts more deeply, I guess. 13:58:10 13:58:12
MR. SPEYER: Dr. Ingersoll, I don't have any more questions. I appreciate your time. And thank you. 13:58:16 13:58:16 13:58:19
THE WITNESS: Thank you. 13:58:22
MR. SPEYER: Okay. I think we're done, Gillian. 13:58:30 13:58:31
MS. WADE: I think so. 13:58:34
THE VIDEOGRAPHER: Nobody has any more questions? 13:58:35 13:58:36
MR. MORRIS: No. 13:58:39
MR. CRETA: No questions from Amazon. Thank you. 13:58:42 13:58:43

CERTIFICATE OF REPORTER - NOTARY PUBLIC

I, JUDITH E. BELLINGER, RPR, CRR, CSR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 29th day of April, 2024.

My Commission Expires: November 3, 2024

Judith E. Bellinger

_______________________________

E-NOTARY PUBLIC IN AND FOR

THE STATE OF MARYLAND

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 26321
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
2450 Colorado Avenue, Ste. 100E
Santa Monica, California 90404
Telephone: (310) 396-9600

Attorneys for Plaintiff and the Class
(additional counsel listed on signature block)

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

WILLIENE JACKSON-JONES, *et al.*, on behalf of themselves and all others similarly situated,

Plaintiff,

v.

EPOCH EVERLASTING PLAY, LLC, a Delaware limited liability company, TARGET CORPORATION, a Minnesota corporation, and AMAZON.COM SERVICES LLC, a Delaware corporation,

Defendants.

CASE NO. 2:23-cv-02567-ODW-SK

**DECLARATION OF WILLIAM ROBERT INGERSOLL, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date: June 10, 2024
Time: 1:30 p.m.
Judge: Hon. Otis D. Wright II
Crtrm.: 5D

I, William Ingersoll, Ph.D., declare as follows:

1. This is a declaration regarding a proposed methodology for calculating restitution in the matter at hand. I was retained by proposed Class Counsel, Milstein, Jackson, Fairchild & Wade, LLP, WH Law, Martin Walker PC, and Durham, Pittard & Spaulding, LLP, attorneys for the plaintiffs.

2. I received my Ph.D. in Economics from the University of Arizona in January of 2016. My specializations are Microeconomic Theory, Econometrics, and Industrial Organization. Econometrics is the application of statistical methods to economic models. The hedonic regression I propose in this report is covered by this training.

3. I am currently an Assistant Professor at Azusa Pacific University, where I have taught courses in econometrics, industrial organization, and microeconomic theory.

4. I am a published experimental economist. An experiment of mine, done with co-author Dr. Alex Roomets, was published in the Journal of Economic Behavior and Organization.

5. With Drs. Lynn Matthews and Mike Phillips, I am a co-author on a case study published in the Journal of Case Studies (2021) that helps students identify deceptive advertising using statistical analysis methods.

6. I am also an economist and statistician for Phillips, Fractor & Co. I have been contributing to cases at the firm since 2018. In my capacity in this role, I have been lead expert on and assisted on many different projects for economic consulting and in support of expert witness reports. Many of these reports require the use of econometric analysis, which is the application of statistical methods to economic theory, used to test economic theory with actual data, better understand a situation through data analysis, or create data-based forecasts. I have also helped to estimate econometric models for litigation purposes, similar to the one I propose in this case.

7. I have included as an attachment to this document my CV, which includes a list of all publications I have authored in the previous 10 years and list of expert

testimony for the previous 4 years.

8. The compensation paid to Phillips, Fractor, & Company, LLC for my time for the study and testimony in this matter is $500 per hour, regardless of the outcome.

**SCOPE OF THIS EXPERT DECLARATION**

9. I have been asked to present the methodology I would use if requested calculate restitution to consumers if: (1) it is found that the appropriate measure of restitution is the entirety of the price paid by consumers for the subject products ("Full Refund Method"), and, alternatively, (2) if it is found that the appropriate measure of restitution is the portion of price attributable to the offending portion of the subject products ("Offset Method").

10. For purposes of my analysis, I was asked to assume that the plaintiff's allegations are true and that the subject products are being sold in violation of the law.

**PROPOSED FULL REFUND METHOD**

11. If it is found that a full refund is the appropriate measure of restitution in this case, losses could be calculated with data that the defendants have in their possession.

12. Namely, the quantities of the specific SKUs/UPCs or other identifiers could be used along with the pricing data of those SKUs/UPCs or other identifiers to find the total amount paid by consumers for the subject products during the relevant timeframe.

**PROPOSED OFFSET METHOD**

13. Alternatively, if the trier of fact determines that the proper measure of restitution is a refund of the portion of price attributable to the offending portion of the subject products, I can calculate the portion of the price due to the offending portion of the subject products with data that the defendants have in their possession.

14. I propose measuring the portion of the price attributable to the offending portion of the product using hedonic regression analysis.

<u>Overview of Hedonic Regression Analysis</u>

15. Hedonic pricing, used at least as early as Haas (1922) and Court (1939), and re-popularized by Rosen (1974), is a technique used by economists to estimate the

value of different characteristics of a good. It accomplishes this by comparing a set of products, their characteristics, and the prices of those goods. Using regression analysis, the price premiums, or hedonic prices, for each of the characteristics are estimated. In plain English, this means that we can estimate the additional price a consumer is willing to pay for each of these characteristics individually. There are numerous examples in the literature of using a hedonic pricing model to estimate price premiums in differentiated good products. For some examples, see Corsia and Strømb (2013) on organic wine; Kuminoff, Zhang, and Rudi (2004) on green hotels; Maguire, Owens, and Simon (2004) on organic babyfood; Schollenberg (2012) on Fair Trade coffee; and Phillips (2003) on internet domain names.

Specifically for this case

16. With regards to the matter at hand, a hedonic price model can be used to estimate the portion of prices that are due to the offending portion of the subject products. Specifically, this would be accomplished by denoting the characteristics of the specific products. If we account for other price-relevant characteristics (for example, number or presence of larger pieces, number or presence of medium pieces, number or presence of smaller allegedly offending pieces, etc.), the resulting hedonic price estimate for the smaller allegedly offending pieces will give us a value of how much of the price of the product was due to that characteristic compared to a similar product without this characteristic.

17. In essence, the effect of these characteristics on price is identified by the variation in price as the characteristics vary, all else equal.

18. In other words, we would use a regression to explain the price of a product SKU/UPC with the characteristics of the product itself. Doing this across all SKUs/UPCs will allow us to see how prices are set given the data. A possible model to be estimated would look like the following:

$$P_{Total} = \beta_0 + \beta_{Small\ Parts} * x_{Number\ of\ small\ parts} + \boldsymbol{\beta X_{Other\ attributes}} + \varepsilon,$$

where the β's are the parameters to be estimated, the P's and x's are the product

specific data, and the disturbance term, $\varepsilon$.

19. With the estimate of the marginal effect due to the small parts, we could apply this effect as appropriate to each product by multiplying the product's number of small parts by the estimate to yield the portion of the product's price that is attributable to the small parts. Taking this portion and multiplying by the quantity sold would yield the total value of the portion of the allegedly offending product.

20. To accomplish this, the quantities and prices of the specific SKUs/UPCs, which the defendants have stated they have and will produce, will be needed. I would also use the SKUs/UPCs to quantify the attributes of the individual products. This would be done with guidance from the attorneys to determine, from a legal perspective in this case, which pieces are offending pieces.

21. I would use these data to estimate a hedonic pricing model as described above and to write a report detailing our methods and findings.

22. There are other methodologies that could be used to calculate restitution, and specifically to calculate a restitutionary offset, depending on the data that actually becomes available, and/or data that is available from sources other than defendants.

I declare under penalty of perjury that the foregoing is true and correct. Executed on March 8, 2024, in Pasadena, California.

William Robert Ingersoll, Ph.D.

**REFERENCES**

Corsia, A., & Strømb, S. (2013). The Price Premium for Organic Wines: Estimating a Hedonic Farm-Gate Price Equation. *Journal of Wine Economics*, 8(1), 29-48.

Court, A.T. (1939). Hedonic Price Indexes with Automotive Examples. The Dynamics of Automobile Demand, 99-117, General Motors Corporation.

Haas, G. C. (1922). *Sale prices as a basis for farmland appraisal* (Vol. 9). University Farm.

Kuminoff, N. V., Zhang, C., & Rudi, J. (2010). Are travelers willing to pay a premium to stay at a "green" hotel? Evidence from an internal meta-analysis of hedonic price premia. Agricultural and Resource Economics Review, 39(3), 468-484.

Maguire, K. B., Owens, N., & Simon, N. B. (2004). The price premium for organic babyfood: a hedonic analysis. *Journal of Agricultural and Resource Economics*, 132-149.

Phillips, G. M. (2003). *A Hedonic Regression Model for Internet Domain Name Valuation*. Business Valuation Review, 22(2), 90-98.

Rosen, S. (1974). Hedonic prices and implicit markets: product differentiation in pure competition. Journal of political economy, 82(1), 34-55.

Schollenberg, L. (2012). Estimating the hedonic price for Fair Trade coffee in Sweden. *British Food Journal*.

PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

# WILLIAM R. INGERSOLL, PH.D.

August 2023

- Experience designing, understanding, and adjusting models and experiments and using the information to answer practical questions about markets, develop more effective models and better address new problems.
- Strong skills in data manipulation and statistical analysis, building arguments, and conducting research according to the scientific method.
- Proficiency in STATA, Matlab, R, EViews, and Excel.

Economist and Statistician
Phillips, Fractor & Company, LLC
2018 to present

Assistant Professor of Economics
School of Business and Management - Azusa Pacific University (Azusa, CA)
August 2016 to present

Instructor, Dept. of Economics
University of Arizona (Tucson, AZ)
Summers 2008, 2009, 2010, 2012 and Spring 2009

## Education

| | |
|---|---|
| Ph.D. 2016 | Economics<br>University of Arizona, Tucson<br>Dissertation: Technology Advancement in Network Markets and Agent Bargaining |
| M.A. 2007 | Economics<br>University of Arizona, Tucson |
| B.A. 2006 | Economics (*magna cum laude*), Minor in Mathematics<br>Sonoma State University (Rohnert Park, CA) |

3452 East Foothill Blvd. Suite 220
Pasadena, California 91107-3154
T: (626) 744-3540 | O: www.Rule26.com

### Second Language and Email

Spanish (basic)
Email: wingersoll@rule26.com

### Fields of Specialization

Industrial Organization, Microeconomic Theory, Econometrics, Behavioral/Experimental Economics

### Publications and Book Review

1. "Currency, ForEx, and Cryptocurrency in Global Business" chapter in M.W. Cawman and P. Fine-Skalnik (Ed.), Global Business and Marketing Strategy: Integrative Workbook of Exercises and Case Studies. [Preliminary Edition] Cognella, Inc., 2023.
2. "Curtain Promises" with A.L. Matthews and G. Michael Phillips, Journal of Case Studies, November 2021, Issue 2.
3. "Bargaining with a Partially Incentivized Agent", (with Alex Roomets) Journal of Economic Behavior and Organization, Vol. 171 (March 2020) doi.org/10.1016/j.jebo.2020.01.018
4. "Technology Advancement in Network Markets", University of Arizona, mimeo, 2015.
5. Review of Rediscovering Social Economics: Beyond the Neoclassical Paradigm by Roger D. Johnson for *Faith and Economics*, Fall 2017.

### Working Paper

"How Long Will They Rent? Quantitative Analysis of Residential Mobility, Tenant Demographic Traits, and Rent Control" with M.C. Phillips, T.A. Sargent, and G.M. Phillips.

### Presentation

"A Test of Sequential Nash Bargaining" presented at *2013 Economic Science Association Conference*, Santa Cruz, CA.

PHILLIPS, FRACTOR & COMPANY, LLC

ECONOMICS / STATISTICS / FINANCE
CONSULTING / RESEARCH / TESTIMONY
A Limited Liability Company

**Project Contributions**

BORDERS Initiative – Research Asst. to Judy Gans at the Udall Center for Studies in Public Policy.
-Location analysis of apprehension data
-Real estate impact analysis of permanent border checkpoint

E-Verify Policy Analysis - Research Asst. to Judy Gans at the Udall Center
-Employment impact of new employee registration policies

Economic Impact of Immigrants - Research Asst. to Judy Gans at the Udall Center
-State-by-state and regional analysis of economic contributions of immigrants
-Food stamp usage among immigrants

**Courses Taught**

Labor Economics
Econometrics
Industrial Organization and Regulation
Managerial Economics
Environmental Economics
Virtual Economies

**Association Memberships**

American Statistical Association
National Association of Forensic Economics
National Association of Business Economics

# William Ingersoll, Ph.D. – Testimony List

## Depositions:

| | |
|---|---|
| 03/09/2022 | Jeffrey Barr et al v. Action Sales & Metal Co., Inc. –<br>Los Angeles Superior Court BC723895 |
| 05/10/2022 | Nico Carlos v. Wal-Mart Associates, Inc. –<br>United States District Court, Central District of Calif. 5:21-cv-00294-AB-KK |
| 06/23/2022 | Fay, et al vs. Solomon –<br>Los Angeles Superior Court 19STCV24611 |
| 11/10/2022 | Chao v. Martinez Ortiz, et al –<br>District Court Clark County, Nevada A-21-834916-C |
| 11/14/2022 | Azaria Shahbazian v. CVS RX Services, Inc., *et al* –<br>AAA 01-20-0004-8811 |
| 01/04/2023 | Anthony Davis v. CVS Pharmacy, Inc., et al –<br>USDC, Central District of California 2:21-cv-02484-DMG-KS |
| 11/20/2023 | Robert Donovan, et al v. Diestel Turkey Ranch –<br>Orange Superior Court 30-2021-01183688-CU-BT-CXC |
| 02/14/2024 | Claudia Neuman, et al v. Evie Ryland, et al –<br>Los Angeles Superior Court 22STCV08019 |
| 02/23/2024 | Ashkan King Aminpour, et al v. Lara D. Calhoun, et al –<br>San Diego Superior Court 37-2018-00054834-CU-BT-CTL |

## Trial & Arbitration Testimony:

| | |
|---|---|
| 07/08/2022 | Jeffrey Barr et al v. Action Sales & Metal Co., Inc. –<br>Los Angeles Superior Court BC723895 |
| 10/06/2022 | Frank Basile vs. Parviz Taherpour, et al –<br>Los Angeles Superior Court 20STCV13012 |
| 01/31/2023 | Azaria Shahbazian v. CVS RX Services, Inc. –<br>Arbitration AAA 01-20-0004-8811 |

**O**

# United States District Court
# Central District of California

| | |
|---|---|
| WILLIENE JACKSON-JONES et al.,<br>Plaintiffs,<br>v.<br>EPOCH EVERLASTING PLAN, LLC et al.,<br>Defendants. | Case № 2:23-cv-02567-ODW (SKx)<br>**ORDER DENYING MOTIONS TO DISMISS [15][16]** |

## I. INTRODUCTION

Plaintiffs bring this putative class action against Defendants for unjust enrichment and violations of California's Unfair Competition Law ("UCL"). (Notice of Removal Ex. A ("Compl.") ¶¶ 78–102, ECF No. 1-1.) Plaintiffs contend that Calico Critters Flocked Toys are banned hazardous substances under the Federal Hazardous Substances Act, 15 U.S.C. § 1261 ("FHSA") and allege that Defendants unlawfully market and sell these toys in violation of federal law. (*Id.* ¶ 29.) Defendants move to dismiss Plaintiff's Complaint. (Epoch Mot. ("Mot."), ECF No. 15; Amazon Joinder Mot., ECF No. 16.) For the reasons below, the Court **DENIES** Defendants' Motions.[1]

[1] Having carefully considered the papers filed in connection with the Motions, the Court deemed the matters appropriate for decision without oral argument. Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II. BACKGROUND

All factual references derive from Plaintiffs' Complaint, unless otherwise noted, and all well-pleaded factual allegations are accepted as true for purposes of these Motions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Statutory and Regulatory Framework

The FHSA prohibits the "introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance." 15 U.S.C. § 1263(a). Under the FHSA, the term "hazardous substances" includes "any toy or other article intended for use by children" which the Consumer Products Safety Commission ("Commission") by "regulation determines presents an electrical, mechanical, or thermal hazard." *Id.* § 1261(f)(1)(D).[2] "[M]echanical hazard" includes articles that "if, in normal use or when subjected to reasonably foreseeable damage or abuse, its design or manufacture presents an unreasonable risk of personal injury or illness . . . because the article (or any part or accessory thereof) may be aspirated or ingested." *Id.* § 1261(s)(7).

In regulating children's toys, the Commission promulgated what has come to be known as the "Small Parts" rule. 16 C.F.R. § 1500.18(a)(9). The rule provides that a toy poses a "mechanical hazard," and is thus a "banned hazardous substance" under the FHSA, if it is intended for use by children under three years old and presents a choking, aspiration, or ingestion hazard because of small parts. *Schmidt*, 536 F. Supp. 3d at 899 (citing 16 C.F.R. § 1500.18(a)(9)). Section 1501 of the Small Parts rule describes what is covered or exempt from § 1500.18(a)(9). *See* 16 C.F.R. § 1501.1. Section 1501.2 lists "certain articles that are subject to § 1500.18(a)(9)"; § 1501.3 lists articles that are specifically exempted; and § 1501.4 provides a test method for determining whether an article is hazardous for children under three because it is "too

[2] The Consumer Product Safety Act, 15 U.S.C. § 2051, authorizes the Commission to declare a product a hazardous substance, require specific labeling, exempt substances from the full requirements of the FHSA, and ban substances altogether. *See Schmidt v. Int'l Playthings LLC*, 536 F. Supp. 3d 856, 898–99 (D.N.M. 2021) (citing 15 U.S.C. §§ 1261(q)(1), 1262(a)(1), (b), (c)).

small." *Id.* Regarding articles that are subject to the rule, § 1501.2(a) provides a "non-exclusive listing of 'covered products'" and, for "unlisted" articles, § 1501.2(b) provides "three non-determinative criteria" for assessing whether the product is subject to the rule. *See Toy Mfrs. of Am., Inc. v. Consumer Prod. Safety Comm'n*, 630 F.2d 70, 78 (2d Cir. 1980).

