No. 24-7157

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

EPOCH EVERLASTING PLAY, LLC AND AMAZON.COM SERVICES LLC,
DEFENDANTS/APPELLANTS,

v.

WILLIENE JACKSON JONES
PLAINTIFF/APPELLEE.

---

On Appeal from the United States District Court
for the Central District of California
No. 2:23-cv-02567-ODW
Hon. Otis D. Wright, II

---

## PLAINTIFF-APPELLEE'S ANSWERING BRIEF

---

Gillian L. Wade
Sara D. Avila
Marc A. Castaneda
WADE KILPELA SLADE LLP
2450 Colorado Ave., Suite 100E,
Santa Monica, CA 90404
Telephone: (310) 667-7273

David F. Slade
WADE KILPELA SLADE LLP
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
Telephone: (501) 417-6445

Justin R. Kaufman
Philip Kovnat
DURHAM, PITTARD &
SPALDING, LLP
505 Cerillos Rd., Ste. A209
Santa Fe, NM 87501
Telephone: (505) 986-0600

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellee Williene Jackson-Jones states, by and though their counsel, that she is not a corporate entity and therefore has no parent corporations, subsidiaries, or affiliates that have issued shares to the public.


Date: March 7, 2025                    WADE KILPELA SLADE LLP


                                  */s/ Gillian L. Wade*
                                  Gillian L. Wade

                                  *Attorney for Plaintiff-Appellee Williene Jackson-Jones*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ..................................................................... i

TABLE OF AUTHORITIES ...................................................................v

INTRODUCTION .................................................................................1

JURISDICTIONAL STATEMENT .........................................................5

ISSUES PRESENTED..........................................................................6

STATEMENT OF THE CASE................................................................7

    I.    Factual Background ......................................................................7

        A.    Plaintiff alleges UCL "Unlawful" and "Unfair" Prong violations arising from Defendants' manufacture and sale of certain Calico Critters flocked toys that are banned hazardous substances because they are intended for children under three and contain small parts ......7

        B.    Plaintiff purchased a collection of Calico Critters for her grandchild, some of which were, unbeknownst to Plaintiff, banned hazardous substances..........................................................................10

        C.    Plaintiff seeks restitution and injunctive relief under the UCL ..........14

            1.    Restitution.........................................................................14

            2.    Injunctive Relief.........................................................14

    II.    Procedural History ......................................................................14

        A.    In a Motion-to-Dismiss Order outside the purview of this appeal, the District Court held that Calico Critters are intended for children under three as a matter of law ......................................................14

        B.    The District Court correctly certified a Rule 23(b)(3) Class of California consumers who purchased Calico Critters flocked toys that contained small parts..........................................................15

SUMMARY OF THE ARGUMENT ......................................................18

STANDARD OF REVIEW ................................................................19

ARGUMENT ...................................................................................20

I.  The District Court Did Not Abuse its Discretion in Finding Plaintiff
    Satisfied the Adequacy Requirement with Respect to Standing ...............20

    A.  The 'actual or imminent injury' requirement......................................21

        1.  The District Court applied the correct legal rule........................21

            (a)  The Ninth Circuit's *Davidson* decision ..............................22

            (b)  *Davidson*'s reasoning applies to the alleged misconduct
                 at issue here .......................................................24

                 i.   Plaintiff's UCL unlawful prong claim.......................25

                 ii.  Plaintiff's UCL unfair prong claim ..........................28

            (c)  Defendants' argument conflicts with *Davidson* and has
                 been rejected by this Court ...................................30

                 i.   Defendants' application of a *Clapper* "precise test" is
                      unavailing..................................................31

                 ii.  Defendants' reliance on *Lujan* is merely an indirect
                      challenge to the validity of *Davidson*, and their other
                      authority is unavailing ...................................34

            (d)  *Williams* is likewise distinguishable...................................37

        2.  The District Court's factual findings were neither illogical,
            implausible, nor without support in inferences that may be drawn
            from the facts in the record.........................................39

    B.  The "wronged in a similar way" requirement.....................................42

iii

II.   The District Court Correctly Found That Plaintiff's Full Refund Model is Appropriate for Measuring Class-Wide Restitution in a Manner Consistent with Plaintiff's Theory of Liability ............................................................45

       A.   The District Court properly held a full refund is the appropriate measure of restitution for Plaintiff and Class Members, who purchased toys that should have never been available for sale ...........49

       B.   In the event the Court finds a full refund is not an appropriate measure of restitution, the Court should find Plaintiff's alternative Offset Model is an appropriate measure .......................................................59

CONCLUSION ...............................................................................................61

STATEMENT OF NO RELATED CASES ...........................................................62

CERTIFICATE OF COMPLIANCE ....................................................................63

CERTIFICATE OF SERVICE ............................................................................64

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*
731 F.3d 952 (9th Cir. 2013) .................................................................19, 41

*Ang v. Bimbo Bakeries USA, Inc.*
2018 WL 4181896 (N.D. Cal. Aug. 31, 2018) ............................................56

*Armstrong v. Davis*
275 F.3d 849 (9th Cir. 2001) ........................................................................42

*Berrin v. Delta Air Lines, Inc.*
2024 WL 5371340 (C.D. Cal. Dec. 11, 2024) ............................................35

*Brazil v. Dole Packaged Foods, LLC*
660 F. App'x 531 (9th Cir. 2016) ................................................................55

*Caldera v. J.M. Smucker Co.*
2014 WL 1477400 (C.D. Cal. Apr. 15, 2014) ............................................56

*Chowning v. Kohl's Dep't Stores, Inc.*
2016 WL 1072129 (C.D. Cal. Mar. 15, 2016) ......................................50, 55

*City of Los Angeles v. Lyons*
461 U.S. 95 (1983) ........................................................................................21

*Clapper v. Amnesty Int'l USA*
568 U.S. 398 (2013) ..........................................................................31, 32, 33

*Comcast Corp. v. Behrend*
569 U.S. 27 (2013) ...................................................................................2, 46

*Davidson v. Kimberly-Clark Corp.*
889 F.3d 956 (9th Cir. 2018) ...............................................................*passim*

*Davidson v. Kimberly-Clark Corp.*
76 F. Supp. 3d 964 (N.D. Cal. 2014) ....................................................23, 30

*Day v. AT&T Corp.*
    63 Cal. App. 4th 325 (1998) ................................................................50, 51, 52

*Edleson v. Travel Insured Int'l, Inc.*
    2022 WL 687147 (S.D. Cal. Mar. 8, 2022) ....................................................35

*Falcone v. Nestle USA, Inc.*
    2024 WL 4868298 (S.D. Cal. Sept. 26, 2024) .............................................57

*Fletcher v. Security Pac. Nat'l Bank*
    23 Cal.3d 442 (1979) .................................................................................51

*Hamm v. Mercedes-Benz USA, LLC*
    2021 WL 1238304 (N.D. Cal. Apr. 2, 2021) ................................................60

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*
    609 F. Supp. 3d 942 (N.D. Cal. 2022) .........................................3, 48, 53, 54

*In re POM Wonderful, LLC*
    2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .............................................56

*In re Steroid Hormone Product Cases*
    181 Cal. App. 4th 145 (2010) .........................................3, 48, 52, 53, 55, 58

*In re Tobacco Cases II*
    240 Cal. App. 4th 779 (2015) .......................................................................56

*In re Vioxx Class Cases*
    180 Cal. App. 4th 116 (2009) .......................................................................55

*In re Zappos.com, Inc.*
    888 F.3d 1020 (9th Cir. 2018) ....................................................................33

*Just Film, Inc. v. Buono*
    847 F.3d 1108 (9th Cir. 2017) ....................................................................46

*Korea Supply Co. v. Lockheed Martin Corp.*
    29 Cal.4th 1134 (2003) ...............................................................49, 50, 51, 58

*Kraus v. Trinity Management Services, Inc.*
    23 Cal. 4th 116 (2000) ...................................................................59

*Krottner v. Starbucks Corp*.
    628 F.3d 1139 (9th Cir. 2010) ......................................................33

*Kwikset Corp. v. Superior Ct.*
    51 Cal.4th 310 (2011) ..............................................................51, 57

*Lambert v. Nutraceutical Corp.*
    870 F.3d 1170 (9th Cir. 2017) ......................................................47

*Lanovaz v. Twinings N. Am., Inc.*
    726 F. App'x 590 (9th Cir. 2018).................................................35

*Lanovaz v. Twinings N. Am., Inc.*
    2016 WL 4585819 (N.D. Cal. Sept. 2, 2016).............................. 36

*Leyva v. Medline Indus. Inc.*
    716 F.3d 510 (9th Cir. 2013) ...................................................20, 47

*Lujan v. Defs. of Wildlife*
    504 U.S. 555 (1992)........................................................32, 34, 35, 38

*Lytle v. Nutramax Labs., Inc.*
    114 F.4th 1011 (9th Cir. 2024) .....................................................46

*Makaeff v. Trump Univ., LLC*
    309 F.R.D. 631 (S.D. Cal. 2015) ..................................................54

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*
    31 F.4th 651 (9th Cir. 2022) .........................................................46

*Ortega v. Nat. Balance, Inc*.
    300 F.R.D. 422 (C.D. Cal. 2014).................................................52

*Pet Food Express, Ltd. v. Applied Underwriters, Inc.*
    2019 WL 4318584 (E.D. Cal. Sept. 12, 2019) .............................60

vii

*Rodriguez v. Just Brands USA, Inc.*
　　2021 WL 1985031 (C.D. Cal. May 18, 2021)...................................35, 36, 37

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*
　　65 F.4th 1012 (9th Cir. 2023) ........................................................................32

*Schmidt v. Int'l Playthings LLC*
　　536 F. Supp. 3d 856 (D.N.M. 2021).........................................................8, 15

*Shahinian v. Kimberly-Clark Corp.*
　　2016 WL 11722907 (C.D. Cal. Nov. 14, 2016) ...........................................56

*Sharma v. Volkswagen AG*
　　2022 WL 20299948 (N.D. Cal. Jan. 21, 2022) ............................................36

*Summers v. Earth Island Inst.*
　　555 U.S. 488 (2009).......................................................................................25

*United States v. Hinkson*
　　585 F.3d 1247 (9th Cir. 2009) .................................................................20, 41

*Van v. LLR, Inc.*
　　61 F.4th 1053 (9th Cir. 2023) ........................................................................20

*Victor v. Bigelow*
　　No. 13-2976 (N.D. Cal. Mar. 29, 2016) .......................................................45

*Vinluan-Jularbal v. Redbubble, Inc.*
　　2021 WL 4286539 (E.D. Cal. Sept. 21, 2021) .............................................28

*Williams v. Reckitt Benckiser LLC*
　　65 F.4th 1243 (11th Cir. 2023) ..........................................................37, 38, 39

*Willis v. Colgate Palmolive Co.*
　　2023 WL 11915708 (C.D. Cal. Jan. 5, 2023)................................................49

*Wolin v. Jaguar Land Rover N. Am., LLC*
　　617 F.3d 1168 (9th Cir. 2010) .......................................................................20

## Statutes

15 U.S.C. § 1261 ...................................................................................1, 8

15 U.S.C. § 1262 ......................................................................................8

15 U.S.C. § 1263(a) ............................................................................9, 52

16 C.F.R. § 1500.18(a)(9) .......................................................................9

16 C.F.R. § 1501 ......................................................................................9

16 C.F.R. § 1501.2 .................................................................................15

16 C.F.R. §1501.4 .............................................................................17, 27

28 U.S.C. § 1332(d) ................................................................................5

Bus. & Prof. Code § 17200 ......................................................................2

Cal. Bus. & Prof. Code § 17203 .............................................................50

Fed. R. Civ. P. Rule 23(a) ......................................................................15

Fed. R. Civ. P. Rule 23(b)(3) ...............................................15, 16, 17, 45

## Other Authorities

1 MCLAUGHLIN ON CLASS ACTIONS § 4.28 (21st ed. 2024)................. 26, 39

# INTRODUCTION

Infants have died, and toddlers have suffered severe injuries, as a direct result of Defendants' marketing and sale of Calico Critters Flocked Toys (the "Products")—small, fuzzy animal figurines and accessories that pose a lethal choking hazard to children. These Products are legally classified as banned hazardous substances under the Federal Hazardous Substances Act, 15 U.S.C. § 1261, *et seq*. ("FHSA"), and should not be for sale. Flouting federal safety regulations, two district court orders finding the Products are banned hazardous substances, and a recall of some of the Products directed by the Consumer Product Safety Commission ("CPSC"), Defendants-Appellants Epoch Everlasting Play, LLC ("Epoch") and Amazon.com Services LLC ("Amazon") (collectively, "Defendants") continue to knowingly market, distribute, and sell these dangerous toys in violation of the FHSA and California law.