## B. Factual Background

"The Calico Critters Flocked Toys consist of anthropomorphized animals dressed in human clothes—plastic, poseable animal figures with a flocked exterior, giving the feel of fur and functioning as a mix between a stuffed animal and a doll." (Compl. ¶ 17.) "When a toy is 'flocked,' that means that its surface is coated in soft, fuzzy fibers that give the toy the feeling of velour or felt." (*Id.* ¶ 18.) The "Calico Critters Flocked Toys include accessories, furniture, and dollhouse playsets." (*Id.* ¶ 19.) Epoch Everlasting Play, LLC is responsible for designing, manufacturing, and marketing the Calico Critters Flocked Toys. (*Id.* ¶ 14.) Target Corporation and Amazon.com Services LLC both sell Epoch's Calico Critters Flocked Toys. (*Id.* ¶¶ 15–16.)

Williene Jackson-Jones and Karen Santos purchased Calico Critters Flocked Toys for their grandchildren, from Amazon and Target, respectively. (*Id.* ¶¶ 55, 59.) Jackson-Jones and Santos contend that Calico Critters Flocked Toys were sold unlawfully because they are (1) intended for children under three and (2) have small parts that violate the Small Parts regulation, and are therefore banned hazardous substances. (*Id.* ¶¶ 17–32.) They assert that the toys are intended for children under three because flocked figures are listed as articles subject to the Small Parts rule in 16 C.F.R. § 1501.2(a), and because Epoch and Target intentionally market the Calico Critters Flocked Toys to children under three, despite labeling the toy as "3+." (*Id.* ¶¶ 20–49.) Had Jackson-Jones and Santos known that the Calico Critters Flocked Toys were banned hazardous substances posing a risk of serious injury or death, they would not have purchased the toys. (*Id.* ¶¶ 50–63.)

### C. Procedural Background

Plaintiffs Jackson-Jones and Santos initiated this putative class action against Defendants Epoch, Target, and Amazon. (*Id.* ¶¶ 64–77.) Plaintiffs assert claims for unjust enrichment and violation of the UCL premised on Defendants' introduction of banned hazardous substances, namely the Calico Critters Flocked Toys, into interstate commerce in violation of the FHSA. (*Id.* ¶¶78–102.)

Defendants move to dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (*See* Mot.)

## III. LEGAL STANDARD

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

# IV. DISCUSSION

Defendants move to dismiss Plaintiffs' claims on the basis that Plaintiffs cannot sufficiently allege that Calico Critters Flocked Toys are intended for children under three years of age because Plaintiff's interpretation of the Small Parts rule is untenable. (Mot. 3.) Defendants contend the plain language of § 1501.2 either does not support Plaintiffs' interpretation, or is ambiguous and renders Plaintiffs' claims less than plausible. (*Id.* at 3–4.) Defendants assert that the proper interpretation of the Small Parts rule demonstrates that flocked toys are not *per se* intended for use by children under three pursuant to the list of included articles in § 1501.2(a), but that a case-by-case application of the three-factor test in § 1501.2(b) is required to determine whether any particular flocked toy is subject to the rule. (*Id.*)

Plaintiffs oppose dismissal. (*See* Opp'n, ECF No. 26.) Plaintiffs argue the plain language of § 1501.2 is unambiguous and supports their interpretation that flocked toys are intended for use by children under three, as a matter of law, pursuant to § 1501.2(a). (*Id.* at 6–10.) They assert that, even if the Court finds § 1501.2(a) ambiguous, such that application of the three-factors in § 1501.2(b) may be required, Plaintiffs have sufficiently alleged that Calico Critters Flocked Toys are intended for children under three years of age according to the three factors. (*Id.* at 10–12.)

The Court finds the plain language of § 1501.2 unambiguously defines flocked animals and figures as undeniably intended for children under three years of age.[3]

## A. Statutory or Regulatory Interpretation

Statutory or regulatory construction begins with the plain language of the statute or regulation. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (statutory); *Safe Air*, 488 F.3d at 1097 (regulatory). "[W]here the [plain] language

[3] As the Court finds § 1501.2's plain language unambiguous, it need not, and does not, consider agency guidance in interpreting the regulation. *See Safe Air for Everyone v. U.S. E.P.A.*, 488 F.3d 1088, 1097 (9th Cir. 2007) (stating that an agency's interpretation of its regulation "should not be considered when the regulation has a plain meaning"). Accordingly, the Court denies as moot Defendants' Request for Judicial Notice of communications and comments from the Commission. (Req. Judicial Notice, ECF No. 15-1.)

provides a clear answer, it ends there as well." *Hughes Aircraft*, 525 U.S. at 438; *Safe Air*, 488 F.3d at 1097. "Ordinarily, a word's usage accords with its dictionary definition," but context will also inform its meaning. *Yates v. United States*, 574 U.S. 528, 537 (2015).

Traditional canons of interpretation guide a court's construction. *In re Dumont*, 581 F.3d 1104, 1111 (9th Cir. 2009). Courts should "resist reading words or elements into a statute [or regulation] that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997). They must strive to "give effect, if possible, to every clause and word" of a statute or regulation. *Duncan v. Walker*, 533 U.S. 167, 174 (2001). "No clause, sentence, or word shall be superfluous, void, or insignificant." *In re Dumont*, 581 F.3d at 1111.

Familiar interpretive guides may also aid a court's construction. *Yates*, 574 U.S. at 539. The canon *nositur a sociis*—a word is known by the company it keeps—provides that a "word is given more precise content by the neighboring words with which it is associated." *Id.* at 543 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). The related canon, *ejusdem generis*, provides that, "where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 545 (alteration in original) (quoting *Wash. State Dep't Soc. & Health Servs. v. Guardianship Est. Keffeler*, 537 U.S. 371, 384 (2003)).

**B. 16 C.F.R. § 1501.2**

Section 1501.2 "describes certain articles that are subject to § 1500.18(a)(9)." 16 C.F.R. § 1501.1.

It states:

> **(a) This regulation** (§ 1500.18(a)(9) and the criteria described in § 1501.4 below) **applies to all toys and other articles intended for use by children under 3 years** (36 months) of age that are introduced into interstate commerce after the effective date. **Such articles include, but are not to limited to**: squeeze toys; teethers; crib exercisers; crib gyms;

> crib mobiles; other toys or articles intended to be affixed to a crib, stroller, playpen, or baby carriage; pull and push toys; pounding toys; blocks and stacking sets; bathtub, wading pool and sand toys; rocking, spring, and stick horses and other figures; chime and musical balls and carousels; jacks-in-the-box; stuffed, plush, and **flocked animals and other figures**; preschool toys, games and puzzles intended for use by children under 3; riding toys intended for use by children under 3; infant and juvenile furniture articles which are intended for use by children under 3 such as cribs, playpens, baby bouncers and walkers, strollers and carriages; dolls which are intended for use by children under 3 such as baby dolls, rag dolls, and bean bag dolls; toy cars, trucks, and other vehicles intended for use by children under 3. In addition, such articles include any other toys or articles which are intended, marketed or labeled to be entrusted to or used by children under 3 years of age.
>
> **(b)** In determining which toys and other articles are intended for use by children under 3 years (36 months) of age, for purposes of this regulation, the following factors are relevant: the manufacturer's stated intent (such as on a label) if it is a reasonable one; the advertising, promotion, and marketing of the article; and whether the article is commonly recognized as being intended for children under 3.
>
> **(c)** This regulation does not apply to toys or articles which are solely intended for use by children 3 years of age or older. In addition, it does not apply to all articles to which children under 3 years of age might have access simply because of presence in a household. Certain articles which are specifically exempted from this regulation are listed in § 1501.3 below.

16 C.F.R. § 1501.2 (emphases added).

**C. Analysis**

Section 1501.2 begins by describing its subject: "This regulation . . . applies to all toys and other articles intended for use by children under 3 years . . . of age . . . ." *Id.* § 1501.2(a). The parties' dispute the correct interpretation of the clause "intended for use by children under 3." Plaintiffs contend a toy or article is "intended for use by

children under 3" as a matter of law, pursuant to § 1501.2, if it is identified as one of the "articles include[d]." (Compl. ¶¶ 21–22; Opp'n 5–10.) If a toy or article is not listed in § 1501.2(a), Plaintiffs assert it may still be "intended for children under 3" if an analysis of the three "relevant" factors in § 1501.2(b) demonstrate as much. (Opp'n 10–12; *see also* Compl. ¶¶ 33–49.) In contrast, Defendants contend that a toy or article is *not* "intended for children under 3" unless a case-by-case analysis of § 1501.2(b)'s three factors demonstrates it is, regardless of whether the article is identified in subsection (a)'s list of "articles include[d]." (*See* Mot. 4, 10–12.)

*1. Plain Language*

Subsection (a) lists fourteen specific types of toys or articles, five general types of toys or articles, and has a catch-all provision for "any other toys or articles" that are "intended for use by children under 3 years" of age. 16 C.F.R. § 1501.2(a). Relevant here, the last item identified in the list of specific toys is "flocked animals and other figures." *Id.*

Prefacing subsection (a)'s lists is the clause, "such articles include, but are not limited to." *Id.* To "include" means "[t]o contain as a part of something," *Include*, Black's Law Dictionary (11th ed. 2019), or "to take in or comprise as a part of a whole or group," *Include*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/include (last accessed Nov. 9, 2023). Putting this together, flocked figures are "contain[ed]" in or "comprise" a part of the group of "such articles" that are intended for use by children under three. 16 C.F.R. § 1501.2(a) ("Such articles include [i.e., contain, or are comprised of] . . . flocked animals and other figures . . . .").

Subsection (a) proceeds from the specific, i.e., fourteen specific types of articles that are definitively included as intended for use by children under three, to the general, five general types of articles commonly understood to be intended for use by children of varying ages. 16 C.F.R. § 1501.2(a) (listing five general types of articles: "preschool toys, games and puzzles"; "riding toys"; "infant and juvenile furniture

articles"; "dolls"; and "toy cars, trucks, and other vehicles"). These five generalized articles incorporate a self-limiting qualifier: "intended for use by children under 3." *Id.* Therefore, before an article of the type listed in these five broader categories will be "include[d]" in "such articles," it must be determined that the article is "intended for use by children under 3." The final broadest category, the catch-all of "any other toys or articles," similarly limits its contents to only those toys "which are intended, marketed or labeled to be entrusted to or used by children under 3." *Id.*

In sum, the first fourteen specific articles listed in subsection (a) are "include[d]" in "such articles" without a qualifier, and thus there is no need to assess the item to determine that it is, in fact, intended for use by children under three. The next five more general types of articles include a self-limiting qualifier, meaning those items are "include[d]" in "such articles" only if they are determined to be "intended for use by children under 3." The final catch-all similarly incorporates a self-limiting qualifier, such that "any other toys or articles" may be "include[d]" in "such articles" and subject to the regulation if they are determined to be "intended, marketed or labeled" for use by children under three.

Enter subsection (b). This subsection provides three factors that are "relevant" "[i]n determining which toys and other articles are intended for use by children under 3 years." 16 C.F.R. § 1501.2(b). The relevant factors come immediately after the list of five general types of "toys and other articles" and the catch-all "any other toys or other articles," each of which incorporate the defining qualifier "intended for use by children under" three. Considering these provisions and clauses in context, the identified articles with a defining qualifier in subsection (a) are followed immediately by the three factors in subsection (b); the factors are described as "relevant" to determining whether an article or toy is indeed "intended for children under 3," and thus "include[d]" in "such articles" under the Small Parts rule. *Id.* ("In determining which toys and other articles are intended for use by children under 3 years . . . for purposes of this regulation, the following factors are relevant . . . .").

Applying the above plain language construction to a hypothetical toy, a product identified in the first fourteen specific toys or articles, like "flocked" figures, is "include[d]" as an "article[] intended for use by children under 3 years." 16 C.F.R. § 1501.2(a). A product not identified in the initial fourteen articles, but listed in the following five more general types of articles, such as "dolls which are intended for use by children under 3," is "include[d]" in "such articles" if an assessment of the relevant three factors from subsection (b) determines the doll is indeed intended for use by children under three. Finally, a product that is not identified, either specifically or generally, in subsection (a) is captured by the catch-all, "any other toys or articles," and is "include[d]" in "such articles" if an assessment of the three relevant factors from subsection (b) determines the unlisted product is indeed intended for use by children under three.

The foregoing interpretation gives effect "to every clause and word," *Duncan*, 533 U.S. at 174, does not render any clause or word superfluous, *In re Dumont*, 581 F.3d at 1111, and reads nothing into the regulation that does not appear on its face, *Bates*, 522 U.S. at 29. It is consistent with *noscitur a sociis* and *ejusdem generis*, in that the contextual analysis proceeds from (a) to (b), from specific to general, with content made more precise by reference to associated neighboring words. *See Yates*, 574 U.S. at 543–45.

Finally, this interpretation is consistent with other courts' construction of the regulation. For instance, the Second Circuit in *Toy Manufacturers of America Inc.* considered whether the regulation provided sufficient guidance to manufacturers regarding whether products would be subject to the Small Parts rule. 630 F.2d at 78. The court there concluded that "the non-exclusive listing of 'covered products' provides a reasonable degree of guidance in assessing many articles." *Id.* "To the extent that it remains uncertain whether an 'unlisted' article falls within the coverage of the Small Parts Regulation, [the court] believe[d] that application of the three non-determinative criteria will resolve the issue satisfactorily in most, if not all,

cases." *Id.* (footnote omitted); *see also Schmidt*, 536 F. Supp. 3d at 930 (finding a Calico Critters flocked toy "intended for use by children under three years . . . as a matter of law" because flocked toys are "listed in § 1501.2(a)" (internal quotation marks omitted)).

The above analysis demonstrates that the plain language "provides a clear answer" and is consistent with traditional rules of statutory construction. *Hughes Aircraft*, 525 U.S. at 438. Accordingly, the Court's interpretation of § 1501.2 rightfully ends here. *Id.*

*2. No Ambiguity*

Defendants contend that, even if the Court finds Plaintiffs' interpretation reasonable, which the Court does, § 1501.2 is nevertheless ambiguous because it is susceptible to Defendants' proposed interpretation as well. (*See* Mot. 3–4, 12–17.) Defendants seek dismissal on the basis that Plaintiffs' claims are not plausible if § 1501.2 is found to be ambiguous. (*Id.*)

Language of a regulation is considered ambiguous "if reasonable people could find its terms susceptible to more than one interpretation." *Nat. Res. Def. Council, Inc. v. County of Los Angeles*, 725 F.3d 1194, 1205 (9th Cir. 2013); *Kisor v. Wilkie*, --- U.S. ---, 139 S. Ct. 2400, 2410 (2019) (stating that a regulation "susceptible to more than one reasonable reading" is "genuinely ambiguous"). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

Defendants' desired construction of § 1501.2 proposes that no toy or article will be deemed as "intended for children under 3" unless a case-by-case analysis of § 1501.2(b)'s three factors demonstrates that it is. (*See* Mot. 4, 10–12.) Defendants contend the three-factor analysis is thus required irrespective of the lists of identified articles in subsection (a). (*Id.*)

Defendants' proposed construction violates basic tenets of interpretation, in particular that "every clause and word" of a regulation must be "give[n] effect," *Duncan*, 533 U.S. at 174, and that "no clause sentence, or word shall be superfluous, void, or insignificant," *In re Dumont*, 581 F.3d at 1111. Defendants' reading would render the lists of identified articles, which comprise more than 80% of subsection (a) (roughly 181 words out of 222), superfluous or insignificant at best, leaving only the first sentence fully in play. No reasonable person could find § 1501.2 susceptible to such an eviscerating interpretation. *Cf. Kisor* 139 S. Ct. at 2410. As the Court finds the regulation is not reasonably susceptible to Defendants' proposed construction, the Court does not find the regulation ambiguous.

Defendants cite *Schmidt*, from the District Court of New Mexico, for support that the regulation is ambiguous. (*See* Mot. 13.) The court in *Schmidt* found § 1501.2 was ambiguous because it was "subject to two reasonable interpretations." 536 F. Supp. 3d at 919. The first interpretation provided that subsection (b)'s three factors should be assessed first, to determine whether a toy is intended for use by children under three, and that subsection (a)'s identified articles merely offer an additional factor for assessment. *Id.* The second interpretation provided that subsection (a)'s identified articles include items that are definitely intended for use by children under three, and unlisted items are evaluated using subsection (b)'s three factors. *Id.*

To the extent that the court in *Schmidt* found § 1501.2 ambiguous based on these two interpretations, the Court respectfully disagrees. For one thing, the Court finds it illogical to begin in the middle of a regulation, as *Schmidt's* first interpretation would do, by starting with (b)'s three factors and then backtracking to consider (a)'s identified articles as an additional factor. For another, *Schmidt's* first interpretation impermissibly reads words into subsection (b) that are not written there, namely by adding a fourth factor (i.e., whether an article is identified in (a)'s lists) to (b)'s express *three* relevant factors.

Accordingly, the Court finds § 1501.2 is not reasonably susceptible to Defendants' proposed interpretation here, nor is it reasonably susceptible to the first articulated interpretation in *Schmidt*. As such, the Court finds that Defendants have not established ambiguity in § 1501.2. The Court's plain language interpretation above stands.

*3. Plaintiffs' Claims*

Plaintiffs allege the Calico Critters Flocked Toys are banned hazardous substances under the FHSA because flocked toys are intended for use by children under three as a matter of law and have small parts that violate the Small Parts rule. (*Id.* ¶¶ 2, 28–29.) Plaintiffs premise each of their causes of action on Defendants' unlawful marketing and sale of Calico Critters Flocked Toys, in violation of the FHSA. (*See* Compl. ¶¶ 7, 80, 89–93, 98.) As the Court finds Plaintiffs' interpretation of § 1501.2 consistent with the regulation's plain language as well as traditional rules and canons of interpretation, the Court concludes that Plaintiffs sufficiently allege plausible claims against Defendants.