Defendants not only continue to unlawfully sell these Products, they have also engaged in a deceptive labeling scheme falsely claiming the toys are intended for children "ages 3+" in order to evade liability—despite clear evidence (including Epoch's own marketing materials) and regulatory authority demonstrating their Products were designed for, marketed to, and intended for children under the age of three. Defendants ignore these facts in their brief, choosing instead to make crude jokes about sex dolls.

1

The Court's order certifying a class of California purchasers of the Products should be affirmed. Plaintiff-Appellee Williene Jackson-Jones ("Plaintiff"), on behalf of herself and a class of California consumers, brought this lawsuit to hold Defendants accountable for their unlawful and unfair business practices under California's Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* ("UCL"). The UCL is a broad statute designed to address a wide range of unfair competition practices and business misconduct. The UCL prohibits any unlawful, unfair, or fraudulent business act or practice. The statute is written in the disjunctive, establishing three separate and distinct theories of liability. The 'unlawful' prong borrows violations of other laws and treats them as independently actionable under the UCL, while the 'unfair' prong addresses business practices that are deemed unfair even if not specifically prohibited by another law.

The District Court correctly certified the class and logically determined Plaintiff has standing to pursue her claims under the UCL, including Article III standing to pursue injunctive relief under the UCL. The court also correctly found Plaintiff's full refund damages model—based on the fact that Defendants sell an unlawful product—satisfied Rule 23(b)(3)'s predominance requirement and *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013), because it reliably calculated class-wide restitution in a manner consistent with Plaintiff's theory of liability. The court's findings are consistent with Ninth Circuit precedent and well-established

principles of California consumer protection law.

Indeed, the District Court correctly found Plaintiff has standing to seek injunctive relief consistent with *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018). In *Davidson,* this Court held a plaintiff has standing to pursue injunctive relief when she "desire[s] to purchase" the product at issue but "cannot rely on" defendant's representations about its safety. Here, Plaintiff testified she would purchase Calico Critters again if the safety hazards were removed, but she cannot trust Defendants to sell lawful products. Moreover, Defendants' marketing continues to target young children, meaning Plaintiff's grandchildren and other class members remain at risk of future exposure to these hazardous toys.

The District Court also correctly applied *Comcast*, which demands that Plaintiff's damages model is capable of reliably calculating restitution on a class-wide basis, consistent with her theory of liability. Although the District Court was not required to evaluate the merits of Plaintiff's full refund theory at this stage, its acceptance of the full refund measure of restitution was not clear error. Courts within this Circuit and California appellate courts have repeatedly held that when a product is unlawful to sell—like those here—consumers are entitled to a full refund. *See, e.g.*, *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 976 (N.D. Cal. 2022). Defendants' argument that a full refund is not

3

"restitution" because consumers "received value" from the banned toys is factually and legally erroneous, and endorsing their position would effectively legitimize the sale of unlawful products.

The District Court's well-reasoned decision should be affirmed. Defendants knowingly market and sell banned hazardous products that have caused preventable deaths. The District Court's finding that Plaintiff has standing to seek an injunction was correct. And its conclusion that she is entitled to restitution in the form of a full refund for the unlawful sale of banned hazardous substances was not illogical, implausible, nor unsupported by inferences drawn from the facts in the record.

# JURISDICTIONAL STATEMENT

Plaintiff agrees with Defendants' jurisdictional statement. Br. 4; Federal Rule of Apellate Procedure ("FRAP") 28(b)(1). Pursuant to FRAP28(b)(1) and Ninth Circuit Rule 28-2.2, Plaintiff further states as follows. Defendant Epoch timely removed this case from the California Superior Court for the County of Los Angeles to the United States District Court for the Central District of California. *See* SER-114–217.

The Central District had subject matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 (28 U.S.C. § 1332(d)) ("CAFA"), because the Class Action Complaint alleged damages in excess of $5,000,000, there existed minimal diversity between at least one of the class members and Epoch, and none of the exceptions applied. 28 U.S.C. § 1332(d). *Id*. The Central District issued an order granting class-action certification on September 5, 2024. Pursuant to Federal Rule of Civil Procedure 23(f), Defendants timely petitioned for permission to appeal the Central District's class certification order on September 19, 2024. This Court granted permission to appeal on November 19, 2024.

## ISSUES PRESENTED

1. Did the District Court apply the correct legal rule for determining a plaintiff's standing to seek injunctive relief under the UCL's unlawful and unfair prongs?

2. Were the District Court's factual findings supporting its determination that Plaintiff had Article III standing illogical, implausible, or without support in inferences that may be drawn from the record?

3. Was the District Court's finding that Plaintiff's full-refund model of class-wide restitution satisfied the requirements of *Comcast* illogical, implausible, or without support in inferences that may be drawn from the record?

## STATEMENT OF THE CASE

I.    **Factual Background**

    A.    **Plaintiff alleges UCL "Unlawful" and "Unfair" Prong violations arising from Defendants' manufacture and sale of certain Calico Critters flocked toys that are banned hazardous substances because they are intended for children under three and contain small parts.**

Calico Critters are a type of plastic, poseable animal figurines with a flocked exterior, giving them the feel of fur and function of a stuffed animal combined with a doll. ER-219 (Complaint), ¶ 17. In myriad instances, the figurines come with small accessories. ER-220, ¶ 19.

Since at least 2017, In violation of federal regulations, and notwithstanding the "3+" label on the Products' packaging, Epoch has intentionally marketed its Products to children under the age of three. ER-220–26, ¶¶ 20-41. For example, Epoch's marketing strategy included, among other things, providing "touch points" of "dolls, figures, and playsets" beginning at age two. ER-225–26, ¶¶ 39-41 (describing internal market research). Its own market research revealed that "the largest category of girls who play with small dolls/ collectibles is girls aged two to three" and "brand fanship is highest among girls aged two to three[.]" ER-225, ¶38. Thus, to capture this young market directly, Epoch "[m]arket[ed] directly to girls, not just parents" and used "bold packaging designs that catch girls' attention in stores" and "offer TV ads." ER-225–226.

Defendants have continued to carry out this highly effective (yet fatal) marketing and sale strategy despite repeated identification of the Products as unsafe by consumer watchdog groups and Epoch's awareness of the above-mentioned fatalities and injuries. ER-228-29 ¶¶ 50, 54. Epoch did not change the Products' design or packaging, and Amazon did not change the Products' placement after a 22-month old suffered from brain trauma in 2013 in Utah, a child's death in Japan in 2015, and a 26-month old's death in 2018 in New Mexico, which resulted in a wrongful death lawsuit. ER-228, ¶¶ 51-53; ER-215; *see also generally Schmidt v. Int'l Playthings LLC*, 503 F. Supp. 3d 1060 (D. N.M. 2020). Indeed, some of the law firms appointed Class Counsel here litigated the *Schmidt* action, which involved a 26-month old's tragic choking death. SER-73 at ¶18.

Plaintiff alleges, and the District Court agreed, that Calico Critters products containing small accessories are banned hazardous substances under the FHSA, 15 U.S.C. § 1261, *et seq.*, and are therefore unlawful to sell, in their current form. ER-221–224 at ¶¶22-32, 233–234 at ¶¶78-85. Under the FHSA, Congress empowered the CPSC with the authority to declare what toys or articles are banned hazardous substances. *See generally* 15 U.S.C. § 1262. Pursuant to that authority, the CPSC promulgated the "Small Parts Rule," which provides that "any toy or other article intended for use by children under 3 years of age which presents a choking,

aspiration, or ingestion hazard because of small parts as determined by [16 C.F.R. § 1501]" is a banned hazardous substance. 16 C.F.R. § 1500.18(a)(9).

For a toy to be deemed a banned hazardous substance, it must satisfy two requirements: (1) it must be intended for use by children under three, *see* 16 C.F.R. § 1501.2, and (2) it must itself be, or it must contain, a small part (as determined by whether the toy or a part thereof fits without compression into a hollow cylinder 1.25 inches in diameter (the "choke tube")), *see* 16 C.F.R. §1501.4. The products at issue here satisfy both requirements.



It is a violation of the FHSA to introduce and/or deliver for introduction into interstate commerce banned hazardous substances. *See* 15 U.S.C. § 1263(a). Accordingly, Plaintiff alleges that Defendants' sale of these products violate both the "unlawful" and "unfair" prongs of California's UCL and have resulted in Defendants' unjust enrichment.

**B.    Plaintiff purchased a collection of Calico Critters for her grandchild, some of which were, unbeknownst to Plaintiff, banned hazardous substances.**

Plaintiff has seven grandchildren between one and thirteen years old. SER-28. She first became aware of Calico Critters through TV advertisements in 2020 or 2021. ER-54-55. At her deposition, she remembered the ad depicting "a little bunny family" which she found "cute." ER-55, 57, 60. Drawn in by the ad, she went online and purchased a set for her granddaughter. ER-55.

One aspect of Calico Critters that attracted Plaintiff was the ability to expand base sets with additional accessories. ER-60 ("that was enticing because I [could] have purchased a whole little bunny world for her"). In fact, Plaintiff was "obsessed with [the little bunny] family," noting that "every other week something new was coming out." ER-61.

Plaintiff's granddaughter C.J. loved playing with Calico Critters (including the small accessories), describing them as her "favorite toys." ER-67, 68–69, 70-71 Additionally, "when the other grandkids came over," they joined in, including but not limited to her two older brothers. ER-65, 66.

Not surprisingly, Plaintiff's granddaughter asked for more Calico Critters, having "see[n] ads" and in-store displays at Target. ER-70. As a frequent shopper at Walmart and Amazon, Plaintiff too encountered the Calico Critters. ER-74.

Ultimately, Plaintiff made several purchases of Calico Critters products between late 2019 and July of 2022. ER-68, 73.