## V. CONCLUSION

For the reasons discussed above, the Court **DENIES** Defendants' Motions to Dismiss. (ECF Nos. 15, 16.)

**IT IS SO ORDERED.**

November 13, 2023

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**

**ARNOLD & PORTER KAYE SCHOLER LLP**
JAMES F. SPEYER (Bar No. 133114)
james.speyer@arnoldporter.com
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
Telephone: +1 213.243.4000
Facsimile: +1 213.243.4199

IAN S. HOFFMAN (admitted *pro hac vice*)
ian.hoffman@arnoldporter.com
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
Telephone: +1 202.942.6406
Facsimile: +1 202.942.5999
ian.hoffman@arnoldporter.com

*Attorneys for Defendants*
EPOCH EVERLASTING PLAY, LLC
and TARGET CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WILLIENE JACKSON-JONES, individually and on behalf of all others situated, KAREN SANTOS, individually and on behalf of all others situated,

Plaintiffs,

vs.

EPOCH EVERLASTING PLAY, LLC, a Delaware limited liability company, TARGET CORPORATION, a Minnesota corporation, and AMAZON.COM SERVICES LLC, a Delaware corporation,

Defendants.

Case No.: 2:23-cv-02567-ODW-SK

**NOTICE OF MOTION AND MOTION TO DISMISS OF DEFENDANTS EPOCH EVERLASTING PLAY, LLC AND TARGET CORPORATION**

Date: June 5, 2023
Time: 1:30 p.m.
Judge: Hon. Otis D. Wright II
Crtrm.: 5D

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE THAT on June 5, 2023, at 1:30 p.m. at 350 W. 1st Street, Los Angeles, California 90012 in Courtroom 5D of the above-captioned Court, Defendants Epoch Everlasting Play, LLC ("EEP") and Target Corporation ("Target") will and hereby does move to dismiss Plaintiffs' Class Action Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on April 4, 2023.

This motion is based on this notice, the following Memorandum of Points and Authorities, the concurrently-filed Request for Judicial Notice, any arguments heard or considered by the Court, and any other matters the Court may properly consider.

## STATEMENT OF RELIEF SOUGHT

Defendants seek an order pursuant to Rule 12(b)(6) dismissing the Complaint with prejudice for failure to state a claim upon which relief can be granted.

Dated: April 26, 2023

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *James F. Speyer*
James F. Speyer
Ian S. Hoffman

*Attorneys for Defendants*
EPOCH EVERLASTING PLAY, LLC
and TARGET CORPORATION

# TABLE OF CONTENTS

**Page**

Introduction ........ 1

Background ........ 5

A. The Complaint ........ 5

B. The Statutory And Regulatory Scheme ........ 6

C. CPSC Guidance On Section 1501.2 ........ 7

1. CPSC's General Guidance ........ 8

2. CPSC's Guidance Specific To Calico Critters ........ 9

Argument ........ 10

I. THE LEGAL STANDARD ........ 10

II. THE COMPLAINT FAILS TO STATE ANY CLAIM BECAUSE THE PLAIN LANGUAGE OF SECTION 1501.2 CANNOT SUPPORT THE ESSENTIAL ALLEGATION THAT ALL FLOCKED TOYS ARE INTENDED FOR CHILDREN UNDER THREE ........ 10

III. THE COMPLAINT FAILS TO STATE ANY CLAIM EVEN IF THE PLAIN LANGUAGE OF SECTION 1501.2 IS AMBIGUOUS, BECAUSE SUCH AMBIGUITY CREATES ONLY AN INSUFFICIENT POSSIBILITY OF A VIOLATION ........ 12

IV. THE COMPLAINT FAILS TO STATE ANY CLAIM BECAUSE CONSISTENT CPSC GUIDANCE CONCLUSIVELY NEGATES PLAINTIFFS' CONSTRUCTION OF SECTION 1501.2 ........ 14

A. CPSC Guidance Shows That Plaintiffs' Construction of Section 1501.2 Is Untenable ........ 15

B. The *Schmidt* Decision Does Not Change The Outcome ........ 16

Conclusion ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ *passim*

*Bates v. United States*,
522 U.S. 23 (1997) ........ 11

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 4, 10, 13, 14

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........ 14

*In re Dumont*,
581 F.3d 1104 (9th Cir. 2009) ........ 11

*Montana Env't Info. Ctr. v. Thomas*,
902 F.3d 971 (9th Cir. 2018) ........ 12

*Schmidt v. International Playthings LLC*,
536 F. Supp. 3d 856 (D.N.M. 2021) ........ 13, 14, 16, 17

*United States v. King*,
24 F.4th 1226 (9th Cir. 2022) ........ 14

**Statutes**

15 U.S.C. § 1261(q)(1) ........ 6

15 U.S.C. § 1263(a) ........ 6

Unfair Competition Law, Cal. Bus. & Profs Code §§ 17200, *et seq.* ........ 6

Consumer Product Safety Act, 15 U.S.C. §§ 2051, *et seq.* ........ 1

Federal Hazardous Substances Act, 15 U.S.C. §§ 1261, *et seq.* ........ 6

Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.* ........ 13

**Rules**

Fed. R. Civ. P. 8 .......... 14

Fed. R. Civ. P. 12(b)(6) .......... 1

**Regulations**

16 C.F.R. § 1500.18(a)(9) .......... 2, 6

16 C.F.R. § 1501 .......... 8

16 C.F.R. § 1501.1 .......... 6

16 C.F.R. § 1501.2 .......... *passim*

16 C.F.R. § 1501.2(a) .......... *passim*

16 C.F.R. § 1501.2(b) .......... *passim*

16 C.F.R. § 1501.4 .......... 7

Defendants Epoch Everlasting Play, LLC ("EEP") and Target Corporation ("Target") respectfully submit this motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

**Introduction**

Since 1987, EEP has distributed a popular line of toys known as "Calico Critters." Calico Critters are small "flocked" animal figures. "Flocking" is a manufacturing process involving the application of fine particles to adhesive surfaces to produce a velvety texture. Calico Critters come with detachable clothing and a wide range of accessories such as bicycles, strollers and tea sets. The Calico Critters line consists of hundreds of different toys and is responsible for over half of EEP's revenues. Here is an example of a Calico Critters toy:




Compl. ¶ 25. As this image indicates, the front of the package prominently states in the upper-right corner "WARNING: CHOKING HAZARD-Small parts/Not for children under 3 years" and in the lower-left corner "**3+**."

This lawsuit seeks to outlaw the entire Calico Critters line as banned hazardous substances under the Consumer Product Safety Act. Each purported claim in the complaint is based solely on the allegation that all Calico Critters figures are banned hazardous substances because each violates what is known as the "small parts rule" of the Consumer Products Safety Commission. *See* 16 C.F.R. § 1500.18(a)(9). CPSC implemented the small parts rule in 1979.

To plead and prove a violation of the small parts rule, one must show two elements. First, the toy in question must be intended for use by children under three. Second, the toy must itself be a small part or contain a small part, as determined by whether the toy or part thereof fits into a prescribed hollow cylinder (and therefore presents a choking hazard to small children). The complaint alleges (and for purposes of this motion defendants do not dispute) that every Calico Critters flocked figure and its accessories fit into the cylinder and are accordingly small parts under the rule.

The complaint fails to state a claim because it does not allege a sufficient factual basis to support the first element of a small parts rule violation—that the toys in question are intended for children under three. The *sole* basis for this allegation is that, according to plaintiffs, a CPSC regulation (16 C.F.R. § 1501.2) creates a per se, categorical rule that *all* flocked figures are automatically intended for children under three.

Plaintiffs are wrong. Section 1501.2 creates no such per se rule. And because it creates no such rule, plaintiffs have failed to state any violation of the small parts rule, upon which their entire complaint hinges.

Section 1501.2 defines the scope of the small parts rule. Subsection (a) sets forth a non-exhaustive list of toys that the CPSC offers as general examples of the types of products intended for use by children under three, including "stuffed, plush and flocked animals and other figures." Subsection (a) does not state that this list is dispositive, and does not state that *all* "stuffed, plush and flocked" figures are intended for children under three. Subsection (b) sets forth a three-factor test for determining "*which* toys" are intended for children under three; these factors require an individualized evaluation of (1) the manufacturer's stated intent, (2) the advertising, promotion and marketing of the toy, and (3) whether the toy is commonly recognized as being intended for children under three.

The complaint makes no attempt to show that any Calico Critters toy is commonly recognized as intended for children under three or satisfies Section

1501.2(b)'s three-factor test. Instead, the allegation that all Calico Critters toys are intended for children under three is based exclusively on the assertion that the reference in Section 1501.2(a) to "stuffed, plush and flocked animals and other figures" must mean that *all* toys with such figures are necessarily and automatically intended for children under three.

The implications of plaintiffs' position are breathtaking. Under their theory, *every* stuffed, plush and flocked toy sold in the United States must be intended for children under three. As a result, according to plaintiffs, every stuffed, plush and flocked figure that is itself a small part, or contains a detachable small part, or is packaged with a small part, was actually sold illegally and is a banned hazardous substance under the small parts rule. This would outlaw an enormous swath of products that are currently on the market and have been for decades, regardless of the product's features, marketing, labeling and warnings, or the dexterity required to use the toy.

The complaint fails to allege a sufficient factual basis for the essential allegation that all flocked figures are intended for children under three for three independent reasons.

*First*, the plain language of Section 1501.2 cannot support plaintiffs' construction of it. Their construction would create the perverse outcome that a toy that is clearly *not* intended for children under three, under an application of the factors that CPSC itself mandates for making that determination, would nonetheless be deemed to be intended for children under three. Moreover, under plaintiffs' construction, the Section 1501.2(b) test for determining which toys are intended for children under three would only apply to toys that are not listed in Section 1501.2(a)—despite the fact that no such limiting language appears in 1501.2(b). This would require one to read words into the regulation that are not there.

*Second*, even if Section 1501.2 may reasonably be read as establishing a per se rule that toys listed in 1501.2(a) are categorically intended for children under three, it

is at least equally reasonable that the section should *not* be read as establishing such a per se rule. In that circumstance, the plain language of the regulation is ambiguous because it is consistent with two different interpretations.

As the Supreme Court's landmark pleading decisions in *Twombly* and *Iqbal* teach, where an essential element of a lawsuit is supported by an ambiguous allegation (that is, one as consistent with a violation as with no violation), the plaintiff has only stated the mere *possibility* of a violation—and that is not sufficient to state a claim. Instead, the plaintiff must allege sufficient factual matter to make a violation of law more than merely possible. Plaintiffs have failed to do that, because their only basis for the essential factual allegation that all flocked toys are intended for children under three is an ambiguous (at best) regulation that may or may not support the allegation.

*Third*, when the plain language of Section 1501.2 is considered in light of how the CPSC has consistently construed this regulation for decades, any ambiguity dissolves, and it becomes clear that plaintiffs' interpretation of the regulation is untenable. A trove of guidance from CPSC over the years—all of which is judicially noticeable and thus appropriate for consideration on this motion—conclusively negates that interpretation. This guidance shows that CPSC does not construe 1501.2(a) as creating the per se rule for which plaintiffs advocate, and instead applies the 1501.2(b) factors on a case-by-case basis to determine whether any particular toy is intended for children under three. For example:

- In 1993, CPSC published a guide expressly designed to help toy manufacturers determine if their toys were intended for children under three. Request for Judicial Notice ("RJN"), Ex. A, at 11. This guide states that this determination is made by applying the three-part test of Section 1501.2(b). *Id.* It does *not* state that there are any categories of toys that are automatically considered to be intended for children under three.

- In 2020, CPSC published another guide designed to help toy manufacturers determine whether their toys are intended for children under three. RJN, Ex. B. Despite its 350 pages, this guide does not mention a categorical list of toys that are automatically intended for children under three. Instead, the Guidelines state that "the factors used to assist in determining which toys and other articles are intended by use for children under 3 years of age *are found in 16 C.F.R. § 1501.2(b)* and involve evaluating [the three factors listed therein]." *Id.* at 118 (emphasis added).
- In 1992, CPSC specifically addressed the Calico Critters line and determined that it is "*not subject to the Small Parts Requirements*" because the toys are intended for children over three. RJN, Ex. C, at 466 (emphasis added).
- In 2021, CPSC again addressed a specific Calico Critters model and determined that it "appears to be *appropriately age labeled for children 3+*." RJN, Ex. D, at 468 (emphasis added).

As these documents and a number of others (discussed below) make clear, the guidance CPSC has consistently promulgated for decades is irreconcilable with plaintiffs' construction of Section 1501.2(a) as a categorical determination that all flocked, stuffed and plush toys are intended for children under three. And because their entire lawsuit depends on that unsupported and incorrect construction, it must be dismissed.

## Background

### A. The Complaint

The complaint is a purported class action filed by two named plaintiffs on behalf of a putative class of all California consumers who bought a Calico Critters product in the last four years. The defendants are EEP (the distributor of Calico Critters), Target and Amazon (retailers of Calico Critters).

The complaint purports to assert three claims, for (1) violation of the "unlawful" prong of California's Unfair Competition Law ("UCL"), (2) violation of the "unfair" prong of the UCL, and (3) unjust enrichment. Each claim is based on the same allegation: that all Calico Critters toys are "banned hazardous substances" that violate the small parts rule because they "are intended for use by children under three years of age and pose a choking, aspiration or ingestion hazard because of their small parts." Compl. ¶¶ 80, 89, 98.

The allegation that all Calico Critters toys are intended for children under three is premised exclusively on the assertion that CPSC, through 16 C.F.R. §1501.2(a), "has identified 'stuffed, plush and flocked animals and other figures'—like the Calico Critters Flocked Toys—as automatically intended for children under 3." Compl. ¶ 21.

The complaint seeks restitution, the recall of all Calico Critters toys currently in distribution, and a permanent ban on the sale of all Calico Critters toys. *Id.* ¶¶ 83–84, 94–95, 101.

**B. The Statutory And Regulatory Scheme**

The Federal Hazardous Substances Act prohibits the "introduction into commerce of any . . . banned hazardous substance." 15 U.S.C. §1263(a). Under the FHSA, CPSC has the authority to determine by regulation toys that are banned hazardous substances. 15 U.S.C. §1261(q)(1).

CPSC has promulgated regulations concerning banned hazardous substances. Under 16 C.F.R. §1500.18(a)(9), known as the small parts rule, "any toy intended for use by children under 3 years of age which presents a choking, aspiration or ingestion hazard because of small parts" is a banned hazardous substance. *See* 16 C.F.R. §1501.1. Thus, for a toy to be deemed a banned hazardous substance, it must satisfy two requirements: (1) it must be intended for use by children under three, and (2) it must itself be, or contain, a small part (as determined by whether the toy or part thereof fits without compression into a hollow cylinder one and one quarter inches in diameter (16 C.F.R. §1501.4)).

Section 1501.2 of 16 C.F.R. is entitled "Scope." Section 1501.2(a) lists 19 types of "articles" that it states are "intended for use by children under 3 years (36 months) of age . . . ." The first 14 types of articles are:

> Squeeze toys; teethers; crib exercisers; crib gyms; crib mobiles; other toys or articles intended to be affixed to a crib, stroller, playpen, or baby carriage; pull and push toys; pounding toys; blocks and stacking sets; bathtub, wading pool and sand toys; rocking, spring and stick horses and other figures; chime and musical balls and carousels; jacks-in-the-box; stuffed, plush and flocked animals and other figures.

The remaining five types of articles are:

> preschool toys, games and puzzles intended for use by children under three; riding toys intended for use by children under three; infant and juvenile furniture articles which are intended for use by children under three . . . dolls which are intended for use by children under three…toy cars, trucks and other vehicles intended for use by children under three.

Section 1501.2(b) states that

> In determining which toys and other articles are intended for use by children under 3 years (36 months) of age, for purposes of this regulation, the following factors are relevant: [1] the manufacturer's stated intent (such as on the label) if it is a reasonable one; [2] the advertising, promotion and marketing of the article; and [3] whether the article is commonly recognized as being intended for children under 3.

(numbering added).

**C. CPSC Guidance On Section 1501.2**

Over the last 30 years, CPSC has issued guidance on multiple occasions showing how it construes Section 1501.2. This guidance is in the form of both general communications regarding how to determine whether a toy is intended for children under three, and specific communications with EEP concerning Calico Critters. These communications show that CPSC does not construe Section 1501.2 to establish a categorical rule that items listed in Section 1501.2(a) are automatically intended for children under three without regard for whether the toy in question satisfies the factors set out in Section 1501.2(b).

**1. CPSC's General Guidance**

- *Manufacturer's Abbreviated Guide For Age-Labeling Toys (1993).* This 95-page guide states that Section 1501 "sets forth the relevant factors to be considered in determining which toys are intended for use by children under three. These factors are: 1. the manufacturer's stated intent (such as on a label), if it is a reasonable one; 2. the advertising, promotion and marketing of the article; and 3. whether the article is commonly recognized as being intended for children under three." RJN, Ex. A, at 11. The guide further states that it is "designed to assist manufacturers and importers of toys in performing age determinations to determine applicability of the small parts regulation." *Id.* The guide does not mention any categorical or per se list of toys that are automatically deemed intended for children under three.
- *Age Determination Guidelines (2002).* This 313-page document states that "[f]or a firm to know if the Small Parts Regulation applies to a particular toy, the firm must determine the age of the child for whom the toy is intended. For the Small Parts Regulation, the relevant factors to be considered in determining which toys are intended for use by children under 3 years (36 months) of age are the manufacturer's stated intent—such as on a label—if it is a reasonable one; the toy's advertising, promotion and marketing; and whether the toy is commonly recognized as being intended for children under 3 years of age (see 16 CFR Section 1501.2(b))." RJN, Ex. F, at 480. The guide does not mention any per se or categorical rule, and does not refer to Section 1501.2(a).
- *Age Determination Guidelines (2020).* This guide repeats with insignificant revisions the language from the 2002 Guidelines quoted directly above. *See* RJN, Ex. B, at 118. It also does not refer to any list of toys automatically deemed to be intended for children under three.