When the originally purchased "bunny family" arrived, Plaintiff noticed they were "actually smaller" than expected and had assumed they "would be taller." ER-62-63. Over time, she became "concerned when [she] discovered how tiny [some of the] little pieces were." ER-72. A lot of pieces started disappearing, with Plaintiff growing increasingly concerned that her granddaughter "had consumed some of them." SER-32–33.

In late 2022, in what Plaintiff described as "the straw that broke the camel's back[,]" Plaintiff witnessed her granddaughter putting pieces in her mouth (and on one occasion, her ear). ER-72-73, SER-33. At that point, Plaintiff "made a decision that [her granddaughter] wasn't going to play" with them anymore. ER-72. When Plaintiff stopped letting C.J. play with her Calico Critters toys and eventually gave them away because of concerns about the safety of the small parts. *See, e.g.,* SER-38 at 95:2-11 (Plaintiff testified: "I had put them in her brother's room so that she couldn't even see them. They were in canisters. And then we gave them away towards the end of 2022 . . . ."), SER-39 at 99:17-19 ("I really didn't want to get rid of it, but I knew I had to.") hen her granddaughter asked for more Calico Critters for Christmas in 2022, Plaintiff refused. ER-73.

Notably, Plaintiff's final purchase occurred after she had retained counsel, despite learning during her initial discussions with counsel that the toys posed a choking hazard. ER-73, SER-33. When asked why she purchased more Calico Critters (specifically, a school lunch set), Plaintiff responded: "Because it didn't the little tiny, tine things like little bar of soap with it"; and she added "I had a lot invested into this[,] [s]o I really didn't want to get rid of it[.]" SER-39. But then, "when the product…came[,]" Plaintiff discovered that the school lunch set included "small items," leading her to ask herself, "Williene, why did you even purchase this?" SER-40.

Despite these issues, Plaintiff still believes Calico Critters are "a great product." SER-40. She brought this lawsuit for "[s]afety reasons" – hoping that this "great product" can "be improved" with "[l]arger pieces" (*i.e.*, "elimination of those small pieces"). SER-40, SER-45. While she believes the small accessories should be eliminated, she does "not necessarily" believe the "critters themselves…should be eliminated[.]" SER-45. But so long as her safety concerns persist, "at this time," she has "no desire to buy any more Calico Critters." ER-77. *See also* ER-7-8 (District Court citing "at this time" response to mean Plaintiff would be interested in purchasing product if there were not choking dangers).

Without knowledge of their dangers, or that they qualified as banned hazardous substances, Plaintiff purchased approximately eighteen Calico Critters

12

flocked toys for her granddaughter. SER-90, SER-53–54. Three of those were flocked toys sold with small parts. SER-90. Indeed, not every Calico Critter product is a banned hazardous substance, and both lawful and unlawful products are sold side-by-side on store shelves and online. As Alyssa Masterson, the Epoch executive charged with overseeing marketing and compliance of Calico Critters products, attested in her declaration opposing class certification: "Some Calico Critters flocked figures fit inside the small parts cylinder . . . and some do not, and some . . . accessories fit inside the . . . cylinder and some do not. SER-50 at ¶4. This case is limited to approximately 228 Calico Critters flocked toys containing small parts. ER-16–24.

Even in the wake of two children's deaths, Epoch continues to turn a blind eye to the toys' dangers and regulatory non-compliance. During her 2020 deposition in the *Schmidt* wrongful death case Ms. Masterson testified that she did not know how to define small parts under the regulation and stated: "I don't know the specifics of how the testing is performed." SER-24. In 2023 Defendant undertook a woefully inadequate recall, limited only to the small bottle and pacifier accessories. SER-60–61. Defendants have continued selling Calico Critters flocked toys with other small parts, as defined by the FHSA and the corresponding federal regulations.

### C. Plaintiff seeks restitution and injunctive relief under the UCL.

#### 1. Restitution

Plaintiff seeks restitution under the UCL and a claim for unjust enrichment. At the class-certification stage, Plaintiff's expert, William Ingersoll, Ph.D. ("Dr. Ingersoll"), presented two viable, alternative methodologies for calculating restitution on a class-wide basis, one of which was the "Full Refund Method." ER-168 ("Ingersoll Decl.") at ¶¶ 11-12. This approach flows from the principle that the appropriate measure of restitution is returning the entire purchase price to the consumer, on the ground that the products were banned hazardous substances and thus were never lawful to sell in interstate commerce in the first place. *Id*. Class members would be compensated the price paid for the products in question, using Defendants' sales data, including SKU/UPC identifiers and pricing information. *Id.*

#### 2. Injunctive Relief

In addition to restitution, Plaintiff also seeks injunctive relief under the UCL. Specifically, if Plaintiff prevails on the merits, she will seek "[a]n order enjoining Defendants from pursuing the policies, acts, and practices complained" in her Complaint. ER-236.

## II. Procedural History

### A. In a Motion-to-Dismiss Order outside the purview of this appeal, the District Court held that Calico Critters are intended for children under three as a matter of law.

After removing this case to federal court, Defendants moved to dismiss

14

Plaintiff's claims on the basis that she cannot sufficiently allege the Products are intended for children under three years of age, challenging her interpretation of the Small Parts Rule. ER-180. The District Court engaged in an extensive analysis of the relevant regulation—16 C.F.R. § 1501.2—and concluded that, like all other flocked toys, Calico Critters are "intended for children under three years of age" as a matter of law. ER-180-188.[1] The Court found that Plaintiff's claims are premised on Defendants' "unlawful marketing and sale of Calico Critters Flocked Toys, in violation of the FHSA," and Plaintiff's interpretation of §1501.2 was "consistent with the regulation's plain language and traditional rules as well as canons of interpretation[.]" ER-188. Accordingly, Plaintiffs "sufficiently allege plausible claims against Defendants." *Id*. Defendants do not challenge this ruling from the District Court as part of this appeal.

### B. The District Court correctly certified a Rule 23(b)(3) Class of California consumers who purchased Calico Critters flocked toys that contained small parts.

In its opinion, the District Court found that Plaintiff affirmatively established by a preponderance of evidence each of the elements of Federal Rule of Civil Procedure Rule 23(a) and (b)(3), and thus that this case is amenable to class treatment. The court certified the following class "on all causes of action set forth

---

[1] The court in the New Mexico wrongful death case involving Calico Critters flocked toys with small parts reached the same conclusion. *See Schmidt*, 536 F. Supp. 3d at 915.

in Jackson-Jones's Complaint: 'All persons in the state of California who purchased at least one of the Products, for personal use and not for re-sale, since January 30, 2019.'" ER-14–16. A list of the Calico Critters toys at issue was attached as Appendix A to the Order.

Defendants challenge two of the District Court's findings: (1) Plaintiff has Article III standing to seek injunctive relief, and (2) Plaintiff's Full Refund model is appropriate for measuring damages in a way that is consistent with her theory of liability.

In opposing class certification below, Defendants argued that Plaintiff fails to satisfy Rule 23(a)(4)'s adequacy requirement because, in their view, she lacks Article III standing. In rejecting Defendants' argument, the District Court considered Plaintiff's deposition testimony and found that she demonstrated a sufficient likelihood of repeated or ongoing injury for Article III standing. ER-7-8.

Defendants argued below that Plaintiff cannot meet Rule 23(b)(3) predominance because neither of her proposed restitution models can reliably measure monetary relief on a classwide basis. ER-11. Although the District Court was not required to evaluate the merits of Plaintiff's full refund theory at the class certification stage, the District Court found that Plaintiff's Full Refund Model comports with the requirements of *Comcast.* ER-12. As such, the Order did not reach Defendants' arguments against the Offset Method. *Id*.

In evaluating Rule 23(b)(3) predominance, the Court reasoned that "the question of whether the Products are indeed banned hazardous substances is central and common to all proposed class members' claims." ER-8-9. The District Court further observed that "all that remains" to be decided in this case is "whether the Products contain small parts under the regulations" (*i.e.* §1501.4 of the FHSA), which can be adduced through "[c]ommon evidence regarding the Products themselves." ER-9.

## SUMMARY OF THE ARGUMENT

The District Court did not abuse its discretion in finding that Plaintiff satisfied the Rule 23 adequacy requirement for Article III standing to seek injunctive relief. *Davidson* provides the correct legal rule for assessing standing in this context, and its reasoning extends to claims brought under the UCL's unlawful and unfair prongs. Consistent with *Davidson*, Plaintiff established an actual or imminent injury as well as a sufficient likelihood of being wronged in a similar way. Given that she maintains an interest in purchasing legal Calico Critters products, she faces an ongoing injury due to her inability to determine whether the products comply with the law and the ongoing exposure, to which both she and her granddaughter are subjected, to Defendants' unfair conduct. Further, the District Court's factual findings in this regard were neither illogical, implausible, or without support in inferences that may be drawn from the record.

The District Court also correctly upheld Plaintiff's Full Refund Model as an appropriate measure of class-wide restitution under the UCL. The court properly applied *Comcast* in determining that Plaintiff's methodology aligns with her theory of liability, which is that Defendants sold banned hazardous substances in violation of the FHSA, making a full refund appropriate. Because class certification is not the stage to assess the viability of Plaintiff's theory of liability (that is left for trial), the analysis should end there—that is, the Court should uphold the District Court's

18

determination that Plaintiff's Full Refund Model satisfies *Comcast*. Even if the viability of Plaintiff's theory is considered, a full refund restores class members to their original position, as courts have found that consumers derive no value from unlawful products and requiring an offset in such cases would improperly legitimize an unlawful sale.

Additionally, should the Court decline to endorse Plaintiff's full refund theory, Plaintiff has proffered an alternative Offset Method to isolate the portion of the price attributable to the Products' small parts, which render the Products banned hazardous substances. If the Court should hold the Full Refund theory is unviable for any reason, Plaintiff respectfully urges the Court to remand the issue for further proceedings to determine whether the Offset Method reliably calculates class-wide restitution consistent with *Comcast*.

In sum, the District Court's rulings on standing and restitution were legally sound and well-supported. Plaintiff demonstrated a continued risk of harm warranting injunctive relief and proposed a restitution model consistent with her claims. The Court should affirm in full.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to certify a class under Rule 23 for abuse of discretion." *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013) (citations removed). Further, "[w]hen reviewing a grant of class

certification, we accord the district court noticeably more deference than when we review a denial of class certification." *Id.* (quoting *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010)).

The inquiry involves a "two-step test[.]" *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (citing *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009)). "First, we 'look to whether the trial court identified and applied the correct legal rule to the relief requested.'" *Id.* (quoting *Hinkson*, 585 F.3d at 1263). This step is reviewed de novo. *Hinkson*, 585 F.3d at 1261-62.

"Second, we look to whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *Leyva*, 716 F.3d at 513 (quoting *Hinkson*, 585 F.3d at 1263). This is a "significantly deferential test[.]" *Hinkson*, 585 F.3d at 1262.

Thus, "[a]ny underlying determinations of law are reviewed de novo,…and any underlying determinations of fact are reviewed for clear error." *Van v. LLR, Inc.*, 61 F.4th 1053, 1062 (9th Cir. 2023) (citations removed).

## ARGUMENT

## I.  The District Court Did Not Abuse its Discretion in Finding Plaintiff Satisfied the Adequacy Requirement with Respect to Standing.