### 2. CPSC's Guidance Specific To Calico Critters

- *1992 Opinion Letter.* In this letter, CPSC confirmed that it reviewed two exemplars of Calico Critters toys (which were then being sold under the name "Sylvanian Families") and determined that they were "not subject to the Small Parts Requirements." RJN, Ex. C, at 466. CPSC explained its decision as follows: "We believe that this type of miniature world play set and flocked animal toys is appropriate for children over three years of age. The elaborate design of the clothing and accessories, the theme behind the different characters, and the functions of the accessories are all features that children over three years of age are able to appreciate." *Id.*
- *2021 Opinion Email.* In this email from CPSC to EEP, CPSC informed EEP that a particular Calico Critters model "appears to be appropriately age labeled for children 3+ and nothing further is required on the part of Epoch Everlasting Play LLC at this time." RJN, Ex. D, at 468.[1]
- *2023 CPSC Press Release.* In 2023, CPSC announced the recall of all Calico Critters "that were sold with bottle and pacifier accessories," on the ground that "[t]he bottle and pacifier accessories pose a choking hazard to children." RJN, Ex. G, at 788. The announcement instructs parents to "[t]ake the recalled bottle and pacifier accessories away from children immediately." *Id.* It does not instruct parents to stop using the Calico Critters flocked animal figures that were sold with the bottle and pacifier accessories, even though those flocked figures are small parts.

---

[1] CPSC subsequently reversed itself as to the age grade of this particular model (which is not among the models allegedly bought by plaintiffs), but did so by applying the Section 1501.2(b) factors, and not on the ground that under Section 1501.2(a) all flocked toys are automatically intended for children under three. RJN, Ex. I, at 808. While EEP maintains that CPSC made dispositive errors in its revised determination as to this model, those errors make no difference here, because even CPSC's about-face on this particular model demonstrates that CPSC takes a case-by-case approach and does not apply the per se rule proffered by Plaintiffs.

- *2023 EEP FAQs.* These FAQs were issued in conjunction with the bottle and pacifier recall and approved by CPSC. RJN, Ex. H. The FAQs state in part: "Q: I have Calico Critters products with small parts that are not bottle and pacifier accessories. Are these products recalled? A. No. Products without bottle and pacifier accessories are not recalled and *can continue to be used by children ages 3 and above*." RJN, Ex. H, at 798 (emphasis added).

## Argument

### I. THE LEGAL STANDARD

To survive a 12(b)(6) motion, a claim "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* (citation omitted). To do so, the complaint must allege facts showing "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### II. THE COMPLAINT FAILS TO STATE ANY CLAIM BECAUSE THE PLAIN LANGUAGE OF SECTION 1501.2 CANNOT SUPPORT THE ESSENTIAL ALLEGATION THAT ALL FLOCKED TOYS ARE INTENDED FOR CHILDREN UNDER THREE

The plain language of Section 1501.2—which is all plaintiffs offer in support of their allegation that all flocked toys are intended for children under three—cannot support plaintiffs' construction of it. Under their interpretation, all stuffed, plush and flocked figures are automatically intended for children under three, even if applying the factors of 1501.2(b) shows that such a toy is not intended for children under three. In other words, under plaintiffs' theory, even if (a) the toy is not "commonly recognized as being intended for children under three," (b) the "advertising, promotion and marketing" of the toy is not directed to consumers buying toys for children under three, and (c) the manufacturer clearly states on the label that the toy is

intended only for children older than three, the toy will nonetheless be categorized as intended for children under three.

Under plaintiffs' interpretation of Section 1501.2, therefore, a toy of the type listed in 1501.2(a) must be considered to be intended for children under three—even when a case-specific evaluation *affirmatively disproves* that the toy is intended for children under three, using the test set out *by the CPSC itself* for determining which toys are so intended. That is an absurd and unacceptable outcome. *See In re Dumont*, 581 F.3d 1104, 1111 (9th Cir. 2009) (statutes should not be construed in a manner that "lead[s] to absurd or impracticable consequences.") (internal quotation marks omitted).

Moreover, courts should not read words into statutes or regulations that do not appear in them. *See, e.g.*, *Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face."). But plaintiffs' interpretation would have the Court do just that. Section 1501.2(b) sets out the test for "determining which toys and other articles are intended for use by children under 3 years (36 months) of age, for purposes of this regulation." It does not in any way limit "*which* toys and other articles" are subject to the test. Under plaintiffs' interpretation, though, Section 1501.2(b) does *not* set out the test for determining whether many different types of toys are intended for children under three—namely, the first 14 types listed in Section 1501.2(a). Thus, under plaintiffs' reading of the regulation, Section 1501.2(b) only sets out the test for "determining which toys and other articles *other than the first fourteen types of toys listed in Section 1501.2(a)* are intended for use by children under 3." That is a material, and impermissible, addition to the regulation's language.

The position that all Calico Critters toys are necessarily intended for children under three also defies common sense. *See Iqbal*, 556 U.S. at 679 (determining whether a claim has been stated requires the court "to draw on its experience and common sense"). As the images of the toys (above and on pages 4–7 of the

complaint) show, playing with these toys—manipulating the clothing and tiny accessories—requires a level of dexterity that the fingers of very small children simply do not possess.

Finally, plaintiffs' interpretation would have sweeping real-world consequences for toy manufacturers—it would ban a huge swath of toys currently on the market and in children's bedrooms nationwide, and would expose manufacturers to civil and potentially criminal liability for having sold them. Such a dramatic, far-reaching outcome should be based only on the clearest of indications that Section 1501.2(a) creates a per se rule establishing that *all* "stuffed, plush and flocked animals and other figures" are categorically intended for children under three. Yet this section has no such definitive, all-encompassing language. It does not say that "all" such toys are intended for children under three, or that "each and every" such toy is so intended, or anything similar. For this reason as well, plaintiffs' interpretation is not reasonable.

Because the plain language of Section 1501.2 cannot reasonably support plaintiffs' interpretation, and their entire complaint hinges on that interpretation, the Court should dismiss the complaint.

## III. THE COMPLAINT FAILS TO STATE ANY CLAIM EVEN IF THE PLAIN LANGUAGE OF SECTION 1501.2 IS AMBIGUOUS, BECAUSE SUCH AMBIGUITY CREATES ONLY AN INSUFFICIENT POSSIBILITY OF A VIOLATION

Even assuming for argument's sake that Section 1501.2's plain language is reasonably susceptible to plaintiffs' construction of it, that language is at least equally susceptible to a construction that does *not* create a categorical rule that all flocked toys are intended for children under three. Where plain language is susceptible to two different reasonable interpretations, it is ambiguous as a matter of law. *See Montana Env't Info. Ctr. v. Thomas*, 902 F.3d 971, 978 (9th Cir. 2018). And under the pleading standards of *Twombly* and *Iqbal*, this ambiguity is fatal to plaintiffs' attempt to state a claim.

In *Schmidt v. International Playthings LLC*, the U.S. District Court for the District of New Mexico held (in a case involving a Calico Critters toy) that Section 1501.2's plain language was ambiguous because it "can be read reasonably in two ways." 536 F. Supp. 3d 856, 918 (D.N.M. 2021). Under one interpretation, "it is logical to turn to the three-factor § 1501.2(b) test as the primary method to determine whether a toy is intended for use by children under three years old, because it states how to make the required determination . . . [and] it is not dispositive whether a toy is enumerated in the non-exhaustive list of nineteen types of toys, but a general example to consider, because § 1501.2(a) does not state that the non-exhaustive list is dispositive." *Id.* at 921–22 (footnote omitted). Under another interpretation, fourteen of the types of toys listed in 1501.2(a) are "categorically intended for use by children under three years old," and the 1501.2(b) factors are not applied to such toys. *Id.* at 923.

After the *Schmidt* decision issued, CPSC's chairman released a statement noting the decision's holding that Section 1501.2 is ambiguous. *See* RJN, Ex. E, at 470. The chairman's statement did not disagree with this conclusion, and did not state that Section 1501.2(a) created any categorical rule. *See id.*

When the allegations of a complaint are ambiguous—that is, when they are as consistent with lawful behavior as with unlawful behavior—*Twombly* teaches that the complaint does not state a claim, because it has only alleged the possibility of unlawful conduct. In *Twombly*, the court held that plaintiffs failed to state a claim of unlawful agreement under Section One of the Sherman Act because their only allegations supporting such an agreement were allegations of parallel conduct among the competitor-defendants. 550 U.S. at 548. Because parallel conduct among competitors is "ambigu[ous]" behavior that is as consistent with lawful behavior as with an unlawful agreement, the allegations raised only the insufficient possibility of unlawful conduct. *Id.* at 554. As the Supreme Court held in *Iqbal*, this does not satisfy the Rule 8 requirement of a "showing" that "the pleader is entitled to relief":

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

For the reasons discussed in the prior section, defendants disagree that the plain language of Section 1501.2 is reasonably susceptible to plaintiffs' interpretation of it (and also note that the *Schmidt* court did not consider any of those reasons in arriving at its ruling on ambiguity). But even if plaintiffs' interpretation is reasonable, that just demonstrates the ambiguity of the language—and this ambiguity creates only the *possibility* that under Section 1501.2 all flocked toys are automatically intended for children under three. Just as in *Twombly*, where the allegation of parallel conduct was insufficient because it was as consistent with legal independent action as with an unlawful agreement, the plain language of Section 1501.2 is insufficient because it is (at best) as consistent with a construction that all flocked toys are not categorically intended for children under three as it is with a construction that all flocked toys are so intended. And where the complaint does not allow the Court to "infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)). ; *see also In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108–09 (9th Cir. 2013) (allegations equally consistent with lawful conduct as with unlawful conduct "remain stuck in 'neutral territory'" and are "insufficient to withstand a motion to dismiss").

## IV. THE COMPLAINT FAILS TO STATE ANY CLAIM BECAUSE CONSISTENT CPSC GUIDANCE CONCLUSIVELY NEGATES PLAINTIFFS' CONSTRUCTION OF SECTION 1501.2

When the plain language of a statute or regulation is ambiguous, courts may look to extrinsic evidence to determine meaning. *See United States v. King*, 24 F.4th 1226, 1231 (9th Cir. 2022) (extrinsic evidence may be considered "when necessary to resolve a statutory ambiguity"). Here, a wealth of evidence, in the form of CPSC guidance consistently issued over decades, confirms that plaintiffs' interpretation of

Section 1501.2 is untenable. Because their entire complaint depends on that interpretation, the Court should dismiss the complaint.

### A. CPSC Guidance Shows That Plaintiffs' Construction of Section 1501.2 Is Untenable

CPSC's general guidance as to Section 1501.2 negates the notion that 1501.2(a) creates an inviolable list of toys that are automatically deemed intended for children under three, even if the 1501.2(b) factors might demand the opposite conclusion. As shown above at pages 7–10, CPSC issued this guidance, spanning the last 30 years, expressly to inform manufacturers and distributors how to determine whether their toys are intended for children under three for purposes of complying with CPSC's small parts rule. The guidance consistently instructs firms to make this determination by applying Section 1501.2(b)'s three-factor test. It does not so much as mention any list of toys that are automatically intended for children under three. If CPSC understood 1501.2(a) as creating such a list, it would have been massively deceptive, and a dereliction of duty, not to so inform toy manufacturers and distributors when it issued guidance. CPSC's silence speaks volumes.

CPSC's specific guidance with respect to the Calico Critters line also negates any idea that flocked figures are per se intended for children under three. As shown above at pages 9–10, CPSC examined Calico Critters figures in 1992 and determined that due to the "elaborate design of the clothing and accessories, the theme behind the different characters, and the function of the accessories," they are "appropriate for children over three years of age" and are "*not subject to* the Small Parts Requirements." RJN, Ex. C, at 466 (emphasis added). In 2021, CPSC reached the same conclusion. *See* RJN, Ex. D, at 468. And, in 2023, CPSC required a recall on the ground that certain *accessories* to Calico Critters figures "pose a choking hazard to children," RJN, Ex. G, at 788, and approved a set of FAQs that informed parents that the flocked figures themselves "*can continue to be used by children ages 3 and above*." RJN, Ex. H, at 798 (emphasis added).

If CPSC understood Section 1501.2(a) as creating a per se rule that all flocked figures are intended for children under three, it would have decided that the Calico Critters toys it studied violated the small parts rule (and thus were banned hazardous substances) because they are flocked and consist of small parts. But CPSC did no such thing, and in fact expressly allowed Calico Critters to continue to be used. CPSC's decades-long course of communication with EEP conclusively negates plaintiffs' construction of Section 1501.2.

**B. The *Schmidt* Decision Does Not Change The Outcome**

After concluding that Section 1501.2's plain language is ambiguous, the *Schmidt* court looked to extrinsic evidence and ruled, at the summary judgment stage, that "any toy listed in § 1501.2(a) is intended definitively for use by children under three . . . ." 536 F. Supp. 3d at 925. The *Schmidt* court's ruling is not persuasive, because in reaching its conclusion it either failed to or did not have the opportunity to consider critically important extrinsic evidence.

The *Schmidt* court's ruling depends entirely on a single document: CPSC's notice of final agency regulation, published in the Federal Register in 1979, before the small parts rule took effect. *Id.* at 925–26 (citing 44 Fed. Reg. 34892–93 (June 15, 1979)). The *Schmidt* court based its ruling on the fact that in this Federal Register entry, CPSC "describes § 1501.2(a)'s list as 'a specific list of the toys which are covered,' and as a 'lengthy list of the types of products' that all [sic] 'definitely covered.'" *Id.* at 929 (quoting 44 Fed. Reg. 34897).

In making its determination, however, the *Schmidt* court did not address other sections of the same Federal Register entry that cut against the idea that Section 1501.2(a) creates a categorical list. Among other things, the *Schmidt* court ignored the statement that the Commission's compliance and enforcement staff will be required to "carefully appl[y]" the 1501.2(b) factors "*in every case*, before initiating *any* enforcement action under the small parts regulation." *Id.* at 929 (quoting 44 Fed. Reg. 34897–98) (emphases added). If 1501.2(a) had created an ironclad rule that all

categories of toys listed therein were automatically intended for children under three, the directive that compliance and enforcement staff must "carefully appl[y]" the Section 1501.2(b) factors "*in every case*" would make no sense and would impose a meaningless burden on CPSC staff. Therefore, because this Federal Register entry also supports the view that 1501.2(a) does not create any categorical list, it cannot support the dispositive weight the *Schmidt* court placed on it.

Moreover, the *Schmidt* court did not consider *any* of the CPSC communications and guidelines that defendants have brought to the attention of this Court. These communications all show that CPSC's conduct and guidance is irreconcilable with the construction of Section 1501.2 on which the complaint depends.

**Conclusion**

For the foregoing reasons, defendants EEP and Target respectfully request that the Court grant their motion and dismiss the complaint with prejudice.

Dated: April 26, 2023

ARNOLD & PORTER KAYE SCHOLER LLP

By: */s/ James F. Speyer*
James F. Speyer
Ian S. Hoffman

*Attorneys for Defendants*
EPOCH EVERLASTING PLAY, LLC
and TARGET CORPORATION

**CERTIFICATE OF COMPLIANCE PURSUANT TO L.R. 11-6.2**

The undersigned, counsel of record for Epoch Everlasting Play, LLC and Target Corporation, certifies that this brief contains 5421 words, and this certification complies with the word limit of L.R. 11-6.1.

*/s/ James F. Speyer*
James F. Speyer

# EXHIBIT C

U.S. CONSUMER PRODUCT SAFETY COMMISSION
WASHINGTON, D.C. 20207

OFFICE OF COMPLIANCE
AND ENFORCEMENT

Division of
Regulatory Management
Tel: 301-504-0400
Fax: 301-504-0359

SEP 03 1992

Mr. Aaron Locker
Locker Greenberg & Brainin, P.C.
One Penn Plaza
New York, New York 10119

Re: Sylvanian Families

Dear Mr. Locker:

Thank you for your August 20, 1992, letter which included a brochure illustrating the Sylvanian Families line together with two specimen flocked Sylvanian animals.

The staff has reviewed the specimens and retail package showing an age grade of "Age 4+". We believe that this type of miniature world play set and flocked animal toys is appropriate for children over three years of age. The elaborate design of the clothing and accessories, the theme behind the different characters, and the functions of the accessories are all features that children over three years of age are able to use and appreciate. While not subject to the Small Parts Requirements, the Sylvanian Families and accessories would remain subject to all other applicable requirements.

This interpretation is based solely on the information and sample you provided to the staff. If additional facts come to our attention, the interpretation could change. Also, the views in this letter could be changed or superseded by the Commission.

We hope this information is helpful to you.

Your sample is being returned under separate cover. If you have any questions about the information contained in this letter, please feel free to contact me.

Sincerely,

PCMajor

Pamela C. Major
Compliance Officer

# EXHIBIT D

**From:** Afflerbach, Carol
**To:** Rubel, Eric A.; Gillice, Michelle F.
**Subject:** CONFIDENTIAL
**Date:** Friday, October 29, 2021 9:25:12 AM

External E-mail

Dear Mr. Rubel and Ms. Gillice,

This e-mail is in follow-up to our telephone conversation on September 20, 2021, in which you requested clarification of the intent of the letter you received dated August 30, 2021 concerning Epoch Everlasting Play LLC. CPSC staff's intent was to notify you that, upon review of the information you submitted, the Calico Critters Yellow Labrador Twins, Model CC2019 appears to be appropriately age labeled for children 3+ and nothing further is required on the part of Epoch Everlasting Play LLC at this time.

Thank you for the supplemental information you submitted on September 23, 2021 concerning the death of a child in Japan in 2015 from choking on a pacifier component of a Calico Critters product and for the opinion letter you submitted dated September 3, 1992 in which staff determined that the Sylvanian Families toys were appropriate for children over three years of age.

Please feel free to contact me if you have additional questions or concerns.