With respect to standing, the "plaintiff bears the burden of demonstrating that her injury-in-fact is concrete, particularized, and actual or imminent; fairly traceable

to the challenged action; and redressable by a favorable ruling." *Davidson*, 889 F.3d at 967 (quotations removed). Additionally, "[w]here standing is premised entirely on the threat of repeated injury, a plaintiff must show 'a sufficient likelihood that he will again be wronged in a similar way.'" *Id.* at 967 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). Here, Defendants argue that Plaintiff failed to satisfy the "actual or imminent" and "wronged in a similar way" requirements. Defs.' Br. at 13-14.

### A. The "actual or imminent injury" requirement

Though Defendants do not frame their analysis under *Leyva's* two-part test, they appear to challenge the District Court's legal criteria *and* factual findings on "actual or imminent" injury. First, as explained below, Defendants implicitly argue the court applied the wrong legal rule and advance a standard conflicting with *Davidson*. Second, they contend the court erred in its factual findings.

#### 1. The District Court applied the correct legal rule.

The District Court applied the correct legal rule, reviewed *de novo*. It found Plaintiff "demonstrate[d] a sufficient likelihood of repeated injury" because she was interested in purchasing the products if they no longer posed a choking hazard. ER-7-8. This determination aligns with this Court's analysis in *Davidson*.[2]

---

[2] As Defendants observe, "[a]lthough the district court did not cite it, Plaintiff relied below [in her Class Certification briefing] on this Court's decision in *Davidson*[.]" Defs.' Br. at 24.

### (a)   The Ninth Circuit's *Davidson* decision

*Davidson* arose from a "split among the district courts in the Ninth Circuit as to whether a plaintiff lacks Article III standing to seek injunctive relief under the UCL and FAL when the plaintiff has knowledge of the defendant's alleged misconduct." *Davidson*, 889 F.3d at 967-68 (citation removed). In *Davidson*, the alleged misconduct was the defendant's false advertising and mislabeling of its sanitary wipes as "flushable." *Id.* at 961. Plaintiff sought, *inter alia*, "an order requiring [defendant] to stop marketing their wipes as 'flushable.'" *Id.* at 961.

In its decision, the Court highlighted certain facts:

- Through personal use and research, plaintiff "became concerned that the wipes were not truly flushable";

- As a result, plaintiff "stopped using the [defendant's] wipes altogether" and "has never again purchased flushable wipes";

- "Yet [plaintiff] continues to desire to purchase wipes that are suitable for disposal in a household toilet";

- Plaintiff "would purchase truly flushable wipes manufactured by [defendant] if it were possible to determine prior to purchase if the wipes were suitable to be flushed";

- Plaintiff "regularly visits stores that sell [defendant's] flushable wipes";

- Plaintiff "is unable to determine, based on the packaging, whether the wipes are truly flushable";[3] and

---

[3] As noted by the *Davidson* district court, the plaintiff there believed "the design and construction of the flushable wipes may change over time, as defendants use different technology or respond to pressure from legislatures, government agencies,

22

- Plaintiff "would not have purchased the [wipes], or would have paid less for [them], had [defendant] not misrepresented (by omission and commission) the true nature of their [wipes]."

*Id.* at 962 (citations to *Davidson* complaint removed).

The *Davidson* district court held that the plaintiff lacked standing for injunctive relief. *Davidson v. Kimberly-Clark Corp.*, 76 F. Supp. 3d 964, 970 (N.D. Cal. 2014). Although the plaintiff desired to purchase truly flushable wipes, the district court found she lacked standing because she had "no intention of purchasing the same Kimberly–Clark product in the future." *Davidson*, 889 F.3d at 966 (citation omitted). The district court distinguished 'food labeling' cases where the same "product might still be purchased by the plaintiff if properly labeled." *Davidson*, 76 F. Supp. 3d at 970.

This Court reversed, holding that plaintiff had standing and faced "imminent or actual harm" by virtue of her "not being able to rely on [defendant's] labels in the future[.]" *Davidson*, 889 F.3d at 967; *see also id.* at 971 ("recogniz[ing] a history of lawsuits based on similar informational injuries"). *Davidson* elaborated, "hold[ing] that Davidson adequately alleged that she faces an imminent or actual threat of future harm due to Kimberly–Clark's false advertising" because

---

competitors, or environmental organizations[.]" *Davidson v. Kimberly-Clark Corp.*, 76 F. Supp. 3d 964, 969 (N.D. Cal. 2014).

"Davidson has alleged that she desires to purchase Kimberly–Clark's [truly] flushable wipes." *Id.* at 971. It rejected the district court's reasoning that there was no "actual or imminent" harm if the plaintiff did not intend to purchase "the same" (*i.e.*, non-flushable) product (as opposed to a hypothetical "truly flushable" product). Rather, allegations that Davidson "would purchase truly flushable wipes manufactured by [defendant]" amounted to an "intention to repurchase *the product at issue*." *Id.* at 962, 970 (emphasis added).

The Court also wrote the following: "We observe—although our conclusion is not based on this consideration—that our holding alleviates the anomalizes the opposite conclusion would crate . . . . [A]llowing a defendant to undermine California's consumer protection statutes and defeat injunctive relief simply by removing a case . . . is an unnecessary affront to federal and state comity [and] an unwarranted federal intrusion into California's interests and laws. . . . This is because 'the primary form of relief available under the UCL . . . is an injunction." *Id.* at 970 (citations omitted). The same logic applies with equal force here.

**(b)** ***Davidson's*** **reasoning applies to the alleged misconduct at issue here.**

Plaintiff acknowledges that a narrow reading of *Davidson* could suggest it is confined to cases where previously deceived consumers challenge deceptive

conduct.[4] However, although the alleged misconduct in *Davidson*—of which the plaintiff became aware after her purchase—was deceptive, its reasoning applies equally to the alleged "unlawful" and "unfair" misconduct at issue here.

### i. Plaintiff's UCL unlawful prong claim

*Davidson*'s reasoning applies to Plaintiff's UCL unlawful prong claim. Here, the alleged misconduct that Plaintiff discovered is not false advertising but the fact that some Calico Critter products are rendered unlawful due to the inclusion of small parts. As explained below, when assessing Plaintiff's potential consumer status, the nature of the product, potential information to which Plaintiff will be exposed (and her ability to ascertain a product's legality), and even the current market landscape, Plaintiff arguably faces an actual or imminent threat of informational injury that is even more pronounced than in *Davidson*.

First, similar to the plaintiff in *Davidson*, who wished to purchase truly flushable wipes, Plaintiff has established a sufficient intention to purchase Calico Critters that are not banned hazardous substances. ER-7-8; *see also infra* pp. 12-13. Like the plaintiff in *Davidson*, who sought flushable wipes for environmental

---

[4] As this Court stated, "[w]e hold that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase, because the consumer may suffer an 'actual and imminent, not conjectural or hypothetical' threat of future harm." *Davidson*, 889 F.3d at 969 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

reasons, Plaintiff's interest is genuine—she considers Calico Critters "great product[s]" in which she has a "lot invested[.]" SER39–40. Her grandchild has repeatedly requested these "favorite toys." ER-67-71, 73. Like in *Davidson*, Plaintiff regularly visits online and physical retailers selling the products. ER-74. As noted above, she purchased more Calico Critters even after learning some were banned hazardous substances. *See supra* pp. 11-12.

Second, the nature of the product itself is a pertinent factor. As in *Davidson*, the product can be modified to achieve compliance: Defendants need only cease selling parts violating the Small Parts Rule. Since "the product is apt to change[,]" "the plaintiff's injury flow[s] from the prospect of future changes to the product." 1 MCLAUGHLIN ON CLASS ACTIONS § 4.28 (21st ed. 2024) (discussing *Davidson*); *see also supra* p. 22-24, n. 3 (wipes subject to change).

Third, the information Plaintiff may encounter in the future—and its potential to create confusion about the product's legality, even given Plaintiff's current knowledge—is also significant. Just as the plaintiff in *Davidson* might have later assumed that a "flushable" representation indicates the product was reformulated, Plaintiff may similarly see the "not intended for children under three" warnings and conclude Calico Critters have been modified to achieve compliance with the small-

parts rule.[5] Even if Plaintiff sees the product contains small parts, she cannot tell *how* small they are (ER-62–63, SER-39–40) much less whether they pass the "choke tube" test established by 16 C.F.R. § 1501.4. *See* ER-221. Furthermore, unlike in *Davidson*, where "flushable" was a lay term easily understood by the plaintiff, Plaintiff here is neither an attorney nor a regulatory expert and cannot be expected to determine a product's legality—even if the necessary information were theoretically available. *See, e.g.,* Defs.' Br. at 6 (discussing the various regulatory factors and tests for determining whether a toy is intended for children under three).

Finally, even the current market environment—where both lawful and unlawful Calico Critters remain available to consumers—substantially increases the likelihood that Plaintiff will struggle to distinguish between them despite her knowledge. In *Davidson*, it was sufficient that the plaintiff *might* encounter "truly flushable" wipes in the future.[6] *Davidson*, 889 F.3d at 962, 970. Here, that scenario

---

[5] *See* ER-224 (Complaint stating, "According to the CPSC's Enforcement Policy and Procedural Guides, placing a 'not intended for children under three' label on a flocked toy that is by definition intended for children under three years of age does not transform a banned hazardous substance into a toy that is in compliance with CPSC regulations. *Enforcement Policy & Procedural Guide 2.05*, Figure 2 (U.S. CSPC 1990)").

[6] As Defendants note, "[t]he figures are *often* sold with detachable clothing and accessories[.]" Defs.' Br. at 5 (citing ER-220) (emphasis added). *See also* SER-50 ("Some Calico Critters flocked figures fit inside the small parts cylinder…and some do not…some Calico Critters products contain small figures and accessories, while other products contain no small figures or small accessories").

is not merely hypothetical—it is the reality. In fact, even after learning that some Calico Critters were banned hazardous substances, Plaintiff purchased additional Calico Critters under the mistaken belief they did not contain unlawful small parts. *See supra* pp. 11-13. Plaintiff's awareness of the alleged misconduct not only fails to eliminate the risk of future informational injury—it has already proven insufficient to prevent that injury.

One district court found that the reasoning in *Davidson* squarely supports Plaintiff's Article III standing under the UCL's "unlawful" prong. In *Vinluan-Jularbal v. Redbubble, Inc.*, No. 21-573, 2021 WL 4286539 (E.D. Cal. Sept. 21, 2021), the plaintiff's UCL 'unlawful' prong claim was based on the defendant's alleged violations of the Lanham Act, specifically the sale of counterfeit goods on its website. *Id.* at *1. Relying on *Davidson*, the court held that the plaintiff had standing to seek injunctive relief because she alleged that she would make future purchases from the defendant's website if assured that the products were not counterfeit. *Id.* at *2. This constituted a sufficient threat of future harm to establish constitutional standing for injunctive relief. *Id.*

Despite now knowing that some Calico Critter products are banned hazardous substances, Plaintiff faces an actual or imminent risk of future injury.