Sincerely,

Carol Afflerbach
Compliance Officer
U.S. Consumer Product Safety Commission
Office of Compliance and Field Operations
Division of Regulatory Enforcement

*****!!! Unless otherwise stated, any views or opinions expressed in this e-mail (and any attachments) are solely those of the author and do not necessarily represent those of the U.S. Consumer Product Safety Commission. Copies of product recall and product safety information can be sent to you automatically via Internet e-mail, as they are released by CPSC. To subscribe or unsubscribe to this service go to the following web page: http://www.cpsc.gov/en/Newsroom/Subscribe *****!!!

23STCV01931
Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Yvette Palazuelos

Electronically FILED by Superior Court of California, County of Los Angeles on 01/30/2023 02:46 PM David W. Slayton, Executive Officer/Clerk of Court, by G. Carini,Deputy Clerk

**MILSTEIN JACKSON**
**FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, California 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

[Additional counsel on signature page.]

*Attorneys for Plaintiffs and the Proposed Class*

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

WILLIENE JACKSON-JONES, individually and on behalf of all others situated, KAREN SANTOS, individually and on behalf of all situated,

Plaintiffs

vs.

EPOCH EVERLASTING PLAY, LLC, a Delaware limited liability company, TARGET CORPORATION, a Minnesota corporation, and AMAZON.COM SERVICES LLC, a Delaware corporation,

Defendants.

Case No. 23STCV01931

**CLASS ACTION COMPLAINT**

1. Violations of Unfair Competition Law, ‘Unlawful’ Prong, Cal. Bus. & Prof. C. § 17200, *et seq.*
2. Violations of Unfair Competition Law, ‘Unfair’ Prong, Cal. Bus. & Prof. C. § 17200, *et seq.*
3. Unjust Enrichment

Plaintiffs Williene Jackson-Jones and Karen Santos ("Plaintiffs"), through undersigned counsel, bring this Class Action Complaint against Defendants Epoch Everlasting Play, LLC, Target Corporation, and Amazon.com Services LLC (collectively, "Defendants"), and allege the following based upon the investigation of counsel, except as to allegations pertaining to Plaintiffs, which are based upon personal knowledge:

## NATURE OF THE ACTION

1. Plaintiffs bring this action on their own behalf and on behalf of a class of consumers as defined below to redress Defendants' unlawful sale of a line of flocked animal toy products known as Calico Critters (the "Calico Critters Flocked Toys").

2. The Calico Critters Flocked Toys constitute banned hazardous substances under Section 15(a)(1) of the Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.* (the "CPSA") because they are intended for use by children under 3 years of age and pose a choking, aspiration, or ingestion hazard because of their small parts.

3. The Calico Critters Flocked Toys are highly dangerous and have resulted in multiple instances of children under 3 suffering severe injury and even death due to choking.

4. Instead of making a safer toy, Defendants chose to play a labeling and marketing game with deadly consequences. Defendants attempted to circumvent the regulation designed to protect children under three by age labeling and marketing the toys as "3+" and providing a choking hazard warning.

5. The CPSC anticipated such games and issued guidelines to prevent such conduct by toy manufacturers and distributers. According to the CPSC's Enforcement Policy and Procedural Guides, placing a "not intended for children under three" label on a flocked toy that is by definition intended for children under three years of age does not transform a banned hazardous substance into a toy that is in compliance with CPSC regulations. *Enforcement Policy & Procedural Guide 2.05*, Figure 2 (U.S. CSPC 1990).

6. Despite Defendants' knowledge of the Calico Critters Flocked Toys' hazardous nature, including instances of injury and death caused by their use, Defendants have sold and continue to sell the Calico Critters Flocked Toys to consumers at various retail locations throughout

the country, with misleading (and potentially deadly) labeling. Defendants' introduction or delivery for introduction of banned hazardous substances into interstate commerce is unlawful under 15 U.S.C. § 1263(a).

7. Accordingly, this action seeks to provide restitution and related injunctive and declaratory relief to California consumers harmed by Defendants' illegal sale of the Calico Critters Flocked Toys, under the following causes of action: (i) violations of the 'unlawful' prong of California's Unfair Competition Law, Cal. Bus. & Prof. Code §17200, *et seq*. (the "UCL"); (ii) violations of the 'unfair' prong of the UCL; and (iii) unjust enrichment.

## JURISDICTION AND VENUE

8. This Court has personal jurisdiction over Defendants because Defendants are foreign entities authorized to do business in California and have sufficient minimum contacts with California or otherwise intentionally avail themselves of the laws and markets of California, through the distribution and sale of the Calico Critters Flocked Toys in California, to render the exercise of jurisdiction by the California courts permissible.

9. Defendants' activities in California gave rise to the claims identified herein, both suffered by Plaintiffs and by members of the proposed Class. Defendants have introduced the Calico Critters Flocked Toys into the stream of commerce in California, including the Calico Critters Flocked Toys purchased by Plaintiffs and the Class, each of which give rise to the claims of Plaintiffs and the Class.

10. Venue is proper in this Court because Defendants have conducted business and entered into transactions in this County, and the conduct at issue occurred in, and/or emanated from, in part, this County. Moreover, Plaintiff Williene Jackson-Jones resides in this County.

## PARTIES

11. Plaintiff Williene Jackson-Jones is an individual, a resident of Lancaster, California, and a member of the Class alleged herein.

12. Plaintiff Karen Santos is an individual, a resident of Pleasanton, California, and a member of the Class alleged herein.

13. Defendant Epoch Everlasting Play, LLC ("Epoch") is a Delaware limited liability company, having its principal office at 75D Lackawanna Avenue, Parsippany, New Jersey 07054, and is duly organized and existing pursuant to law. Epoch conducts substantial business in California and throughout the United States. At all relevant times, Epoch has been engaged in the marketing, distribution, and sale of the Calico Critters Flocked Toys in California and throughout the United States.

14. Epoch, formerly known as International Playthings LLC, is a subsidiary of, and US-based distributor for a Japanese toy company named Epoch Co. Ltd. ("Epoch Co."). As the US-based distributor of Epoch Co., Epoch has the same duties, responsibilities and liability under the law in designing, manufacturing and marketing the Calico Critters Flocked Toys at issue.

15. Defendant Target Corporation ("Target") is a retail company headquartered in Minnesota. Target primarily sells household goods, including the Calico Critters Flocked Toys purchased by Plaintiffs.

16. Defendant Amazon.com Services LLC is an online retail company headquartered in Washington. Defendant sells a wide range of consumer products, including the Calico Critters Flocked Toys purchased by Plaintiffs.

## FACTUAL ALLEGATIONS

### A. Defendants' Hazardous Calico Critters Flocked Toys.

17. Since the 1980s, Epoch has built an internationally-recognized brand of flocked toys, played with by little children throughout the world. The Calico Critters Flocked Toys consist of anthropomorphized animals dressed in human clothes—plastic, poseable animal figures with a flocked exterior, giving the feel of fur and functioning as a mix between a stuffed animal and a doll.



18. The Calico Critters Flocked Toys are flocked toys. When a toy is "flocked," that means that its surface is coated in soft, fuzzy fibers that give the toy the feeling of velour or felt.

19. In addition to the flocked figurines, Defendant's Calico Critters Flocked Toys include accessories, furniture, and dollhouse playsets.



**B. Calico Critters Are Intended for Children Under Age 3 as a Matter of Law, Yet They Present a Lethal Choking Hazard.**

20. Critically, per federal regulations, flocked toys like the Calico Critters Flocked Toys are considered to be intended for children under 3 years old as a matter of law.

21. The Consumer Product Safety Commission ("CPSC") has identified "stuffed, plush, and flocked animals and other figures"—like the Calico Critters Flocked Toys—as automatically intended for children under 3. *See* 16 C.F.R. 1501.2(a).

22. The CPSC has also established regulations banning "[a]ny toy or other article intended for use by children under 3 years of age which presents a choking, aspiration, or ingestion hazard because of small parts as determined by part 1501 of this chapter and which is introduced into interstate commerce after January 1, 1980." 16 C.F.R. § 1500.18(a)(9).

23. To determine whether a toy presents a choking, aspiration, or ingestion hazard, the CPSC provides a test procedure using a cylinder the size of a fully expanded throat of a child under three years old, known as the choke tube. *See* 16 C.F.R. § 1501.4. The choke tube is 1.25 inches in diameter. *Id.* If a toy fits the choke tube in any orientation and without being compressed, it fails to comply with the test procedure and is considered a choking, aspiration, or ingestion hazard.

24. The Calico Critters Flocked Toys and their accessories are miniscule and "fit the choke tube," presenting a terrifying choking hazard to children under three.



25. For example, the Calico Critters Town Tea and Treats Set purchased by Plaintiff Jackson-Jones contains miniature accessories, including a tea pot, tea pot lid, treat stand, handle, server, teacups, saucers, plates, and artificial macarons and chocolates—each of which easily fits the choke tube.




26. Additionally, the Calico Critters Town Chocolate Lounge purchased by Plaintiff Jackson-Jones contains miniature plates, serving utensils, cups, saucers, and artificial treats that each fit within the choke tube as well.





27. Furthermore, the Calico Critters Persian Cat Triplets purchased by Plaintiff Karen Santos contains three miniature cat figurines that are each 1.25 inches in length and also fit the choke tube.




28. Because the Calico Critters Flocked Toys and their accessories are flocked toys and fit the choke tube, they constitute statutorily banned hazardous substances. *See* 15 U.S.C. § 2064(a)(1) ("the term 'substantial product hazard' means . . . a failure to comply with an applicable

consumer product safety rule under this Act or a similar rule, regulation, standard, or ban under any other Act enforced by the Commission which creates a substantial risk of injury to the public").

29. Defendants have violated and continue to violate the Federal Hazardous Substances Act, 15 U.S.C. § 1261, *et seq*. ("FHSA") by introducing and/or delivering for introduction banned hazardous substances into interstate commerce. *See* 15 U.S.C. § 1263(a).

30. Instead of making a safer toy, Defendants chose to play a labeling and marketing game with deadly consequences. Defendants attempted to circumvent the regulation designed to protect children under three by age labeling and marketing the part as "3+" and providing a choking hazard warning.

31. But the CPSC anticipated such games and issued guidelines to prevent such conduct by toy manufacturers and distributers.

32. According to the CPSC's Enforcement Policy and Procedural Guides, placing a "not intended for children under three" label on a flocked toy that is by definition intended for children under three years of age does not transform a banned hazardous substance into a toy that is in compliance with CPSC regulations. Enforcement Policy & Procedural Guide 2.05, Figure 2 (U.S. CSPC 1990).

**C. Epoch Intentionally Marketed the Calico Critters Flocked Toys to Children Under Three Years of Age.**

33. Epoch's marketing strategy for the Calico Critters Flocked Toys involved willful ignorance, at best, and dangerous deception, at worst. At every moment, however, Epoch refused to acknowledge (1) the age of the children playing with its toys and (2) the inherent danger posed to that audience.

34. In one stunning example, Epoch failed to age grade[1] the Calico Critters Flocked Toys, demonstrating its willingness to ignore regulations and remain ignorant.

35. Nonetheless, Epoch ultimately learned the age demographic of its key audience—including the fact that they were too young to play with Defendant's toys. Marketing documents

[1] Age grading is a process used to analyze a particular toy product to determine what age children are appropriate to interact with the product. The process matches the attributes of the toy to the attributes of the child. It is used to determine what regulations will apply to the product.

reveal that Epoch *intentionally marketed* the Calico Critters Flocked Toys to children under the age of three.

36. In August 2017, Epoch commissioned marketing research to understand the attitudes and usage of the Calico Critters Brand in the United States. The report—"The Calico Critters Story, Understanding Attitudes and Usage of the Brand, USA,"—contains information about Epoch's intentional, purposeful, and research-backed marketing to two-year-old girls.

37. Included within the report was a survey conducted in the United States among a nationally representative population of category-involved girls and their parents, meaning that the girls (1) play with or collect small toys, and (2) play with at least two brands in the Calico Critters category. Epoch surveyed 300 parents of girls aged two to three. The mean age of the girls surveyed in the aged-two-to-three category was two years, seven months old.

38. The survey revealed the following: (1) the largest category of girls who play with small dolls/collectibles is girls aged two to three; (2) girls tend to come to the Calico Critters…around age 3; (3) 75% of girls ages two to three play with Calico Critters a few times a week; (4) as girls age, the play severely drops, with the largest drop occurring at age 4 to 5; (5) brand fanship is highest among girls aged two to three; and (6) overwhelmingly higher brand engagement (emotional commitment or loyalty) occurs at age two to three than for any other age subset, at 74%.

39. The report also provided a marketing strategy, which included: (1) "touch points" of "dolls, figures and playsets" beginning at age two; (2) developing stories that meet the girls where they are, and beginning those stories to children as young as age two; (3) bypassing parents and marketing directly to girls; and (4) using bold designs that catch the child's eye.

40. The brand strategy included bypassing parents and marketing directly to girls:







41. The executive summary of the report stated that fanship and engagement is strongest among younger girls (two-to-three-years-old), and decisions to purchase small dolls/collectibles are girl-led and usually occur on the spot:




42. All of this information was actually known by Epoch as of at least August 2017.

43. Following the report, Epoch actively initiated a campaign that mirrored the findings of the report and began marketing the Calico Critters Flocked Toys to girls under the age of three.

**D. Target Intentionally Marketed the Calico Critters Flocked Toys to Children Under Three Years of Age.**

44. At all times relevant to this complaint, Target owned and operated over 300 store locations in California. Among the stores owned and operated by Target is the location in Dublin, California, where Plaintiff Santos purchased Calico Critters Flocked Toys (the "subject store").

45. Target controls the presentation of merchandise in each of its stores, including the subject store, requiring its employees to place its products in conformity with a series of presentation, signage and spacing standards (hereinafter the "presentation standards") researched and written by Target and communicated to its employees.

46. Target's presentation standards are part of a researched marketing effort, specifically targeting young children and babies, with the purpose and design to lure them into buying certain products.

47. As part of its marketing efforts, implemented through its presentation standards, Target requires its stores to place Calico Critters Flocked Toys at the face and eye level of children under the age of three.

48. Target's aim is to increase the sales volume of these products to families, by enticing young children to see and access these products.

49. Target's presentation standards has induced consumers into purchasing Calico Critters Flocked Toys for children under the age of three.

**E. History of Choking Events Caused by the Calico Critters Flocked Toys.**

50. The Calico Critters Flocked Toys have been identified as dangerous choking hazards by a watchdog group—the U.S. Public Interest Research Group—that seeks the recall of these toys by the CPSC.[2]

51. In April 2013, 22-month-old James Rencher swallowed and choked on a miniature doll pacifier at his home in Farmington, Utah. Although the doctors were able to remove the toy from his windpipe, he suffered brain trauma. The pacifier was part of a Calico Critters toy set.

52. In May 2018, two-year-ten-month-old Dakotah Dedios swallowed and chocked on another pacifier toy from the Calico Critters Yellow Labrador Twins set, resulting in her death.

53. James's injury and Dakotah's death were all the result of the Calico Critters Flocked Toys and Defendants' unlawful conduct of putting a banned hazardous substance on the market.

54. The Calico Critters Flocked Toys were recently identified as one of the "Ten Worst Toys" by World Against Toys Causing Harm, Inc. According to the press release, "This set of cute 'critters' is labeled for ages '3+' on the throw-away packaging, however 'flocked animals', regardless of labels, are appealing to oral-age children, as recognized by the industry small parts regulation. The Calico Critters collection includes small parts, such as a pacifier, with the potential for choking injuries."[3]

**F. Plaintiffs' Purchase of Calico Critters Flocked Toys.**

55. Plaintiff Jackson-Jones purchased the following Calico Critters Flocked Toys for her granddaughter on Amazon.com:

---

[2] SANTA FE NEW MEXICAN, Nov. 27, 2020, http://www.santafenewmexican.com/news/local_news/toy-linked-to-new-mexico-child-s-deathtops-watchlist/article_6cb49678-2e96-11eb-8fe3-6ffdaf34150d.html.

[3] *W.A.T.C.H. Reveals Its 2020 Nominees For The "10 Worst Toys" This Holiday Season* (Nov. 2020) (available at https://toysafety.org/wp-content/uploads/2020/11/2020-Ten-Worst-Toys-With-Photos.pdf)

a) Calico Critters Baby Airplane Ride, Dollhouse Playset with Maple Cat Figure Included (purchased June 11, 2021);

b) Calico Critters Sunshine Nursery Bus for Dolls (purchased June 6, 2021);

c) Calico Critters Baby Ferris Wheel, Dollhouse Playset with Toy Poodle Figure Included (purchased June 4, 2021);

d) Calico Critters Town Chocolate Lounge (purchased May 25, 2021);

e) Calico Critters, Doll House Furniture and Decor, Laundry & Vacuum Cleaner (purchased May 25, 2021);

f) Calico Critters Dress Up Set (Lavender & Aqua) (purchased May 25, 2021);

g) Calico Critters Town Girl Series - Silk Cat (purchased May 25, 2021); and

h) Calico Critters Town Tea and Treats Set (purchased May 22, 2021).

56. The Calico Critters Flocked Toys purchased by Plaintiff Jackson-Jones were and are banned hazardous substances, which Defendants unlawfully introduced and/or delivered for introduction into interstate commerce, in violation of 15 U.S.C. § 1263(a).

57. Had Plaintiff Jackson-Jones known these Calico Critters Flocked Toys were banned hazardous substances, she would not have purchased them.

58. Plaintiff Jackson-Jones has suffered an injury in fact and has lost money as a result of Defendant's unlawful sale of the Calico Critters Flocked Toys.

59. Plaintiff Santos purchased the following Calico Critters Flocked Toys for her two grandchildren, who were under the age of three at the time of purchase, from a Target store in Dublin, California:

a) Calico Critters Tuxedo Cat Family Set (purchased in November 2021);

b) Calico Critters Persian Cat Triplets (purchased in November 2021); and

c) Calico Critters Persian Cat Family (purchased in November 2021).

60. The Calico Critters Flocked Toys purchased by Plaintiff Santos were and are banned hazardous substances, which Defendants unlawfully introduced and/or delivered for introduction into interstate commerce, in violation of 15 U.S.C. § 1263(a).