### ii.    Plaintiff's UCL unfair prong claim

*Davidson*'s reasoning likewise applies to Plaintiff's UCL unfair prong claim,

whereby the 'alleged misconduct' Plaintiff discovered includes Defendants marketing and sale of the flocked toys to children under three. ER-8. While Plaintiff's "unfair" allegations are largely based on Defendants' sale of banned hazardous substances (*see id.*), her Complaint details additional unfair conduct, alleging that Defendants knowingly marketed their flocked toys to children under three years of age despite a documented history of choking incidents. *See* ER-224-228.[7] Plaintiff's knowledge of Defendants' unfair conduct is insufficient to shield her grandchildren from Defendants' marketing. *See, e.g.,* Compl. at ER-225-226 (Epoch's internal marketing documents advise to "[m]arket directly to girls, not just parents," "use **bold packaging designs** that catch girls' attention in stores", and "offer **TV ads**" (emphases in original)); ER-70 (Plaintiff's granddaughter "would see ads" and in-store displays). Further, Defendants' unfair conduct obviously includes the "ongoing risk to children under the age of three, [whereby] Plaintiff's grandchildren may be exposed to the products in the future." Compl. at ER-230.[8]

---

[7] Defendants' assertion that the "complaint is based entirely on the assertion that Calico Critters toys violate the CPSC's Small Parts Rule" is false. Defs.' Br. at 6.

[8] While Plaintiff's Complaint does not specifically detail proposed injunctive relief with respect to Defendants' marketing, the Prayer for Relief seeks "[a]n order enjoining Defendants from pursuing the policies, acts, and practices complained of herein." ER-236. Further, the future danger imposed by Defendants' marketing would necessarily be resolved if Plaintiff's proposed injunction to prevent Defendants from selling illegal products is granted.

Despite knowledge of Defendants' unfair conduct in the Product's marketing and/or sale, Plaintiff faces an actual or imminent risk of future injury.

### (c) Defendants' argument conflicts with *Davidson* and has been rejected by this Court.

Defendants reject this Court's reasoning in *Davidson* and impliedly advance a different standard. According to Defendants, "buying a product only 'if' it undergoes some future change that may or may not occur is the epitome of an inadequate hypothetical or conjectural injury." Defs.' Br. at 15; *see also id.* at 21 ("[t]he conditional nature of any future purchase by definition renders any future injury conjectural, hypothetical, and merely possible"). Since Plaintiff would only buy Calico Critters that do not pose choking dangers, "the only products that [Plaintiff] arguably express[es] any interest in purchasing are products that do not yet exist, and may never exist—a plainly insufficient expression of future harm to confer Article III standing." *Id.* at 23-24 (citation removed). Defendants add that "Plaintiff's admission that she will not buy any Calico Critters product containing small parts means that she will not buy any of the 'Products' as she herself defined them in her class definition." *Id.* at 21 n. 1.

Defendants' reasoning mirrors that of the trial court in *Davidson*, which concluded that Davidson lacked standing because she "has no intention of purchasing *the same* [allegedly non-flushable] product[.]" 76 F. Supp. 3d at 969 (emphasis added). It follows from Defendants' argument that this Court erred by

30

holding that the plaintiff in *Davidson* established standing through her allegation that she "would purchase truly flushable wipes manufactured by [defendant]," which this Court held, amounted to an "intention to repurchase the product at issue." *Davidson*, 889 F.3d at 962, 970.

**i. Defendants' application of a *Clapper* "precise test" is unavailing.**

Departing from *Davidson*, Defendants advance a stricter legal standard requiring injury to be "certainly impending"—which—according to Defendants— categorically excludes an intent to repurchase the product "on a conditional basis ('if' the small parts were removed)[.]" Defs.' Br. at 14 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)); *see also id.* at 2, 18, 19, 22 (relying on *Clapper*).

In *Clapper*, the Supreme Court addressed whether individuals whose work required communication with likely surveillance targets under the Foreign Intelligence Surveillance Act ("FISA") had Article III standing to challenge its constitutionality. *Clapper*, 568 U.S. at 401. The Court cautioned that standing requirements are "especially rigorous" where a case challenges the constitutionality of an "action taken by…the Federal Government[,]" especially "in the fields of intelligence gathering and foreign affairs[.]" *Id.* at 408, 409 (collecting cases) (quotations removed). Against this backdrop, the Court explained that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for

Article III purposes—that the injury is certainly impending." *Id.* at 409 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 (1992)). The Court rejected the plaintiffs' standing arguments, which relied "on a highly attenuated chain" of hypothetical government actions as "highly speculative," and the Court reiterated its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors." *Id.* at 410, 414.

Defendants' rigid application of *Clapper*'s "certainly impending" language overlooks the case's context. As this Court has explained, *Clapper* involved an "especially rigorous" standing analysis in a national security case "to avoid judicial usurpation of the powers of the political branches." *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1025 (9th Cir. 2023), *cert. denied*, 144 S. Ct. 190 (2023) (quotations removed).[9] In *San Diego County*, the defendant contended that *Clapper*'s "certainly impending" standard abrogated this Court's pre-*Clapper* test for standing to seek declaratory relief, which required a plaintiff to show "a real and reasonable apprehension that he will be subject to

---

[9] Another distinction is that, unlike here, *Clapper* involved no allegations of past harm, let alone multiple harms (i.e. purchases) occurring over many years. ER-68, 73. In *Lujan*, the Court noted that imminence is more important when no past harm has been alleged. Responding to the dissent's concern that its ruling would impose excessive pleading requirements—"such as a nightly schedule of attempted activities"—the majority explained that the dissent's cases "all involve actual harm"; however, "where there is no actual harm, its imminence (though not its precise extent) must be established." 504 U.S. at 564.

liability." *Id*. at 1023, 1024 (quotations removed). Noting that "*Clapper* recognized that standing may exist when there is a 'substantial risk that the harm will occur,'" the Court "reject[ed] [the] unexplained insistence that we transform the 'certainly impending' language in *Clapper* into a 'precise test' by which we must analyze the existence of Article III jurisdiction in any and all cases, regardless of their contexts." *Id*. at 1025 (citation omitted). *Clapper*, therefore, "does not require plaintiffs, for purposes of establishing standing, 'to demonstrate that it is literally certain that the harms they identify will come about.'" *Id.* (quoting *Clapper*, 568 U.S. at 412) *see also In re Zappos.com, Inc.*, 888 F.3d 1020, 1023 (9th Cir. 2018) (in data breach case, "[w]e reject Zappos's argument that *Krottner* [*v. Starbucks Corp.*, 628 F.3d 1139 (9th Cir. 2010)]," which found standing "based on the risk of identity theft"is "no longer good law after *Clapper*… and hold that, under *Krottner*, Plaintiffs have sufficiently alleged standing").

While this Court cited *Clapper*'s "certainly impending" language in *Davidson*, it clearly concluded that the plaintiff there satisfied that standard and did not apply the 'precise test' Defendants now advocate. *See* 889 F.3d at 967 (noting *Clapper*'s "certainly impending" standard is consistent with earlier articulations of the appropriate test for standing to obtain prospective relief); *see also id.* at 970-72 (concluding plaintiff faced an actual threat of future harm that was sufficiently "concrete and particularized") (citation omitted). In other words, to the extent that

this Court required the *Davidson* plaintiff to demonstrate a "certainly impending" injury—as the Court understood and applied that phrase in *Davidson*—Plaintiff has likewise done so here for the reasons above.

> ### ii. Defendants' reliance on *Lujan* is merely an indirect challenge to the validity of *Davidson*, and their other authority is unavailing.

Defendants repeatedly invoke *Lujan* to suggest a conflict between the two cases, implicitly arguing that even if Plaintiff satisfies the *Davidson* standard, she still fails under *Lujan*. Defendants contend that "even if Plaintiff had…testified [that she] would be interested in buying Calico Critters in the future[,] mere interest in a product is insufficient[.]" Defs.' Br. at 14. A "mere statement of interest[,]" Defendants argue, is inconsistent with *Lujan*'s "holding that ''some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be' are insufficient[.]" *Id.* at 23 (quoting *Lujan*, 504 U.S. at 564); *see also id* at 18-19 (discussing *Lujan*). Defendants conclude that Plaintiff has "failed to show even the 'some day' intention the *Lujan* [C]ourt found inadequate[.]" *Id.* at 20 (quotations removed).

At its core, Defendants' argument challenges *Davidson* as being inconsistent with *Lujan*. They implicitly argue that this Court's holding in *Davidson*—that a "desire…to purchase [defendant's truly] flushable wipes" constitutes "an imminent

or actual threat of future harm," *Davidson*, 889 F.3d at 971—does not satisfy *Lujan*'s requirement for concrete plans and specificity.

Suffice it to say, *Davidson* is the controlling law in this Circuit, and this Court considered and reconciled *Lujan* in forming its opinion. *Id.* at 967, 971 (citing *Lujan*, 504 U.S. at 560); *see also Berrin v. Delta Air Lines, Inc*., No. 23-4150, 2024 WL 5371340, at *3 (C.D. Cal. Dec. 11, 2024) ("*Davidson* is the Ninth Circuit authority controlling on the issue of Article III standing with respect to injunctive relief").[10]

Defendants' cited cases as to "some day intentions" or a lack of concrete plans are materially different and thus unpersuasive. *See* Defs.' Br. at 23 (citing *Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590 (9th Cir. 2018) (unpublished); *Rodriguez v. Just Brands USA, Inc.*, No. 20-4829, 2021 WL 1985031 (C.D. Cal. May 18, 2021)).

In *Lanovaz*, the plaintiff lacked standing for injunctive relief because, *inter alia*, she unequivocally testified that she would not repurchase the defendant's products even if the misleading labels were corrected. 726 F. App'x at 591. The

---

[10] Other courts have explained why *Davidson* and *Lujan*'s "concrete plans" language can be reconciled. *See, e.g., Edleson v. Travel Insured Int'l, Inc*., No. 21-323, 2022 WL 687147, at *4 (S.D. Cal. Mar. 8, 2022) (suggesting *Lujan*'s "concrete plans" requirement satisfied in *Davidson* due to allegations that plaintiff "regularly visited stores where the defendant's products were sold and was ready to purchase the products if the representation on the products' labels was accurate").

35

panel of this Court dismissed her interrogatory response—where she stated she might "consider buying" the products—as a conclusory "profession of an intent" which directly contradicted her sworn testimony. *Id*. Indeed, at the summary judgment hearing, the plaintiff had "not challenged defendant's assertion that she does not intend to buy Twinings' products again[,]" leading the district court to find the issue "conceded." *Lanovaz v. Twinings N. Am., Inc.*, No. 12-2646, 2016 WL 4585819, at *5 (N.D. Cal. Sept. 2, 2016). Unlike in *Lanovaz*, this issue is far from conceded, as Plaintiff testified to a continued interest in purchasing Defendants' "great product," which is her granddaughter's "favorite toy."[11]

    *Rodriguez* is similarly distinguishable. There, the plaintiff's only stated intent derived from one complaint allegation that he "may purchase the CBD products in the future under the reasonable belief that the CBD Claims have been corrected."[12] The court found this insufficient, contrasting it with *Davidson*, where plaintiff demonstrated a "firm intention to purchase" by allegations that "she 'continue[d] to desire to purchase' the defendant's products, that she 'would purchase' them if it

---

[11] At least one court rejected attempts to analogize *Lanovaz*, emphasizing that *Davidson* does not demand a "firm intent" to repurchase, only a plausible possibility of future harm. *Sharma v. Volkswagen AG*, No. 20-2394, 2022 WL 20299948, at *6 (N.D. Cal. Jan. 21, 2022); *see also id.* (further noting that to the extent *Lanovaz*'s 'profession of an intent' statement "conflicts with *Davidson*, the [c]ourt must disregard it because *Lanovaz* is a non-binding memorandum disposition").