61. Had Plaintiff Santos known these Calico Critters Flocked Toys were banned hazardous substances, she would not have purchased them.

62. Plaintiff Santos has suffered an injury in fact and has lost money as a result of Defendant's unlawful sale of the Calico Critters Flocked Toys.

63. Defendants continue to sell Calico Critters Flocked Toys, which pose an ongoing risk to children under the age of three, and Plaintiffs' grandchildren may be exposed to the products in the future. Thus, injunctive relief enjoining Defendants from selling Calico Critters Flocked Toys is appropriate.

## CLASS ALLEGATIONS

64. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth.

65. Plaintiffs bring this action on behalf of themselves and all other similarly-situated persons as a class action pursuant to Code of Civil Procedure section 382.

66. Plaintiffs seek to represent a class composed of and defined as follows (the "Class"):

**All persons in the State of California who purchased at least one Calico Critters Flocked Toys Product, for personal use and not for re-sale, since January 30, 2019.**

67. Plaintiffs reserve the right to modify or refine the Class definition based upon discovery of new information or in order to accommodate any concerns of the Court.

68. Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them. Also excluded from the proposed Class are the Court, the Court's immediate family and Court staff.

69. **Ascertainable Class:** The members of the Class are readily ascertainable. The Class definition identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of

this action may be provided to Class members through notice published in newspapers or other publications.

70. **Numerosity:** The proposed Class is so numerous that joinder of all members would be impracticable. The precise number of Class members is unknown at this time but can be readily determined from public records and Defendants' records. Plaintiffs reasonably estimate that the Class is likely to include over a thousand members.

71. **Commonality and Predominance:** A well-defined community of interest in the questions of law or fact involving and affecting all members of the Class exists, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual Class members. The questions of law and fact common to Plaintiffs and the Class include, among others, the following:

a) Whether the Calico Critters Flocked Toys are statutorily banned hazardous substances;
b) Whether Defendants violated the FHSA by introducing and/or delivering for introduction banned hazardous substances into interstate commerce;
c) Whether Defendants' conduct caused Plaintiffs and the Class to suffer economic harm;
d) Whether Defendants violated California Business and Professions Code section 17200, *et seq.*;
e) Whether Defendants were unjustly enriched by their sale of the Calico Critters Flocked Toys;
f) Whether Plaintiffs and the Class are entitled to injunctive relief;
g) Whether Plaintiffs and the Class are entitled to restitution and if so, the appropriate measure; and,
h) Whether Plaintiffs and the Class are entitled to declaratory and/or other equitable relief.

72. **Typicality:** Plaintiffs are members of the Class they seek to represent. Plaintiffs' claims are typical of the Class members' claims because they all were injured as a result of Defendants' conduct.

73. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them and the Class. There are no conflicts between Plaintiffs and the unnamed class members. Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

74. To prosecute this case, Plaintiffs have chosen the undersigned counsel, which is very experienced in class action litigation and has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

75. **Superiority.** A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

a) Joinder of all class members would create extreme hardship and inconvenience for class members as they reside throughout the state;

b) Individual claims by class members are impractical because the costs to pursue individual claims may exceed the value of what any one class member has at stake. As a result, individual class members may have no interest in prosecuting and controlling separate actions;

c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

e) Individual suits would not be cost effective or economically maintainable as individual actions; and

f) This action is manageable as a class action.

76. The Class is not so large that it would be unmanageable, and no difficulties are foreseen providing notice to individual claimants. Class members can be readily identified using records and information kept by Defendants in the usual course of business and within their control.

77. **Final Declaratory or Injunctive Relief**. Plaintiffs also satisfy the requirements for maintaining a class seeking declaratory and/or injunctive relief. Defendants have acted or refused to act on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

**Violations of the Unfair Competition Law – Unlawful Prong**

**California Bus. and Prof. Code § 17200, *et seq.***

**(On Behalf of the Class)**

78. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

79. Plaintiffs bring this claim under the 'unlawful' prong of the UCL, on behalf of themselves and the Class, who were subject to Defendants' above-described unlawful conduct.

80. Defendants have violated and continues to violate the FHSA by introducing and/or delivering for introduction banned hazardous substances into interstate commerce. *See* 15 U.S.C. § 1263(a). The Calico Critters Flocked Toys are banned hazardous substances under Section 15(a)(1) of the CPSA because they are intended for use by children under 3 years of age and pose a choking, aspiration, or ingestion hazard because of their small parts.

81. Defendants' violations of the FHSA and the CLRA constitute predicate acts which violate the UCL's 'unlawful' prong.

82. Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendant's actions as set forth herein. Specifically, prior to filing this action, Plaintiffs purchased the Calico Critters Flocked Toys for their own personal use. In so doing, they were unaware that the Calico Critters Flocked Toys were banned

hazardous substances. Plaintiffs were harmed by Defendants' conduct because they would not have purchased the Calico Critters Flocked Toys had they known they were banned hazardous substances.

83. Pursuant to section 17203 of the UCL, Plaintiffs and the Class seek restitution and an order of this Court enjoining Defendants from engaging in the unlawful business practices alleged herein in connection with the sale of the Calico Critters Flocked Toys.

84. Specifically, Plaintiffs seek injunctive relief compelling Defendants to (1) recall the Calico Critters Flocked Toys currently in distribution and (2) permanently refrain from selling Calico Critters Flocked Toys in the future that pose a choking, aspiration, or ingestion hazard and are intended for use by children under 3 years of age.

85. Plaintiffs and the Class have no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Violations of the Unfair Competition Law – Unfair Prong**

**California Bus. and Prof. Code § 17200, *et seq.***

**(On Behalf of the Class)**

86. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

87. Plaintiffs bring this claim under the 'unfair' prong of the UCL, on behalf of themselves and the Class, who were subject to Defendants' above-described unfair conduct.

88. As alleged hereinabove, Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, prior to filing this action, Plaintiffs purchased the Calico Critters Flocked Toys for their own personal use. In so doing, they were unaware that the Calico Critters Flocked Toys were banned hazardous substances.

89. Defendants' business practices, as alleged herein, are unfair because their conduct in selling banned hazardous substances is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. The gravity of the harm to consumers is not outweighed by the utility of Defendants' conduct.

90. Defendants' business practices are also unfair because they undermine public policy, which is tethered to specific statutory provisions, including the CPSA and the FHSA.

91. Lastly, Defendants' business practices are unfair because: (1) the injury to the consumer is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) consumers could not reasonably have avoided the injury because they did not know the Calico Critters Flocked Toys were banned hazardous substances.

92. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described above.

93. Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Defendants are continuing to sell the Calico Critters Flocked Toys.

94. Pursuant to section 17203 of the UCL, Plaintiffs and the Class seek restitution and an order of this Court enjoining Defendants from engaging in the unfair business practices alleged herein in connection with the sale of the Calico Critters Flocked Toys.

95. Specifically, Plaintiffs seek injunctive relief compelling Defendants to (1) recall the Calico Critters Flocked Toys currently in distribution and (2) permanently refrain from selling Calico Critters Flocked Toys in the future that pose a choking, aspiration, or ingestion hazard and are intended for use by children under 3 years of age.

96. Plaintiffs and the Class have no adequate remedy at law.

**<u>THIRD CAUSE OF ACTION</u>**

**Unjust Enrichment**

**(On Behalf of the Class)**

97. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

98. Defendants should have never sold the Calico Critters Flocked Toys (and were actually legally precluded therefrom) because they are banned hazardous substances under Section 15(a)(1) of CPSA because they are intended for use by children under 3 years of age and pose a choking, aspiration, or ingestion hazard because of their small parts.

99. As a result of Defendants' selling the Calico Critters Flocked Toys, Defendants received a benefit which was conferred upon them by Plaintiffs and the Class (and/or at their expense), and it is unjust for Defendants to retain that benefit.

100. Under the circumstances, it is against equity and good conscience to permit Defendants to retain the ill-gotten benefits that it received from Plaintiffs and Class members.

101. As a direct and proximate result of Defendants' actions, Defendants have been unjustly enriched. Plaintiffs and Class members have a right to restitution in an amount to be proven at trial.

102. Plaintiffs and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the members of the Class defined herein, pray for judgment and relief on all Causes of Action as follows:

A. An order certifying that the action may be maintained as a Class Action;

B. An order enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

C. Pre-judgment interest from the date of filing this suit;

D. Restitution;

E. Reasonable attorneys' fees under Cal. Civ. Proc. Code § 1021.5;

F. Costs of this suit; and

G. Such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs and the Class by counsel hereby request a trial by jury as to all issues so triable.

January 30, 2023

Respectfully submitted,

/s/ G. Wade

Gillian L. Wade
Sara D. Avila
Marc A. Castaneda
**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**

*Counsel for Plaintiffs and the Proposed Class*

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 19 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

WILLIENE JACKSON-JONES, individually and on behalf of all others situated,

Plaintiff - Respondent,

v.

EPOCH EVERLASTING PLAY, LLC, a Delaware limited liability company and AMAZON.COM SERVICES, LLC, a Delaware corporation,

Defendants - Petitioners.

No. 24-5744

D.C. No.
2:23-cv-02567-ODW
Central District of California,
Los Angeles

ORDER

Before: S.R. THOMAS and COLLINS, Circuit Judges.

The motion (Docket Entry No. 7) for leave to file a reply in support of the petition for permission to appeal is granted.

The petition for permission to appeal is granted. *See* Fed. R. Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959-60 (9th Cir. 2005) (describing factors this court considers in analyzing a Rule 23(f) petition). Within 14 days, petitioners must comply with Federal Rule of Appellate Procedure 5(d)(1).

ACCO,(SKx),DISCOVERY,MANADR,PROTORD,STAYED

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:23-cv-02567-ODW-SK

Williene Jackson-Jones et al v. Epoch Everlasting Play, LLC et al
Assigned to: Judge Otis D. Wright, II
Referred to: Magistrate Judge Steve Kim
Case in other court: Los Angeles Superior Court, 23STCV01931
Ninth CCA, 24-07157
Cause: 28:1441 Notice of Removal

Date Filed: 04/05/2023
Jury Demand: Plaintiff
Nature of Suit: 380 Personal Property: Other
Jurisdiction: Diversity

**Plaintiff**

**Williene Jackson-Jones**
*individually and on behalf of all others situated*

represented by

**Gillian L. Wade**
Wade Kilpela Slade LLP
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
310-667-7273
Fax: 424-276-0473
Email: gwade@waykayslay.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David F. Slade**
Wade Kilpela Slade LLP
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
501-417-6445
Fax: 424-276-0473
Email: slade@waykayslay.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John F. Walker , III**
Martin Walker, PC
111 West Ferguson Street
Tyler, TX 75702
903-526-1600
Fax: 903-595-0796
Email: jwalker@martinwalkerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin R. Kaufman**
Durham, Pittard and Spalding, LLP
505 Cerrillos Rd., Suite A 209
Santa Fe, NM 87501
505-986-0600

Email: jkaufman@dpslawgroup.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc Alexander Castaneda**
Wade Kilpela Slade LLP
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
310-667-7273
Fax: 424-276-0473
Email: marc@waykayslay.com
*ATTORNEY TO BE NOTICED*

**Mark Alan Milstein**
Milstein Jackson Fairchild and Wade LLP
2450 Colorado Avenue Suite 100E
Santa Monica, CA 90404
310-396-9600
Fax: 310-396-9635
Email: mmilstein@mjfwlaw.com
*ATTORNEY TO BE NOTICED*

**Philip Matthew Kovnat**
Durham, Pittard and Spalding, LLP
505 Cerrillos Road
Suite A209
Santa Fe, NM 87501
505-986-0600
Email: pkovnat@dpslawgroup.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara D. Avila**
Wade Kilpela Slade LLP
2450 Colorado Avenue, Suite 100E
Santa Monica, CA 90404
310-667-7273
Fax: 424-276-0473
Email: sara@waykayslay.com
*ATTORNEY TO BE NOTICED*

**<u>Plaintiff</u>**

**Karen Santos**
*individually and on behalf of all others situated*
*TERMINATED: 04/10/2024*

represented by

**Gillian L. Wade**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David F. Slade**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John F. Walker , III**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Justin R. Kaufman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Marc Alexander Castaneda**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Philip Matthew Kovnat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sara D. Avila**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Toy Association** represented by **Anne K. Edwards**
Smith Gambrell and Russell LLP
444 South Flower Street Suite 1700
Los Angeles, CA 90071-2901
213-358-7200
Fax: 213-358-7300
Email: aedwards@sgrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Epoch Everlasting Play, LLC**
*a Delaware limited liability company* represented by **James F. Speyer**
Arnold and Porter Kaye Scholer LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844
213-243-4000
Fax: 213-243-4199
Email: james.speyer@arnoldporter.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ian S. Hoffman**
Arnold and Porter Kaye Scholer LLP
601 Massachusetts Avenue, NW
Washington, DC 20001-3743
202-942-6406
Fax: 202-942-5999

Email: ian.hoffman@arnoldporter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Target Corporation**
*a Minnesota corporation*
*TERMINATED: 04/10/2024*

represented by **Ian S. Hoffman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James F. Speyer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Amazon.com Services LLC**
*a Delaware corporation*

represented by **Jennifer J. Nagle**
KandL Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
617-951-9197
Fax: 617-261-3175
Email: jennifer.nagle@klgates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kevin S Asfour**
K and L Gates LLP
10100 Santa Monica Boulevard 8th Floor
Los Angeles, CA 90067
310-552-5000
Fax: 310-552-5001
Email: kevin.asfour@klgates.com
*ATTORNEY TO BE NOTICED*

**Michael R. Creta**
KandL Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
617-951-9101
Fax: 617-261-3175
Email: michael.creta@klgates.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert W. Sparkes**
K and L Gates LLP
State Street Financial Center
One Congress Street, Suite 2900
Boston, MA 02114-2010
617-951-9134
Fax: 617-261-3175
Email: robert.sparkes@klgates.com

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/05/2023 | 1 | NOTICE OF REMOVAL from Los Angeles Superior Court, case number 23STCV01931 Receipt No: ACACDC-35087577 - Fee: $402, filed by Defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Attorney James F. Speyer added to party Epoch Everlasting Play, LLC(pty:dft))(Speyer, James) (Entered: 04/05/2023) |
| 04/05/2023 | 2 | CIVIL COVER SHEET filed by Defendant Epoch Everlasting Play, LLC. (Speyer, James) (Entered: 04/05/2023) |
| 04/05/2023 | 3 | NOTICE of Interested Parties filed by Defendant Epoch Everlasting Play, LLC, identifying Epoch Playthings LLC, Epoch Co., Ltd.. (Speyer, James) (Entered: 04/05/2023) |
| 04/05/2023 | 4 | CERTIFICATE OF SERVICE filed by Defendant Epoch Everlasting Play, LLC, served on 4/5/23. (Speyer, James) (Entered: 04/05/2023) |
| 04/05/2023 | 5 | NOTICE OF ASSIGNMENT to District Judge Otis D. Wright, II and Magistrate Judge Steve Kim. (car) (Entered: 04/05/2023) |
| 04/05/2023 | 6 | NOTICE TO PARTIES OF COURT-DIRECTED ADR PROGRAM filed. (car) (Entered: 04/05/2023) |
| 04/05/2023 | 7 | Notice to Counsel Re Consent to Proceed Before a United States Magistrate Judge. (car) (Entered: 04/05/2023) |
| 04/05/2023 | | CONFORMED COPY OF COMPLAINT against Defendants Amazon.com Services LLC, Epoch Everlasting Play, LLC, Target Corporation. Jury Demanded, filed by Plaintiffs Williene Jackson-Jones, Karen SantoS. Filed in State Court on 1/30/2023 Submitted with Attachment 1 to Notice of Removal 1 (car) (Entered: 04/05/2023) |
| 04/05/2023 | 8 | NOTICE OF PRO HAC VICE APPLICATION DUE for Non-Resident Attorney Ian S Hoffman. A document recently filed in this case lists you as an out-of-state attorney of record. However, the Court has not been able to locate any record that you are admitted to the Bar of this Court, and you have not filed an application to appear Pro Hac Vice in this case. Accordingly, within 5 business days of the date of this notice, you must either (1) have your local counsel file an application to appear Pro Hac Vice (Form G-64) and pay the applicable fee, or (2) complete the next section of this form and return it to the court at cacd_attyadm@cacd.uscourts.gov. You have been removed as counsel of record from the docket in this case, and you will not be added back to the docket until your Pro Hac Vice status has been resolved. (car) (Entered: 04/05/2023) |
| 04/06/2023 | 9 | MINUTE ORDER IN CHAMBERS by Judge Otis D Wright, II: This action has been assigned to the calendar of Judge Otis D. Wright II. EFFECTIVE IMMEDIATELY- No mandatory chambers copies required, EXCEPT FOR EXCEPT FOR motions for summary judgment and any other evidence-heavy motions. The Court's Electronic Document Submission System (EDSS) allows people without lawyers who have pending cases in the US District Court for the Central District of California to submit documents electronically to the Clerk's Office The parties may consent to proceed before a Magistrate Judge appearing on the voluntary consent list. PLEASE refer to Local Rule 79-5 for the submission of CIVIL ONLY SEALED DOCUMENTS. CRIMINAL SEALED DOCUMENTS will remain the same. Please refer to Court's Website and Judge's procedures for information as applicable. (lc) (Entered: 04/06/2023) |