[12] Compl. at ¶ 6, *Rodriguez v. Just Brands USA, Inc.*, No. 20-4829 (C.D. Cal. Oct. 26, 2020), ECF No. 60.

were possible, and that she 'regularly visit[ed]' stores selling the defendant's products such that she continued to be presented with its packaging." *Rodriguez*, 2021 WL 1985031, at *4 (quoting *Davidson*, 889 F.3d at 970-71). Every one of these key facts from *Davidson*, which *Rodriguez* distinguished, are not only present here but backed by sworn testimony.[13] *See supra* pp. 11-13.

### (d)   *Williams* is likewise distinguishable

Defendants' attempt to draw parallels to the Eleventh Circuit's decision in *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243 (11th Cir. 2023), is similarly unpersuasive. *See* Defs.' Br. at 21-22, 23-24, 24-25. *Williams* involved deceptive marketing of "brain performance" supplements. 65 F.4th at 1247. Notably, plaintiffs alleged that "it is biochemically impossible for the ingredients [in the brain supplements] to improve brain performance." *Id.* at 1251 (quotations removed). Relatedly, the *Williams* plaintiffs "never allege[d] if or when [the defendant] will be able to produce any products that actually improve brain performance in line with their expectations." *Id.*

As to whether plaintiffs had standing to seek injunctive relief, the court observed that all the plaintiffs "offer is an allegation that they 'would like to

---

[13] To the extent *Rodriguez* could be interpreted to mean that a plaintiff lacks standing even when willing to purchase the challenged products in the future if they become lawful to sell or are no longer misleadingly advertised, such a holding cannot be reconciled with *Davidson*.

purchase Defendants' products if they truly improved brain performance,' but are 'unable to rely on Defendants' representations regarding the effectiveness of Defendants' products in deciding whether to purchase Defendants' products in the future.'" *Id.* at 1254 (quoting complaint). The court in *Williams* described this Court's reasoning in *Davidson* as "rest[ing] on an assumption that the plaintiff will, in fact, try to purchase the defendant's products again in the future, at which point the plaintiff will again be deceived by the defendant's advertising, or at least doubt its veracity." *Id.* at 1256 (citing 889 F.3d at 970). By contrast, in *Williams*, "[b]ecause the [p]laintiffs do not allege when, if ever, [defendant] might produce a product they would be interested in purchasing," they were unable to establish Article III standing. *Id.* (citing *Lujan*, 504 U.S. at 564).

Defendants' reliance on *Williams* is misplaced for several reasons. First, the *Williams* plaintiffs took the position that a future product that improved brain performance was "biochemically impossible." *Id.* at 1255-56. Here, by contrast, Calico Critter products without choking hazards are not only possible but *actually exist*—indeed, Plaintiff purchased a product she mistakenly believed fit that description, after she retained counsel in this suit. ER-62–63, SER-39–40. And whereas the plaintiffs in *Williams* failed to explain "when, if ever" the defendant might produce a product appealing to them, Plaintiff here has described specific changes—selling flocked toys without small parts, and thus toys that are not banned

38

hazardous substances—that would eliminate her concerns. *See supra* p. 12. Defendants' reliance on *Williams* as support for the claim that the "conditional nature of any future purchases by definition renders any future injury conjectural [and] hypothetical" overlooks this critical distinction. Defs.' Br. at 21.[14] Also, far from offering one allegation in a complaint (as was true in *Williams*), Plaintiff here has provided unequivocal testimony of her interest in purchasing Defendants' "great product" if her safety concerns are addressed. *See supra* pp. 13.

For all of these reasons, Plaintiff has satisfied the actual or imminent injury requirement with respect to her unlawful and unfair claims.

**2.** **The District Court's factual findings were neither illogical, implausible, nor without support in inferences that may be drawn from the facts in the record.**

The District Court's factual findings were neither illogical, implausible, or without support in the record. Indeed, Defendants' assertion that "the record is bereft of any evidence that Plaintiff desires *or* intends to buy Calico Critters again" is unfounded. Defs.' Br. at 2-3; *see also id.* at 22 (claiming that no "record evidence support[s] [the] proposition" that Plaintiff "would be *interested* in buying the

---

[14] A key aspect of *Davidson* was that "the product is apt to change." MCLAUGHLIN, § 4.28 (discussing *Davidson*). Thus, the "Ninth Circuit made clear that the plaintiff's injury flowed from the prospect of future changes to the product. Absent that possibility, the plaintiff would be at no risk of future confusion, because she could avoid the defendant's wipes based on her understanding that they were not 'flushable.'" *Id.*

products again") (emphasis added); *id.* at 19 ("there is no evidence in the record that [Plaintiff] has any *intention* of buying the products again") (emphasis added).

In its opinion, the District Court made several factual findings supporting its determination on standing. Rejecting Defendants' contention that Plaintiff "lacks standing because 'she has no intention of purchasing the products again,'" (ER-7), the District Court found: (a) Plaintiff's "grandchild asked her for more Calico Critters, but she declined to purchase them because she believes the toys are unsafe in their current form," (ER-7, citing Pl. Dep. at ER-72-73, and ER-77); (b) "[a]lthough [Plaintiff] does not intend to purchase the Calico Critters toys while they are still hazardous substances, she would be interested once more if '[i]njunctive relief . . . removed choking dangers,'" (*id.*, citing ER-30-31 and Pl. Dep. at ER-77); and (c) had Plaintiff "known that the toys were banned hazardous substances, she would not have purchased them," (ER-4, citing Compl. at ER-229).

As described in detail above, the record includes even more facts supporting a finding of standing. *See supra* pp. 26-28. Yet Defendants overlook significant portions of the record, pointing to one deposition excerpt in which, in response to the question "So it's fair to say that you have no desire to buy any more Calico Critters products, right?," Plaintiff said "Not at this time, no." ER-77; *see also* Defs.' Br. at 3, 19. But as described above, this was in the wake of her finding her granddaughter with pieces in her mouth and ear in July 2022. *See supra* p. 11. Even

40

after she had concerns about the small pieces and retained counsel, she purchased Calico Critters that she believed did not have small pieces. SER-39–40. But then, "when the product came[,]" she "saw the small items" and realized she had made a mistake, asking herself, "Williene, why did you even purchase this?" SER-40.

Thus, it is true that, "at this time," Plaintiff does not wish to purchase more products because they might pose a safety hazard; she has no way of knowing if the Calico Critters she encounters while shopping are legally compliant, and thus safe for her children. When asked why she brought the lawsuit, Plaintiff responded "[s]afety reasons…it's a great product. It could be improved [due to the small parts]." SER-40.

The District Court's findings—bolstered by other facts in the record—are not only analogous to *Davidson* but even more compelling in demonstrating an actual or imminent future injury of the kind contemplated by that decision. Moreover, as demonstrated by the record evidence, these factual findings were neither illogical, implausible, or without support in inferences that may be drawn from the facts in the record. Given the "significantly deferential test" governing these factual findings (which is "noticeably more deferential" since the court granted certification), there is no basis to disturb them on appeal. *Hinkson*, 585 F.3d at 1262; *Abdullah*, 731 F.3d at 956.

**B.      The "wronged in a similar way" requirement**

Plaintiff has established a sufficient likelihood that she will again be wronged in a similar way. "In determining whether an injury is similar, we 'must be careful not to employ too narrow or technical an approach. Rather, we must examine the questions realistically: we must reject the temptation to parse too finely, and consider instead the context of the inquiry.'" *Davidson*, 889 F.3d at 967 (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001)). In *Davidson*, this Court explained why the plaintiff satisfied this requirement:

> Despite now knowing that the "flushable" labeling was false…, should Davidson encounter the denomination 'flushable' on a Kimberly–Clark wipes package at the grocery store today, she could not rely on that representation with any confidence….In other words, Davidson faces the similar injury of being unable to rely on Kimberly–Clark's representations of its product in deciding whether or not she should purchase the product in the future.

*Id.* at 971-72 (quotations and citations removed).

The same reasoning applies here. Plaintiff's injury stemmed from her unknowingly purchasing a banned hazardous substance. And now, despite knowing that some (but not all) Calico Critters are unlawful, she will be unable to ascertain the product's lawfulness in the future (if not present). *See supra* pp. 16-27. And despite her knowledge of Defendants' unfair conduct, the exposure to Defendants'

marketing and labeling, *inter alia*, continues to be an ongoing injury. *See supra* p. 28-29.

Defendants make two arguments regarding the 'wronged in similar way' requirement. First, they argue that Plaintiff "cannot incur any future injury from the conduct of which she complains because she has repeatedly conceded that she will not under any circumstances buy the products as long as they contain small parts[.]" Defs.' Br. at 20; *see also id.* at 21 ("By making clear that she is unwilling to buy illegal choking hazards, . . . . she has foreclosed herself from showing that she will be wronged again in . . . . a 'similar way'") (quotations and citations removed). As this argument is duplicative of their "actual or imminent injury" argument, Plaintiff will not address it again here.

Second, Defendants contend that "Plaintiff has repeatedly conceded, and the district court recognized, that she will not even consider buying Calico Critters unless and until she receives her requested injunctive relief." Defs.' Br. at 3. This, Defendants argue, "eliminates any possibility that she will incur any future injury from the conduct of which she complains." *Id.*; *see also id.* at 14-15 ("if she would only buy the product again if injunctive relief were to cure the conduct of which she complains, there is no possibility of future injury").

This argument fails. As an initial matter, Plaintiff never testified that her desire to purchase the product was contingent upon the granting of an injunction;

indeed, she actually purchased the product even after she became aware of Defendants' alleged misconduct.[15] Further, as examined in detail above, Plaintiff's future injury stems from her inability to assess the product's legality and/or ongoing exposure to Defendants' unfair conduct—not an absolutely certain future purchase.

The cases cited by Defendants offer no support. *See* Defs.' Br. at 20-21 (citing *Swearingen v. Late July Snacks LLC*, 2017 WL 4641896 (N.D. Cal. Oct. 16, 2017)), and 23 (citing *Victor v. R.C. Bigelow, Inc.*, 708 F. App'x 333 (9th Cir. 2017) (unpublished)).

Unlike *Swearingen*, Defendants cannot establish Plaintiff's clear "intent *not* to purchase the products absent issuance of a court injunction." *Swearingen*, 2017 WL 4641896, at *4. Further, *Swearingen* was decided by a district court before *Davidson*, and it even noted that "there are cases now pending before the Ninth Circuit which could clarify the issue[.]" *Id. Davidson* did just that.

In *Victor* (a pre-*Davidson* unpublished decision), a panel of this Court held that the plaintiffs could not be wronged in a similar way because they (unlike

---

[15] While the District Court summarized Plaintiff's Class Certification Reply Brief for this proposition (ER-7), the brief was more nuanced, arguing that Plaintiff sought to purchase the product—which she described as "great"—if it were "improved" to address her concerns. *See* ER-30-31. The deposition excerpt cited by the District Court stated Plaintiff did not wish to purchase the product "at this time." ER-77. Thus, Defendants' assertion that Ms. Jackson-Jones "repeatedly admitted" she "would only consider buying [Calico Critters] if injunctive relief removed choking dangers" lacks support. Defs.' Br. at 14 (quotations removed).