| | | |
|---|---|---|
| 04/06/2023 | 10 | NOTICE of Interested Parties filed by Defendant Amazon.com Services LLC, identifying Amazon.com Sales, Inc. and Amazon.com, Inc.. (Attorney Kevin S Asfour added to party Amazon.com Services LLC(pty:dft))(Asfour, Kevin) (Entered: 04/06/2023) |
| 04/07/2023 | 11 | Notice of Compliance filed by Defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Exhibit A)(Speyer, James) (Entered: 04/07/2023) |
| 04/11/2023 | 12 | STIPULATION Extending Time to Answer the complaint as to All Defendants, re Complaint - (Discovery), filed by defendants Target Corporation, Epoch Everlasting Play, LLC.(Attorney James F. Speyer added to party Target Corporation(pty:dft))(Speyer, James) (Entered: 04/11/2023) |
| 04/12/2023 | 13 | APPLICATION of Non-Resident Attorney Ian S. Hoffman to Appear Pro Hac Vice on behalf of Defendants Epoch Everlasting Play, LLC, Target Corporation (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35125738) filed by Defendants Epoch Everlasting Play, LLC, Target Corporation. (Attachments: # 1 Proposed Order) (Speyer, James) (Entered: 04/12/2023) |
| 04/14/2023 | 14 | ORDER GRANTING APPLICATION of Non-Resident Attorney Ian S. Hoffman to Appear Pro Hac Vice on behalf of Defendants Epoch Everlasting Play, LLC, Target Corporation and designating James F. Speyer as local counsel 13 by Judge Otis D. Wright, II. (lc) (Entered: 04/14/2023) |
| 04/26/2023 | 15 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by defendants Epoch Everlasting Play, LLC, Target Corporation. Motion set for hearing on 6/5/2023 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Request for Judicial Notice, # 2 Proposed Order) (Speyer, James) (Entered: 04/26/2023) |
| 04/26/2023 | 16 | NOTICE OF MOTION AND MOTION to Dismiss Case filed by Defendant Amazon.com Services LLC. Motion set for hearing on 6/5/2023 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order) (Asfour, Kevin) (Entered: 04/26/2023) |
| 04/27/2023 | 17 | ORDER that the Scheduling Conference is set for July 10, 2023 at 1:30 PM ; compliance with FRCP 16, and 26(f) and filing of joint report; Counsel for plaintiff shall immediately serve this Order on all parties, including any new parties to the action by Judge Otis D Wright, II. (lc) (Entered: 04/27/2023) |
| 04/27/2023 | 18 | NOTICE TO FILER OF DEFICIENCIES in Electronically Filed Document RE: Epoch Everlasting Play, LLC and, Target Corporation 's NOTICE OF MOTION AND MOTION to Dismiss Case 15 . The following error(s) was/were found: Local Rule 7-1.1 no notice of interested parties. Clarification: ONLY defendant Target Corporation has no Notice of interested party on file. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 04/27/2023) |
| 05/02/2023 | 19 | APPLICATION of Non-Resident Attorney Robert W. Sparkes to Appear Pro Hac Vice on behalf of Defendant Amazon.com Services LLC (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35242957) filed by Defendant Amazon.com Services LLC. (Attachments: # 1 Proposed Order) (Asfour, Kevin) (Entered: 05/02/2023) |
| 05/02/2023 | 20 | APPLICATION of Non-Resident Attorney Jennifer J. Nagle to Appear Pro Hac Vice on behalf of Defendant Amazon.com Services LLC (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35243017) filed by Defendant Amazon.com Services LLC. (Attachments: # 1 Proposed Order) (Asfour, Kevin) (Entered: 05/02/2023) |
| 05/02/2023 | 21 | APPLICATION of Non-Resident Attorney Michael R. Creta to Appear Pro Hac Vice on behalf of Defendant Amazon.com Services LLC (Pro Hac Vice Fee - $500 Fee Paid, |

| | | |
|---|---|---|
| | | Receipt No. ACACDC-35243076) filed by Defendant Amazon.com Services LLC. (Attachments: # 1 Proposed Order) (Asfour, Kevin) (Entered: 05/02/2023) |
| 05/03/2023 | 22 | NOTICE of Interested Parties filed by Defendant Target Corporation, identifying Shipt, Inc.; Target Brands, Inc.; Target Enterprise, Inc.; and Target General Merchandise, Inc. as having a pecuniary interest in the outcome of the case. (Speyer, James) (Entered: 05/03/2023) |
| 05/03/2023 | 23 | ORDER GRANTING APPLICATION of Non-Resident Attorney Robert W. Sparkes to Appear Pro Hac Vice on behalf of Defendant Amazon.com Services LLC designating Kevin S. Asfour as local counsel 19 by Judge Otis D. Wright, II. (lc) (Entered: 05/04/2023) |
| 05/03/2023 | 24 | ORDER GRANTING APPLICATION of Non-Resident Attorney Jennifer J. Nagle to Appear Pro Hac Vice on behalf of Defendant Amazon.com Services LLC designating Kevin S. Asfour as local counsel 20 by Judge Otis D. Wright, II. (lc) (Entered: 05/04/2023) |
| 05/03/2023 | 25 | ORDER GRANTING APPLICATION of Non-Resident Attorney Michaell R. Creta to Appear Pro Hac Vice on behalf of Defendant Amazon.com Services LLC designating Kevin S. Asfour as local counsel 21 by Judge Otis D. Wright, II. (lc) (Entered: 05/04/2023) |
| 05/15/2023 | 26 | OPPOSITION to NOTICE OF MOTION AND MOTION to Dismiss Case 15 filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Wade, Gillian) (Entered: 05/15/2023) |
| 05/16/2023 | 27 | APPLICATION of Non-Resident Attorney David F. Slade to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos (Pro Hac Vice Fee - $500 Previously Paid on 5/16/2023, Receipt No. ACACDC-35325755) filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Proposed Order on Application of Non-Resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wade, Gillian) (Entered: 05/16/2023) |
| 05/16/2023 | 28 | APPLICATION of Non-Resident Attorney John F. (Jack) Walker, III to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35325849) filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Proposed Order on Application of Non-Resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wade, Gillian) (Entered: 05/16/2023) |
| 05/18/2023 | 29 | ORDER GRANTING APPLICATION of Non-Resident Attorney David F. Slade to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos and designating Gillian I. Wade as local counsel 27 by Judge Otis D. Wright, II. (lc) (Entered: 05/18/2023) |
| 05/18/2023 | 30 | ORDER GRANTING APPLICATION of Non-Resident Attorney John F. (Jack) Walker, III to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos and designating Gillian I. Wade as local counsel 28 by Judge Otis D. Wright, II. (lc) (Entered: 05/18/2023) |
| 05/22/2023 | 31 | REPLY in Support of NOTICE OF MOTION AND MOTION to Dismiss Case 15 filed by Defendants Epoch Everlasting Play, LLC, Target Corporation. (Speyer, James) (Entered: 05/22/2023) |
| 05/22/2023 | 32 | JOINDER filed by Defendant Amazon.com Services LLC joining in Reply (Motion related) 31 . (Asfour, Kevin) (Entered: 05/22/2023) |
| 05/31/2023 | 33 | The hearing on the MOTION TO DISMISS 15 16 , scheduled for June 5, 2023 at 1:30 P.M., is hereby VACATED and taken off calendar. No appearances are necessary. The |

| | | |
|---|---|---|
| | | matter stands submitted, and will be decided upon without oral argument. An order will issue.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 05/31/2023) |
| 06/02/2023 | 34 | APPLICATION of Non-Resident Attorney Justin R. Kaufman to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35425430) filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Proposed Order on Application of Non-Resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wade, Gillian) (Entered: 06/02/2023) |
| 06/02/2023 | 35 | APPLICATION of Non-Resident Attorney Philip Kovnat to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35425552) filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Proposed Order on Application of Non-Resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wade, Gillian) (Entered: 06/02/2023) |
| 06/06/2023 | 36 | NOTICE of Deficiency in Electronically Filed Pro Hac Vice Application RE: APPLICATION of Non-Resident Attorney Justin R. Kaufman to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos (Pro Hac Vice Fee - $500 Fee Paid, Receipt No. ACACDC-35425430) 34 . The following error(s) was/were found: Local Rule 83-2.1.3.3(d) Attached Certificate of Good Standing not issued within 30 days prior to filing of the application. Other error(s) with document(s): GSC from NY and TX over 30 days. (lt) (Entered: 06/06/2023) |
| 06/07/2023 | 37 | ORDER DENYING APPLICATION of Non-Resident Attorney Justin R. Kaufman to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos and designating Gillian L. Wade as local counsel SEE DISCREPANCY ON DOCKET NO. 36 34 by Judge Otis D. Wright, II. (lc) (Entered: 06/07/2023) |
| 06/07/2023 | 38 | ORDER GRANTING APPLICATION of Non-Resident Attorney Philip Kovnat to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos and designating Gillian I. Wade as local counsel 35 by Judge Otis D. Wright, II. (lc) (Entered: 06/07/2023) |
| 06/07/2023 | 39 | Corrected APPLICATION of Non-Resident Attorney Justin R. Kaufman to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones, Karen Santos (Pro Hac Vice Fee - $500 Previously Paid on 6/2/2023, Receipt No. ACACDC-35425430) filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Proposed Order on Application of Non-Resident Attorney to Appear in a Specific Case Pro Hac Vice) (Wade, Gillian) (Entered: 06/07/2023) |
| 06/08/2023 | 40 | ORDER GRANTING APPLICATION of Non-Resident Attorney Justin R. Kaufman to Appear Pro Hac Vice on behalf of Plaintiffs Williene Jackson-Jones and Karen Santos and designating Gillian I. Wade as local counsel 39 by Judge Otis D. Wright, II. (lc) (Entered: 06/08/2023) |
| 07/03/2023 | 41 | JOINT REPORT Rule 26(f) Discovery Plan ; estimated length of trial 5 days, filed by Plaintiffs Williene Jackson-Jones, Karen Santos.. (Wade, Gillian) (Entered: 07/03/2023) |
| 07/05/2023 | 42 | MINUTE ORDER IN CHAMBERS by Judge Otis D. Wright, II: The Court is in receipt of the parties Joint Rule 26(f) Report 41 . The Court VACATES the Scheduling Conference on July 10, 2023, and will reset the Scheduling Conference, if necessary, following resolution of Defendants' pending motions.. (lc) (Entered: 07/05/2023) |
| 11/13/2023 | 43 | ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS (SEE DOCUMENT FOR SPECIFIC DISCUSSION HEREIN) 15 , 16 by Judge Otis D. Wright, II. (lc) (Entered: 11/13/2023) |

| | | |
|---|---|---|
| 11/14/2023 | 44 | SCHEDULING AND CASE MANAGEMENT ORDER (BENCH TRIAL) by Judge Otis D. Wright, II. THE SCHEDULING CONFERENCE IS VACATED. Bench Trial set for 3/28/2025 09:00 AM L Final Pretrial Conference set for 3/3/2025 01:30 PM ; Motion in Limine set for hearing on 3/17/2025 at 01:30 PM (SEE DOCUMENT FOR ALL SPECIFIED DEADLINES). (lc) (Entered: 11/14/2023) |
| 11/14/2023 | 45 | ORDER/REFERRAL to ADR Procedure No 3 by Judge Otis D. Wright, II. Case ordered to a private mediator based upon a stipulation of the parties or by the court order. (lc) (Entered: 11/14/2023) |
| 11/22/2023 | 46 | STIPULATION Extending Time to Answer the complaint as to Target Corporation answer now due 12/13/2023; Epoch Everlasting Play, LLC answer now due 12/13/2023; Amazon.com Services LLC answer now due 12/13/2023, re Complaint - (Discovery), filed by Defendant Target Corporation; Epoch Everlasting Play, LLC.(Speyer, James) (Entered: 11/22/2023) |
| 12/05/2023 | 47 | NOTICE OF MOTION AND MOTION to Certify the Courts November 13 Order Pursuant to 28 U.S.C. § 1292(b) (together with Defendant Amazon.com Services LLC) filed by defendants Epoch Everlasting Play, LLC, Target Corporation. Motion set for hearing on 1/22/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Order) (Speyer, James) (Entered: 12/05/2023) |
| 12/11/2023 | 48 | NOTICE OF MOTION AND MOTION to File Amicus Brief *Proposed Brief of the Toy Association, Inc., as Amicus Curiae in Support of Defendants' Motion to Certify the Court's November 13 Order Pursuant to 28 USC Section 1292(b)* filed by proposed amicus curiae Toy Association. Motion set for hearing on 1/22/2024 at 01:30 PM before Judge Otis D. Wright II. (Attorney Anne K. Edwards added to party Toy Association(pty:bkmov)) (Edwards, Anne) (Entered: 12/11/2023) |
| 12/13/2023 | 49 | ANSWER to Complaint - (Discovery), filed by Defendant Amazon.com Services LLC. (Asfour, Kevin) (Entered: 12/13/2023) |
| 12/13/2023 | 50 | ANSWER to Complaint - (Discovery), filed by defendant Epoch Everlasting Play, LLC. (Speyer, James) (Entered: 12/13/2023) |
| 12/13/2023 | 51 | ANSWER to Complaint - (Discovery), filed by Defendant Target Corporation.(Speyer, James) (Entered: 12/13/2023) |
| 12/29/2023 | 52 | OPPOSITION to NOTICE OF MOTION AND MOTION to Certify the Courts November 13 Order Pursuant to 28 U.S.C. § 1292(b) (together with Defendant Amazon.com Services LLC) 47 , NOTICE OF MOTION AND MOTION to File Amicus Brief *Proposed Brief of the Toy Association, Inc., as Amicus Curiae in Support of Defendants' Motion to Certify the Court's November 13 Order Pursuant to 28 USC Section 1292(b)* 48 filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Declaration of David Slade in Support of Plaintiffs' Opposition to Defendants' Motion for Interlocutory Appeal and Amicus Brief in Support)(Wade, Gillian) (Entered: 12/29/2023) |
| 01/08/2024 | 53 | REPLY in Support of NOTICE OF MOTION AND MOTION to Certify the Courts November 13 Order Pursuant to 28 U.S.C. § 1292(b) (together with Defendant Amazon.com Services LLC) 47 filed by Defendants Epoch Everlasting Play, LLC, Target Corporation. (Speyer, James) (Entered: 01/08/2024) |
| 01/12/2024 | 54 | The hearing on the MOTION to Certify the Courts November 13 Order 47 ; and MOTION to File Amicus Brief 48 , scheduled for January 22, 2024 at 1:30 P.M., are hereby VACATED and taken off calendar. No appearances are necessary. The matters stands submitted, and will be decided upon without oral argument. An order will |

| | | |
|---|---|---|
| | | issue.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 01/12/2024) |
| 02/09/2024 | 55 | Joint STIPULATION for Protective Order filed by defendants Epoch Everlasting Play, LLC, Target Corporation. (Attachments: # 1 Exhibit A - [Proposed] Stipulated Protective Order, # 2 Exhibit B - Redlined [Proposed] Stipulated Protective Order)(Speyer, James) (Entered: 02/09/2024) |
| 02/12/2024 | 56 | NOTICE of Change of address by Gillian L. Wade attorney for Plaintiffs Williene Jackson-Jones, Karen Santos. Changing attorneys address to 2450 Colorado Avenue, Suite 100E, Santa Monica, CA 90404. Filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Wade, Gillian) (Entered: 02/12/2024) |
| 02/12/2024 | 57 | NOTICE of Change of address by Sara D. Avila attorney for Plaintiffs Williene Jackson-Jones, Karen Santos. Changing attorneys address to 2450 Colorado Avenue, Suite 100E, Santa Monica, CA 90404. Filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Avila, Sara) (Entered: 02/12/2024) |
| 02/12/2024 | 58 | NOTICE of Change of address by Marc Alexander Castaneda attorney for Plaintiffs Williene Jackson-Jones, Karen Santos. Changing attorneys address to 2450 Colorado Avenue, Suite 100E, Santa Monica, CA 90404. Filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Castaneda, Marc) (Entered: 02/12/2024) |
| 02/12/2024 | 59 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Steve Kim re Stipulation for Protective Order 55 . (See document for further details). (et) (Entered: 02/12/2024) |
| 02/13/2024 | 60 | NOTICE of Change of address by John F. Walker, III attorney for Plaintiffs Williene Jackson-Jones, Karen Santos. Changing attorneys address to 202 West Erwin, Suite 202, Tyler, TX 75702. Filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Walker, John) (Entered: 02/13/2024) |
| 02/14/2024 | 61 | Joint STIPULATION for Extension of Time to File Motion for Class Certification, Opposition to Motion, Reply re Motion, Extend Hearing Date filed by Defendants Epoch Everlasting Play, LLC, Target Corporation. (Attachments: # 1 Proposed Order)(Speyer, James) (Entered: 02/14/2024) |
| 02/20/2024 | 62 | ORDER GRANTING JOINT STIPULATION TO EXTEND CERTAIN BRIEFING DEADLINES AND HEARING ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION 61 by Judge Otis D. Wright, II: Filing deadlines: Motion: 3/11/2024 (same); Opposition: 6/3/2024; Reply: 6/17/2024; Hearing: 6/10/24 at 1:30 PM. (lc) (Entered: 02/20/2024) |
| 03/11/2024 | 63 | NOTICE OF MOTION AND MOTION to Certify Class *(Redacted)* filed by Plaintiffs Williene Jackson-Jones, Karen Santos. Motion set for hearing on 6/10/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Memorandum Plaintiffs' Redacted Motion For Class Certification, # 2 Declaration of Gillian L. Wade, Esq. in Support of Plaintiffs Motion for Class Certification, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Declaration of William Robert Ingersoll, Ph.D. in Support of Plaintiffs' Motion for Class Certification, # 13 Declaration of Joseph P. Mohorovic in Support of Plaintiffs' Motion for Class Certification, # 14 Declaration of Williene Jackson-Jones in Support of Plaintiffs Motion for Class Certification, # 15 Declaration of Karen Santos in Support of Plaintiffs Motion for Class Certification, # 16 Proposed Order) (Wade, Gillian) (Entered: 03/11/2024) |
| 03/11/2024 | 64 | APPLICATION to file document *Plaintiffs' Motion For Class Certification* under seal filed by Plaintiffs Williene Jackson-Jones, Karen Santos. (Attachments: # 1 Declaration of Sara D. Avila, # 2 Proposed Order)(Avila, Sara) (Entered: 03/11/2024) |