Plaintiff here) would "not consider buying even properly labeled tea until they receive an injunction." *Victor*, 708 F. App'x at 334. The *Victor* district court found that the plaintiffs had testified they would not purchase the tea under any circumstances because of their anger toward defendant. Order at *9, *Victor v. Bigelow*, No. 13-2976 (N.D. Cal. Mar. 29, 2016). In light of this admission, the court found subsequent contradictory testimony to be "nonsensical." *Id.* In fact, in *Victor*, plaintiffs' counsel "made the troubling suggestion at oral argument that their testimony about their desire to buy Bigelow products may have been driven not by their true intentions but rather by what he believed would be the answer most likely to cause a court to hold that they had standing." *Victor*, 708 F. App'x at 334 n. 2. Such concerns are not present here. Plaintiff has satisfied the "wronged in a similar way" requirement.

## II. The District Court Correctly Found That Plaintiff's Full Refund Model is Appropriate for Measuring Class-Wide Restitution in a Manner Consistent with Plaintiff's Theory of Liability.

In challenging the District Court's findings as to Plaintiff's Full Refund Model, Defendants misstate both (1) the standard for evaluating Plaintiff's methodology under Rule 23(b)(3)'s predominance requirement at the class-certification stage, and (2) this Court's standard of review for class-certification orders on appeal.

At the class-certification stage, the relevant inquiry is whether the plaintiff's methodology reliably calculates restitution on a classwide basis, consistent with the plaintiff's theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (damages must be "capable of measurement on a classwide basis"). At this stage, the court simply must "find[], by a preponderance of evidence, that the [plaintiff's] model will be able to reliably calculate damages in a manner common to the class at trial." *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1024 (9th Cir. 2024). Additionally, the model must allow restitution to be "determined without excessive difficulty and attributed to [the] theory of liability." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017); *accord Lytle*, 114 F.4th at 1027 ("where an expert's damages model is untethered from plaintiff's theory of liability ... , *Comcast* holds that a plaintiff may not rely upon it to show that damages are 'capable of measurement on a classwide basis'").

Critically, class certification is not the stage at which the court determines whether Plaintiff's theory of liability is viable—that is reserved for trial. *Lytle*, 114 F.4th at 1024 ("class action plaintiffs are not required to actually prove their case through common proof at the class certification stage"); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 661 (9th Cir. 2022) ("[T]he district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact

46

establishes that plaintiffs would win at trial."). Indeed, "[w]hether [Plaintiff] could prove [restitution] to a reasonable certainty on the basis of [her] full refund model is a question of fact that should be decided at trial." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1184 (9th Cir. 2017), *rev'd on other grounds*, 586 U.S. 188 (2019).

As discussed above, the relevant standard of review on appeal follows a two-step analysis: (1) the Court first determines *de novo* whether the District Court applied the correct legal rule, and (2) it then reviews whether the trial court's resolution of the motion resulted from a factual finding that was illogical, implausible, or unsupported by the record. *See Leyva*, 716 F.3d at 513.

Applied here, the District Court correctly identified *Comcast* as the governing standard for evaluating whether Plaintiff's methodology can calculate restitution on a classwide basis. ER-11. Defendants do not dispute *Comcast* is the correct legal rule, and indeed rely on it in their opening brief. *See* Defs.' Br. at 25. Furthermore, it was neither illogical, implausible, nor unsupported by the record for the District Court to find that Plaintiff's Full Refund Model is capable of calculating restitution in accordance with Plaintiff's theory of liability (i.e., that Defendant sold banned hazardous substances in violation of the FHSA). ER-12. Indeed, Plaintiff's Full Refund Model appropriately multiplies the price of Products by the number of Products sold to Class members during the Class Period, which is consistent with Plaintiff's theory that the Products should have never been available for sale in the

first place. *Id.* For this reason alone, the District Court's finding that Plaintiff's Full Refund Model is appropriate for measuring restitution in a manner consistent with her theory of liability, should be affirmed.

Regardless, the District Court was correct to conclude that "[w]hen a party sells products to consumers that are 'inherently unfair or illegal,' a full refund [restitutionary] model is appropriate." ER-12 (*citing In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 976 (N.D. Cal. 2022) (*citing In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010)).

As discussed further below, while a full refund restitutionary award is appropriate only in certain circumstances, this case falls squarely within one of those scenarios—namely, when the product at issue is banned or unlawful and should never have been sold in the first place. The case law provides that requiring an "offset" for the product's supposed value in this context would effectively legitimize an unlawful sale. Trial courts should not be tasked with assigning valuations to products that should never have been made available for purchase in the first place.

However, if the Court were inclined to disagree with a uniform line of district court and California appellate decisions and reject a full refund as a proper measure of restitution here, Plaintiff proposed an alternative Offset Method in the

proceedings below.[16] That method isolates the portion of the Products' purchase prices attributable to the small parts that render them banned hazardous substances. In this way, the Offset Method serves as a failsafe mechanism, ensuring that restitution may account for the products' value, should the Court determine that such an adjustment is required. *See generally Willis v. Colgate Palmolive Co.,* No. CV 19-8542, 2023 WL 11915708, at *20 (C.D. Cal. Jan. 5, 2023) ("[B]ecause Plaintiff has put forth an appropriate [alternative] model for calculating damages," she "has met her burden under *Comcast*.").

### A. The District Court properly held a full refund is the appropriate measure of restitution for Plaintiff and Class Members, who purchased toys that should have never been available for sale.

To the extent the Court examines Plaintiff's theory of liability, the Court should uphold the District Court's finding that a full refund is an appropriate measure of restitution under the UCL where a defendant sells products to consumers that are "inherently unfair or illegal." ER-12.

As an initial matter, Plaintiff does not dispute certain aspects of Defendants' characterization of the UCL and its remedies. Plaintiff agrees that "prevailing plaintiffs are generally limited to injunctive relief and restitution." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144 (2003); *see also* Defs.' Br. at

---

[16] The District Court "decline[d] to reach Defendants' arguments against Jackson-Jones's alternative Offset Method damages model …." ER-12.

26 (citing same proposition). Plaintiff further acknowledges restitution under the UCL is intended to "restore money or property to victims of [unfair business] practices." *Korea Supply Co.*, 29 Cal.4th at 1150; *see also Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 339 (1998) ("The intent of the section is to make whole, equitably, the victim of an unfair practice."); *see also* Defs.' Br. at 26, 28 (citing same propositions). The statute itself authorizes courts to make "such orders or judgments . . . as may be necessary to restore any person . . . any money or property . . . which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.

However, Defendant's characterization of the UCL as striking a balance between "broad liability and limited relief," is incomplete and ultimately irrelevant. *See* Defs.' Br. at 27 (*citing Korea Supply Co.*, 29 Cal. 4th at 1152). In using this language, the California Supreme Court was not stating the scope of restitution itself is limited in any way, but rather, that relief under the UCL is limited to restitution and injunctive relief, and that "nonrestitutionary disgorgement of profits is not an available remedy in an individual action under the UCL." *Korea Supply*, 29 Cal. 4th at 1152; *see also Chowning v. Kohl's Dep't Stores, Inc.*, No. 15-8673, 2016 WL 1072129, at *12 (C.D. Cal. Mar. 15, 2016) ("This Court defers to the careful 'balance struck in this state's unfair competition law between broad liability and limited relief.' … The UCL and FAL authorize only restitution and injunctive

relief.") (*citing Korea Supply Co.*, 29 Cal. 4th at 1152). The California Supreme Court broadly defined restitution as the "return [of] money obtained through an unfair business practice to those persons in interest from whom the property was taken …." *Korea Supply*, 29 Cal. 4th at 1144-45. Incidentally, Plaintiff is *not* seeking nonrestitutionary disgorgement, nor does that term appear in the complaint or anywhere in the proceedings before the District Court, as discussed hereinbelow.

The California Supreme Court has interpreted the UCL to provide courts with broad, equitable powers to fashion an appropriate restitutionary award. *See Fletcher v. Security Pac. Nat'l Bank*, 23 Cal.3d 442, 449 (1979) (holding the "general equitable principles underlying [these provisions] as well as [their] express language arm the trial court with the cleansing power to order restitution to effect complete justice"). For example, the Court in *Day* recognized "the amount being restored [under UCL restitution] has been objectively measurable as that amount which the defendant would not have received but for the unfairly competitive practice." 63 Cal. App. 4th at 339. Indeed, the UCL operates "to return to a person those measurable amounts which are wrongfully taken by means of an unfair business practice." *Id.*; *accord Kwikset Corp. v. Superior Ct.*, 51 Cal.4th 310, 336 (2011) (restitution is defined as "restoration of *any* interest in 'money or property, real or personal, which may have been acquired by means of such unfair competition.'") (emphasis added).

Here, Defendants have sold Plaintiffs banned hazardous substances, in violation of the FHSA. *See* 15 U.S.C. § 1263(a). The sale of these banned Products itself constitutes an unlawful and unfair business practice, such that restitution is objectively measurable as the Products' purchase price, which Defendants would not have received but for their violation of FHSA. *Day*, 63 Cal. App. 4th at 339. Contrary to Defendants' suggestions, a full refund would not impose any windfall for Plaintiff or members of the Class. Rather, the full refund model would make them whole by restoring them to where they would have been had the unlawful sales never taken place.

The District Court's acceptance of the full refund theory of restitution, designed to restore Plaintiff and Class members to their position *before* the purchase of the unlawful Products, is consistent with the case law. *See In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 156-57 (approving full refund); *Ortega v. Nat. Balance, Inc.*, 300 F.R.D. 422, 430 (C.D. Cal. 2014) (allowing plaintiffs to "recover their full purchase price" because the product "was illegal"). For example, in *In re Steroid Hormone Products*, the plaintiff sought to certify a class of consumers to pursue, among other things, a claim under the unlawfulness prong of the UCL that "GNC sold products containing androstenediol [a controlled substance] without requiring a prescription." 181 Cal. App. 4th at 150. GNC argued the plaintiffs' full refund theory, based on the unlawfulness of the underlying transactions, did not

adequately account for the "value" of the products. *Id.* at 159. The Court rejected that argument and held the class should be certified, reasoning, unlike false advertising cases, "where the plaintiffs put valuation at issue by alleging that due to the alleged misrepresentations they paid more for a medication than it was worth, in this case [the plaintiff] does not put valuation at issue when he alleges that he bought a product that was illegal to sell or possess." *Id*. at 160.

Consistent with the reasoning in *In re Steroid Hormone Products*, the District Court's conclusion that, "[w]hen a party sells products to consumers that are 'inherently unfair or illegal,' a full refund damages model is appropriate," is correct. *See* ER-12 (*citing In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig*., 609 F. Supp. 3d 942, 976 (N.D. Cal. 2022) (*citing In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157)). In *JUUL*, the court approved plaintiffs' full refund theory, because the case centered on "inherently unfair or illegal sales." *Id*. The holding in *JUUL* applies squarely with the facts of this case.

Defendants argue *JUUL* is distinguishable because the court held a full refund was an appropriate remedy for the illegal sale of vaping devices to minors because "youth purchasers received no value from [the devices] at all." Defs.' Br. at 33 (*citing JUUL*, 609 F. Supp. 3d at 976). Defendants contend it was this finding of "no value" that permitted the court to hold that a full refund was an available remedy and distinguishes *Juul* from this case. Defs.' Br. at 33. This argument is

misleading, omits key language from the citation, and is ultimately incorrect. The relevant sentence in the opinion reads: "Plaintiffs' theory is that because it was illegal or inherently unfair to market and sell the JUUL product to youth, youth purchasers received no value from it at all." *JUUL*, 609 F. Supp. 3d at 976. In other words, the plaintiff's theory of liability was that the products were legally valueless *because* it was unlawful to sell. There is no reason to believe that the plaintiffs did not use or enjoy the vaping devices, in a colloquial sense. But because the plaintiff's theory of liability was based on the premise that the underlying sales were unlawful, rendering the products without value, the *JUUL* court found the full refund model consistent with the plaintiff's theory and "support[ed] certification." *Id.*

Additionally, Defendants argue *JUUL* is distinguishable because it involves products that were not only unlawful to sell, but also unlawful to buy or possess. However, the *JUUL* court never actually made that distinction. Again, the *JUUL* court found that a full refund was appropriate "because it was illegal or inherently unfair *to market and sell the JUUL product to youth* ...." *JUUL,* 609 F. Supp. 3d at 976 (emphasis added). And although the court in *In re Steroid Hormone Products Cases* did observe that the plaintiff "bought a product that was illegal to sell or possess," 181 Cal. App. 4th at 159, the latter fact was not central to the court's holding. As observed in *Makaeff v. Trump Univ., LLC*, 309 F.R.D. 631 (S.D. Cal. 2015), the court's approval of a full refund to customers was based on the "finding

that to permit an offset in such a case would legitimatize the illegal sale." *Id.* at 639 (relying on *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 159).

To be sure, in the context of *false advertising cases* invoking the UCL, courts have observed the proper measure of restitution in a case involving fraud is the "difference between what the plaintiff paid and the value of what the plaintiff received." *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 131 (2009). But Plaintiff here is not contending Defendants engaged in false advertising, nor is Plaintiff's theory of liability premised on having paid more for the Products than they were worth, based on a particular representation. These facts alone render Defendants' case law distinguishable. For example, in *Chowning v. Kohl's Department Stores, Inc.*, 733 F. App'x 404 (9th Cir. 2018) (unpublished), a panel of this Court held that restitution should be based on the difference between the price paid and the value received due to advertising misrepresentations, not because the product was unlawful. *Id.* at 405. Similarly, in *Brazil v. Dole Packaged Foods, LLC*, 660 F. App'x 531 (9th Cir. 2016) (unpublished), a panel of this Court limited damages to the price premium attributable to misleading labels, which was appropriate given the products were expressly found not be illegal. *Id.* at 533-34 & n.1 (the "illegal-product claims were dismissed in the district court's order partially certifying the class").

In *Caldera v. J.M. Smucker Co.*, No. 12-4936, 2014 WL 1477400 (C.D. Cal. Apr. 15, 2014), the court rejected a full refund theory in a false advertising case, where there was no claim of illegality. *Id.* at *4 (damages could be calculated by "computing the effect of unlawful conduct on the market price of the product purchased by the class"). *Shahinian v. Kimberly-Clark Corp.,* No. 14-8390, 2016 WL 11722907 (C.D. Cal. Nov. 14, 2016), on which Defendants also rely, similarly involved misrepresentation, and the court denied a full refund because the issue was mislabeling, not that the products were unlawful. *Id.* at *14-16. Moreover, the court in *Ang v. Bimbo Bakeries USA, Inc.*, No.13-1196, 2018 WL 4181896 (N.D. Cal. Aug. 31, 2018), reached the same conclusion. *Id.* at *13. As have multiple other courts. *See In re Tobacco Cases II*, 240 Cal. App. 4th 779, 802 (2015) (same); *In re POM Wonderful, LLC*, No. 10-2199, 2014 WL 1225184, at *2-3 (C.D. Cal. Mar. 25, 2014) (same).

Defendants nevertheless insist Plaintiff's restitutionary model should account for the value Defendants claim Plaintiff attributed to the Products, given her testimony she and her granddaughter played with the Products. Defendants claim playing with the Products amounts to a "benefit" conferred. But any supposed "benefit" was vitiated by the fact Plaintiff *stopped* letting C.J. play with her Calico Critters toys and eventually *gave them away* because of concerns about the safety of the small parts. *See, e.g.,* SER-38 at 95:2-11 ("I had put them in her brother's

56

room so that she couldn't even see them. They were in canisters. And then we gave them away towards the end of 2022 . . . ."), SER-39 at 99:17-19 ("I really didn't want to get rid of it, but I knew I had to."). This testimony indicates that the products were indeed worthless, even though Plaintiff allowed her granddaughter to use the Products. Plaintiff further testified she would not have purchased the Products had she known they were banned hazardous substances. SER-54 at ¶ 7.

Courts have found that whether the plaintiff "use[s] the product" is not dispositive as to whether the product has value. *Falcone v. Nestle USA, Inc.*, No. 19- 723, 2024 WL 4868298, at *12 (S.D. Cal. Sept. 26, 2024). In *Falcone*, the court found the plaintiff's full refund restitutionary model susceptible to common proof on behalf of all class members, based on the plaintiff's theory that "the [chocolate] products are worthless or at best have *de minimis* value because they were produced through abhorrent practices of child slave labor and deforestation." *Id.* at *13. In doing so, the court rejected the defendant's argument that there should be an offset for the value of the product, given the "consumer was able to use the product." *Id.* at *12. In reaching its conclusion, the *Falcone* court relied on an example from *Kwikset*, where the California Supreme Court observed: "[n]onkosher meat might taste and in every respect be nutritionally identical to kosher meat, but to an observant Jew who keeps kosher, the former would be worthless." *Id.* (*citing Kwikset*, 51 Cal. 4th at 330).

Here, it requires no stretch to conclude Plaintiff, and reasonable consumers, would not knowingly purchase a banned hazardous substance—particularly a dangerous toy for infants, which was intentionally designed for infants and has resulted in infant deaths. *See* SER-54 at ¶ 7 ("Had I known the products … were banned hazardous substances, I would not have purchased them."); *cf. In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 157 ("we assume that a reasonable person would not knowingly commit a criminal act"). Even if the Court were to accept Defendant's demand that an offset is required, Plaintiff's decision to dispose of the products for safety reasons only underscores the Products' lack of value, rendering the full refund model appropriate, even if the Court were to accept Defendant's demand for an offset.

Lastly, Plaintiff acknowledges that neither damages, punitive damages, nor nonrestitutionary disgorgement are available remedies under the UCL. *Korea Supply.,* 29 Cal.4th at 1144. However, Plaintiff has never sought damages, punitive damages, nor nonrestitutionary disgorgement in this matter. Defendant's repeated insistence Plaintiff's Full Refund Model amounts to nonrestitutionary disgorgement is particularly unusual, given the District Court never used the phrase or even suggested Plaintiff's Full Refund Model constituted such a remedy. Plaintiff notes nonrestitutionary disgorgement has been defined as the "surrender of all profits earned as a result of an unfair business practice regardless of whether those profits

represent money taken directly from persons who were victims of the unfair practice." *Id.* at 1145 (*citing Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal. 4th 116, 127 (2000)). This is clearly inconsistent with Plaintiff's theory. Plaintiff is not seeking all of Defendants' profits irrespective of whether those profits represent money taken from Class members who purchased the Products. Rather, Plaintiff is seeking *restitution* designed to make her and the class whole by restoring them to where they would have been had the sale of banned hazardous substances never taken place.

> **B.** **In the event the Court finds a full refund is not an appropriate measure of restitution, the Court should find Plaintiff's alternative Offset Model is an appropriate measure.**

As an alternative way to calculate class-wide restitution using class-wide evidence, Plaintiff offered a proposed "Offset Method" in the event the Court were to find the Products had some value, despite their status as banned hazardous substances. ER-168-70.

To that end, Plaintiff's expert economist, William Ingersoll, Ph.D. ("Dr. Ingersoll"), proposed using a hedonic regression analysis to determine how much of each Product's price is due to the small parts (as defined under 16 C.F.R. §1501.4), which render the product a banned hazardous substance. ER-168; SER-13–14 (Ingersoll Tr.) at 71:8-72:6. Dr. Ingersoll explained he would first identify the various features of the Products, such as the number of large, medium, and

smaller pieces. ER-169; ER-117-18 (Ingersoll Tr. at 73:23-74:20). Then he would input these features into his hedonic regression to analyze how the Products' different characteristics affect their prices. ER-169-70. This would allow Dr. Ingersoll to determine how much of the Product's price is due to the small parts. *Id*. To find the total value attributed to those parts, he would multiply the price contribution by the quantity sold of each Product. ER-170. As a second approach under the Offset Method, Dr. Ingersoll could isolate the value of the presence or absence of small parts rather than counting them for each product. ER-129-30 (Ingersoll Tr. at 85:12-86:11).

Assuming the trier of fact finds the Products have some value (which Plaintiff does not concede), the Offset Method isolates the portion of each Product rendered a banned hazardous substance to quantify restitution. This aligns with Plaintiff's alternative theory that, at a minimum, she overpaid due to the Products' unlawfulness. *See, e.g., Pet Food Express, Ltd. v. Applied Underwriters, Inc.*, No. 16-1211, 2019 WL 4318584, at *6 (E.D. Cal. Sept. 12, 2019) (recognizing economic loss from overpayment due to legal violations). Additionally, the hedonic regression model is a "widely accepted econometric methodology that satisfies the four *Daubert* factors of testability, peer review and publication, measurable error rate, and general acceptance." *Hamm v. Mercedes-Benz USA, LLC*, No. 16-3370, 2021 WL 1238304, at *14 (N.D. Cal. Apr. 2, 2021).

60

Accordingly, if the Court holds the Full Refund theory is somehow unviable, Plaintiff respectfully asks the Court to remand the issue for further proceedings, allowing the District Court to assess in the first instance whether Plaintiff's Offset Method satisfies *Comcast*.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court affirm the district court's order granting class certification.

Date: March 7, 2025

Respectfully submitted,

**WADE KILPELA SLADE LLP**
Gillian L. Wade
David F. Slade
Sara D. Avila
Marc A. Castaneda

*/s/ Gillian L. Wade*
Gillian L. Wade

*Attorneys for Plaintiff-Appellee Williene Jackson-Jones*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Statement of Related Cases Pursuant to Circuit Rule 28-2.6**

**9th Cir. Case Number** _____

The undersigned attorney or self-represented party states the following:

[X]  I am unaware of any related cases currently pending in this court.

[ ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*s/Gillian L. Wade*_____          **Date:** March 7, 2025
Gillian L. Wade

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Certificate of Compliance for Briefs

**This brief contains 13, 833 words,** excluding the items exempted by Fed. R. App. P. 32(f).

The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


*s/Gillian L. Wade*_____       **Date:** March 7, 2025
Gillian L. Wade

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed March 7, 2025.

*/s/ Gillian L. Wade*
Gillian L. Wade
**WADE KILPELA SLADE LLP**
2450 Colorado Ave., Suite 100E,
Santa Monica, CA 90404
Telephone: (310) 667-7273
gwade@waykayslay.com