| | | |
|---|---|---|
| 03/15/2024 | 65 | NOTICE OF FILING DECLARATION OF ROBERT MILLER IN SUPPORT OF PLAINTIFFS APPLICATION TO SEAL CERTAIN OF AMAZON'S CONFIDENTIAL INFORMATION re APPLICATION to file document *Plaintiffs' Motion For Class Certification* under seal 64 filed by Defendant Amazon.com Services LLC. (Attachments: # 1 Declaration of Robert Miller)(Asfour, Kevin) (Entered: 03/15/2024) |
| 03/15/2024 | 66 | NOTICE OF FILING DECLARATION OF ALYSSA MASTERSON IN SUPPORT OF PLAINTIFFS' APPLICATION TO SEAL CERTAIN OF EEP'S CONFIDENTIAL INFORMATION re APPLICATION to file document *Plaintiffs' Motion For Class Certification* under seal 64 filed by Defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Declaration of Alyssa Masterson)(Speyer, James) (Entered: 03/15/2024) |
| 03/15/2024 | 67 | NOTICE OF FILING DECLARATION OF TINZING ARTMANN IN SUPPORT OF PLAINTIFFS' APPLICATION TO SEAL CERTAIN OF TARGET'S CONFIDENTIAL INFORMATION re APPLICATION to file document *Plaintiffs' Motion For Class Certification* under seal 64 filed by Defendant Target Corporation. (Attachments: # 1 Declaration of Tinzing Artmann)(Speyer, James) (Entered: 03/15/2024) |
| 03/18/2024 | 68 | Local Civil Rule 11-6 limits memoranda of points and authorities and trial briefs to 7,000 words and requires the filing party to include a certificate of compliance, certifying that the document complies with the type-volume limitation. See C.D. Cal. Civ. L.R. 11-6.2 (providing certification form). Plaintiffs move for class certification, but the Court is unable to locate the requisite certification of compliance with Local Rule 11 6. Accordingly, the Court ORDERS Plaintiffs to file a Local Rule 11-6 certificate of compliance within three court days of the date of this order. Alternatively, Plaintiffs may file an amended motion that complies with Local Rule 11 6 within three court days. Failure to timely comply with this Order may result in the Court striking the noncompliant filing.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 03/18/2024) |
| 03/18/2024 | 69 | RESPONSE filed by Plaintiffs Williene Jackson-Jones, Karen Santosto Generic Text Only Entry,,, 68 *L.R. 11-6.2 Certificate of Compliance for Plaintiffs' Motion for Class Certification* (Avila, Sara) (Entered: 03/18/2024) |
| 03/18/2024 | 70 | RESPONSE filed by Plaintiffs Williene Jackson-Jones, Karen Santosto Generic Text Only Entry,,, 68 *L.R. 11-6.2 Certificate of Compliance for Plaintiffs' Application to File Under Seal Plaintiffs' Motion for Class Certification* (Avila, Sara) (Entered: 03/18/2024) |
| 04/08/2024 | 71 | Joint STIPULATION to Dismiss Karen Santos, Target Corporation filed by Plaintiffs Williene Jackson-Jones, Karen Santos.(Wade, Gillian) (Entered: 04/08/2024) |
| 04/09/2024 | 72 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Stipulation to Dismiss Party 71 . The following error(s) was/were found: Proposed document was not submitted or was not submitted as a separate attachment. Body Text conflicts with Title. Title is dismissing plaintiff Karen Santos and Target Corporation ONLY. Body text reads : "hereby stipulate and agree to dismiss (a) all claims asserted by Plaintiff Karen Santos against all Defendants without prejudice, and (b) all claims asserted by Plaintiff Williene Jackson-Jones against Defendant Target Corporation without prejudice. Accordingly, the Parties stipulate and agree that both Plaintiff Santos and Defendant Target Corporation are dismissed from this action." Therefore a proposed order should have been submitted to dismiss this ONE plaintiff and as to the named defendants In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 04/09/2024) |

| | | |
|---|---|---|
| 04/10/2024 | 73 | ORDER by Judge Otis D. Wright, II: The Court, having considered the Joint Stipulation filed by Plaintiffs Williene Jackson-Jones and Karen Santos and Defendants Epoch Everlasting Play, LLC, Target Corporation, and Amazon.Com Services LLC 71 hereby orders that, pursuant to Federal Rule of CivilProcedure 41(a)(1)(A)(ii): (a) all claims asserted by Plaintiff Karen Santos against all Defendants are dismissed without prejudice, and (b) all claims asserted by Plaintiff Williene Jackson-Jones against Defendant Target Corporation are dismissed without prejudice. Accordingly the Clerk of the Court is directed to terminate Plaintiff Karen Santos as a plaintiff in this action and to terminate Defendant Target Corporation as a defendant in this action. (lc) (Entered: 04/10/2024) |
| 04/12/2024 | 74 | Joint STIPULATION for Order to Extend Certain Briefing Deadlines and Hearing on Plaintiffs Motion for Class Certification filed by defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Proposed Order)(Speyer, James) (Entered: 04/12/2024) |
| 04/15/2024 | 75 | ORDER GRANTING PLAINTIFFS' MOTION TO FILE UNDER SEAL 64 by Judge Otis D. Wright, II. Plaintiffs' application to file under seal is GRANTED. The following unredacted documents shall be filed under seal pursuant to Local Rule 79-5: Plaintiffs' Motion for Class Certification only, the redacted version of which is presently filed at ECF No. 63-1. (rolm) (Entered: 04/15/2024) |
| 04/15/2024 | 76 | ORDER GRANTING JOINT STIPULATION TO EXTEND CERTAIN BRIEFING DEADLINES AND HEARING ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION 74 by Judge Otis D. Wright, II. Motion set for hearing on 6/24/2024 at 01:30 PM before Judge Otis D. Wright II. (SEE DOCUMENT FOR FURTHER DETAILS.) (rolm) (Entered: 04/15/2024) |
| 05/02/2024 | 77 | SEALED NOTICE OF MOTION AND MOTION *FOR CLASS CERTIFICATION* re Order on Motion for Leave to File Document Under Seal, 75 filed by Plaintiff Williene Jackson-Jones.(Wade, Gillian) (Entered: 05/02/2024) |
| 05/10/2024 | 78 | ORDER DENYING DEFENDANTS' MOTION FOR INTERLOCUTORY APPEAL by Judge Otis D. Wright, II: The Court DENIES Defendants' Motion to certify interlocutory appeal 47 , and DENIES non-party Toy Association's Motion for leave to file an amicus brief 48 . (lc) Modified on 5/10/2024 (lc). (Entered: 05/10/2024) |
| 05/15/2024 | 79 | Joint STIPULATION for Order to Increase Word Limit for Defendants' Opposition to Plaintiffs' Motion for Class Certification and Plaintiff's Reply filed by defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Proposed Order)(Speyer, James) (Entered: 05/15/2024) |
| 05/16/2024 | 80 | ORDER GRANTING STIPULATION TO INCREASE WORD LIMIT FOR DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND PLAINTIFFS REPLY 79 by Judge Otis D. Wright, II : Defendants shall have up to 10,000 words for their joint opposition brief, and Plaintiff shall have up to 5,500 words for her reply brief. (lc) (Entered: 05/16/2024) |
| 05/17/2024 | 81 | OPPOSITION to NOTICE OF MOTION AND MOTION to Certify Class *(Redacted)* 63 , SEALED NOTICE OF MOTION AND MOTION *FOR CLASS CERTIFICATION* re Order on Motion for Leave to File Document Under Seal, 75 77 *filed by Defendant Amazon.com Services LLC and* filed by Defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Exhibit A to Opposition, # 2 Declaration of Ian Hoffman, # 3 Exhibit 1 to Hoffman Declaration, # 4 Exhibit 2 to Hoffman Declaration, # 5 Declaration of Alyssa Masterson)(Speyer, James) (Entered: 05/17/2024) |
| 06/07/2024 | 82 | REPLY In Support Of NOTICE OF MOTION AND MOTION to Certify Class *(Redacted)* 63 filed by Plaintiff Williene Jackson-Jones. (Attachments: # 1 Declaration of Gillian L. Wade, Esq. in Support of Plaintiff's Reply in Support of Motion for Class |

| | | |
|---|---|---|
| | | Certification, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Wade, Gillian) (Entered: 06/07/2024) |
| 06/12/2024 | 83 | NOTICE OF MOTION AND MOTION for Leave to file Sur-Reply in Opposition to Plaintiffs Motion for Class Certification *filed by Defendant Amazon.com Services LLC and* filed by defendant Epoch Everlasting Play, LLC. Motion set for hearing on 7/15/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Proposed Sur-Reply, # 2 Proposed Order) (Speyer, James) (Entered: 06/12/2024) |
| 06/13/2024 | 84 | On June 12, 2024, Defendants filed a motion for leave to file a sur-response to Plaintiffs motion for class certification. (ECF No. 83.) Plaintiff indicated she would oppose Defendants motion. Pursuant to Local Rule 6-1, the Court shortens the time period for Plaintiffs opposition to Defendants motion. The Court is inclined to grant Defendants motion for leave to file a sur response. To the extent Plaintiff nevertheless seeks to oppose Defendants motion for leave to file a sur-response, Plaintiff shall file any such opposition BY NO LATER THAN MONDAY, JUNE 17, 2024. The Court VACATES the July 15, 2024 hearing on Defendants Motion, (ECF No. 83), and will resolve the matter without oral argument.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 06/13/2024) |
| 06/17/2024 | 85 | OPPOSITION to NOTICE OF MOTION AND MOTION for Leave to file Sur-Reply in Opposition to Plaintiffs Motion for Class Certification *filed by Defendant Amazon.com Services LLC and* 83 filed by Plaintiff Williene Jackson-Jones. (Wade, Gillian) (Entered: 06/17/2024) |
| 06/20/2024 | 86 | The hearing on the MOTION to Certify Class 63 , scheduled for June 24, 2024 at 1:30 P.M., is hereby VACATED and taken off calendar. No appearances are necessary. The matter stands submitted, and will be decided upon without oral argument. An order will issue.THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (sce) TEXT ONLY ENTRY (Entered: 06/20/2024) |
| 06/20/2024 | 87 | ORDER GRANTING DEFENDANTS' MOTION FOR LEAVE TO FILE SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION 83 by Judge Otis D. Wright, II. (lc) (Entered: 06/20/2024) |
| 06/20/2024 | 88 | DEFENDANTS SUR-REPLY IN OPPOSITION TO PLAINTIFFS MOTION FOR CLASS CERTIFICATION re SEALED NOTICE OF MOTION AND MOTION *FOR CLASS CERTIFICATION* re Order on Motion for Leave to File Document Under Seal, 75 77 *filed by Defendant Amazon.com Services LLC and* filed by Defendant Epoch Everlasting Play, LLC. (Speyer, James) (Entered: 06/20/2024) |
| 07/22/2024 | 89 | NOTICE of Appearance filed by attorney Mark Alan Milstein on behalf of Plaintiff Williene Jackson-Jones (Attorney Mark Alan Milstein added to party Williene Jackson-Jones(pty:pla))(Milstein, Mark) (Entered: 07/22/2024) |
| 07/29/2024 | 90 | Notice of Change of Firm Affiliation filed by Plaintiff Williene Jackson-Jones. (Wade, Gillian) (Entered: 07/29/2024) |
| 08/22/2024 | 91 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: Notice (Other) 90 . The following error(s) was/were found: Incorrect event selected. Correct event to be used is: Notice of Change of Attorney Business or Contact information.. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (ak) (Entered: 08/22/2024) |
| 09/05/2024 | 92 | ORDER GRANTING MOTION FOR CLASS CERTIFICATION 63 by Judge Otis D. Wright, II: For the reasons discussed above, the Court GRANTS Jackson-Joness |

| | | |
|---|---|---|
| | | Motionfor Class Certification. Accordingly, the Court CERTIFIES the following class under Federal Rule of Civil Procedure 23(b)(3) on all causes of action set forth in Jackson-Joness Complaint (SEE DOCUMENT FOR SPECIFICS). The Court ORDERS Jackson-Jones to lodge with the Court a Proposed Order Appointing Class Counsel as described above within seven (7) calendar days of the date of this Order. (lc) (Entered: 09/05/2024) |
| 09/10/2024 | 93 | NOTICE OF LODGING filed re Order on Motion to Certify Class Action,, 92 (Attachments: # 1 Proposed Order Appointing Class Counsel)(Wade, Gillian) (Entered: 09/10/2024) |
| 09/11/2024 | 94 | ORDER APPOINTING CLASS COUNSEL by Judge Otis D. Wright, II: Consistent with Plaintiff's Notice of Change of Firm Affiliation, IT IS HEREBY ORDERED THAT the following attorneys are appointed class counsel pursuant to Fed. R. Civ. P. Rule 23(g): Gillian L. Wade, David Slade, Marc A. Castaneda, and Sara D. Avila of the law firm Wade Kilpela Slade LLP; Justin R. Kaufman and Philip M. Kovnat of the law firm Durham, Pittard & Spaulding, LLC; and Jack Walker of the law firm Martin Walker. (lc) (Entered: 09/11/2024) |
| 09/25/2024 | 96 | Joint STIPULATION to Reschedule Extending Case Schedule filed by Defendant Epoch Everlasting Play, LLC. (Attachments: # 1 Declaration of Ian S. Hoffman in Support, # 2 Declaration of Kevin S. Asfour in Support, # 3 Proposed Order)(Speyer, James) (Entered: 09/25/2024) |
| 09/25/2024 | 97 | NOTICE TO FILER OF DEFICIENCIES in Electronic Filed Document RE: ONLY the Proposed Order to the Stipulation to Reschedule, 96 . The following error(s) was/were found: L.R. 58-10 at least 2 lines of text must accompany the Signature Line for Signature of Judge on a last page of proposed order. In response to this notice, the Court may: (1) order an amended or correct document to be filed; (2) order the document stricken; or (3) take other action as the Court deems appropriate. You need not take any action in response to this notice unless and until the Court directs you to do so. (lc) (Entered: 09/25/2024) |
| 09/30/2024 | 98 | MINUTE ORDER IN CHAMBERS by Judge Otis D. Wright, II: Having read and considered the Parties' Joint Stipulation to Extend the Case Schedule, and for good cause shown, the Court hereby GRANTS the stipulation 96 . The remaining case schedule is hereby modified as follows:Bench Trial set for 5/30/2025 09:00 AM ; Final Pretrial Conference set for 4/30/2025 01:30 PM ; Motion in limine set for hearing on 5/14/2025 at 01:30 PM (SEE DOCUMENT FOR ALL SPECIFIED DEADLINES). (lc) (Entered: 09/30/2024) |
| 11/11/2024 | 99 | ( MOTION WITHDRAWN PER PLAINTIFF'S NOTICE OF WITHDRAWAL DOCKET NO. 102). NOTICE OF MOTION AND MOTION for Order for Approval of Class Notice Plan and Content of Notice filed by Plaintiff Williene Jackson-Jones. Motion set for hearing on 12/9/2024 at 01:30 PM before Judge Otis D. Wright II. (Attachments: # 1 Declaration of Sara D. Avila in Support of Plaintiffs Notice of Motion and Motion for Approval of Class Notice Plan and Content of Notice, # 2 Declaration of Mark Schey Regarding Class Certification Notice, # 3 Proposed Order Granting Plaintiffs Motion to Approve Class Notice) (Avila, Sara) Modified on 11/26/2024 (lc). (Entered: 11/11/2024) |
| 11/18/2024 | 100 | OPPOSITION to NOTICE OF MOTION AND MOTION for Order for Approval of Class Notice Plan and Content of Notice 99 *filed by Defendant Amazon.com Services LLC and* filed by Defendant Epoch Everlasting Play, LLC. (Speyer, James) (Entered: 11/18/2024) |
| 11/19/2024 | 101 | ORDER from Ninth Circuit Court of Appeals filed. CCA # 24-5744. The motion for leave to file a reply in support of the petition for permission to appeal is granted. The petition for permission to appeal is granted. See Fed. R. Civ. P. 23(f); Chamberlan v. Ford Motor |

| | | |
|---|---|---|
| | | Co., 402 F.3d 952, 959-60 (9th Cir. 2005) (describing factors this court considers in analyzing a Rule 23(f) petition). Within 14 days, petitioners must comply with Federal Rule of Appellate Procedure 5(d)(1). (mat) (Entered: 11/21/2024) |
| 11/25/2024 | 102 | Notice of Withdrawal of Motion for Order,, 99 filed by Plaintiff Williene Jackson-Jones. (Wade, Gillian) (Entered: 11/25/2024) |
| 11/26/2024 | 104 | NOTIFICATION from Ninth Circuit Court of Appeals of case number assigned and briefing schedule. Appeal Docket No. 24-7157 assigned Re Order from Ninth Circuit Court, 101 as to Defendants Epoch Everlasting Play, LLC, Amazon.com Services LLC (car) (Entered: 12/01/2024) |
| 11/27/2024 | | APPEAL FEE PAID: as to Defendant Epoch Everlasting Play, LLC; Receipt Number: 24564 in the amount of $605. (jji) (Entered: 11/27/2024) |
| 11/27/2024 | 103 | Joint STIPULATION to Stay Case pending Resolution of Appeal filed by plaintiff Epoch Everlasting Play, LLC. (Attachments: # 1 Proposed Order)(Speyer, James) (Entered: 11/27/2024) |
| 12/02/2024 | 105 | ORDER RE: JOINT STIPULATION TO STAY CASE PENDING RESOLUTION OF APPEAL 103 by Judge Otis D. Wright, II: The case is and shall remain STAYED in its entiretyincluding but not limited to all deadlines in the operative scheduling order, all fact and expert discovery, and all summary judgment and trial proceedingspending the Ninth Circuit Court of Appeals' resolution of Defendants' appeal of this Court's class certification order pursuant to Federal Rule of Civil Procedure 23(f). It is further ORDERED that the parties shall submit a joint status report within 14 days of the Ninth Circuit's issuance of the mandate. (lc) (Entered: 12/02/2024) |


## PACER Service Center

### Transaction Receipt

| 01/02/2025 13:29:51 | | | |
|---|---|---|---|
| **PACER Login:** | aporter11 | **Client Code:** | 1104755.00005/23214 |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-02567-ODW-SK End date: 1/2/2025 |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |